**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PETTY OFFICER FIRST CLASS BROCK STONE,　　　)
　　(Anne Arundel County, Maryland)　　　　　　)
STAFF SERGEANT KATE COLE,　　　　　　　　　)
SENIOR AIRMAN JOHN DOE,　　　　　　　　　　)
AIRMAN FIRST CLASS SEVEN ERO GEORGE,　　　)
PETTY OFFICER FIRST CLASS TEAGAN GILBERT,　)
TECHNICAL SERGEANT TOMMIE PARKER,*　　　　)
　　*and*　　　　　　　　　　　　　　　　　　)
AMERICAN CIVIL LIBERTIES UNION　　　　　　　)
OF MARYLAND, INC.,　　　　　　　　　　　　　)
3600 Clipper Miller Road, Suite 350　　　　　　　　)
Baltimore, MD 21211　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiffs,　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　　　　)　　　Case No. _____
　　　　　　　　　　　　　　　　　　　　　　)
DONALD J. TRUMP,　　　　　　　　　　　　　　)
in his official capacity as　　　　　　　　　　　　)
President of the United States　　　　　　　　　　)
1600 Pennsylvania Avenue NW　　　　　　　　　)
Washington, D.C. 20500　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
JAMES MATTIS,　　　　　　　　　　　　　　　)
in his official capacity as Secretary of Defense　　　)
U.S. Department of Defense　　　　　　　　　　　)
1400 Defense Pentagon　　　　　　　　　　　　　)
Washington, D.C. 20301　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
RYAN McCARTHY,　　　　　　　　　　　　　　)
in his official capacity as Acting Secretary of the　　)
U.S. Department of the Army　　　　　　　　　　)
101 Army Pentagon　　　　　　　　　　　　　　)
Washington, D.C. 20301　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
RICHARD SPENCER,　　　　　　　　　　　　　)
in his official capacity as Secretary of the　　　　　)

---

* The individual Plaintiffs concurrently move to waive their obligations under Local Rule 102.2(a) to provide addresses, on the basis of their objectively reasonable fear that publicizing their home addresses would subject Plaintiffs to harassment (potentially including violence) and threats. For similar reasons, Plaintiff John Doe is concurrently moving to proceed anonymously.

U.S. Department of the Navy                              )
1200 Navy Pentagon                                      )
Washington D.C. 20350                                  )
                                                       )
HEATHER WILSON                                          )
in her official capacity as Secretary of the           )
U.S. Department of the Air Force                       )
1690 Air Force Pentagon                                )
Washington, D.C. 20330                                 )
                                                       )
                                                       )
_____Defendants._____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

1.      Thousands of transgender service members are serving honorably in this

country's Armed Forces. Some perform critical roles in intelligence analysis, disaster relief,

medical care, and pre-deployment training at bases in the United States. Others have deployed to

combat zones in Iraq and Afghanistan. Many transgender service members have received awards

for their service, and some have served for decades. All have answered the selfless call of service

to our nation by putting themselves in harm's way to protect the rights and freedoms

fundamental to this country.

2.      The individual plaintiffs in this case ("Individual Plaintiffs") are just some of

those transgender service members. Petty Officer Stone has served in the U.S. Navy for 11 years,

including a nine-month deployment to Afghanistan, and is currently assigned to a unit at Fort

Meade, in Maryland. Staff Sergeant Cole has served in the U.S. Army for almost ten years,

including a one-year deployment to Afghanistan where she served as a team leader and

designated marksman. Senior Airman Doe has served for approximately six years on active duty

in the U.S. Air Force, where he was awarded "Airman of the Year" for his flight. Airman First

Class George has been enlisted in the Air National Guard since 2015. He is training as a nurse,

and intends to seek a commission in the U.S. Army. Petty Officer Gilbert has served in the U.S.

Navy for 13 years, including a one-year deployment to Afghanistan, and currently serves as an

information and space systems technician. Technical Sergeant Parker served in the Marine Corps

for four years and has served in the Air National Guard for 26 years, now working as a fuel

technician.

3.      At the culmination of a thorough process of research and analysis, the Department

of Defense ("DoD") concluded in 2016 that there was no basis for the military to exclude men

and women who are transgender from openly serving their country, subject to the same fitness

requirements as other service members. This review process carefully considered and rejected

the notion that medical costs, military readiness, or other factors presented any plausible reason

to discriminate against service members who are transgender, many of whom had already been

serving with honor in silence for decades. Accordingly, the Secretary of Defense issued a

directive (the "Open Service Directive") that service members who are transgender be permitted

to serve openly without fear of discharge; that these service members receive medically

necessary healthcare, as do others who serve their country; and that, beginning on July 1, 2017,

men and women who are transgender be permitted to enlist in the military subject to stringent

enlistment standards.

4.      On the morning of July 26, 2017, President Trump declared on Twitter that the

Individual Plaintiffs and all other men and women who are transgender would no longer be

allowed to continue serving in the military "in any capacity." This pronouncement was posted

under the handle @realDonaldTrump:



5.     The Trump Administration has provided no evidence that this pronouncement was based on any analysis of the actual cost and disruption allegedly caused by allowing men and women who are transgender to serve openly. News reports indicate that the Secretary of Defense and other military officials were surprised by President Trump's announcement, and that his actual motivations were purely political, reflecting a desire to accommodate legislators and advisers who bear animus and moral disapproval toward men and women who are transgender, with a goal of gaining votes for a spending bill that included money to build a border wall with Mexico.

6.     On August 25, 2017, President Trump formalized his ban in a Memorandum for the Secretary of Defense and the Secretary of Homeland Security, with the subject "Military Service by Transgender Individuals" (the "Transgender Service Member Ban"). President Trump directed the Secretary of Defense to "return to" the pre-2016 policy of banning service by men and women who are transgender. President Trump further banned the use of government resources to fund "sex-reassignment surgical procedures" for service members regardless of cost

or medical necessity. President Trump gave the Secretary of Defense six months to develop a plan to implement aspects of the Trump Transgender Service Member Ban, but its impacts are already being felt today.

7.     As a consequence of the Transgender Service Member Ban, thousands of Americans already serving their country—many of whom publicly revealed that they are transgender after DoD formally welcomed their service in June 2016—have been told that they are no longer welcome. While the Pentagon develops a plan to involuntarily terminate their military service, men and women who are transgender will be singled out from other service members and denied medically necessary healthcare that is provided to everyone else. Other men and women who are transgender will be denied the opportunity to serve altogether, even if they could satisfy the stringent standards for enlistment applicable to all others seeking to serve.

