# Exhibit 24

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
June 28, 2017 - Final

©2017, Provided under license from Bloomberg Government.

Bloomberg Government
Support: 1-877-498-3587
www.bgov.com

All materials herein are protected by United States copyright law and/or license from Bloomberg Government, and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of Bloomberg Government. You may not alter or remove any trademark, copyright or other notice from copies of the content.

# House Armed Services Committee Holds Markup on the Fiscal 2018 Defense Authorization Bill

**LIST OF PANEL MEMBERS**

THORNBERRY:
The committee will come to order. The chair notes the presence of a quorum.

The committee meets today to consider and mark up HR 2810, the National Defense Authorization Act for Fiscal Year 2018.

For 55 straight years, under Congresses and presidents of both parties, an annual NDAA has been signed into law. I'm certain that this year will be no different. The members of this committee have an overwhelming commitment to the duty placed on us by the Constitution to support the men and women who serve our nation in the military.

Every member of this committee has contributed to this legislation. Committee members suggested 1,531 separate legislative provisions for consideration in the marks. Over 330 amendments were filed for today.

The members also contributed by asking thoughtful questions at our briefings and hearings, by traveling to visit our troops at home and overseas, by sharing their personal experiences and insights, and by talking with one another about how to solve problems.

And so, first, I want to express my appreciation to each of the members and to our staffs for your work so far in developing this year's NDAA. This is a team effort, and I think it's safe to say there's nothing else like it these days in Congress.

And I want to especially express appreciation to the ranking member, because his spirit of working together, even when, and especially when, we have different views, keeping in mind the security of the nation, is something that also is -- is not common

So even our fixed is inadequate and we should really fix it or get rid of this life insurance policy because it really is a fraud to say you have this policy but then when in fact you need it you don't get to benefit from it because you are getting some other benefit through the Veterans Administration. And with that I yield back.

THORNBERRY:
Does the gentlelady want to continue with the amendment or?

DAVIS:
Yes. Thank you. I'm sorry. I'm going to withdraw the amendment so that we can work hard from now until...

THORNBERRY:
OK, so that the amendment is withdrawn.

Next we have the gentlelady from Missouri Ms. Hartzler?

HARTZLER:
Thank you, Mr. Chairman. I have an amendment at the desk.

THORNBERRY:
The clerk will distribute the amendment. Without objection the amendment is considered as read and the gentlelady is recognized for five minutes.

HARTZLER:
Thank you. This is an important amendment to advance the readiness of our fighting force and to save precious taxpayer money. It repeals the policy instituted last summer by then-Secretary of Defense Ash Carter without any input from members of Congress which allows transgender individuals to serve and be recruited in the military. This policy is ill-conceived and contrary to our goals of increasing troop readiness, and investing defense dollars into addressing budget shortfalls of the past.

By recruiting and allowing transgender individuals to serve openly in our military, we are subjecting taxpayers to high medical costs including an average of $130,000 per transition surgery, lifetime hormone treatments and potential additional surgeries to address the average 25 percent of individuals who experience complications in addition to possible mental health issues and cost of training the new policy.

The surgeries alone are estimated to cost $1.35 billion over the next 10 years and that is with the assumption of only 30 percent of individuals choosing to transition. That equivalent money could fund 13 F-35s, 14 Super Hornet F-18s, two B-21

Long-Range Strike Bombers, eight KC-46, all ATN wing replacements or increase the end-strength of our troops.

In addition the policy subjects TRICARE to hormone therapy for family members and its associated costs as the policy covers 16 and 17 year old dependents. This policy is not only costly, it also is a threat to our readiness in lost time for additional training, the inability to deploy and decrease morale. Every member of the military must undergo a day-long training on the new policy which translates for our troops into lost time in the cockpit, on the firing range or in a simulator which our force so desperately needs.

Reserve forces are hit especially hard by this training as time is limited when these members are on duty. But it's not just time away from primary task that is concerning, it is also the lack of deployability of the individuals going through the sex transition process. The process requires between 210 and 238 work days where a soldier is not deployable after surgery. This recovery time equates to 1.4 million manpower days over 10 years where transgender personnel cannot deploy and fight our nation's wars.

This doesn't address the concern of non-deployability after transition due to ongoing hormone treatments that require refrigeration and other long-term care. A soldier cannot be deployed to the mountains of Afghanistan with the need to refrigerate medicine. Someone has to cover those days of non-deployability, meaning an already stressed force will be further stressed. Also, the diagnosis and treatment of gender dysphoria renders service personnel ineligible for special duties like flying status, personnel reliability program and jobs requiring TS, SCI, SAP security clearances.

Why would we purposely recruit individuals to serve whom we know cannot serve? Is it fair to change our session standards for this one condition knowing it will result in many being unable to serve their country when we deny military service to individuals with less complicated conditions like flat feet, bunions, asthma and sleep walking?

Is it fair to recruit our sons and daughters to fight for our nation and instead of being able to focus on the enemy, subjecting them to disturbing distractions of very personal privacy issues involving sleeping and showering with individuals born of the opposite sex? It is not.

Military service is a privilege, not a right. It's predicated on the singular goal of winning wars and defeating the enemy. All decisions on personnel and funding should be made with this in mind.

High entry and retention standards are required because failure in the job costs lives. Last year's memorandum is costly in dollars and it's short on common sense. It is imperative that our nation reverses this ill-advised policy and ensure our tax dollars are spent wisely, fairness is restored and we ensure our military personnel can succeed on the battlefield.

I plan to withdraw my amendment after some vital discussion tonight in hopes of giving the DOD the opportunity to address this problem internally by reversing this policy. However, if the DOD fails to act decisively on this policy, future action must be taken by us the guardians of national defense. It is imperative that the original policy that has stood the test of time be reinstated to prioritize our readiness, save precious defense dollars and ensure our men and women serving our nation can fight and win our nation's wars.

So, Mr. Chairman, I yield back with the intent to withdraw this amendment after discussion.

THORNBERRY:
Further discussion? Mr. Russell?

RUSSELL:
Thank you, Mr. Chairman. Mr. Chairman, no clear definition of dysphoria exists for our military to develop this current policy that was implemented last year.

In the psychiatric DSM-V manual, the definition lacks clear empirical support and ranks among the lowest of scores in the inter- rater reliability standards or Kappa standards. Yet the Armed Services are being forced to provide medical recommendations on unproven criteria without regard to their rights of conscience, both medically and morally.

With regard to fully qualified servicemembers, should those definitions be accepted or coerced then we should accept the definition that says a servicemember would be burdened by a profound state of depression, anxiety and agitation and has a high risk of suicide. This does not sound like an otherwise, quote, "fully- qualified servicemember," end quote.

This coerced policy also does not address the diminishment of readiness due to non-deployable dysphoric servicemembers. It places the priorities of a dysphoric non-deployable servicemember who constitutes by one studied estimate at one in 20,000 individuals and it sidelines the readiness, it sidelines the morale and the welfare, the rights and privacy concerns of 99.9999 percent of the Armed Forces.

For example, in the current training manuals that have been implemented to both soldiers and commanders for guidelines, listen to the following vignette, "Following her transition from male to female which did not include sex reassignment surgery, a transgender soldier begins using female barracks bathroom and shower facilities. Because she did not undergo a surgical the soldier still has male genitalia." This is from the Army training manual.

The guideline, "All soldiers should be respectful of the privacy and modesty concerns of others, however, transgender soldiers are not required or expected to modify or adjust their behavior based on the fact that they do not match soldiers."