**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

|  |  |
|---|---|
| BROCK STONE, *et al.*,<br><br>                    *Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States, *et al.*,<br><br>                    *Defendants*. | Case 1:17-cv-02459-MJG<br><br>Hon. Marvin J. Garbis |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS'
APPLICATION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................3

    A.    History of the Military's Accessions Policy Regarding Transgender Individuals ...................3

    B.    The President's Memorandum and Plaintiffs' Complaint .........................................5

    C.    Plaintiffs' Amended Complaint and the Interim Guidance .......................................7

STANDARD OF REVIEW FOR MOTION TO DISMISS ..................................................10

ARGUMENT............................................................................................................................11

    I.    The Court Should Grant Defendants' Motion to Dismiss for Lack of Jurisdiction ...............11

        A.    The Court's Standing Inquiry Should Be Especially Rigorous .................................11

        B.    Plaintiffs Have Not Met Their Burden of Showing an Injury-in-Fact .................................12

        C.    Plaintiffs' Claims Are Not Ripe for Adjudication.................................................14

    II.    Plaintiffs' Motion for a Preliminary Injunction Should Be Denied ...........................................16

        A.    Plaintiffs Have Not Shown that They Are Likely to Suffer an Irreparable
            Harm Absent the Entry of a Preliminary Injunction .............................................17

        B.    Plaintiffs Are Unlikely To Succeed on the Merits....................................................18

            1.    Plaintiffs Have Not Challenged Defendants' Operative Policy for
                Enlisted Transgender Service Members, and any such Challenge
                Would Fail to State an Equal Protection Claim .............................................19

            2.    Plaintiffs' Challenge to the Accession Policy is Unlikely to Succeed ..............................20

            3.    In any Event, an Equal Protection Challenge to Defendants' Longstanding
               Accession Policy Would Not Succeed ..........................................................23

                a.    The military's longstanding accessions policy is subject to a highly
                   deferential form of review ..........................................................................23

                b.    Plaintiffs are unlikely to succeed on their challenge to the military's
                   longstanding accessions policy ...................................................................26

            4.    Plaintiffs Are Unlikely To Succeed on Their Due Process Claim ..................................30

            5.    Plaintiffs are Unlikely to Succeed on Their Claim under 10 U.S.C. § 1074 ....................31

C.    The Balance of Equities and the Public Interest Weigh Strongly against the Entry of a Preliminary Injunction ...................................................................................32

D.    The Injunctive Relief Plaintiffs Seek Is Inappropriate.............................................................33

CONCLUSION....................................................................................................................................35

## INTRODUCTION

Plaintiffs—the American Civil Liberties Union of Maryland (ACLU) **and** six transgender members of the military—ask this Court to prejudge the constitutionality of a future Government policy regarding military service by transgender individuals and issue the extraordinary relief of a worldwide preliminary injunction. That challenge is premature several times over. To start, the President issued a memorandum on August 25, 2017, setting forth his policy directive to the Secretary of Defense and the Secretary of Homeland Security and ordering a further study of policies concerning military service by transgender individuals. The President's memorandum states that no policy changes to the status quo will be effective until at least March 2018. The President further directed the Secretary of Defense to determine how to address transgender individuals currently serving in the military and that *no action* be taken against such individuals until *after a policy review is completed.*

Although the Presidential Memorandum had no immediate effect on individual service members, Plaintiffs filed this action on August 28, 2017. ECF No. 1. They later amended their complaint, ECF No. 39, and moved for a preliminary injunction, ECF No. 40, on September 14, 2017. That same day, however, the Secretary of Defense issued Interim Guidance reaffirming that for now, no current service member will be involuntarily separated, discharged, or denied reenlistment solely on the basis of a gender dysphoria diagnosis or transgender status, and service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition. This is the policy in effect today.

Plaintiffs' current complaint and motion account for none of this. The Amended Complaint does not even mention, let alone challenge, the Interim Guidance in effect today. Similarly, Plaintiffs declined to bring the Interim Guidance to the Court's attention in connection with their pending motion, even though the Guidance plainly constitutes a significant development that negates their demand for emergency relief.

Nor do any of the Plaintiffs face a current or imminent threat of injury during the interim period while the policy is being studied. Plaintiffs allege that they fear being involuntarily separated from the military, denied reenlistment, or denied transition related medical care. But none of those alleged injuries are occurring, or will occur, under the Interim Guidance. And beyond that, it is unclear whether those currently serving members will be affected by the future policy regarding service by transgender individuals once it is finalized and implemented. Without such injury, Plaintiffs lack standing and their claims are not ripe. The Court should dismiss this case for lack of jurisdiction.

Were the Court to address Plaintiffs' motion for a preliminary injunction, it should deny them the drastic and extraordinary relief they seek. To establish that preliminary relief is appropriate, Plaintiffs must show that they will suffer irreparable harm if an injunction is not entered, that they are likely to succeed on the merits, that the balance of equities tips in their favor, and that an injunction is in the public interest. Plaintiffs have not made any of those showings.

To begin, for the same reasons this Court lacks jurisdiction, Plaintiffs cannot show that they will suffer irreparable harm absent a preliminary injunction. The speculative harms they believe may occur in the future, once the policy is formulated and implemented, cannot be redressed at this stage.

Nor can Plaintiffs show that they are likely to succeed on the merits. Even if they could somehow establish jurisdiction at this stage, the policy currently in place—which maintains the status quo for transgender persons currently serving in the military—has not been challenged and, in any event, is plainly lawful. Moreover, to the extent Plaintiffs assail the President's directive to study the policy questions at issue and to develop a new policy in accordance with his memorandum, they likewise have no meritorious claim. Plaintiffs cannot show a likelihood of success on their equal protection, due process, or statutory claim given that the Defense Department has not completed its review or adopted a final policy.

Even if Plaintiffs could challenge the military's longstanding accession policy, that challenge would fail because the policy withstands the highly deferential review required here. Federal courts owe the utmost deference to the political branches in the field of national defense and military affairs, because the Constitution commits military decisions exclusively to those branches and because courts "have less competence" to second-guess military decision-making. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). Decisions concerning the composition of a military force and the requisite conditions attendant to that service are at the core of these constitutionally committed powers.

Finally, the balance of equities and the public interest weigh against injunctive relief. While Plaintiffs are suffering no injury during the interim period when the policy is being examined—and may never be injured by the policy finally adopted—the Government is convening a panel of experts to study the policy, analyze the data, and provide recommendations. The public interest obviously would be harmed if an injunction precluded the President and Secretary of Defense from receiving expert advice on important issues of military personnel policy and acting in light of the results of that study. And even if Plaintiffs somehow hurdle every problem with their challenge, there is no basis for the worldwide injunction against the military they request.

## BACKGROUND

### A.    History of the Military's Accessions Policy Regarding Transgender Individuals

The U.S. military has long required individuals to satisfy rigorous standards in order to serve. The military presumptively excludes individuals who suffer from particular physical and mental conditions, although individualized waivers may be available. DOD Instruction 6130.03 at 7 (Apr. 28, 2010) (DODI 6130.03). These exclusions are necessary to ensure, *inter alia*, that service members are "capable of performing duties," free of conditions that "may require excessive time lost from duty for necessary treatment or hospitalization," and "adaptable to the military environment without the necessity of geographical area limitations." *Id.* at 2.