8.     Without input from the Department of Defense and Joint Chiefs of Staff, and without any deliberative process, President Trump cast aside the rigorous, evidence-based policy of the Open Service Directive, and replaced it with discredited myths and stereotypes, uninformed speculation, and animus against people who are transgender.

9.     Plaintiffs bring this action to right this unconstitutional wrong.

## THE PARTIES

### Plaintiff Stone

10.     Petty Officer First Class Brock Stone is a 34-year-old man.

11.     Petty Officer Stone is assigned to a unit at Fort Meade, Maryland through at least August 2020, and resides off-base with his wife in Anne Arundel County.

12.     Petty Officer Stone has served in the U.S. Navy for 11 years, including a nine-month deployment to Afghanistan. Petty Officer Stone was awarded an achievement medal in

connection with his deployment, and he has received multiple other commendations, including a flag letter of commendation and multiple recommendations for early promotion. He has received extensive and costly training and is skilled in his field.

13.     Petty Officer Stone is transgender.

14.     Petty Officer Stone publicly revealed his transgender status to military personnel in reliance upon DoD's June 2016 Open Service Directive.

15.     Pursuant to his evaluation by DoD medical personnel, Petty Officer Stone is undergoing hormone therapy as a medically necessary part of his gender transition.

16.     Since arriving at Fort Meade in July 2017, Petty Officer Stone has received medically necessary treatment related to his gender transition at Walter Reed National Military Medical Center in Bethesda, Maryland. He was close to finalizing a medical treatment plan that included surgery at the time he was transferred to Fort Meade. Before President Trump issued his Transgender Service Member Ban, Petty Officer Stone planned and expected that his treatment plan at Fort Meade would include medically necessary surgery in 2018.

17.     Petty Officer Stone is a member of the ACLU of Maryland.

**<u>Plaintiff Cole</u>**

18.     Staff Sergeant Kate Cole is a 27-year-old woman.

19.     Staff Sergeant Cole is stationed at Fort Polk, Louisiana.

20.     Staff Sergeant Cole has served in the U.S. Army for almost ten years, including a one-year deployment to Afghanistan where she served as a team leader and designated marksman. Staff Sergeant Cole currently works as a Cavalry Scout, where she operates with a tank unit.

21.     Staff Sergeant Cole is transgender.

22.     Staff Sergeant Cole publicly revealed her transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

23.     Pursuant to her evaluation by DoD medical personnel, Staff Sergeant Cole is undergoing hormone therapy as a medically necessary part of her gender transition. She is scheduled to receive medically necessary surgery in the next few weeks.

**Plaintiff Doe**

24.     Senior Airman John Doe is a 25-year-old man.

25.     Senior Airman Doe is stationed at Little Rock Air Force Base, Arkansas.

26.     Senior Airman Doe has served for approximately six years on active duty in the U.S. Air Force, where he is pursuing cryogenics certification. He was awarded "Airman of the Year" for his flight.

27.     Senior Airman Doe has deployed to Qatar for a six-month deployment.

28.     Senior Airman Doe is transgender.

29.     Senior Airman Doe publicly revealed his transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

30.     Pursuant to his evaluation by DoD medical personnel, Senior Airman Doe is undergoing hormone therapy as a medically necessary part of his gender transition and had planned to receive medically necessary surgery in the summer of 2017.

31.     Following President Trump's July 2017 tweets announcing the forthcoming Trump Transgender Service Member Ban, Senior Airman Doe was informed by e-mail from the medical command at the base where he was scheduled to undergo surgery that all gender transition-related surgeries, including his own, had been put on hold pending further DoD guidance.

### Plaintiff George

32.     Airman First Class Seven Ero George is a 41-year-old man.

33.     Airman First Class George is stationed at the Selfridge Air National Guard Base, Michigan.

34.     Airman First Class George is in the Air National Guard, where he serves in the base security force. He is also a member of the base Honor Guard, performing military funeral honors for deceased veterans, retirees, and active duty members; providing dignified transfers; and performing color guard details.

35.     Airman First Class George is transgender.

36.     Airman First Class George publicly revealed his transgender status to military personnel in reliance upon DoD's June 2016 Open Service Directive.

37.     Pursuant to his evaluation by DoD medical personnel, Airman First Class George is undergoing hormone therapy as a medically necessary part of his gender transition and has undergone medically necessary surgery.

38.     Airman First Class George intends to pursue a commission in the U.S. Army Nurse Corps, while he finishes a civilian degree in nursing. This effort to seek a commission in a different service would subject Airman First Class George to the Army's accession policies, including the ban on accessions included in President Trump's Transgender Service Member Ban.

### Plaintiff Gilbert

39.     Petty Officer First Class Teagan Gilbert is a 31-year-old woman.

40.     Petty Officer Gilbert is a reservist stationed in Phoenix, Arizona.

41.     Petty Officer Gilbert has served in the U.S. Navy for more than 13 years, including a one-year deployment to Afghanistan. She is currently in the Naval Reserve working as an information and space systems technician.

42.     Petty Officer Gilbert is transgender.

43.     Petty Officer Gilbert publicly revealed her transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

44.     Pursuant to her evaluation by DoD medical personnel, Petty Officer Gilbert is undergoing hormone therapy as a medically necessary part of her gender transition and plans to seek approval for medically indicated surgical treatment in the future.

**Plaintiff Parker**

45.     Technical Sergeant Tommie Parker is a 54-year-old woman.

46.     Technical Sergeant Parker is stationed at Stewart Air National Guard Base, New York and has served in the Marine Corps for four years and the Air National Guard for 26 years, including deployments to Okinawa (with the Marine Corps) and Germany (with the Air National Guard). She now works as a fuel technician.

47.     Technical Sergeant Parker is transgender.

48.     Technical Sergeant Parker publicly revealed her transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

49.     Pursuant to her evaluation by DoD medical personnel, Technical Sergeant Parker is undergoing hormone therapy as a medically necessary part of her gender transition.

**Plaintiff ACLU of Maryland**

50.     Plaintiff American Civil Liberties Union of Maryland, Inc. ("ACLU of Maryland") is an affiliate of the American Civil Liberties Union, a non-profit, nationwide, non-partisan membership organization with over 1,500,000 members.

51.     Plaintiff ACLU of Maryland's growing membership comprises over 42,000 Maryland members, including one or more men and women who are transgender who are currently serving in the U.S. military or who intend to volunteer for service in the U.S. military.