3

For decades, these conditions have included "transsexualism." *Id.* at 48; *see also, e.g.*, DOD Directive 6130.3 at ¶ 2–34(b) (Mar. 31, 1986) ("[t]ranssexualism and other gender identity disorders"); Army Regulation 40–501 at ¶ 6–32(b) (May 17, 1963) ("behavior disorders[] as evidenced by … transvestism").  This condition, like others, is subject to a waiver process.  Under DODI 6130.03, the military shall "[a]uthorize the waiver of the standards [for entry] in individual cases for applicable reasons and ensure uniform waiver determinations," and service-specific implementing rules set forth the process for each branch, *see, e.g.*, Army Reg. 40-501, Standards of Medical Fitness at ¶ 1-6(b).

In July 2015, former Secretary of Defense Ashton Carter ordered the creation of a working group "to study … the policy and readiness implications of welcoming transgender persons to serve openly" and instructed the group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness."  Statement by Former Secretary of Defense Ash Carter, Release No. NR-272-15.[1]  The Defense Department also commissioned the RAND Corporation to study the matter, which in turn issued a report concluding that the proposed policy change would impose burdens on the military, but that such costs were "negligible" or "marginal."  RAND Report 33, 46, 69, 70.[2]

On June 30, 2016, former Secretary Carter issued a directive setting forth a new policy on service by transgender individuals.  Defense Department Directive-Type Memorandum ("DTM") 16-005.[3] The directive allowed transgender individuals currently in the military to begin serving openly and authorized the Departments of Defense and Homeland Security to fund sex-reassignment

---

[1] Statement by Former Secretary of Defense Ash Carter, Release No. NR-272-15, is available online at: https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/statement-by-secretary-of-defense-ash-carter-on-dod-transgender-policy/ (last visited Oct. 12, 2017).

[2] The RAND Report is available online at: https://www.rand.org/pubs/research_reports/RR1530.html (last visited Oct. 12, 2017).

[3] Defense Department Directive-Type Memorandum 16-005 is available online at: https://www.defense.gov/Portals/1/features/2016/0616_policy/DTM-16-005.pdf (last visited Oct. 12, 2017).

surgeries.  *Id.*  It also ordered the revision of the military's accession policy by July 1, 2017.  *Id.*  That revision would provide that a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" were all presumptively "disqualifying."  *Id.*  Under the proposed revision, however, the applicant could overcome that presumption by proving that: (i) in the case of gender dysphoria, he had "been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months"; (ii) in the case of a medical gender transition, he had completed all medical treatment and had "been stable in the preferred gender for 18 months"; and (iii) in the case of surgery, he had waited 18 months since the operation and "no functional limitations or complications persist, nor is any additional surgery required."  *Id.*

On June 30, 2017, Secretary of Defense James Mattis extended the deadline for revising the accession policy by six months, until January 1, 2018.  Department of Defense, Release No. NR-250-17 (June 30, 2017).[4]  Nearly a month later, on July 26, 2017, the President stated on Twitter that "the United States Government will not accept or allow transgender service members to serve in any capacity in the U.S. military," citing the "medical costs and disruption that transgender in the military would entail."  Am. Compl., ECF No. 9 at ¶ 81.

### B.    The President's Memorandum and Plaintiffs' Complaint

On August 25, the President issued a memorandum to the Secretaries of Defense and Homeland Security regarding military service by transgender individuals.  Presidential Memorandum, 82 FR 41319.  The Presidential Memorandum explains that, until June 2016, longstanding policy and practice "generally prohibited openly transgender individuals from accession into the United States

---

[4] Department of Defense Release No: NR-250-17 is available online at:
https://www.defense.gov/News/News-Releases/News-Release-View/Article/1236145/statement-by-chief-pentagon-spokesperson-dana-w-white-on-transgender-accessions/ (last visited Oct. 12, 2017).

military and authorized the discharge of such individuals." *Id.*, § 1. In his role as Commander in Chief, the President found that former Secretary Carter had failed to identify a sufficient basis to conclude that ending these longstanding policies "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." *Id.* Accordingly, he determined, "further study is needed to ensure that implementation of last year's policy change would not have those negative effects." *Id.*

The President directed the military to maintain its longstanding policy and practice regarding transgender service that were in place before June 2016. Those policies would remain in place until there existed a sufficient basis to conclude that ending them would not cause the harms identified by the President. The President also stated that the Secretary of Defense, in consultation with the Secretary of Homeland Security, should advise him at any time if a policy change is warranted. *Id.* § 1(b).

The President then directed the Secretaries of Defense and Homeland Security to maintain the current policy regarding accession of transgender individuals into the military beyond January 1, 2018—when the revision announced in June 2016 was set to take effect—until such time as the Secretary of Defense, in consultation with the Secretary of Homeland Security, provides a recommendation to the contrary that the President finds convincing. *Id.* § 2(a). The President also directed the Departments of Defense and Homeland Security to halt the use of resources to fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his sex. *Id.* § 2(b).

Other than the provision regarding accessions, the Memorandum's provisions take effect on March 23, 2018. This delayed implementation date was adopted so that the two Cabinet Secretaries can study the issues addressed in the Memorandum and submit an implementation plan to the President by February 21, 2018. *Id.* § 3.

The Memorandum also addresses currently serving transgender individuals.  It provides that "[a]s part of the implementation plan, the Secretary of Defense, in consultation with the Secretary of Homeland Security, shall determine how to address transgender individuals currently serving in the United States military."  *Id.*   And "[u]ntil the Secretary has made that determination, no action may be taken against such individuals under the policy set forth in Section 1(b) of this memorandum."  *Id.*

Although Presidential Memorandum had no immediate effect on individual service members, Plaintiffs filed this action on August 28, 2017.  ECF No. 1.  Plaintiffs alleged that the President's Memorandum violated their equal protection and substantive due process rights under the Fifth Amendment to the Constitution.  *Id.*

The following day, on August 29, 2017, Secretary Mattis issued a statement explaining that the Department of Defense had received the Presidential Memorandum and would develop a study and implementation plan.  Statement of Secretary Jim Mattis, Release No: NR-312-17.[5]  Secretary Mattis promised to "establish a panel of experts serving within the Departments of Defense and Homeland Security to provide advice and recommendations on the implementation of the president's direction." *Id.*  According to Secretary Mattis, the "[p]anel members will bring mature experience, most notably in combat and deployed operations, and seasoned judgment to this task," and "will assemble and thoroughly analyze all pertinent data, quantifiable and non-quantifiable."  *Id.*  Secretary Mattis also stated that he expected to issue interim guidance on the issue of service by transgender individuals "to ensure the continued combat readiness of the force until our final policy on this subject is issued."  *Id.*

### C.     Plaintiffs' Amended Complaint and the Interim Guidance

Rather than waiting for Secretary Mattis to issue interim guidance, Plaintiffs amended their

---

[5] The August 29, 2017 Statement of Secretary Jim Mattis, Release No: NR-312-17, is available online at:   https://www.defense.gov/News/News-Releases/News-Release-View/Article/1294351/   (last visited on Oct. 12, 2017).

complaint on September 14, 2017, ECF No. 39[6], and filed a motion for a preliminary injunction, Pls. Mem., ECF No. 40.  On the same day, Secretary Mattis issued Interim Guidance regarding military service by transgender individuals.  Interim Guidance, Exhibit 1.[7]  The Interim Guidance states, "first and foremost," that the military "will continue to treat every Service member with dignity and respect." *Id.*  It then confirms that the military's longstanding accessions policy, "which generally prohibit[s] the accession of transgender individuals into the Military Services, remain[s] in effect because current or history of gender dysphoria or gender transition does not meet medical standards." *Id.*  It emphasizes, however, that this "general[]" prohibition remains "subject to the normal waiver process." *Id.*

The Interim Guidance also addresses potential harms alleged by the Plaintiffs who are current service members.  On the issue of involuntary discharges, it states that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status." *Id.*  The Interim Guidance also addresses reenlistment into military service, providing that  "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be reenlisted in service under existing procedures." *Id.*  Finally, it directs that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." *Id.*

When the Interim Guidance was issued, Defendants' counsel provided it to Plaintiffs' counsel and asked Plaintiffs to amend their complaint and withdraw or, at least narrow, their motion for a preliminary injunction to account for arguments and allegations that have been overcome by the

---

[6] In addition to their equal protection and substantive due process claims, Plaintiffs' Amended Complain contains a new claim that the President's Memorandum violates 10 U.S.C. § 1074, which provides generally that service members are entitled to medical and dental care in any facility of any uniformed service.