52.     The ACLU of Maryland litigates cases in which government officials have attempted to discriminate against men and women who are transgender, and therefore the ACLU of Maryland has a direct interest in challenging the ban at issue in this case.

53.     The ACLU of Maryland's interest in protecting both its members and other men and women who are transgender from discrimination on the basis of sex and transgender status is both germane and fundamental to the organization's purpose of furthering the principles of liberty and equality embodied in the Constitution and the nation's civil rights laws.

**Defendants**

54.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, on August 25, 2017, he issued the Transgender Service Member Ban.

55.     Defendant James Mattis is the Secretary of Defense and is sued in his official capacity. DoD is responsible for providing the military forces needed to deter war and protect the security of the United States. At all times relevant to this Complaint, Defendant Mattis was acting as an employee and agent of the United States. In that capacity, Defendant Mattis is responsible for supervising the branches of the U.S. Armed Forces; for promulgating,

implementing, and enforcing the policies and regulations that govern military service in all branches of the U.S. Armed Forces; and for ensuring the legality of these policies and regulations. In this role, he is responsible for the maintenance and enforcement of Department of Defense Instruction ("DoDI") 1300.28, which establishes DoD policies regarding transgender service members.

56.     Defendant Ryan McCarthy is the Acting Secretary of the Army and is sued in his official capacity. The Department of the Army is the DoD branch that defends the land mass of the United States, its territories, commonwealths, and possessions. At all times relevant to this Complaint, Defendant McCarthy was acting as an employee and agent of the United States. In that capacity, Defendant McCarthy has overall responsibility for the Army and for the Army's development, administration, and enforcement of policies and regulations that affect service by transgender service members. These policies and regulations include Army publications and directives implementing DoD policy governing transgender service members.

57.     Defendant Richard Spencer is the Secretary of the Navy and is sued in his official capacity. The Department of the Navy is the DoD branch that maintains, trains, and equips combat-ready maritime forces. At all times relevant to this Complaint, Defendant Spencer was acting as an employee and agent of the United States. In that capacity, Defendant Spencer has overall responsibility for the Navy and Marine Corps and for those services' development, administration, and enforcement of policies and regulations that affect service by transgender service members. These policies and regulations include Navy and Marine Corps publications and directives implementing DoD policy governing transgender service members.

58.     Defendant Heather Wilson is the Secretary of the Air Force and is sued in her official capacity. The Department of the Air Force is the DoD branch that provides the U.S.

—11—

military with air and space capability. At all times relevant to this Complaint, Defendant Wilson was acting as an employee and agent of the United States. In that capacity, Defendant Wilson has overall responsibility for the Air Force and for the Air Force's development, administration, and enforcement of policies and regulations that affect service by transgender service members. These policies and regulations include Air Force publications and directives implementing DoD policy governing transgender service members.

## JURISDICTION AND VENUE

59.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the United States Constitution, the laws of the United States, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

60.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff Stone and Plaintiff ACLU of Maryland reside in this District, and because a substantial part of the events or omissions giving rise to this action occurred and are occurring in this District.

## FACTUAL ALLEGATIONS

**A.    Current Military Service by Men and Women Who Are Transgender**

61.     Transgender Americans have served, and continue to serve, in the military with distinction, including in combat. As of May 2014, the Williams Institute at UCLA School of Law estimated that men and women who are transgender account for approximately 8,800 active members of the U.S. Armed Forces. This figure may be even higher today in light of DoD's June 2016 Open Service Directive regarding transgender service.

62.     Men and women who are transgender also serve openly in civilian roles supporting the U.S. military, including as contractors in combat zones.

### B.   Medical Treatment for Transgender Service Members

63.   Pursuant to DoDI 1300.28 (§ 1.2(a)), "[t]ransgender persons . . . are subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention."

64.   The American Psychiatric Association and every other major mental health organization recognize that being transgender is not a mental disorder and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.

65.   Some men and women who are transgender, however, experience "gender dysphoria," a diagnostic term used to describe the incongruence between a person's gender identity and the gender that they were assigned at birth where such incongruence is accompanied by clinically significant distress.

66.   As with all medical conditions, varying courses of treatment for gender dysphoria may be medically necessary depending on the needs of the individual, as determined in consultation with medical professionals. These treatments, often referred to as transition-related care, may include social role transition, hormone therapy, and surgery (sometimes called "sex reassignment surgery" or "gender confirmation surgery"). The goal of the treatment is to align an individual's outward expression of gender, body, and biochemistry with the person's gender identity in order to eliminate the clinically significant distress.

67.   According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate the distress caused by the condition.

68.     In accordance with that medical consensus and contemporary standards of care, Medicare, Medicaid, and private insurance policies across the country routinely cover transition-related care as medically necessary treatment.

69.     The medical needs of transgender service members with gender dysphoria are not materially different from those of other service members. For example, the military provides routine psychological care to all service members around the globe, including men and women who are transgender. It also provides long-term hormone treatments for persons with diabetes and other endocrine disorders, and stocks cross-sex hormones in its dispensaries in the United States and abroad. The military further provides medically-indicated surgery to all service members, including chest and breast reconstruction, hysterectomy, and genital reconstruction, among other procedures that might be prescribed to treat gender dysphoria.

## C.     History of DoD Policy on Transgender Military Service

### 1)     Historical Regulatory Ban

70.     Starting some time before 1981, DoD maintained and enforced a policy barring men and women who are transgender from enlisting or being retained in the U.S. Armed Forces.

71.     That policy, codified in former DoDI 1332.38,[1] prohibited men and women who are transgender from serving openly, whether or not they required any ongoing medical treatment and even if they were fit to serve. In contrast, non-transgender individuals, including those requiring medical interventions, were allowed to remain in military service if they could demonstrate their fitness to serve.

---

[1] DoDI 1332.38 applied to all service members and listed specific medical conditions and diagnoses that (1) required referral for medical evaluation of fitness for continued service, or (2) were ineligible for disability evaluation (and resulted in placement on a track for administrative separation). Transgender status was in the latter category.

—14—

72.     Notably, in order to establish medical fitness, service members do not have to prove that they are universally deployable. According to DoDI 1332.38, "[i]nability to perform the duties of his or her office, grade, rank, or rating in every geographic location and under every conceivable circumstance will not be the sole basis for a finding of unfitness."

73.     Neither former DoDI 1332.38 nor the various service branch regulations that implemented it articulated a rationale for presuming that being transgender renders a service member administratively unfit.