[7] By agreement with the Acting Secretary of Homeland Security, this Interim Guidance also applies to the U.S. Coast Guard.  Interim Guidance, Exhibit 1.

current operative policy regarding military service by transgender individuals.  Plaintiffs refused to do so.  Their current complaint and motion for a preliminary injunction therefore fail to address the current state of the Government's policy regarding military service by transgender individuals.  Given the way this litigation has unfolded, many of the allegations in Plaintiffs' amended complaint and motion for a preliminary injunction have been overcome by events or are not factually accurate.  This is true for each of the six individual Plaintiffs.  Under current policy, not one of them has been discharged from the military, refused health care by the military, or denied accession to the military.

Brock Stone serves in the U.S. Navy and has publicly revealed his transgender status to military personnel.  ECF No. 39 ¶¶ 13, 15.[8]  According to Plaintiffs, Stone "faces the prospect that he will be forced out of the military," *id.* ¶ 22, and may not be eligible for a promotion because of his transgender status.  Stone Decl. ¶13.  Defendants have submitted a declaration explaining that, under the Interim Guidance, Stone will not be discharged from the military or denied a promotion on the basis of his transgender status.  *See* Declaration of Joey J. Johnson.

Kate Cole serves in the U.S. Army and has publicly revealed her transgender status to military personnel.  ECF No. 39 ¶¶ 21, 23.  Cole alleges that medically necessary surgery related to her gender transition was canceled in September 2017.  *Id.* ¶ 25.  Defendants have submitted a declaration explaining that Cole's surgery has been rescheduled for October 2017.  *See* Declaration of Matthew Vanderlugt (filed under seal).

John Doe serves in the U.S. Air Force and has revealed his transgender status to military personnel.  ECF No. 39 ¶¶ 28, 31.  Doe alleges that his transition related surgery was canceled in July 2017, *id.* ¶ 33, and that he fears that he will not be allowed to reenlist.  Doe Declaration ¶10.  Defendants have submitted declarations explaining that, under the Interim Guidance, Doe will not

---

[8] In this memorandum and related documents, the Government uses Plaintiffs' choice of pronouns for purposes of consistency and for the convenience of the Court.

be discharged from the Air Force based on his transgender status, and his request to re-enlist has been approved. *See* Declaration of FKP (filed under seal). In addition, Doe's surgery has not been deleted from his treatment plan and can be rescheduled at his request. *See* Declaration of MJB (filed under seal).

Ero George serves in the Air National Guard and has revealed his transgender status to military personnel. ECF No. 39 ¶¶ 28, 31. George allegedly is finishing a degree in nursing and fears that he will not be able to transition to the U.S. Army Nurse Corp. *Id.* ¶ 40. George does not allege that he has applied to join the U.S. Army Nurse Corp. and, under the Interim Guidance, he will not be discharged from the military based on his transgender status. *See* Declaration of Helen A. Harris.

Teagan Gilbert serves in the U.S. Navy Reserves and has revealed her transgender status to the military. ECF No. 39 ¶¶ 43, 45. Gilbert allegedly plans to apply to U.S. Navy Officer Candidate School after graduation from college, where she has one year of course work left. *Id.* ¶ 47. Gilbert does not allege that she has applied to U.S. Navy Officer Candidate School and, under the Interim Guidance, she will not be discharged from the military based on her transgender status. *See* Declaration of Colin Campbell (filed under seal).

Tommie Parker serves in the Air National Guard and has revealed her transgender status to military personnel. ECF No. 39 ¶¶ 50, 52. Defendants have submitted a declaration explaining that, under the Interim Guidance, Parker will not be discharged from the military or denied reenlistment due to her transgender status. *See* Declaration of Kathleen P. Sileno.

## STANDARD OF REVIEW FOR MOTION TO DISMISS

Under Rule 12(b)(1), the plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of evidence. *See Demetres v. E. W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). A Rule 12(b)(1) challenge to subject matter jurisdiction may proceed as either a facial challenge (on the theory that the complaints' allegations are insufficient to establish jurisdiction) or a factual challenge

10

(on the theory that the complaint's jurisdictional allegations are not true). *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Id.* In a factual challenge, however, courts "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004). Moreover, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction," *Kerns*, 585 F.3d at 192, "[u]nless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute.' " *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009) (citation omitted). In particular, "the district court may ... resolve the jurisdictional facts in dispute by considering evidence ... such as affidavits." *Id.*

To survive Rule 12(b)(6), a complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). In other words, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

## ARGUMENT

## I. The Court Should Grant Defendants' Motion to Dismiss for Lack of Jurisdiction

Plaintiffs' claims should be dismissed for two reasons. First, Plaintiffs neither have suffered a injury that could establish standing nor face an imminent threat of future injury. Second, and in the alternative, their claims are unripe, as the issues presented are not fit for judicial decision, no actual discharge or denial of accession has occurred, and they will not suffer a hardship if the Court withholds consideration until after the policies challenged are implemented and are found to affect Plaintiffs.

### A. The Court's Standing Inquiry Should Be Especially Rigorous

Article III of the Constitution confines federal courts to adjudicating only "actual cases and controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). Accordingly, federal courts have "neither

11

the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them," and must resolve only "real and substantive controvers[ies] admitting of specific relief through a decree of a conclusive character." *Preister v. Newkirk*, 422 U.S. 395, 401 (1975).

One aspect of this case-or-controversy limitation is the requirement of standing. To establish standing, Plaintiffs must prove (1) they must have suffered an injury-in-fact, *i.e.*, a judicially cognizable injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly … trace[able] to the challenged action of the defendant;" and (3) "it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations in original).

To satisfy the first requirement, Plaintiffs must establish they have suffered a "distinct and palpable injury," *Warth v. Seldin*, 422 U.S. 490, 500–01 (1975); a "generally available grievance about government" is insufficient. *Lujan*, 504 U.S. at 573–74. By limiting the judicial power to instances where specific individuals have suffered concrete injuries, standing requirements "serve[] to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). A court's standing inquiry thus should be "especially rigorous when reaching the merits of the dispute" would compel it "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* Here, Plaintiffs have brought a constitutional challenge to the President's policy directive to conduct further study before the military changes its longstanding policies regarding service by transgender individuals. The Court thus should conduct an "especially rigorous" inquiry into the existence of standing. *Id.*

**B.      Plaintiffs Have Not Met Their Burden of Showing an Injury-in-Fact**

Each of the Plaintiffs bears the burden of establishing that they have standing in their own right to pursue their claims. *See, e.g.*, *ACLU Student Chapter-Univ. of Md. Coll. Park v. Mote*, 321 F. Supp. 2d 670, 674 (D. Md. 2004) ("The Court will now consider the standing of each plaintiff to challenge

the [] policy" at issue.), *aff'd by ACLU v. Mote*, 423 F.3d 438 (2005).  An examination of the facts of this case, however, shows that none of the Plaintiffs have standing and, at the very least, that they have brought this action prematurely.