>       2)     **DoD Revisits and Studies the Regulations Regarding Transgender Military Service**

74.     On July 13, 2015, then-Secretary of Defense Ashton Carter issued two directives aimed at updating DoD's existing transgender service member regulations, which the Secretary described as "an outdated, confusing, inconsistent approach that's contrary to our value of service and individual merit [and that is] causing uncertainty that distracts commanders from our core missions." *Statement by Secretary of Defense Ash Carter on DOD Transgender Policy*, DoD (July 13, 2015), https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/.

75.     The Secretary's first directive established a working group to study "the policy and readiness implications of welcoming transgender persons to serve openly." The Acting Under Secretary of Defense for Personnel and Readiness led the group, which was comprised of leaders from the armed services; the Joint Staff; the service secretaries; and personnel, training, readiness and medical specialists from across DoD (with input from transgender service members, outside expert groups, and medical professionals outside the department).

76.     The Secretary's second directive ordered that "decision authority in all administrative discharges for those diagnosed with gender dysphoria or who identify themselves

as transgender be elevated to" the Under Secretary, "who will make determinations on all
potential separations."

77.     From July 2015 to June 2016, members of the working group and other senior
leaders in DoD met with transgender service members deployed throughout the world, including
individuals serving on aircrafts, submarines, and operating bases, as well as at the Pentagon.
These individuals were determined to be high-quality additions to the U.S. Armed Forces, and
DoD leaders observed that the ambiguity of existing regulations regarding the service of
transgender individuals put both the service members and their commanders in a difficult and
fundamentally unfair position.

78.     The DoD working group also carefully examined medical, legal, and policy
considerations associated with permitting transgender service members to serve openly in the
Armed Forces. The working group reviewed data, studied the many allied militaries that already
permit transgender service members to serve openly, and considered analogous examples from
the public and private sectors in the United States. DoD observed, among other things, that the
provision of medical care for men and women who are transgender is becoming common and
normalized in public and private sectors alike.

79.     In conjunction with its working group efforts, DoD commissioned the RAND
Corporation to analyze relevant data and studies to assist with DoD's own review. RAND's work
was "sponsored by the Office of the Under Secretary of Defense for Personnel and Readiness
and conducted within the Forces and Resources Policy Center of the RAND National Defense
Research Institute, a federally funded research and development center sponsored by the Office
of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the
Marine Corps, the defense agencies, and the defense Intelligence Community." Agnes Gereben

Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corporation, at iii–iv (2016) (hereinafter, "RAND Report," attached as **Exhibit A** to this Complaint).

80.     Based on various factors, including its analysis of allied militaries and the expected rate at which American transgender service members would require medical treatment that would impact their fitness for duty or deployability, RAND concluded that there would be "minimal" readiness impacts from allowing transgender service members to serve openly. *See id.* at xii, 2–3. Specifically, RAND estimated that 10 to 130 active component members each year could have reduced deployability as a result of gender transition-related treatments. This amount is negligible relative to the 102,500 non-deployable soldiers in the Army alone in 2015, 50,000 of them in the active component. *Impact of Transgender Personnel on Readiness and Health Care Costs in the U.S. Military Likely to Be Small*, RAND Press Room (June 30, 2016), https://www.rand.org/news/press/2016/06/30.html.

81.     RAND concluded that health care costs would represent "an exceedingly small proportion" of both Active Component and overall DoD health care expenditures. RAND Report, at xi–xii, 31. In so concluding, RAND observed that "[b]oth psychotherapy and hormone therapies are [already] available and regularly provided through the military's direct care system," and "[s]urgical procedures quite similar to those used for gender transition are already performed within the MHS for other clinical indications." *Id.* at 8. For instance, "[r]econstructive breast/chest and genital surgeries are currently performed on patients who have had cancer, been in vehicular and other accidents, or been wounded in combat." *Id.*

### 3) Decision to Permit Transgender Service Members to be Subject to the Same Fitness Standards as Other Service Members

82.     Based on input from the DoD's working group and the RAND Corporation, including information and recommendations from the service secretaries and other Pentagon officials, Secretary Carter issued a directive and memorandum to all military departments regarding military service for transgender service members on June 30, 2016. The Open Service Directive announced that, "[e]ffective immediately, no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity." Further, "[t]ransgender Service members will be subject to the same standards as any other Service member of the same gender." Thus, "[a] Service member whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition." The Open Service Directive is attached as **Exhibit B**.

83.     Citing the RAND Report, the Secretary of Defense explained the three principal reasons underlying the Open Service Directive: (1) the military's need to "avail ourselves of all talent possible" in order to remain "the finest fighting force the world has ever known"; (2) the Secretary's duty to transgender service members and their commanders to "provide them both with clearer and more consistent guidance than is provided by current policies"; and (3) as a matter of principle, "Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so." *Department of Defense Press Briefing by Secretary Carter on Transgender Service Policies in the Pentagon Briefing Room* (June 30,

—18—

2016), https://www.defense.gov/News/Transcripts/Transcript-View/Article/822347/department-of-defense-press-briefing-by-secretary-carter-on-transgender-service/.

84.     The Open Service Directive was to be implemented over the course of a 12-month period, from June 2016 to June 2017. Although transgender service members already in the military on June 30, 2016 were allowed to serve openly as soon as the Open Service Directive took effect, accession of transgender personnel—that is, the process of bringing new enlisted recruits and officer candidates into the military—did not begin immediately. The Policy gave the Department of Defense and the military services approximately one year to conduct training, and to start accepting transgender members into the military beginning on July 1, 2017.

85.     The enlistment requirements were stringent, providing, *inter alia*, that a history of gender dysphoria was disqualifying unless a licensed medical provider certified that the applicant had been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

86.     On September 30, 2016, DoD issued an "Implementation Handbook" to "assist our transgender Service members in their gender transition, help commanders with their duties and responsibilities, and help all Service members understand Department policy allowing the open service of transgender Service members." *Transgender Service in the U.S. Military: An Implementation Handbook*, DoD, at 8 (Sept. 30, 2016), *available at* https://www.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHandbook_093016.pdf?ver=2016-09-30-160933-837. The Handbook explained to transgender service members that DoD's revised transgender service member policy "ensures your medical care is brought into the military health system (MHS), protects your privacy when receiving medical care, and establishes a structured process whereby you may transition gender when medically necessary."

*Id.* at 17. The Handbook encouraged transgender service members to be "open and honest with your leadership when discussing the gender transition process," and further encouraged transgender service members to disclose their transgender status to colleagues. *Id.* at 20.