Plaintiffs allege four categories of injuries.  First, Plaintiffs allege that they are being injured because the service member Plaintiffs may be discharged from the military in the future based on their transgender status.  ECF No. 40-2 at 32.  But Defendants have shown that no Plaintiff has been discharged from the military and that the Interim Policy prohibits individuals from being discharged solely on the basis of transgender status or a diagnosis of gender dysphoria.  Plaintiffs' speculation that they may be discharged in the future is insufficiently concrete and imminent to establish standing. *See, e.g.*, *Amnesty Int'l USA*, 568 U.S. at 409 ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient.").

Second, Plaintiffs allege that they have been injured by the accessions policy.  ECF No. 40-2 at 31–32.  But not one of them has applied to access into the military and been denied.  Although George and Gilbert allegedly plan to make career moves that they believe will trigger the accessions policy *after* they finish their respective courses of study, *id.*; ECF No. 39 ¶¶ 40, 47, such allegations of speculative future harms are insufficient.  And in any event, transgender individuals and individuals who have been diagnosed with gender dysphoria can still apply for a medical waiver that would allow them to access into the military under the Interim Guidance

Third, some Plaintiffs allege they have been injured due to the denial of transition-related medical care.  ECF No. 40-2 at 31.  But under the Interim Guidance, the military is continuing to provide transition-related medical care to service members who have been diagnosed with gender dysphoria by a military medical provider.  In this case, Plaintiff Cole has had his surgery rescheduled, and Plaintiff Doe may reschedule his surgery upon request.  *See* Vanderlugt Decl. (filed under seal);

MJB Declaration (filed under seal).  None of the other Plaintiffs has alleged that they have been denied transition-related medical care.

Finally, Plaintiffs allege that they have been harmed by a stigma resulting from allegedly unconstitutional discrimination.  *See* ECF No. 40-2 at 33.  But that sort of stigmatic injury "accords a basis for standing only to those persons who are personally denied equal treatment."  *Allen*, 468 U.S. at 755.  Plaintiffs have not shown that they themselves have been subject to discriminatory treatment, and they cannot rely upon a claim of stigmatic injury to establish standing.  Instead, "stigmatic injury… requires identification of some concrete interest with respect to which respondents are personally subject to discriminatory treatment," and "[t]hat interest must independently satisfy the causation requirement of standing doctrine."  *Id.* at 757 n.22.  No such interest exists here.

The lack of an injury-in-fact also defeats ACLU's claim to associational standing.  To establish associational standing, ACLU must show: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).  Because the Interim Guidance maintains the status quo, however, ACLU has failed to identify even a single member who has suffered an injury-in-fact.  The only member of the ACLU specifically identified in Plaintiffs' Amended Complaint is Plaintiff Brock Stone, ECF No. 39 ¶ 18, and as shown above, he continues to serve in the U.S. Navy and his transgender status will have no effect on his ability to be promoted.  *See* Johnson Decl.  As ACLU has failed to identify a member who has suffered an injury-in-fact, it lacks organizational standing.  *See id.*

### C.    Plaintiffs' Claims Are Not Ripe for Adjudication

Plaintiffs' claims are also unripe.  The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l*

*Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The prudential ripeness requirement is designed to prevent courts from "entangling themselves in abstract disagreements over administrative policies" until "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998). To decide whether a claim is prudentially ripe, a court must evaluate (1) "the fitness of the issues for judicial decision" and (2) "the hardship[s] to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967). Both considerations show that Plaintiffs' challenge is premature.

First, the issues presented by Plaintiffs' challenge are not fit for judicial decision. "[A] case is fit for judicial decision where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002). Here, by contrast, the policy Plaintiffs assail is still being studied, developed, and implemented, and judicial review at this stage would entangle the Court in an abstract disagreement over a rule that has not yet been formulated or had any concrete effect on Plaintiffs. In addition, no Plaintiff has been discharged, refused health care, or denied accession to the military, so there is no actual decision affecting a litigant, which would be the usual focus of judicial review. Finally, concerns regarding whether issues are fit for judicial decision apply with special force here, where Plaintiffs ask this Court to interfere in a policy making process regarding the composition of the military, an area that is constitutionally committed to the discretion of the political branches.

Under these settled principles, the Court should defer to the policymaking process presently underway concerning service by transgender persons. Plaintiffs cannot establish, nor should this Court attempt to predict, the effect that future policies will have on overall military needs when the military is exploring these issues. While Plaintiffs seek to rely at this stage on the views of members of Congress and former military leaders regarding the policy on military service by transgender

individuals, ECF No. 40-2 at 11, these citations only underscore that different views exist as to a policy debate now underway—not that a possible future policy would be unlawful.

Second, due to the protections afforded by the Interim Guidance, Plaintiffs are not being harmed and will not suffer hardships if the Court withholds consideration.  As for Plaintiffs' allegations that they will be harmed in the future, it is unclear both how the policy regarding military service by transgender individuals will be developed and implemented and whether that policy will even have any effect on Plaintiffs.  Plaintiffs' speculation about future events is insufficient to show that they will be harmed if this Court withholds its consideration.  After all, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998).

The Court does not have before it the final policy, justifications for that final policy, or allegations of concrete, particularized injuries to Plaintiffs that have arisen from application of a final policy.  The Court should therefore decline to issue an advisory opinion on possible constitutional theories, and dismiss Plaintiffs' claims until they become ripe.  That is particularly true given that a plaintiff must "exhaust[] … available intraservice corrective measures" before a district court may review a military decision, *Williams v. Wilson*, 762 F.2d 357, 359 (4th Cir. 1985), and Plaintiffs here have not even suffered an adverse action that could be addressed through the military's administrative process. *See also Wilt v. Gilmore*, 62 F. App'x 484, 487 (4th Cir. 2003); *Guerra v. Scruggs*, 942 F.2d 270, 277 (4th Cir. 1991).

## II.     Plaintiffs' Motion for a Preliminary Injunction Should Be Denied

Because Plaintiffs lack standing and their claims are not ripe, the Court should not consider Plaintiffs' motion for a preliminary injunction but simply dismiss the current amended complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and

dismissing the cause."). But if the Court decides to reach Plaintiffs' motion, it should still deny them the extraordinary and drastic remedy they seek.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A plaintiff cannot prevail without some showing on each of these four factors. *See id.* at 23–24, 31–32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success). And that showing must be especially strong to obtain an injunction from an Article III court that runs to internal operations of the military. Here, Plaintiffs have not made that showing.

## A. Plaintiffs Have Not Shown that They Are Likely to Suffer an Irreparable Harm Absent the Entry of a Preliminary Injunction

Review of Plaintiffs' preliminary injunction motion should begin and end with a consideration of whether they are likely to suffer irreparable injury. To show that a preliminary injunction is warranted, Plaintiffs must demonstrate "that irreparable injury is *likely* in the absence of an injunction," regardless of the likelihood of success on the merits of their claims. *Id.* at 22 (emphasis in original); *see id.* ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). In addition, a "higher requirement of irreparable injury should be applied in the military context given the federal courts' traditional reluctance to interfere with military matters." *Guerra,* 942 F.2d at 273–74. Plaintiffs have not even shown a likelihood of irreparable injury, let alone satisfied this demanding standard.