87.     The Handbook also provided guidance to commanders and non-transgender service members. *Id.* at 25–33. The topics in the Handbook include an overview of the gender transition approval process; guidance specific to transgender service members, commanders, and non-transgender service members, including communication, medical care, deployment and physical fitness, and privacy; frequently asked questions and answers; various potential scenarios and guidance on how to address them; and resources for further information. *See generally id.*

88.     Implementation training began shortly after the policy was announced. This training involved commanders, medical personnel, the operating forces, and recruiters. The training was directed to the entire joint force, in the United States and around the world.

89.     During this same timeframe, each of the service branches conducted a comprehensive review of regulations governing medical care, administrative separations, and manpower management, in order to ensure that service-level issuances were consistent with the DoD instructions.

**D.    Twitter Announcement of Categorical Ban on Service by Men and Women Who Are Transgender**

90.     On the morning of July 26, 2017, President Trump posted the following announcement on Twitter, under the handle @realDonaldTrump:



91.     The Trump Administration has provided no evidence that this about-face in policy was supported by any study of the issue or any consultation with military officers, DoD officials, other military experts, or medical or legal experts.

92.     Press reports indicate that President Trump's motivations in abruptly announcing a transgender ban were largely political, reflecting a desire to placate legislators and advisers who bear animus and moral disapproval toward men and women who are transgender in order to gain votes to pass a defense spending bill that included money to build a border wall with Mexico—a well-known priority for President Trump. Rachel Blade & Josh Dawsey, *Inside Trump's Snap Decision to Ban Transgender Troops*, Politico (July 26, 2017, 2:07 PM), http://www.politico.com/story/2017/07/26/trump-transgender-military-ban-behind-the-scenes-240990; *see also, e.g.*, Tom Porter, *Transgender Military Ban: The Rise of Anti-LGBT Hate*

—21—

*Groups in Trump's White House*, Newsweek (July 26, 2017, 12:47 PM),

http://www.newsweek.com/anti-lgbt-hate-groups-transgender-military-ban-trump-642218;

Asawin Suebsaeng et al., *Trump Bows to Religious Right, Bans Trans Troops*, The Daily Beast

(July 26, 2017, 12:33 PM), http://www.thedailybeast.com/trump-bows-to-religious-right-bans-

trans-troops.

93.    According to subsequent media reports, "President Donald Trump's White House

and Defense Department lawyers had warned him against the transgender military ban for days"

and were "startl[ed]" when they "learned of the change in a series of tweets." Josh Dawsey, *John

Kelly's Big Challenge: Controlling the Tweeter in Chief*, Politico (Aug. 4, 2017, 6:03 PM),

http://www.politico.com/story/2017/08/04/trump-john-kelly-challenge-twitter-241343.

94.    President Trump's actions immediately caused the Individual Plaintiffs and other

transgender service members to fear for their careers, the well-being of their family members and

dependents, their health care and, in some cases, their safety.

95.    The President's actions were also experienced by the Individual Plaintiffs as a

betrayal, in light of their actions to come out publicly to military personnel in reliance on the

June 2016 directive.

96.    Close to 60 retired generals and flag officers from various military branches also

found President Trump's tweet to undermine national security and military readiness, stating:

> This proposed ban, if implemented, would cause significant
> disruptions, deprive the military of mission-critical talent, and
> compromise the integrity of transgender troops who would be
> forced to live a lie . . . The military conducted a thorough research
> process on this issue and concluded that inclusive policy for
> transgender troops promotes readiness. . . . We could not agree
> more.

*Fifty-Six Retired Generals and Admirals Warn that President Trump's Anti-Transgender Tweets,*

*if Implemented, Would Degrade Military Readiness*, Palm Ctr. (Aug. 1, 2017),

http://www.palmcenter.org/fifty-six-retired-generals-admirals-warn-president-trumps-anti-

transgender-tweets-implemented-degrade-military-readiness/.

97.     Members of Congress were similarly "troubled" by President Trump's tweet on a

bipartisan basis, with one Republican lawmaker (and former Navy SEAL) issuing the following

statement:

> I am troubled that [DoD] seemed to be unaware of this potential
> policy change and how it was made public. I understand the DoD
> is in the middle of a review of relevant policies and I believe this
> ban is premature. There are heroic military members willing to put
> their lives on the line and give the ultimate sacrifice on our behalf,
> regardless of their gender identity. I support the ability for those
> who meet all military requirements, medical and otherwise, to have
> the opportunity to serve our great country.

*See* Rep. Scott Taylor (R-Va.), *Statement on Trump Transgender Ban* (July 26, 2017),

https://taylor.house.gov/media/press-releases/statement-trump-transgender-ban.

98.     Senator John McCain, Chairman of the Senate Committee on Armed Services;

also repudiated President Trump's announcement, stating:

> The Department of Defense has already decided to allow currently-
> serving transgender individuals to stay in the military, and many
> are serving honorably today. Any American who meets current
> medical and readiness standards should be allowed to continue
> serving. There is no reason to force service members who are able
> to fight, train, and deploy to leave the military—regardless of their
> gender identity. We should all be guided by the principle that any
> American who wants to serve our country and is able to meet the
> standards should have the opportunity to do so—and should be
> treated as the patriots they are.

*See* Sen. John McCain (R-Ariz.), *Statement by SASC Chairman John McCain on Transgender*

*Americans in the Military* (July 26, 2017),

https://www.mccain.senate.gov/public/index.cfm/2017/7/statement-by-sasc-chairman-john-

mccain-on-transgender-americans-in-the-military.

99.     The Department of Defense declined comment on President Trump's policy

announcement, referring questions to the White House.

100.     The Secretary of Defense was on vacation at the time of President Trump's

announcement on Twitter.

### E.     The Transgender Service Member Ban

101.     Early Friday evening on August 25, 2017, President Trump issued his

Transgender Service Member Ban. A copy is attached as **Exhibit C**.

102.     The Transgender Service Member Ban states that in President Trump's own

"judgment," DoD's decision to adopt the Open Service Directive "failed to identify a sufficient

basis to conclude that terminating the Departments' longstanding policy and practice would not

hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and

there remain meaningful concerns that further study is needed to ensure that continued

implementation of last year's policy change would not have those negative effects."

103.     The Transgender Service Member Ban therefore "direct[s]" the Secretary of

Defense and the Secretary of Homeland Security "to return to the longstanding policy and

practice on military service by transgender individuals that was in place prior to June 2016,"

until President Trump is personally persuaded that a change is warranted. Transgender Service

Member Ban § 1(b).