17

To demonstrate irreparable harm, a party must first "establish that the harm is certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *Action NC v. Strach*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016). Second, it must show that the harm is "beyond remediation." *Id.* Plaintiffs' alleged injuries are neither. First, for much the same reasons they lack standing, Plaintiffs cannot show that they will suffer certain, great, or any actual injuries if the Court does not enter an injunction. *See supra* Part I.

Second, even if Plaintiffs could establish such an injury, they cannot show that it would be beyond remediation. "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). Accordingly, "given the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006). As Plaintiffs' potential injuries are all employment-related, they could be remedied by the Court at a later date and are thus not irreparable. *See, e.g., Guerra,* 942 F.2d at 274 (holding that the prospect of a general discharge from the military is "not an injury of sufficient magnitude to warrant an injunction").

**B.    Plaintiffs Are Unlikely To Succeed on the Merits[9]**

Plaintiffs also cannot establish that they are likely to succeed on the merits. To begin, Plaintiffs' failure to clear the standing and ripeness thresholds forecloses any conclusion that they are likely to prevail on the merits of this lawsuit. *See supra* Part I; *see also, e.g.*, *Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("A difficult question as to jurisdiction is, of course, no reason to grant a preliminary injunction. It says nothing about the 'likelihood of success on the merits,' other than making such

---

[9] For the same reasons that Plaintiffs cannot establish a likelihood of success on the merits, they also fail to state a claim as a matter of law. Accordingly, Plaintiffs' Amended Complaint is also subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

success more *unlikely* due to potential impediments to even reaching the merits."). But even if Plaintiffs could somehow establish jurisdiction at this stage, their challenge would founder for several reasons. First, the policy currently in place—which maintains the status quo for transgender persons currently serving in the military during an interim period while the need for possible changes is studied—has not been challenged in this case and, in any event, is plainly lawful. Second, to the extent Plaintiffs seek to attack the ongoing policy-making process, their claims similarly lack merit. The President's decision that the complex issues presented by the policy on service by transgender individuals warrant additional study before changes are made passes constitutional muster under any standard. Third, even if the Court could somehow review the military's current maintenance of its longstanding accessions policy, the policy would withstand constitutional challenge. Likewise, until the future policy concerning transgender service is resolved and implemented, Plaintiffs cannot show they are likely to succeed on their due process or statutory claims.

> **1.    Plaintiffs Have Not Challenged Defendants' Operative Policy for Enlisted Transgender Service Members, and any such Challenge Would Fail to State an Equal Protection Claim**

Plaintiffs' claims fail to mention, let alone address, the military policy on service by transgender individuals that is currently in effect. For that reason alone, they cannot show a likelihood of success on the merits of their claims. While Plaintiffs say much about the potential impact of the President's August 25 Memorandum, ECF No. 40-2 at 11-12, they never address the operative Interim Guidance issued on September 14, 2017, which bars any disparate treatment of current transgender service members. Under the operative policy:

> [N]o action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status. Transgender Service members are subject to the same standards as any other Service member of the same gender; they may be separated or discharged under existing bases and processes, but not on the basis of gender dysphoria diagnosis or transgender status.

19

Interim Guidance, Exhibit 1.  The operative policy further provides that transgender service members "who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." *Id.*  And it makes clear that "[a]n otherwise qualified transgender Service member whose term of service expires while this Interim Guidance remains in effect, may, at the Service member's request, be re-enlisted in service under existing procedures." *Id.*[10]

Plaintiffs ask this Court to "enter a preliminary injunction prohibiting Defendants from implementing or enforcing … [t]he Transgender Service Member Ban." ECF No. 40-2 at 34.  But as shown above, no such "ban" currently exists.  To the extent Plaintiffs seek to protect transgender service members from being discharged or denied transition-related medical care, the Interim Guidance *already* does that.  The Equal Protection Clause does not apply under these circumstances. "A denial of equal protection entails, at a minimum, a classification that treats individuals unequally." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 707 (9th Cir. 1997).  Here, the current operative policy does not impermissibly classify service members based on transgender status, but rather *prohibits* disparate treatment of existing service members based on that status.  A law forbidding disparate treatment obviously cannot violate the Equal Protection Clause.

### 2.      Plaintiffs' Challenge to the Accession Policy is Unlikely to Succeed

To the extent Plaintiffs seek to challenge Defendants' current policy for the accession of transgender persons into the military, they also cannot establish a likelihood of success on the merits and have failed to state a valid claim challenging that policy for several reasons.

---

[10] The policy also states that "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, *except to the extent necessary to protect the health of the individual who has already begun a course of treatment to reassign his or her sex.*" *Id.* (emphasis added).  There are thus no restrictions on sex-reassignment surgery at present.  In addition, this provision confirms that medically necessary procedures will be accommodated in the future.

First, neither the President's Memorandum nor the operative Interim Guidance establishes a new restriction that has been imposed on Plaintiffs with respect to accession to military service. Even before the President took action, the policy on accession by transgender individuals announced in June 2016 had not gone into effect. Originally scheduled to be implemented on July 1, 2017, Secretary Mattis had deferred implementation of a revised accession policy until January 1, 2018, before the President issued his memorandum. *See* Presidential Memorandum § 1(a). The President's Memorandum merely "extends the deadline to alter the currently effective accession policy beyond January 1, 2018, while [the relevant Departments] continue to study the issue." *Id.* The "currently effective" accession policy is set forth in DODI 6130.03, and was most recently modified in September 2011. *See* DODI 6130.03. The Interim Guidance thus maintains the status quo by continuing the longstanding procedures set forth in DODI 6130.03 to permit further review by a panel of experts before any change in policy occurs. Thus, with respect to accession, Plaintiffs cannot claim that the President imposed a new requirement; instead, he declined to relax longstanding policy without further study. All the President has done is preserve the status quo "until such time as a sufficient basis exists upon which to conclude" that ending the accessions policy would not result in harm to the military. Presidential Memorandum § 1(b). The President has the authority to insist on further study before a significant change to military personnel policy, and Plaintiffs cannot show otherwise, let alone obtain an injunction to halt such a study. And certainly no Plaintiff can credibly sustain a claim for emergency relief as to a policy whose current version has been in place without modification for nearly six years.

Second, Plaintiffs cannot show a likelihood of success on any challenge to the accession policy because it applies to none of them. All of the individual Plaintiffs are already serving, and two of them (George and Gilbert) simply allege that they intend to make career moves they believe would trigger the accession policy *after* finishing their respective courses of study. ECF No. 39 ¶¶ 40, 47. At this

21

point, neither has even applied to access into their targeted positions, let alone had an application denied.

Third, even if one of the Plaintiffs were ready to accede into their targeted positions, the Interim Guidance expressly confirms that the accession policy, which "generally" bars the accession of transgender individuals into the military, is "subject to the normal waiver process." Interim Guidance, Exhibit 1. Plaintiffs therefore could only be injured if they sought those positions, were denied on grounds related to their transgender status, and then were denied individualized waivers. Because none of that has happened, Plaintiffs cannot claim that the accessions policy bars their accession into their targeted positions.

Finally, even if the accession policy did apply to Plaintiffs, the President has concluded only that the analysis undertaken thus far does not provide "a sufficient basis to conclude that terminating the Departments' longstanding policy and practice would not hinder military readiness and lethality, disrupt union cohesion, or tax military resources" and that "further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects." Presidential Memorandum § 1(a). It is plainly reasonable for the Defense Department to study conditions that could have an adverse effect on military readiness and budgetary constraints, and Plaintiffs cannot state a valid claim, let alone support preliminary injunctive relief, on the ground that it is unlawful to do so. In these circumstances, the Court need not—and should not—address the constitutionality of accession policy at this stage. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944). This avoidance principle is particularly applicable here, where Plaintiffs' claims seek to delve into the judgment of military authorities. *See infra* Part II.B.3.