104.     The Transgender Service Member Ban orders that the policy banning enlistment

of men and women who are transgender be extended, until a recommendation to the contrary is

made "that I find convincing."  *Id.* § 2(a). The Transgender Service Member Ban further orders a

"halt" to the use of DoD resources "to fund sex-reassignment surgical procedures for military

—24—

personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." *Id.* § 2(b).

105.    The Transgender Service Member Ban specifies that provisions banning men and women who are transgender from enlisting will take effect on January 1, 2018 (the date Defendant Mattis's directive delaying accessions will expire). It further provides that the provisions banning existing transgender service members from continued service and banning medically necessary healthcare will take effect on March 23, 2018. *Id.* § 3.

106.    The Transgender Service Member Ban further directs the Secretary of Defense, in consultation with the Secretary of Homeland Security, to submit to President Trump by February 21, 2018, a plan to implement the Transgender Service Member Ban and "determine how to address transgender individuals currently serving in the United States military." *Id.* § 3. The Transgender Service Member Ban gives the Secretary of Defense discretion to determine how to implement the Ban, but it does not leave discretion for the Secretary of Defense to allow currently serving members who are transgender to continue to serve indefinitely.

### F.    Fundamental Contradiction Between Transgender Service Member Ban and DoD's Own Considered Conclusions

107.    Although the Transgender Service Member Ban purports to be based on President Trump's "judgment," that judgment appears to reflect nothing more than uninformed speculation, myths, and stereotypes that have already been rebutted by an extensive and rigorous evidence-based process.

108.    For example, as justification for the Transgender Service Member Ban, President Trump stated that allowing men and women who are transgender to continue serving would be disruptive. But the 2016 study commissioned by DoD found that a transgender service member's care would have a substantial impact on readiness *only* if (1) that service member worked in an

"especially unique" military occupation, (2) that occupation was "in demand at the time of transition," *and* (3) the service member needed to be available for "frequent, unpredicted mobilizations." RAND Report, at 43. "Having completed medical transition, a service member could resume activity in an operational unit if otherwise qualified." *Id.* Upon information and belief, the DoD's own working group reached similar conclusions. The American Medical Association similarly adopted a resolution that "there is no medically valid reason to exclude transgender individuals from service in the [United States] military."

109.    Further, high-ranking military personnel have indicated that the Transgender Service Member Ban—not the Open Service Directive—will cause serious disruption to the Armed Forces. *See Fifty-Six Retired Generals and Admirals Warn that President Trump's Anti-Transgender Tweets, if Implemented, Would Degrade Military Readiness*, *supra* ("This proposed ban, if implemented, would cause *significant disruptions*, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie, as well as non-transgender peers who would be forced to choose between reporting their comrades or disobeying policy. As a result, *the proposed ban would degrade readiness*[.]") (emphases added)).

110.    President Trump has similarly invoked alleged concerns about "unit cohesion." The RAND study noted that "[t]he underlying assumption [of these alleged concerns] is that if service members discover that a member of their unit is transgender, this could inhibit bonding within the unit, which, in turn, would reduce operational readiness." *Id.* at 44.

111.    To study the validity of this argument, RAND looked to, among other things, the experiences of foreign countries that permit open transgender military service. There are 18 such countries: Australia, Austria, Belgium, Bolivia, Canada, the Czech Republic, Denmark, Estonia,

Finland, France, Germany, Israel, the Netherlands, New Zealand, Norway, Spain, Sweden, and

the United Kingdom. Observing that "there has been no significant effect of openly serving

transgender service members on cohesion, operational effectiveness, or readiness" in foreign

militaries that permit open transgender service, and that "direct interactions with transgender

individuals significantly reduce negative perceptions and increase acceptance," the RAND study

concluded: "[W]e anticipate a minimal impact on readiness from allowing transgender personnel

to serve openly." *Id.* at 44–45, 47. Upon information and belief, the DoD's own working group

reached similar conclusions.

112.    Senator Tammy Duckworth—an Iraq War Veteran, Purple Heart recipient and

former Assistant Secretary of the Department of Veterans Affairs—has explained that the

Transgender Service Member Ban, not the Open Service Directive, would "harm our military

readiness":

> When I was bleeding to death in my Black Hawk helicopter after I
> was shot down, I didn't care if the American troops risking their
> lives to help save me were gay, straight, transgender, black, white
> or brown. All that mattered was they didn't leave me behind. If
> you are willing to risk your life for our country and you can do the
> job, you should be able to serve—no matter your gender identity or
> sexual orientation.

*See* Sen. Tammy Duckworth (D-Ill.), *Duckworth Statement on Reports Trump Administration*

*Directing DOD to Discriminate Against Transgender Servicemembers* (Aug. 24, 2017),

https://www.duckworth.senate.gov/content/duckworth-statement-reports-trump-administration-

directing-dod-discriminate-against.

113.    Finally, President Trump claimed that allowing transgender service members to

continue service would be too expensive. The RAND Report's study found to the contrary.

Namely, "even in the most extreme scenario that we were able to identify using the private

health insurance data, we expect only a 0.13-percent ($8.4 million out of $6.2 billion) increase in

[active component] health care spending." RAND Report, at 36. By contrast, total military

spending on erectile dysfunction medicines amounts to $84 million annually—ten times the cost

of annual transition-related medical care for active duty transgender service members. Patricia

Kime, *DoD Spends $84M a Year on Viagra, Similar Meds*, Military Times (Feb. 13, 2015),

http://www.militarytimes.com/pay-benefits/military-benefits/health-care/2015/02/13/dod-spends-

84m-a-year-on-viagra-similar-meds/.

114.    An August 2017 report by the Palm Center concluded that *implementing* the

Transgender Service Member Ban will cost $960 million. *See* Aaron Belkin et al., *Discharging

Transgender Troops Would Cost $960 Million*, Palm Center (Aug. 2017), *available at*

http://www.palmcenter.org/wp-content/uploads/2017/08/cost-of-firing-trans-troops.pdf.

**G.    Immediate and Irreparable Harm from the Transgender Service Member
        Ban**

115.    The Individual Plaintiffs and other transgender service members face immediate

and irreparable harm as a result of the Transgender Service Member Ban.

116.    Each Individual Plaintiff and other transgender service members suddenly face

the reality that, despite their years of commitment and training, their careers will prematurely end

and various benefits will be permanently unavailable. Terminating the active service of Plaintiffs

and other transgender service members would also adversely affect their retirement benefits, and

could in some cases preclude eligibility for retirement benefits altogether.