3.   **In any Event, an Equal Protection Challenge to Defendants' Longstanding Accession Policy Would Not Succeed**

Although there is no basis for this Court to address the issue, Plaintiffs' equal protection challenge to the accession policy regarding transgender individuals is unlikely to succeed.

a.   **The military's longstanding accessions policy is subject to a highly deferential form of review**

**i.** Courts have accorded substantial deference to Congress and the President on the development and regulation of military personnel policy. That is not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan*, 413 U.S. at 10. Accordingly, there is "perhaps … no other area" where the Supreme Court has shown the political branches "greater deference." *Rostker v. Goldberg*, 453 U.S. 57, 64–65 (1981).

None of this is to say that the Constitution may be disregarded when military affairs are at stake, *see, e.g.*, *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987) (per curiam), but "the tests and limitations to be applied may differ because of the military context," *Rostker*, 453 U.S. at 67. For instance, judicial "review of … regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations destined for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). In the military context, the government may ban political speeches and the distribution of leaflets, *Greer v. Spock*, 424 U.S. 828 (1976), or even impose prior restraints on circulating petitions, *Brown v. Glines,* 444 U.S. 348, 355 (1980). And even during an era when the Court applied a more rigorous standard for free-exercise claims, it still allowed the Air Force to prohibit a Jewish officer from wearing a yarmulke while working as a clinical psychologist in an Air Force base hospital. *Weinberger*, 475 U.S. 503.

23

The same principle applies to "'[t]he complex, subtle, and professional decisions as to the composition … of a military force.'" *Rostker*, 453 U.S. at 65 (quoting *Gilligan*, 413 U.S. at 10). These "'are essentially professional military judgments, subject always to the civilian control of the Legislative and Executive Branches,'" and thus particularly ill-suited to judicial second-guessing. *Id.* at 65–66 (emphasis omitted). That is in part because choices about the composition of the armed forces "are based on judgments concerning military operations and needs, and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well." *Id.* at 68.

Courts consequently have upheld exclusionary policies in the military while at the same time invalidating similar policies in the civilian sphere. *Compare, e.g., Craig v. Boren*, 429 U.S. 190 (1976), *Reed v. Reed*, 404 U.S. 71 (1971), *and Massachusetts v. HHS*, 682 F.3d 1, 9–10 (1st Cir. 2012), *with Rostker*, 453 U.S. 57, *Schlesinger v. Ballard*, 419 U.S. 498 (1975), *and Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008). Of course, there are limits: no amount of deference could save the military's decision to exclude a race or religion from being considered under the strict scrutiny standard. *See Rostker*, 453 U.S. at 78. But outside those extreme examples, the military's policies are entitled to a "healthy deference" their civilian counterparts do not enjoy. *Rostker*, 453 U.S. at 66.

**ii.** While the Supreme Court has yet to provide a precise explanation of how this deference interacts with traditional tiers of scrutiny, *see id.* at 69–70, at least three features of the highly deferential review applied to military regulations are significant. First, courts defer to the judgments of the political branches even in the face of contrary evidence. In *Weinberger*, for instance, the plaintiff provided "expert testimony that religious exceptions" to the Air Force's dress code "will increase morale by making the Air Force a more humane place," and pointed out "that the Air Force's assertion" that such exceptions "would threaten discipline" was "mere *ipse dixit*, with no support from actual experience or a scientific study in the record." 475 U.S. at 509. The Court dismissed the views of "expert witnesses" as "quite beside the point," because "military officials … are under no

24

constitutional mandate to abandon their considered professional judgment." *Id.* Similarly, in *Rostker*, the Supreme Court rejected the lower court's conclusion that the evidence showed that "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'" 453 U.S. at 63 (citation omitted). As the Court explained, judges could not substitute their "own evaluation of evidence for a reasonable evaluation" by the political branches. *Id.* at 68.

Second, the political branches enjoy a significant latitude to choose "among alternatives" in developing military policy, including among alternatives supported by different government officials and military experts. *Id.* at 71. In *Rostker*, for example, President Carter recommended that Congress "permit the registration and conscription of women as well as men," *id.* at 60, and secured "testimony of members of the Executive Branch and the military in support of that decision," *id.* at 79. That side of the debate stressed that women inducted into the army could "be used to fill noncombat positions, freeing men to go to the front." *Id.* at 81. The Supreme Court rejected the lower court's reliance on this testimony, explaining that the policy question of participation of women in the selective service was appropriately left to Congress and the military rather than the courts. *See id.*

Third, arguable inconsistencies that result from line-drawing have not rendered military policies invalid. The Court in *Weinberger*, for instance, acknowledged that the Air Force both had an "exception … for headgear worn during indoor religious ceremonies" and allowed commanders "in their discretion" to allow "visible religious headgear … in designated living quarters and nonvisible items generally." 475 U.S. at 509. But the fact that "Air Force has drawn the line essentially between religious apparel that is visible and that which is not" did not trouble the Court, for the regulations challenged in that case "reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity." *Id.* at 510.

**iii.** Plaintiffs ignore all of this, treating their premature challenge as if it were a run-of-the-mill civilian case.  They first insist that the military's accessions policy is subject to a conventional strict-scrutiny analysis, but fail to identify a single court that has applied this exacting standard to laws bearing on transgender individuals in any context.  ECF No. 40-2 at 18.  This Court should not be the first to do so with respect to a military judgment.  Indeed, applying strict scrutiny here would mean that transgender status receives far greater protection than core First Amendment freedoms, *see Weinberger*, 475 U.S. 503; *Brown*, 444 U.S. 348; *Greer*, 424 U.S. 828, sexual orientation, *see, e.g., Thomasson v. Perry*, 80 F.3d 915, 919 (4th Cir. 1996) (en banc), and even gender itself, *see Rostker*, 453 U.S. 57.

In the alternative, Plaintiffs insist that the military's policy warrants intermediate scrutiny because it is a sex-based classification or sex stereotyping.  ECF No. 40-2 at 19-21.  But to our knowledge, no court has ever applied heightened scrutiny to a claim of transgender discrimination in the military.  *See, e.g., Doe v. Alexander*, 510 F. Supp. 900, 902, 905 (D. Minn. 1981) (declining to review medical fitness determination policy for service member who had undergone sex change procedure under heightened review).  In any event, every case Plaintiffs cite involves distinctions in the civilian context—typically, employment—and thus are distinguishable.  There is consequently no need for this Court to weigh in on how to apply equal protection doctrine to transgender individuals when it comes to civilian affairs.  *Compare, e.g., Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *cert. pending*, No. 17-301, *with Etsitty v. Utah Transit Auth.*, 502 F.3d 1215 (10th Cir. 2007).  *See generally* ECF No. 40-2 at 19–20 (collecting cases).

### b.  Plaintiffs are unlikely to succeed on their challenge to the military's longstanding accessions policy

In light of the considerable deference due to military personnel decisions, Plaintiffs cannot show that they are likely to succeed on their challenge to the decades-long accessions policy.  As the President explained, there were significant concerns that abandoning this policy could "hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources."   Presidential

26

Memorandum § 1(a).  Plaintiffs do not dispute that these interests are legitimate, and instead contend only that maintaining the status quo does not further them.  *See* ECF No. 40-2 at 21–25.  That argument misses the mark for several reasons.