117.    Plaintiff Petty Officer Stone has served in the U.S. Navy for 11 years, which

included a nine-month deployment to Afghanistan. Petty Officer Stone was awarded an

achievement medal in connection with his deployment, and he has received multiple other

commendations, including a flag letter of commendation and multiple recommendations for early

promotion. Despite this lengthy service and deployment, and the fact that he has received extensive and costly training in his field, he faces the prospect that he will be forced out of the U.S. Navy pursuant to the Transgender Service Member Ban.

118.    Plaintiff Staff Sergeant Cole has served in the U.S. Army for nearly a decade, which included a one-year deployment to Afghanistan. Despite her lengthy service, experience as a team leader, designated marksman, and Cavalry Scout, she faces the prospect that she will be forced out of the U.S. Army pursuant to the Transgender Service Member Ban.

119.    Plaintiff Senior Airman Doe has served for approximately six years in the U.S. Air Force, which included a deployment to Qatar. Despite his service and the fact that he was awarded "Airman of the Year" for his flight, he faces the prospect that he will be forced out of the U.S. Air Force pursuant to the Transgender Service Member Ban.

120.    Plaintiff Airman First Class George has served in the U.S. Air National Guard for two and a half years and intends to pursue a commission in the U.S. Army. Despite his service as base security force, he will be prohibited from commissioning in the U.S. Army and faces the prospect that he will be forced out of the U.S. Air National Guard pursuant to the Transgender Service Member Ban.

121.    Plaintiff Petty Officer Gilbert has served in the U.S. Navy for 13 years, which included a one-year deployment to Afghanistan. Despite her lengthy service and her specialized knowledge as an information and space systems technician, she faces the prospect that she will be forced out of the U.S. Navy pursuant to the Transgender Service Member Ban.

122.    Plaintiff Technical Sergeant Parker has served in the U.S. Marine Corps for four years and the U.S. Air National Guard for 26 years, which included deployments to Japan and

Germany. Despite her lengthy service, she faces the prospect that she will be forced out of the U.S. Air National Guard pursuant to the Transgender Service Member Ban.

123.    In addition, many transgender service members, including Plaintiffs Stone, Cole, Doe, Gilbert, and Parker, will be denied medically necessary surgical treatment that, in many cases, has already been recommended by military medical professionals. Indeed, a scheduled medical procedure for Plaintiff Doe has already been cancelled.

124.    Each transgender service member who is denied medically necessary surgical treatment will suffer serious harm.

125.    The Individual Plaintiffs and other transgender service members also face extraordinary stress, uncertainty, and stigma based on the decision to ban transgender individuals from service and single out their medical care for a ban on coverage. While waiting for their status to be "addressed" as the Trump Transgender Service Member Ban is implemented, Plaintiffs face significant uncertainty and concern about their careers and their futures, must plan for potential discharge, and experience the stigma of being told their service to their country is not valued or wanted, and that their medical care needs are not real or necessary. Upon information and belief, scheduled medical procedures are already being cancelled and some service members are being told that they may not reenlist.

## LEGAL CLAIMS

### COUNT I (Against All Defendants)

VIOLATION OF THE EQUAL PROTECTION COMPONENT OF THE FIFTH
AMENDMENT'S DUE PROCESS CLAUSE

126.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the

allegations in all preceding paragraphs.

127.    The equal protection component of the Due Process Clause of the Fifth

Amendment to the United States Constitution protects all persons, including members of the

Armed Forces.

128.    President Trump issued the Transgender Service Member Ban, directing that:

(i) current service members who are transgender are barred from serving in the U.S. Armed

Forces, irrespective of their ability to demonstrate their fitness to serve (§ 1(b)); (ii) enlistment in

the military by men and women who are transgender is prohibited, irrespective of their ability to

demonstrate their fitness to serve (§ 2(a)); and (iii) currently serving transgender service

members are denied medically necessary surgical care, including in cases where individuals are

stable in their gender transition and able to demonstrate their fitness to serve on the same basis as

other service members (§ 2(b)).

129.    Each of these three policies—and the Transgender Service Member Ban as a

whole—violates Plaintiffs' right to equal protection.

i.   <u>Ban on Existing Service Members (Directive Section 1(b))</u>

130.   Section 1(b) of the Transgender Service Member Ban directs the Secretary of Defense to "return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016," indefinitely.

131.   In so stating, Section 1(b) establishes a broad ban on service by men and women who are transgender, with immediate and longer-term impacts on those currently serving.

132.   Section 3 of the Transgender Service Member Ban requires the Secretary of Defense, in implementing the Transgender Service Member Ban, to determine by February 21, 2018 how to "address" currently serving transgender men and women. Although these service members are permitted to continue serving until this determination is made, transgender service members are immediately impacted by the Transgender Service Member Ban.

133.   All service members who are transgender immediately have grave reason to fear for their careers, and must reevaluate career plans that were premised on the Open Service Directive. Individual Plaintiffs and other service members who are transgender experience significant stress and psychological harm caused by this impending threat to their military service.

134.   Service members who are transgender are also immediately injured by the stigma created by the Transgender Service Member Ban. Even if some transgender service members are permitted to continue serving beyond March 23, 2018, they now serve in a military where the Commander-in-Chief has announced that their service is unwanted and unwelcome, and that their medical care will be withheld. Any transgender service member permitted to remain in his or her position will necessarily be treated as, and experience the harms associated with, a form of second-class status.

ii.  <u>Ban on New Enlistments (Directive Section 2(a))</u>

135.    Section 2(a) of the Transgender Service Member Ban directs the Secretary of Defense to "maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018."

136.    In so stating, Section 2(a) prohibits men and women who are transgender from enlisting and serving openly in the United States Armed Forces. The Open Service Directive had determined that men and women who are transgender would not be disqualified, subject to rigorous accession criteria, at the end of a phase-in period on July 1, 2017. Defendant Mattis delayed new enlistments for a further six months on the asserted basis that further study was warranted. President Trump has now acted to ban enlistment without awaiting the results of any study.

iii.  <u>Ban on Medically Necessary Care (Directive Section 2(b))</u>

137.    Section 2(b) of the Transgender Service Member Ban directs the Secretary of Defense to "halt all use of DoD or DHS resources to fund sex-reassignment surgical procedures for military personnel," except "to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex."

138.    Transgender service members who require medically necessary care to treat gender dysphoria are entitled to care on an equal basis to what is provided to non-transgender service members with medical conditions requiring comparable medically necessary care.