First, the military's longstanding accessions policy rests on the reasonable concern that at least some transgender individuals suffer from medical conditions that could impede the performance of their duties.  *See* DODI 6130.03.  The new accessions policy announced in 2016 acknowledged the legitimacy of this concern by providing that a history of gender dysphoria, medical treatment associated with gender transition, and sex reassignment surgery were disqualifying unless an applicant could prove that he had avoided complications for an 18 month period.  DTM 16-005.  Whether those medical conditions and treatments are sufficiently correlated with transgender status or gender dysphoria as to warrant a broader disqualification is one of the questions that the Defense Department's expert panel will study, and in the interim it was not irrational for the President to maintain the status quo pending that panel's review.  For example, the current edition of the World Health Organization's *International Classification of Diseases* likewise classifies "transsexualism" as a "disorder[] of adult personality and behavior," and there is no reason to think that this judgment is somehow driven by animus.  *International Classification of Diseases* F64.0 (2016) (ICD).

Second, the accessions policy rests on the reasonable conclusion that these conditions may limit the ability of transgender individuals to deploy as well as impose additional costs on the armed forces.  For decades, military professionals indicated that one basis for the policy was that complications associated with hormone therapy and sex-change procedures could impair soldiers from serving around the globe.  *See, e.g.*, *DeGroat v. Townsend*, 495 F. Supp. 2d 845, 850–52 (S.D. Ohio 2007) (discussing testimony of military doctor); *Doe*, 510 F. Supp. at 905 (discussing affidavit of Brigadier General).  Plaintiffs of course dispute this conclusion, relying on the RAND Report and their own declarations.  ECF No. 40-2 at 22.  The RAND Report acknowledges, however, that medical

27

complications would limit deployment capabilities, RAND Report 39–42; it simply concludes that this burden would be "negligible," *id.* at 46. But there is room for the military to think otherwise and, in any event, cases such as *Weinberger* and *Rostker* teach that it is not this Court's role to resolve a battle of the experts in reviewing a military policy.

Similarly, no one disputes that abandoning the longstanding accessions policy would impose costs on the military. Instead, Plaintiffs rely on the RAND Report's estimate that providing health care to transgender service members could cost the military $8.4 million and then dismiss that amount as "little more than a rounding error" in the military's annual health care budget. ECF No. 40-2 at 25. But Plaintiffs' argument ignores other costs associated with their desired policy change, and in any event the military's freedom to choose "among alternatives," *Rostker*, 453 U.S. at 71, includes the ability to decide how best to spend its money. At a minimum, the military is entitled to make the reasonable judgment that spending the millions of dollars necessary to accommodate transgender individuals on other endeavors would more effectively accomplish its "primary business"—*i.e.*, "to fight or be ready to fight wars should the occasion arise." *Id.* at 70 (citation omitted); *see* RAND Report 70 (estimating some costs).

Third, the President could reasonably conclude that the accessions policy furthers "unit cohesion." Presidential Memorandum § 1(a). The RAND study on which Plaintiffs heavily rely noted that "[a] key concern in allowing transgender personnel to serve openly is how this may affect unit cohesion—a critical input for unit readiness," RAND Report 44, and specifically noted that it did "not have direct survey evidence or other data to directly assess the impact on the U.S. military." *Id.* RAND also acknowledged that its assessment of experience in foreign militaries was based on "fairly low numbers of openly serving transgender personnel." *Id.* at 45. Additionally, although the RAND study found that transgender service members were less deployable when seeking treatment, it did not appear to consider whether an impact in deployability in itself would affect unit

28

cohesion. *See id.* at 40, 44-45. Given the limited information presently available, which the RAND study itself acknowledges, it is certainly reasonable for the President to have concluded that maintaining the accessions policy could rationally further unit cohesion, and that the matter warranted further study. And in any event, it is not the role of the judiciary to second-guess a Commander in Chief's judgment in this regard. "The need for deference" fully applies to such assessments, for "[s]hould the judiciary interfere with the intricate mix of morale and discipline that fosters unit cohesion, it is simply impossible to estimate the damage that a particular change could inflict upon national security." *Thomasson*, 80 F.3d at 926.

Ultimately, Plaintiffs' theory reduces to the accusation that any justification for the accessions policy is a pretext for animus and moral disapproval because the military accommodates other soldiers with supposedly similar medical conditions. *See* ECF No. 40-2 at 23–25. But in the civilian context, the political branches are ordinarily free to engage in "line-drawing," even where, unlike here, "some persons who have an almost equally strong claim to favored treatment" are "placed on different sides of the line." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315–16 (1993). That freedom is even more important when it comes to deciding who may serve in the armed forces. For instance, a variety of physical and mental conditions presumptively bar entry into the armed forces, including asthma, DODI 6130.03 at § 11(d); history of severe migraines, *id.* § 27(c); discrepancies in leg-length resulting in a limp, *id.* § 19(a)(2); or any curvature of the spine that would prevent one from wearing a uniform properly, *id.* § 17(c)(2). Reasonable people could disagree over whether these individuals should be able to serve. But that does not mean that the President or military leadership harbors animus towards or moral disapproval of these individuals.

Nor do Plaintiffs' allegations of procedural impropriety suggest an impermissible motive. *See* ECF No. 40-2 at 25–28. Plaintiffs claim that former Secretary Carter "went through a careful and exhaustive process" before reaching one conclusion, while President Trump "abruptly" and

29

"haphazard[ly]" reached a different decision. *Id.* 26–27. There are at least two significant flaws with Plaintiffs' argument. First, at the President's direction, the military is currently in the process of conducting a careful and exhaustive study of the military's policy regarding service by transgender individuals, just as Plaintiffs contend is necessary. *See id.* at 27 (citing "orderly study" previously directed by Secretary Mattis of the prior administration's accession policy). In the meantime, the Interim Guidance, which is currently the operative policy, maintains the status quo while the military's study is ongoing, underscoring that this is anything but a "haphazard" process on which Plaintiffs' "animus" theory rests. Second, even if the current Commander in Chief and Secretary Mattis ultimately reach a conclusion that differs from the approach preferred by former Secretary Carter, disagreement between military leaders over issues of policy is hardly evidence of animus.

### 4. Plaintiffs Are Unlikely To Succeed on Their Due Process Claim

Similarly, Plaintiffs are unlikely to prevail on their due process claim. *See* ECF No. 40-2 at 28–39. Plaintiffs' substantive due process claim fails for essentially the same reasons as their equal protection claim. The President has provided reasons for maintaining the status quo while the military studies the policy on military service by transgender individuals that pass constitutional muster under any standard, especially in light of the significant deference courts accord to military judgments regarding the composition of the fighting force.

To the extent Plaintiffs advance a type of procedural due process claim based on "the right to rely on the Government's promises," *id.* at 29, this theory fails as well. Even if Plaintiffs had been discharged from the military, which they have not, they still would not have a valid procedural due process claim because service members do not have a property right to continued employment in the military. *Guerra*, 942 F.2d at 277–78. Plaintiffs cannot circumvent this limitation be recasting the right at issue as a reliance interest. And Plaintiffs' suggestion that the military is somehow estopped under the Due Process Clause from changing its policies is equally misplaced. ECF No. 40-2 at 29. *See, e.g.*,

30

*United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (estoppel cannot be justified against the government where it would "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation."). Notably, Plaintiffs do not cite any case in which a court has held that a federal agency is estopped from changing its generally applicable policies. Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with the applicable procedures. *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015).[11] Here, the President issued a directive setting forth his policy decision to further study the issue of military service by transgender individuals, before the military departs from longstanding policies and practices. The decision to issue this directive falls squarely within his discretion as Commander in Chief. Accordingly, Plaintiffs cannot show a likelihood of success on their due process claim, and the Court should dismiss that claim for failure to state a claim upon which relief can be granted.