139.    Many of the same or substantially equivalent surgical procedures banned by the Transgender Service Member Ban are covered by the military when used to treat other serious medical conditions. The Transgender Service Member Ban singles out transgender service

members for different treatment by denying them coverage for medically necessary care that is inherently related to their transgender status and gender nonconformity.

*      *      *

140.     The Defendants' actions of adopting, implementing, and enforcing each of the three policies in the Transgender Service Member Ban discriminates against Individual Plaintiffs and other men and women who are transgender on the basis of sex, which is subject to, and fails, heightened scrutiny under the Fifth Amendment.

141.     The Defendants' actions of adopting, implementing, and enforcing each of the three policies in the Transgender Service Member Ban discriminates against the Individual Plaintiffs and other men and women who are transgender on the basis of their transgender status, which is independently subject to, and fails, heightened scrutiny under the Fifth Amendment.

    a.  Men and women who are transgender, as a class, have historically been subject to discrimination.

    b.  Men and women who are transgender, as a class, have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society.

    c.  Men and women who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

    d.  Men and women who are transgender, as a class, are a minority with relatively little political power.

142.     The Defendants' actions of adopting, implementing, and enforcing each of the three policies in the Transgender Service Member Ban discriminates against Plaintiffs and other transgender individuals on the basis of invidious stereotypes, irrational fears, and moral

disapproval, which are not permissible bases for differential treatment under any standard of review.

143.    As a result of the policies, practices, and conduct of the Defendants, men and women who are transgender, including Individual Plaintiffs and members of Plaintiff ACLU of Maryland, have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, threatened disruption of their military service (including loss of promotion and other career opportunities), and violations of their constitutional right to equal protection. Defendants' conduct continues to violate the equal protection rights of men and women who are transgender on a daily basis and is the proximate cause of widespread harm among Plaintiffs.

144.    Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to equal protection.

**COUNT II (Against All Defendants)**

VIOLATION OF SUBSTANTIVE DUE PROCESS

145.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

146.    The substantive component of the Fifth Amendment's Due Process Clause includes not only the privileges and rights expressly enumerated by the Bill of Rights, but also includes the fundamental rights implicit in the concept of ordered liberty.

147.     The Fifth Amendment bars certain government actions regardless of the fairness of the procedures used to implement them, particularly conduct that is so arbitrary as to constitute an abuse of governmental authority.

148.     As a result of the Transgender Service Member Ban, men and women who are transgender, including Individual Plaintiffs, have suffered, or will imminently suffer, a violation of their right to substantive due process because, due to their transgender status, and without any reasoned basis, they are denied an opportunity to demonstrate their continued fitness for duty; the ability to enlist in the U.S. Armed Forces despite being fit to serve; and/or the opportunity to receive medical care on an equal basis as service members who are not transgender. Moreover, the Transgender Service Member Ban unfairly and indefensibly strips Individual Plaintiffs of opportunities and benefits previously recognized by DoD's Open Service Directive, on which they relied.

149.     President Trump issued the Transgender Service Member Ban, directing that: (i) current service members who are transgender are barred from serving in the U.S. Armed Forces, irrespective of their ability to demonstrate their fitness to serve (§ 1(b)); (ii) enlistment in the military by men and women who are transgender is prohibited, irrespective of their ability to demonstrate their fitness to serve (§ 2(a)); and (iii) currently serving transgender service members are denied medically necessary surgical care, including in cases where individuals are stable in their gender transition and able to demonstrate their fitness to serve on the same basis as other service members (§ 2(b)). Each of these three policies—and the Transgender Service Member Ban as a whole—violates Plaintiffs' rights to substantive due process.

150.     The Defendants directly and proximately caused, and continue to cause, the violation of Plaintiffs' rights to substantive due process under the law.

151.    As a result of the policies, practices, and conduct of the Defendants, men and women who are transgender, including Individual Plaintiffs and members of Plaintiff ACLU of Maryland, have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, disruption of their military service (including loss of promotion and other career opportunities), and violations of their constitutional right to substantive due process. Defendants' conduct continues to violate the substantive due process rights of men and women who are transgender on a daily basis and is the proximate cause of widespread harm among Plaintiffs.

152.    Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to substantive due process.

## RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court:

A. Issue a declaratory judgment that the Transgender Service Member Ban violates the equal protection component of the Fifth Amendment to the U.S. Constitution, and is invalid on its face and as applied to Plaintiffs;

B. Issue a declaratory judgment that the Transgender Service Member Ban violates the Fifth Amendment's guarantee of substantive due process, and is invalid on its face and as applied to Plaintiffs;

C. Issue an Order preliminarily and permanently enjoining the Defendants from enforcing the Transgender Service Member Ban, including ordering that:

         i.     Individual Plaintiffs and all other transgender service members may not be discharged, denied promotion, or otherwise receive adverse employment treatment solely on the basis of their transgender status;

        ii.    Individual Plaintiffs and all other transgender service members may not be denied medically necessary care, including for the treatment of gender dysphoria; and

      iii.   Individual Plaintiffs and all other men and women who are transgender may not be denied the opportunity to join a branch of the U.S. Armed Forces, provided they meet the requirements adopted by the Open Service Directive.

D.  Award reasonable attorneys' fees and allowable costs of court; and

E.  Award such other and further relief as it may deem appropriate and in the interests of justice.

Dated: August 28, 2017

Respectfully submitted,

David M. Zionts*
Carolyn F. Corwin*
Jaclyn E. Martínez Resly*
Jeff Bozman*
Marianne F. Kies (Bar No. 18606)
Christopher J. Hanson*
Tom Plotkin*†
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Fax: (202) 778-5987
dzionts@cov.com
ccorwin@cov.com
jmartinezresly@cov.com
jbozman@cov.com
mkies@cov.com
chanson@cov.com
tplotkin@cov.com

Mitchell A. Kamin*
Nicholas A. Lampros*
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
mkamin@cov.com
nlampros@cov.com

Deborah A. Jeon (Bar No. 06905)
David Rocah (Bar No. 27315)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF MARYLAND
3600 Clipper Mill Road, #350
Baltimore, MD 21211
Telephone: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org

Joshua A. Block*
Chase B. Strangio*
James Esseks*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2627
Fax: 212-549-2650
jblock@aclu.org
cstrangio@aclu.org
jesseks@aclu.org

*Attorneys for Plaintiffs*

* *pro hac vice* application forthcoming

†Admitted to the Bars of Pennsylvania and New
Jersey, admission to the Bar of the District of
Columbia pending; and supervised by the
principals of the firm.