5.      **Plaintiffs are Unlikely to Succeed on Their Claim under 10 U.S.C. § 1074**

Plaintiffs are also unlikely succeed on their claim that the military's policy on health care for transgender service members violates 10 U.S.C. § 1074, which provides generally that members of the uniformed services are entitled to medical and dental care in any facility of any uniformed service. The Interim Guidance, however, is consistent with this statutory direction. It states that, "[s]ervice members who receive a gender dysphoria diagnosis from a military medical provider will be provided

---

[11] As explained in *Perez*, a federal agency's policy position is subject to change, as long as it satisfies the constraints of the Administrative Procedure Act ("APA"), 5 U.S.C. § *et seq.* 135 S. Ct. at 1210. The APA does not contemplate claims based on estoppel. To the contrary, the APA does not require that an agency action changing a prior policy satisfy a heightened level of review. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

with treatment for the diagnosed medical condition." Interim Guidance, Exhibit 1. Because this operative policy is consistent with § 1074, Plaintiffs cannot show that they are likely to succeed.

Even if Plaintiffs had standing to challenge the health care policy that is scheduled to take effect on March 22, 2018, which they do not, that policy does not contravene § 1074. As explained in the Interim Guidance, "no new sex reassignment surgical procedures for military personnel will be permitted after March 22, 2018, *except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or health.*" *Id.* (emphasis added). Plaintiffs apparently assume that there could be future situations in which a service member is entitled to medical care under § 1074 but prohibited from receiving it by the policy regarding transition-related health care. ECF No. 40-2 at 29–30. While it is unclear whether this situation could actually arise, it is clearly not presented at this stage in this case by these Plaintiffs.

## C.    The Balance of Equities and the Public Interest Weigh Strongly against the Entry of a Preliminary Injunction

Plaintiffs likewise cannot show the balance of equities tips in their favor. In weighing the equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Plaintiffs are not being harmed by the Interim Guidance, which is the operative rule, and it is unclear whether they will ultimately be harmed by the final policy once it has been studied, developed and implemented. Plaintiffs therefore have not—and cannot—show that they will be harmed if the Court denies their motion for extraordinary preliminary relief. The military, on the other hand, is in the process of gathering a panel of experts who will "bring mature experience, most notably in combat and deployed operations, and seasoned judgment" to the task of providing advice and recommendations on the development and implementation of the policy on military service by transgender individuals. Statement of Secretary Jim Mattis, Release No: NR-312-17. Granting Plaintiffs their requested relief would directly interfere with the panel's work and the military's ability

32

to thoroughly study a complex and important issue regarding the composition of the armed forces. The balance of equities thus tips strongly against issuing a preliminary injunction in this case.

Nor can Plaintiffs show that a preliminary injunction here would be in the public interest. The public has a strong interest in national defense, *see Winter*, 555 U.S. at 7, and, here, both the President and Secretary of Defense have directed that the policy on military service by transgender individuals be subject to further study. The public interest, therefore, weighs strongly against judicial interference with the military's study of its policy on transgender military service.

### D.     The Injunctive Relief Plaintiffs Seek Is Inappropriate

Finally, even if Plaintiffs could somehow clear every other hurdle, the worldwide injunction they seek would still be inappropriate. Their request for a sweeping order "enjoining the Defendants from implementing and enforcing the policies and directives encompassed" in the Presidential Memorandum, ECF No. 39 at 40, suffers from at least three major flaws.

First, that desired injunction would, in large measure, simply require Defendants to comply with the Interim Guidance that the Secretary of Defense has already put in place. The Interim Guidance directs that "no action may be taken to involuntarily separate or discharge an otherwise qualified Service member solely on the basis of a gender dysphoria diagnosis or transgender status." Interim Guidance, Exhibit 1. It also provides that "Service members who receive a gender dysphoria diagnosis from a military medical provider will be provided treatment for the diagnosed medical condition." *Id.* In addition to being unnecessary, the "obey the law" injunction Plaintiffs seek is particularly inappropriate in a suit against the government, where it could subject the government defendants to contempt proceedings for every alleged legal failing, supplanting the civil remedies Congress has provided. *Cobell v. Norton*, 392 F.3d 461, 475 (D.C. Cir. 2004).

Second, Plaintiffs seek an injunction that would in theory apply to service members worldwide. Both constitutional and equitable principles, however, require that injunctive relief be limited to

33

redressing a plaintiff's own cognizable injuries.  Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration."  *Id.* (emphasis in original).  And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties").

These constitutional and equitable limits apply with special force to injunctions concerning military policies.  For example, in *Meinhold v. United States Department of Defense*, 808 F. Supp. 1455 (C.D. Cal. 1993), a district court enjoined the Defense Department, with limited exceptions, "from discharging or denying enlistment to any person based on sexual orientation" in a constitutional challenge brought by a single serviceman.  *Id.* at 1458.  The Supreme Court stayed the injunction to the extent it conferred relief on anyone other than the plaintiff, *U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993), and the Ninth Circuit vacated the injunction except to the extent it applied to him as well, *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1480 (9th Cir. 1994).

The entry of the worldwide injunction sought by Plaintiffs would be similarly indefensible.  To the extent that Plaintiffs have cognizable injuries, those injuries would be fully addressed through an injunction concerning their ability either to accede into or continue serving in the military or to access

medical treatment. *See* Pls. Mem., ECF No. 13 at 39. To the extent that other service members or applicants believe they are injured by any of the policies at issue, they are free to bring their own challenges—and a few have done so. *See, e.g.,* Dkt. 30, *Karnoski v. Trump*, No. 2:17-cv-01297-MJP (W.D. Wash. Sept. 14, 2017). In all events, any injunction here should be limited to Plaintiffs and not extend to other members or applicants not before this Court.

Third, the military personnel decisions that Plaintiffs speculate they will one day face—separation, denial of reenlistment, demotion, denial of promotion, denial of medical treatment, and denial of commission—are ordinarily reviewed by a district court in the APA context. *See, e.g., Stewart v. Stackley*, Civil Action No. 14-0479 (ABJ), 2017 WL 1653147, at *16 (D.D.C. May 1, 2017). That review, of course, occurs *after* the military decision has been made and is subject to the APA's arbitrary and capricious standard. *See, e.g., Wilt v. Gilmore,* 62 F. App'x 484 (4th Cir. 2003). A plaintiff also has the opportunity to raise a constitutional challenge then or through intra-military procedures such as the military corrections boards. *See Chappell* v. *Wallace,* 462 U.S. 296, 303 (1983) ("[Plaintiff's] allegations concerning performance evaluations and promotions, for example, could readily have been challenged within the framework of [] intramilitary administrative procedure[s]."). Here, however, Plaintiffs ask for the extraordinary remedy of a preliminary injunction to prevent certain adverse personnel actions that have not been taken against them and may never occur. If those actions ever do occur, the ordinary administrative framework will provide a more orderly avenue of relief than the premature intrusion into military affairs they currently seek. *See also supra* p. 16.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim upon with relief can be granted. The Court should also deny Plaintiffs' motion for a preliminary injunction.

Dated: October 12, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan B. Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

Counsel for Defendants