```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND

BROCK STONE, et al.              *

            Plaintiffs           *

       vs.                       *   CIVIL ACTION NO. MJG-17-2459

DONALD J. TRUMP et al.           *

            Defendants           *

*     *     *     *     *     *     *     *     *
```

<u>MEMORANDUM AND ORDER RE: MOTIONS</u>

The Court has before it Plaintiffs' Motion for Preliminary Injunction [ECF No. 40], Defendants' Motion to Dismiss [ECF No. 52], and the materials submitted relating thereto.  The Court has reviewed the exhibits, considered the declarations submitted by the parties, held a hearing, and has had the benefit of the arguments of counsel.  Any findings of facts stated herein are based upon the Court's evaluation of the evidence and the inferences that the Court has found it reasonable to draw from the evidence.

I.   <u>INTRODUCTION</u>

In June 2015, then-Secretary of Defense Ashton Carter issued a statement characterizing the regulations that were in effect at that time relating to transgender[1] individuals serving

---

[1]   Men and women who are transgender have a gender different

in the military as "an outdated, confusing, inconsistent
approach that's contrary to our value of service and individual
merit causing uncertainty that distracts commanders from our
core missions." Statement by Secretary of Defense Ash Carter on
DoD[2] Transgender Policy (July 13, 2015), Pls.' Mot. Ex. 28, ECF
No. 40-31. Secretary Carter created a working group to study
"the policy and readiness implications of welcoming transgender
persons to serve openly." Id. The working group included
representatives of the leadership of the Armed Forces; the Joint
Chiefs of Staff; the service secretaries; and personnel,
training, readiness, and medical specialists from across the
Department. See id.; Carson ¶¶ 1, 8-10, ECF No. 40-37.[3] The
working group performed a systematic review including
commissioning studies[4] and meetings with transgender service
members, outside experts, medical personnel, military leaders,
allied militaries, and others. Carson ¶¶ 1, 8-27. After the
year-long study, the working group ultimately concluded that
"[o]pen service by transgender service members would not impose

─────────────────────

from the one assigned to them at birth. See, e.g., Brown Decl.
¶¶ 20-23, ECF No. 40-32; Pls.' Mot. Ex. C ("the RAND Report") 5-
6, 75, ECF No. 40-35.
[2]     Department of Defense.
[3]     The Hon. Brad R. Carson served as the Acting Under
Secretary of Defense for Personnel and Readiness from April 2,
2015 to April 8, 2016. Carson ¶ 1, ECF No. 40-37.
[4]     Including a study conducted by the RAND Corporation—a
nonpartisan, nonprofit military think tank founded by the U.S.
Air Force. Rand Report, ECF No. 40-35.

any significant burdens on readiness, deployability, or unit cohesion." Wilmoth ¶ 23, ECF No. 40-38.

On June 30, 2016, then-Secretary of Defense Carter issued a directive rescinding the policy of discriminating against men and women who are transgender. Open Serv. Dir., Pls.' Mot. Ex. 1, ECF No. 40-4. The Open Service Directive provided that "no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity." Id. at Attach. § 1(a). Men and women who are transgender are "subject to the same standards as any other Service member of the same gender." Id. at Attach. § 1(b). The Directive further provided that medical conditions affecting transgender service members would be treated "in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition." Id. at Attach. § 1(c). These medical services included medical treatment necessary to transition gender while serving. Id. at Attach. § 3(a). The Directive also announced that individuals wishing to join the military would not be prohibited from doing so solely because they are transgender, although there were additional stringent medical requirements to ensure fitness for

duty.  Id. at Attach. § 2.  The implementation of the accession[5]

policy was scheduled to begin "[n]ot later than July 1, 2017."[6]

Id. at Attach. § 2(a).

On June 30, 2017, the day before new enlistments of
transgender persons were scheduled to begin, current Secretary
of Defense Jim Mattis announced that it was necessary to defer
new transgender enlistments for an additional six months to
January 1, 2018, while he reviewed the policy.  Mattis Mem.,
Pls.' Mot. Ex. 8, ECF No. 40-11.  He added that his announcement
did not otherwise change the Open Service Directive and that "we
will continue to treat all Service members with dignity and
respect."  Id.

Shortly thereafter, on July 26, 2017, President Trump
precipitated a change to the policy in force by announcing on
Twitter[7] that "the United States will not accept or allow
Transgender individuals to serve in any capacity in the U.S.
Military."  Pls.' Mot. Ex. 19, ECF No. 40-22.  President Trump

---

[5]    Accession refers to the process of bringing new enlisted
recruits and officer candidates into the military.

[6]    The deadline allowed the DoD a year to prepare for
implementation. Given that the pre-established date for the
Presidential election was November 8, 2016, it was understood
that the deadline extended into a new Administration.

[7]    President Trump later claimed that his Twitter announcement
did the military a "great favor" by ending the "confusing issue"
of transgender service. Cooper, Trump Says Transgender
Ban Is a 'Great Favor' for the Military, N.Y. Times (Aug. 10,
2017), Pls'. Mot. Ex. 9, ECF No. 40-12.

formalized the transgender service member ban on August 25, 2017, in a Memorandum ("the President's Memorandum") stating that in his judgment, the DoD had "failed to identify a sufficient basis to conclude" that the Open Service Directive "would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." President's Mem. § 1(a), Pls.' Mot. Ex. 18, ECF No. 40-21. The memorandum addressed, and rescinded, each component of the Open Service Directive. Id. at §§ 1(b), 2.

The instant lawsuit was filed on August 8, 2017, and three others[8] have been filed in response to the President's policy change.  Plaintiffs here seek declaratory and injunctive relief (including a Motion for Preliminary Injunction).  Defendants seek dismissal of the Amended Complaint [ECF No. 39] pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and denial of Plaintiffs' Motion for Preliminary Injunction.

For reasons as stated herein, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction [ECF No. 40], and GRANTS IN

---

[8]     Doe 1 v. Trump, No. 17-cv-0159-CKK, filed Aug. 9, 2017 in the United States District Court for the District of Columbia; Karnoski v. Trump, No. 17-cv-01297-MJP, filed Aug. 28, 2017 in the United States District Court for the Western District of Washington at Seattle; Stockman v. Trump, No. 17-cv-1799-JGB-KK, filed on Sept. 5, 2017 in the United States District Court for the Central District of California.

PART and DENIES IN PART Defendants' Motion to Dismiss [ECF No. 52].

II.   BACKGROUND

A.   Transgender Military Policy Prior to June 2016

"On September 20, 2011, the military policy known as 'Don't Ask, Don't Tell' (DADT) ended, allowing gay, lesbian and bisexual service members to serve openly."  Gates & Herman, Transgender Military Service in the United States (May 2014), ECF No. 40-7. However, until June 2016, military policies continued to exclude transgender people from serving openly. Id.  Transgender individuals wanting to join the military were prohibited from doing so, and transgender individuals already serving were subject to discharge if their condition became known.  Id.  See also Brown Decl. 9-14, ECF No. 40-32 (noting that pre-2016 military policy listed "Sexual Gender and Identity Disorders" among conditions that rendered a service member unfit and subject to discharge).

B.   Transgender Open Service Directive

On June 30, 2016, after a year-long study, then-Secretary of Defense Carter issued a Directive-type Memorandum ("DTM") mandating the establishment of policy and procedures for "the

retention, accession, separation, in-service transition, and medical coverage for transgender personnel serving in the Military Services." Open Serv. Dir., Pls.' Mot. Ex. 1, ECF No. 40-4. The DTM stated:

> The policy of the Department of Defense is that service in the United States military should be open to all who can meet the rigorous standards for military service and readiness. Consistent with the policies and procedures set forth in this memorandum, transgender individuals shall be allowed to serve in the military.

Id. at 2.

The DTM procedures included three main components.

First, retention. Effective June 30, 2016, "no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity." Id. at Attach. § 1(a). Transgender service members became subject to the same standards as any other service member of the same gender. Id. at Attach. § 1(b).

Second, accession. Not later than July 1, 2017, the DoD Instruction 6130.03 was to be updated to reflect changed policies and procedures related to medical standards for entry into the military. Id. at Attach. § 2(a). A history of gender

dysphoria[9] continued to be disqualifying unless the applicant was medically-certified as having been "stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months." Id. Also, a history of medical treatment with gender transition continued to be disqualifying unless the applicant had completed medical treatment and had been stable in the preferred gender for 18 months, and if the applicant was receiving hormone treatment, the individual had been stable on such treatment for 18 months. Id. Further, a history of sex-reassignment surgery continued to be disqualifying unless a period of 18 months had passed since the most recent surgery, no additional surgeries were required, and the applicant had no functional limitations or complications persisting from the surgery. Id. The Secretaries of the Military Departments and Commandant of the United States Coast Guard could waive the 18-month period in individual cases. Id. at Attach. § 2(b).

Third, sex reassignment surgery. Effective October 1, 2016, the DTM procedures allowed for in-service gender transition and

---

[9] Transgender status alone does not constitute a medical condition; some transgender individuals experience significant distress due to the gender-sex mismatch and are considered to have a medical condition called gender dysphoria. RAND Report 5-6, 75, ECF No. 40-35. This condition can be medically treated with some combination of psychosocial, pharmacological (mainly hormonal), or surgical care. Id. at 6.

provided for further guidance on the provision of necessary medical care and treatment to transgender service members.  Id. at Attach. §§ 3, 4.

In addition, the DTM included an equal opportunity statement and clarified the DoD's position, "consistent with the U.S. Attorney General's opinion, that discrimination based on gender identity is a form of sex discrimination."  Id. at Attach. § 5(a).  Education and training materials were to be developed and disseminated to each Military Department by no later than October 1, 2016, and each Military Department was directed to issue implementing guidance and a written training and education plan by November 1, 2016.  Id. at Attach. §§ 6, 7.

Consistent with the DTM directives, the DoD issued an Implementation Handbook on September 30, 2016.  DoD, Transgender Service in the U.S. Military: An Implementation Handbook, ECF No. 40-9.

### C.   President's Memorandum and Interim Guidance

On June 30, 2017, Secretary of Defense James Mattis deferred implementation of the DTM's directive regarding accession until January 1, 2018.  Mattis Mem., Pls.' Mot. Ex. 8, ECF No. 40-11.

On July 26, 2017, President Trump published three tweets under the handle @realDonaldTrump:



Pls.' Mot. Ex. 19, ECF No. 40-22.

Approximately a month later, on August 25, 2017, President Trump issued a memorandum entitled "Presidential Memorandum for the Secretary of Defense and the Secretary of Homeland Security." President's Mem., Pls.' Mot. Ex. 18, ECF No. 40-21. In the first section, President Trump stated:

> Until June 2016, the Department of Defense (DoD) and the Department of Homeland Security (DHS) (collectively, the Departments) generally prohibited openly transgender individuals from accession into

the United States military and authorized
the discharge of such individuals.

Id. at § 1.

President Trump directed the Departments' Secretaries "to
return to the longstanding policy and practice on military
service by transgender individuals that was in place prior to
June 2016 . . . ." Id. at § 1(b) ("the Retention Directive").
He further directed the Secretaries to "maintain the currently
effective policy regarding accession of transgender individuals
into military service beyond January 1, 2018 . . . ." Id. at §
2(a) ("the Accession Directive"). President Trump also directed
the Secretaries to "halt all use of DoD or DHS resources to fund
sex-reassignment surgical procedures for military personnel,
except to the extent necessary to protect the health of an
individual who has already begun a course of treatment to
reassign his or her sex." Id. at § 2(b) ("the Sex Reassignment
Surgery Directive").

The Accession Directive is to take effect on January 1,
2018; the Retention Directive and the Sex Reassignment Surgery
Directive are to take effect on March 23, 2018. Id. at § 3.

President Trump further directed:

By February 21, 2018, the Secretary of
Defense, in consultation with the Secretary
of Homeland Security, shall submit to me a
plan for implementing both the general
policy set forth in section 1(b) of this

11

> memorandum and the specific directives set
> forth in section 2 of this memorandum.

Id. He added that "no action may be taken" under the Retention Directive against transgender individuals currently serving in the United States military until the Secretary of Defense has determined how to address such individuals.  Id.

On September 14, 2017, Secretary of Defense James Mattis issued a memorandum establishing an interim policy until the directives take effect.  Defs.' Mem., ECF No. 45, Ex. 1 ("Interim Guidance").  Under the Interim Guidance policy, there is no immediate effect on individual service members pending the implementation plan.  Id.  The Interim Guidance states that "[n]ot later than February 21, 2018, [Secretary Mattis] will present the President with a plan to implement the policy and directives in the Presidential Memorandum."  Id. at 1.

D.    The Instant Lawsuit

The individual plaintiffs[10] and the American Civil Liberties Union of Maryland, Inc. ("ACLU") (collectively, "the Plaintiffs") have sued Donald J. Trump in his official capacity as the President of the United States, James Mattis in his official capacity as Secretary of Defense, Ryan McCarthy in his official capacity as Acting Secretary of the U.S. Department of

---

[10]    Described individually herein in Section II.E.

the Army, Richard Spencer in his official capacity as Secretary

of the U.S. Department of the Navy, and Heather Wilson in her

official capacity as Secretary of the U.S. Department of the Air

Force (collectively, "the Defendants") for declaratory and

injunctive relief.  Am. Compl., ECF No. 39.

Plaintiffs seek a declaratory judgment that the policies

and directives encompassed in President Trump's Memorandum dated

August 25, 2017, violate the Fifth Amendment's guarantee of

equal protection and substantive due process and are invalid on

their face and as applied to Plaintiffs.  The Amended Complaint

asserts three causes of action:

- Count I – Violation of the Equal Protection
  Component of the Fifth Amendment's Due Process
  Clause

- Count II – Violation of Substantive Due Process

- Count III – Violation of 10 U.S.C. § 1074.

Plaintiffs' Motion for Preliminary Injunction [ECF No. 40]

seeks to bar Defendants from enforcing the policies and

directives encompassed in President Trump's August 25, 2017,

Memorandum until such time as the Court renders a final judgment

on the merits of this action.

On October 12, 2017, Defendants filed a Motion to Dismiss

[ECF No. 52], seeking dismissal pursuant to Rules[11] 12(b)(1) and

---

[11]    All "Rule" references cited herein are to the Federal Rules

12(b)(6) and denial of any Preliminary Injunction.  Defendants

assert that this Court does not have jurisdiction over this

action because Plaintiffs have not suffered an injury sufficient

to establish standing and because the issues presented are not

ripe for review.  Defendants contend that "Plaintiffs have not

stated plausible claims that the President's decision to

maintain the status quo while Secretary Mattis studies military

service by transgender individuals violates equal protection,

due process, or Federal statutes."  Reply 14, ECF No. 77.

In addition to the parties' briefs and arguments, the Court

has received and considered the following briefs from Amicus

Curiae in support of Plaintiffs' Motion for Preliminary

Injunction:

- The Trevor Project[12] [ECF No. 62],

- Retired Military Officers and Former National Security
  Officials [ECF No. 71], and

- Amici States Massachusetts, California, Connecticut,
  Delaware, Hawaii, Illinois, Iowa, Maryland, New
  Mexico, New York, Oregon, Pennsylvania, Rhode Island,
  Vermont, and the District of Columbia [ECF No. 73].

---

of Civil Procedure.
[12]   Described as "the nation's largest lesbian, gay, bisexual,
transgender, queer, and questioning ("LGBTQ") youth crisis
intervention and suicide prevention organization."  Trevor
Project Amicus Brief 1, ECF No. 62.

E.   <u>The Individual Plaintiffs</u>[13]

1.   <u>Petty Officer First Class Brock Stone</u>

Brock Stone ("Stone") is 34 years old and has served 11 years in the United States Navy, including a 9-month deployment to Afghanistan.  Stone is currently assigned, until August 2020, to a unit at Fort Meade in Maryland, where he works as a computer analyst.  Stone was awarded an achievement medal in connection with his deployment, and he has received multiple other commendations, including the Joint Commendation Medal, the Navy Commendation Medal, the Afghan Campaign Medal, a flag letter of commendation, and multiple recommendations for early promotion.  He is currently eligible for promotion to Chief Petty Officer.  Stone's goal is to serve for at least 20 years and qualify for retirement benefits.  His current contract runs until 2023, which would end three years short of his achieving enough years in service to meet his retirement goal.

Stone has been undergoing hormone therapy as a medically-necessary part of his gender transition.  Since arriving at Fort Meade in July 2017, he has received medically-necessary treatment related to his gender transition at Walter Reed National Military Medical Center in Bethesda, Maryland. Prior to

---

[13]   Plaintiffs' genders are referred to herein by the gender as recognized by the Defense Enrollment Eligibility Report System ("DEERS"), except in one case as noted where the formal changed gender remains pending.

his transfer to Fort Meade, Stone was close to finalizing a

medical treatment plan that included surgery.  After the

transfer in July 2017, he had to restart the treatment plan, but

it is now in the final approval stage.  The treatment plan will

be sent to the medical review board at Walter Reed in November

2017 and thereafter will be submitted to Navy Medical East for

final medical approval.  Plaintiffs assert that it is "highly

likely that Petty Officer Stone will not receive one or both of

his medically-necessary surgeries before March 23[, 2018]."

Opp. Dismiss 11, ECF No. 66.


### 2.    Staff Sergeant Kate Cole

Kate Cole ("Cole") is 27 years old and has served in the

United States Army for almost ten years, including a one-year

deployment to Afghanistan where she served as a team leader and

designated marksman.  Cole is currently stationed at Fort Polk,

Louisiana, working as a Cavalry Scout, where she operates with a

tank unit.  Since enlisting at age 17, Cole has received seven

achievement medals and two Army commendation medals. She

recently received orders to enroll in Drill Sergeant School

starting on January 3, 2018, with an anticipated graduation date

of March 7, 2018.  Following her return from Drill Sergeant

School, she is scheduled to change station from Fort Polk, Louisiana to Fort Benning, Georgia.

Cole has been undergoing hormone therapy and was scheduled to receive medically-necessary surgery related to her gender transition in or around September 2017.  On September 8, 2017, she was informed that her surgical treatment was denied and her pre-surgical consultation was cancelled.  Cancellation has been remedied, but "Cole's treatment plan calls for two additional surgeries, neither of which she will be able to undergo before March 23[, 2018], and one of which she is not even eligible for until after that date." Opp. Dismiss 11, ECF No. 66.


### 3.   Senior Airman John Doe

John Doe ("Doe") is 25 years old and has served for approximately six years on active duty in the United States Air Force, during which he was awarded "airman of the year."  Doe also served in Qatar for a six-month deployment.  Doe is currently stationed at Little Rock Air Force Base, Arkansas and serves as the suicide prevention and interpersonal violence instructor for the base and is pursuing cryogenics certification.  Doe reenlisted on September 9, 2017.

In 2014, Doe began his gender transition, including undergoing certain surgeries, for which he paid out-of-pocket.

He has been undergoing hormone therapy as a medically-necessary part of his gender transition and planned to receive an additional medically-necessary surgery in August 2017. Doe was informed by email from the medical command at the base where he was scheduled to undergo the surgery that all gender-transition-related surgeries were on hold.  Defendants assure that, pursuant to the Interim Guidance, the surgery was not deleted from Doe's treatment plan and can be rescheduled at his request.

### 4.   Airman First Class Seven Ero George

Seven Ero George ("George") is 41 years old and has been enlisted in the Air National Guard since 2015.  George is currently stationed at the Selfridge Air National Guard Base, Michigan and serves in the base security force, where he is a member of the base Honor Guard.  He performs military funeral honors for deceased veterans, retirees, and active duty members; provides dignified transfers, and performs color guard details. George has a Bachelor's Degree in General Studies from the University of Michigan and is currently taking additional training as a nurse.  He is scheduled to complete his Associate's Degree in nursing in December 2017 and plans to pursue a program to earn his Bachelor's Degree in nursing, which he expects to be able to complete in 12-18 months.

George intends to seek a commission, which subjects him to the Army's accession policies.  He has been unable to pursue a commission to date because the historical ban has not yet expired and because his gender has not yet been updated in the Defense Enrollment Eligibility Report System ("DEERS"), which still lists him as female.  George believes all required paperwork has been submitted to update his DEERS gender, his letters of recommendation are lined up, and he expects to be ready to commission immediately upon the lift of the ban in January 2018.

As a medically-necessary part of his gender transition, George has been undergoing hormone therapy and has undergone a medically-necessary surgery, but no further surgeries are required under his medical treatment plan.

### 5.   Petty Officer First Class Teagan Gilbert

Teagan Gilbert ("Gilbert") is 31 years old and has served in the United States Navy for 13 years, including a one-year deployment to Afghanistan.  Gilbert is currently serving as an information and space systems technician in the Naval Reserve stationed in Phoenix, Arizona.  She has been pursuing an undergraduate degree as a prerequisite to commission as an officer and is scheduled to complete her Bachelor's Degree in

Earth and Space Exploration in the Spring of 2019, as well as an undergraduate certificate in Geographic Information Systems. Gilbert's current term of service expires in February 2018, and she is in the process of reenlisting in the Navy for another six-year term.

Gilbert has been undergoing hormone therapy as a medically-necessary part of her gender transition.  She has a medical appointment scheduled for January 2018 to update her treatment plan to include medically-indicated surgical treatment.

### 6.   Technical Sergeant Tommie Parker

Tommie Parker ("Parker") is 54 years old and has served in the Marine Corps for four years and has served in the Air National Guard for 26 years.  During her sixteen plus years of active duty, she has had deployments to Okinawa with the Marine Corps and Germany with the Air National Guard.  She is currently stationed at Stewart Air National Guard Base, New York, working as a fuel technician.

Parker's current term of service expires in January 2018. Her commanding officer informed her that he would recommend her for active duty reenlistment for an additional term of three years thereafter.  Parker is eligible for retirement in three-and-a-half years, and her goal is to serve until retirement.

Parker is undergoing hormone therapy as a medically-
necessary part of her gender transition and is currently paying
out-of-pocket while waiting for her transition plan to be fully
approved.  She does not intend to have any transition-related
surgeries.

F.    The D.C. Court Decision

On Monday, October 30, 2017, a memorandum and order was
issued in a related case, Doe 1 v. Trump, in the United States
District Court for the District of Columbia ("D.C. Court").  The
D.C. Court preliminarily enjoined implementation of the
Retention Directive and the Accession Directive but not the Sex
Reassignment Surgery Directive.  Doe 1 v. Trump, --- F. Supp. 3d
----, No. CV 17-1597 (CKK), 2017 WL 4873042 (D.D.C. Oct. 30,
2017).

In Doe 1, current and aspiring transgender service members
challenged the Accession, Retention, and Sex Reassignment
Surgery Directives on the grounds that the Directives violated
plaintiffs' Fifth Amendment equal protection and due process
rights.  Id. at *1.  The Doe 1 plaintiffs also argued that the
defendants were estopped from rescinding the rights, benefits,
and protections promised to the plaintiffs.  Id. at *2.

The D.C. Court held that the Doe 1 plaintiffs had standing
to challenge the Accession and Retention Directives but lacked
standing to challenge the Sex Reassignment Surgery Directive.
Id.  The court found that the Presidential Memorandum
unequivocally directed the military to prohibit indefinitely the
accession of transgender individuals and to authorize their
discharge and that there was no reason to believe that these
directives would not be executed.  Id. at *1.  The court held
that the plaintiffs had established that they would be injured
by these directives, "due both to the inherent inequality they
imposed, and the risk of discharge and denial of accession that
they engender. Further delay would only serve to harm the
Plaintiffs."  Id.

The D.C. Court also found that the Doe 1 plaintiffs were
likely to prevail on their Fifth Amendment challenge of the
Accession and Retention Directives.  Id. at *2.  First, the
court found that "[a]s a form of government action that
classifies people based on their gender identity, and disfavors
a class of historically persecuted and politically powerless
individuals, the President's directives are subject to a fairly
searching form of scrutiny."  Id. at *2.  The Directives could
not survive such scrutiny because they were not "genuinely based
on legitimate concerns regarding military effectiveness or

22

budget constraints, but [we]re instead driven by a desire to express disapproval of transgender people generally." Id.

More specifically, the court found that a number of factors —including the breadth of the exclusion, the unusual circumstances surrounding the President's announcement, the reasons given for the Directives not appearing to be supported by any facts, and the recent rejection of those reasons by the military itself—"strongly suggest that plaintiffs' Fifth Amendment claim is meritorious." Id. Finally, the court dismissed without prejudice Plaintiffs' estoppel claim, because the complaint "lack[ed] allegations of the sort of particularized representations, reliance, or government misconduct that could justify estoppel against the government." Id.

The D.C. Court granted in part and denied in part the Doe 1 plaintiffs' motion for a preliminary injunction, enjoining the enforcement of the Accession and Retention Directives and reverting the policy to the status quo that had existed before the Presidential Memorandum. Id. The court also granted in part and denied in part the defendants' motion to dismiss the lawsuit, thus dismissing plaintiffs' estoppel challenge and dismissing the plaintiffs' challenge of the Sex Reassignment Surgery Directive for lack of jurisdiction. Id. The D.C. Court

found that none of the plaintiffs in that case could demonstrate a non-speculative injury-in-fact with respect to the Sex Reassignment Surgery Directive.  <u>Id.</u> at *51.

III.  <u>DISCUSSION</u>

    A.   <u>The Court's Jurisdiction</u>

        1.   <u>Legal Standard</u>

            a.   <u>Standing</u>

The issue of plaintiff standing presents a threshold jurisdictional question because "Article III of the U.S. Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" <u>Beck v. McDonald</u>, 848 F.3d 262, 269 (4th Cir. 2017), <u>cert. denied</u> <u>sub nom.</u> <u>Beck v. Shulkin</u>, 137 S. Ct. 2307 (2017) (quoting U.S. Const. art. III, § 2).  "The core goal of the standing inquiry is to ensure that a plaintiff bringing an action has enough of a stake in the case to litigate it properly." <u>Pye v. United States</u>, 269 F.3d 459, 466 (2001). The plaintiff bears the burden of proving jurisdiction by establishing the three "irreducible minimum requirements" of standing:

           (1)  an injury-in-fact (i.e., a concrete and particularized invasion of a legally protected interest);

           (2)  causation (i.e., a fairly traceable connection between the alleged injury

> in fact and the alleged conduct of the
> defendant); and
>
> (3)   redressability (i.e., it is likely and
>        not merely speculative that the
>        plaintiff's injury will be remedied by
>        the relief plaintiff seeks in bringing
>        suit).

Id. (quoting David v. Alphin, 704 F.3d 327, 333 (4th Cir. 2013)); Spokeo, Inc. v. Robins, --- U.S. ----, 136 S. Ct. 1540, 1547, as revised (May 24, 2016).

At the pleading stage, plausible factual allegations may suffice to demonstrate that each element of standing has been adequately pleaded.  Spokeo, 136 St. Ct. at 1547; Beck, 848 F.3d at 270 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  However, the standing analysis is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013).

A defendant may challenge standing at the motion to dismiss stage either facially or factually.  Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017)(quoting Beck, 848 F.3d at 270).  "In a facial challenge, the defendant contends that the complaint 'fails to allege facts upon which [standing] can be based,' and the plaintiff 'is afforded the same procedural protection' that exists on a motion to dismiss."  Id.

(quoting Adams, 697 F.2d at 1219). In a factual challenge, however, a trial court may look beyond the complaint to determine if there are facts to support the jurisdictional allegations. Id.  "Unless the jurisdictional facts are intertwined with the facts central to the merits of the dispute, the district court may . . . resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 348 (4th Cir. 2009) (citations omitted).

### b.   Ripeness

A second Article III threshold inquiry is whether the dispute is ripe for adjudication.  Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 198 (4th Cir. 2013).  The requirement that a case be ripe for decision is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Servs., 509 U.S. 43, 57 n. 18 (1993).

To determine if a case is ripe, the Fourth Circuit balances "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Cooksey v. Futrell, 721 F.3d 226, 2226 (4th Cir. 2013) (quoting

Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003)); Lansdowne, 713 F.3d at 198.

"[A] case is 'fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'"  Lansdowne, 713 F.3d at 198 (quoting Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006)). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]." Id. at 199 (quoting Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208-09 (4th Cir. 1992)).

### 2.   Injury-in-fact

There is no dispute that the Plaintiffs have satisfied the causation and redressability elements of standing.  While the matter is disputed, the Court finds that Plaintiffs have met their burden to satisfy the need for an injury-in-fact.

An injury-in-fact is the "[f]irst and foremost" of standing's three elements. Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 103 (1998).  To suffer an injury-in-fact, the plaintiff must have suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560).  The Spokeo

court stated that to constitute a concrete injury, an injury "must be 'de facto'; that is, it must actually exist . . . [that is] 'real,' and not 'abstract.'" Id.

"This does not mean, however, that the risk of real harm cannot satisfy the requirement of concreteness." Id. at 1549. A court may find standing based on a threatened injury that is "certainly impending" or if there is a "substantial risk" that the harm will occur. Beck, 848 F.3d at 275 (quoting Clapper, 568 U.S. at 409, 414 n.5).

Defendants contend that the Interim Guidance maintains the status quo while the military studies the "President's policy directive," and therefore, they contend that none of the Plaintiffs face a current or imminent threat of injury. Defs.' Mot. 12, ECF No. 52-1. Defendants state that "it is unclear whether those currently serving members will be affected by the future policy regarding service by transgender individuals once it is finalized and implemented." Id. at 2.

When reviewing the effect of the directives in the President's Memorandum, the Court finds persuasive and agrees with the D.C. Court's analysis of the import of the President's Memorandum. See Doe 1, 2017 WL 4873042 at *16-18 ("there is a substantial likelihood that transgender individuals will be indefinitely prevented from acceding to the military as of

January 1, 2018, and that the military shall authorize the discharge of current service members who are transgender as of March 23, 2018."). As Plaintiffs allege, the result of the President's Memorandum, once implemented, constitutes a return to the policy in place prior to June 2016 "until President Trump is personally persuaded that a change is warranted." Am. Compl. ¶ 107. Although there is no immediate implementation pending the provision of the requested plan, the Interim Guidance states that "[n]ot later than February 21, 2018, [Secretary Mattis] will present the President with a plan to implement the policy and directives in the Presidential Memorandum." Interim Guidance 1, ECF No. 45, Ex. 1. "The Court must and shall assume that the directives of the Presidential Memorandum will be faithfully executed." Doe 1, 2017 WL 4873042, at *17. Therefore, the protections of the Interim Guidance expire on February 21, 2018.

The Court cannot interpret the plain text of the President's Memorandum as being a request for a study to determine whether or not the directives should be implemented. Rather, it orders the directives to be implemented by specified dates. President's Mem. § 3, Pls.' Mot. Ex. 18, ECF No. 40-21 ("shall take effect on January 1, 2018 [and] March 23, 2018").

a.   <u>Retention Directive Injury</u>

The Retention Directive, which authorizes the discharge of service members from the military on the basis of transgender status alone, subjects all of the individual Plaintiffs[14] to the threat of discharge as administratively unfit <u>even if</u> they meet the military's demanding medical fitness standards.  While it is possible, as Defendants contend, that none of the Plaintiffs will be discharged on March 23, 2018, they certainly face a substantial risk of being discharged solely on the basis of being transgender.

Importantly, Plaintiffs allege that becoming "subject to discharge" solely for being transgender is a loss of a right they have had since June 2016, withdrawing the guarantee that protects their ability to serve on terms equal to those applied to others.  Am. Compl. Count I, ECF No. 39.  The Retention Directive effectively constitutes a revocation of rights that transgender people had been given.  This revocation of equal protection is an injury.  <u>See, e.g.</u>, <u>Planned Parenthood Of S.C. Inc. v. Rose</u>, 361 F.3d 786, 790 (4th Cir. 2004) ("Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes.").

---

[14]   Plaintiff Stone is a member of the ACLU of Maryland, which gives the ACLU associational standing on the basis of the injuries experienced by Stone.  Am. Compl. ¶ 18; <u>Hunt v. Washington State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977).

Further, Plaintiffs allege that they are now suffering from the uncertainty, the destabilization of their lives and careers, and the stigma associated with being singled out as unfit for service.  Am. Compl. ¶¶ 142-143.  Stigmatic injury can be held sufficient to support standing. See Allen v. Wright, 468 U.S. 737, 755 (1984) (finding that "stigmatizing injury often caused by racial discrimination" is a type of "noneconomic injury" that is "sufficient in some circumstances to support standing").  In the instant case, the Court finds that Plaintiffs' stigmatization is an additional alleged harm that provides support to Plaintiffs' standing arguments, but the Court need not, and does not, address whether it would be sufficient on its own.

In sum, the Court finds that Plaintiffs have met their burden to demonstrate standing to challenge the Retention Directive.

b.   Accession Directive Injury

The Accession Directive prohibits transgender individuals from entering or seeking a commission in the military solely on the basis of their transgender status.  The current prohibition is set to expire on December 31, 2017, but the directive in the President's Memorandum extends the prohibition indefinitely.

Defendants contend that Plaintiffs have not been injured by the Accession Directive because no one has applied for accession into the military and been denied.  Defendants assert that Plaintiffs George and Gilbert's plans to apply for a commission are too speculative and that they could apply for a waiver to allow their accession into the military under the Interim Guidance.

Plaintiffs George and Gilbert allege that they face imminent harm because they will be denied accession into the military as commissioned officers.  Am. Compl. ¶¶ 40, 47, ECF No. 39; Decl. George, ECF No. 40-42; Suppl. Decl. George, ECF No. 66-9; Suppl. Decl. Gilbert, ECF No. 66-11.  Plaintiff Gilbert has one year of coursework left in her degree before she plans to apply to Officer Candidate School and return to "active duty" status.  However, Plaintiff George expects to be ready to commission immediately upon the lift of the ban in January 2018. Plaintiffs clarified at the hearing that George

> is ready, willing, and able to apply to directly commission as an officer as soon as he can.  All he's been waiting for is for the final change in his gender market in the [DEERS] system to go through.  He submitted all that paperwork.  It should go through any minute.  He wants to apply the first day that he can.
>
> . . . .

> [H]is ability to commission and his
> desire to commission are not contingent on
> him completing that nursing program.
>
> As soon as he can commission, he will.
> And he would do it on January 1st if he were
> allowed to do so.

Hr'g Tr. 48:4-17.

George has demonstrated that he is eligible to commission as an officer.  He met with a recruiter in October 2016 to pursue an active duty commission.  Suppl. Decl. George, ECF No. 66-9.  George's plan and efforts to implement his plan are not speculative.  The Court finds that Plaintiff George is subject to a substantial risk that his attempt to accede into the military as a commissioned officer will be prohibited solely on the basis of his transgender status.

Accordingly, the Court finds that Plaintiffs have met their burden to demonstrate standing to challenge the Accession Directive.


c.   The Sex Reassignment Surgery Directive

The Sex Reassignment Surgery Directive prohibits the expenditure of military resources on sex-reassignment surgical procedures.  President's Mem. § 2(b), ECF No. 40-21. This section takes effect on March 23, 2018. Id. § 3.

Defendants contend that no Plaintiff can demonstrate injury-in-fact because the military is continuing to provide transition-related medical care under the Interim Guidance.  Any cancellations that occurred after the President's Memorandum have subsequently been remedied, so no one has been denied transition-related medical care.  Defendants assert that the Plaintiffs in the instant case, like the plaintiffs in Doe 1, have not "'demonstrated that they are substantially likely to be impacted' by the relevant portion of the [President's] Memorandum." Defs.' Reply 8, ECF No. 77 (quoting 2017 WL 4873042, at *24).

In Doe 1, the D.C. Court held that the Doe 1 plaintiffs did not have standing to challenge the Sex Reassignment Surgery Directive because none of them had demonstrated an injury-in-fact with respect to that Directive.  2017 WL 4873042 at *51. First, the court noted that, for the two Doe 1 plaintiffs who were implicated by the provision, the risk of being impacted was not sufficiently great to confer standing.  Id.

One of the Doe 1 plaintiffs alleged that her scheduled transition-related surgery had been canceled.  However, the defendants submitted a declaration, which revealed that her application for supplemental health care waiver was currently being processed, and her transition related-surgery had been

34

rescheduled for January 4, 2018.  Id. at *52.  The defendants
represented that this date remained unaffected by the
Presidential Memorandum.  Id.  Therefore, the D.C. Court
concluded that this plaintiff had failed to show that "she will
not receive the surgery prior to the effective date of the Sex
Reassignment Surgery Directive."  Id.

A second Doe 1 plaintiff had developed a transition
treatment plan but was not planning to begin her treatment until
after a long-term deployment in Iraq.  Id.  The D.C. Court
concluded that "[g]iven the possibility of discharge, the
uncertainties attended by the fact that she has yet to begin any
transition treatment, and the lack of certainty on when such
treatment will begin, the prospective harm engendered by the Sex
Reassignment Surgery Directive is too speculative . . . ."  Id.

In the instant case, Plaintiffs Cole, Doe, Gilbert, and
Stone are potentially impacted by the Sex Reassignment Surgery
Directive.  At the hearing, Plaintiffs asserted that they would
rely on Plaintiffs Cole and Stone for standing to challenge the
Sex Reassignment Surgery Directive.  Hr'g Tr. 62:7-8.

Plaintiff Cole has a final, approved medical plan that
calls for two additional surgeries.  Suppl. Decl. Cole, ECF No.
66-8.  Because Cole will be attending Drill Sergeant School from

January 3, 2018 until March 7, 2018, it is impossible for her to have both surgeries before the March 23rd deadline.  Id.

Plaintiff Stone has a near-final treatment plan that calls for two surgeries, needing only a final stamp of approval, which is not in doubt. Suppl. Decl. Stone, ECF No. 66-13.  The plan calls for the first of the surgeries in April 2018.  Hr'g Tr. 63:15-17.  Although Stone is trying to move the first surgery up to February in an attempt to meet the deadline, it seems unlikely, and the second surgery still needs to be scheduled. Id. at 18-22, Suppl. Decl. Stone, ECF No. 66-13.

Unlike the first plaintiff in Doe 1, Stone and Cole are highly unlikely to complete their medically-necessary surgeries before the effective date of the Directive.  Unlike the second plaintiff in Doe 1, there is no lack of certainty regarding when transition treatment will begin for Stone and Cole since treatment has already begun, and Stone and Cole's surgeries are endangered by the Directive's deadline.

Plaintiffs also seek to assert a statutory claim in support of their challenge to the Directive.  Am. Compl. ¶¶ 163-169, ECF No. 39.[15]  However, the Court does not find the Amended Complaint

---

[15]   Pursuant to 10 U.S.C. § 1074(a), active duty and reserve members of the United States armed services are entitled to medical and dental care in military treatment facilities. Plaintiffs claim that medically-necessary surgery indicated for the treatment of a gender dysphoria diagnosis is "medical care"

to present factual allegations sufficient to present a plausible statutory claim.

Defendants argue that the exception in the Directive will "cover" the Plaintiffs who will not have completed all of their approved and medically-required sex-reassignment surgeries by the effective date.  Section 2(b) directs the Secretaries to "halt all use of DoD or DHS resources to fund sex reassignment surgical procedures for military personnel, <u>except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex</u>." President's Mem. § 2(b), ECF No. 40-21 (emphasis added). Defendants assert that because "Plaintiffs have in fact started a course of treatment to reassign their sex, and have transition plans either submitted or already in place, the exception <u>may</u> in fact apply to them." Defs.' Reply 9, ECF No. 77 (emphasis added).  At the hearing, however, Defendants' counsel could not commit that the exception would apply to Plaintiffs.  Hr'g Tr. 18:22-19:17, 20:11-19.

Plaintiffs contend that the exception seems to refer to "situations in which complications arise from surgery performed

---

that is covered by the statutory right under § 1074(a)(1).  Am. Compl. ¶ 165, ECF No. 39.  As a result, Plaintiffs allege that the Directive will cause them to imminently suffer a violation of a statutory right. <u>Id.</u> at ¶¶ 165, 167.

before March 23."  Pls.' Opp'n 12, ECF No. 66.  Plaintiffs add
that it is not clear that "any service member with a medical
need for surgery will receive that surgery—even if he or she
received no surgical treatment before March 23."  Id.
Plaintiffs argue that if the exception were to be interpreted
under the broad terms proposed by Defendants, the "exception"
would essentially nullify the Directive and contravene President
Trump's premise about the cost of surgical care, adding that
Defendants "may not evade judicial review by advancing (or, in
this case, weakly suggesting) an interpretation of the
challenged action that both is implausible and would fatally
undercut the President's announced policy."  Id.  At the
hearing, Plaintiffs added that "the Government, as far as we're
aware, is not scheduling anything for after March 22nd."  Hr'g
Tr. 28:17-19; 29:8-9.

The Court finds that it is at the very least plausible that
the exception would not apply to Stone and Cole's scheduled
post-March-23rd surgeries.  That conclusion is sufficient at
this juncture to raise Plaintiffs' right to relief above the
speculative and to the plausible level.

Accordingly, the Court finds that Plaintiffs have met their
burden to demonstrate standing to challenge the Sex Reassignment
Surgery Directive.

3.   Ripe for Review

Defendants assert that the Court is being asked to
prematurely judge the constitutionality of a future Government
policy.  The Defendants' argument based on alleged uncertainty
of military policy is not supported by the record before the
Court.  The President has expressly directed the military to
"return to the longstanding policy that was in place prior to
June 2016" that "prohibit[s] openly transgender individuals from
accession into the United States military and authorize[s] the
discharge of such individuals."  President's Mem. § 1, ECF No.
40-21.  The President directed that the military stop using
military resources to fund sex-reassignment surgical procedures
for military personnel.  Id. at § 2(b).  The President ordered
an implementation plan and set definite implementation dates.
Id. at § 3.  The only uncertainties are how, not if, the policy
will be implemented and whether, in some future context, the
President might be persuaded to change his mind and terminate
the policies he is now putting into effect.  Id. at § 1.  The
validity of the Directives in the President's Memorandum is fit
for review.

Further, withholding review would impose hardship on the
Plaintiffs.  The hardship inquiry has largely been addressed in
the standing discussion. Plaintiffs have demonstrated to the

Court's satisfaction that they are likely to suffer imminent harm as a result of the Directives in the President's Memorandum.  They have further demonstrated that they are already suffering harmful consequences such as the cancellation and postponements of surgeries, the stigma of being set apart as inherently unfit, facing the prospect of discharge and inability to commission as an officer, the inability to move forward with long-term medical plans, and the threat to their prospects of obtaining long-term assignments.  Waiting until after the Directives have been implemented to challenge their alleged violation of constitutional rights only subjects them to substantial risk of even greater harms.

Accordingly, the Court finds that this case is ripe for review.

B.   Preliminary Injunction

1.   Legal Standard

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." United States v. South Carolina, 720 F.3d 518, 524 (4th Cir. 2013) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).

To obtain a preliminary injunction, a plaintiff must show

that:

    1.    It will likely succeed on the merits;

    2.    It is likely to suffer irreparable harm absent preliminary relief;

    3.    The balance of equities tips in its favor; and

    4.    An injunction is in the public interest.

Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008); Centro Tepeye v. Montgomery Cty., 722 F.3d 184, 188 (4th Cir. 2013)(en banc).  The plaintiff has the burden of establishing that it meets the Winter factors.  Dewhurst v. Century Aluminum Co., 649 F.3d 287, 293 (4th Cir. 2011).

Statements contained in an uncontroverted affidavit may be accepted as true.  See, e.g., Elrod v. Burns, 427 U.S. 347, 350 n. 1 (1976) ("For purposes of our review . . . uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true.").  The weight to be accorded to affidavit testimony is within the discretion of the court, and statements based on belief rather than personal knowledge may be discounted.  Federal Practice & Procedure § 2949 (collecting authority).

    2.   Likely Success on the Merits

Plaintiffs assert that the Directives in the President's Memorandum violate the equal protection and substantive due

process guarantees of the United States Constitution, as well as service members' statutory right to medical care.  The Court finds that Plaintiffs are likely to succeed on their Equal Protection claim, as discussed below.  Therefore, the Court finds it unnecessary to analyze separately the merits of the Substantive Due Process claim and the Violation of Statute claim.

The men and women who serve in the Armed Forces are "protected by the Fifth Amendment's Due Process Clause[,which] contains within it the prohibition against denying to any person the equal protection of the laws." United States v. Windsor, --- U.S. ----, 133 S. Ct. 2675, 2695 (2013); Frontiero v. Richardson, 411 U.S. 677, 690-91 (1973).  To succeed on an equal protection claim, Plaintiffs must demonstrate that they have been treated differently from others who are similarly situated and also show that the unequal treatment was the result of "intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).  If Plaintiffs can make this showing, the court must then determine "whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

There is no doubt that the Directives in the President's Memorandum set apart transgender service members to be treated

differently from all other military service members.  Defendants argue that deference is owed to military personnel decisions and to the military's policymaking process.  The Court does not disagree.  However, the Court takes note of the Amici of retired military officers and former national security officials, who state "this is not a case where deference is warranted, in light of the absence of any considered military policymaking process, and the sharp departure from decades of precedent on the approach of the U.S. military to major personnel policy changes."  Amicus Br. 6, ECF No. 65-1.  President Trump's tweets did not emerge from a policy review, nor did the Presidential Memorandum identify any policymaking process or evidence demonstrating that the revocation of transgender rights was necessary for any legitimate national interest.  Based on the circumstances surrounding the President's announcement and the departure from normal procedure, the Court agrees with the D.C. Court that there is sufficient support for Plaintiffs' claims that "the decision to exclude transgender individuals was not driven by genuine concerns regarding military efficacy."  Doe 1, 2017 WL 4873042, at *30.

The Court finds persuasive the D.C. Court's reasons for applying intermediate scrutiny: transgender individuals appear to satisfy the criteria of at least a quasi-suspect

43

classification, and the Directives are a form of discrimination on the basis of gender.  Id. at *27-28.  The Court also adopts the D.C. Court's reasoning in the application of intermediate scrutiny to the Directives and finds that the Plaintiffs herein are likely to succeed on their Equal Protection claim.  See id. at *29-32.

Moreover, the Court finds that, based on the exhibits and declarations currently on the record, the Directives are unlikely to survive a rational review.  The lack of any justification for the abrupt policy change, combined with the discriminatory impact to a group of our military service members who have served our country capably and honorably, cannot possibly constitute a legitimate governmental interest.  See U. S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973).

### 3.  Irreparable Harm

Plaintiffs must also make a clear showing that they are likely to be irreparably harmed absent preliminary relief. Winter, 555 U.S. at 20.

Plaintiffs' injuries as described above are the result of alleged violations of their rights to equal protection of the laws under the Fifth Amendment.  In the context of an alleged violation of constitutional rights, a plaintiff's claimed

irreparable harm is inseparably linked to the likelihood of success on the merits. See Centro, 722 F.3d at 190.

Accordingly, the Court's finding that Plaintiffs are likely to succeed on the merits of their constitutional claim counsels in favor of finding that, in the absence of an injunction, they will suffer irreparable harm.

### 4.   Balance of Equities and Public Interest

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24. The Court agrees with the D.C. Court "that Plaintiffs have shown that the public interest and the balance of hardships weigh in favor of granting injunctive relief." Doe 1, 2017 WL 4873042, at *33.  As stated:

> A bare invocation of "national defense" simply cannot defeat every motion for preliminary injunction that touches on the military. On the record before the Court, there is absolutely no support for the claim that the ongoing service of transgender people would have any negative effective on the military at all. In fact, there is considerable evidence that it is the discharge and banning of such individuals that would have such effects. . . . Moreover, the injunction that will be issued will in no way prevent the government from conducting studies or gathering advice or recommendations on transgender service.

<u>Id.</u>

Further, this Court has also received an <u>Amici</u> brief from 15 States, urging the Court to enjoin the Directives because a reinstatement of the pre-June 2016 policies will harm the <u>Amici</u> States and their residents.  Amici Br. 13, ECF No. 63-1.


     5.   <u>Summary</u>

In summary, all the <u>Winter</u> factors weigh in favor of granting a preliminary injunction. The Court shall enjoin the enforcement of the Retention, Accession, and Sex Reassignment Surgical Directives pending the final resolution of this lawsuit.


    C.   <u>Dismissal Under Rule 12(b)(6)</u>

     1.   <u>Legal Standard</u>

A motion to dismiss filed pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint.  A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)(citations omitted).

When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true, and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice.  Id.  A complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009)(quoting Twombly, 550 U.S. at 557).

### 2.   Plaintiffs Present Plausible Claims

Defendants have moved to dismiss Plaintiffs' claims under Rule 12(b)(6).  For the same reasons as the Court has concluded that Plaintiffs are likely to succeed on the merits of the Equal Protection claim, as discussed above, the Court holds that the allegations are adequate and present plausible claims.  The Court shall address separately the plausibility of the Substantive Due Process claim and the Violation of Statute claim.

### a.   Substantive due process

The Supreme Court has stated that "the Due Process Clause was intended to prevent government officials from abusing

[their] power, or employing it as an instrument of oppression."
Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)(citations
omitted).  Substantive due process claims deal with the
reasonableness, or arbitrariness, of the governmental decision.
Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 80 (4th
Cir. 2016).  "Where executive action is concerned, a violation
of an individual's substantive due process rights exists only
when the official action is so egregious, so outrageous, that it
may fairly be said to shock the contemporary conscience."  Id.
(citations omitted).

What rises to the level of conscience-shocking?

> [N]egligently inflicted harm is
> categorically beneath the threshold of
> constitutional due process. It is, on the
> contrary, behavior at the other end of the
> culpability spectrum that would most
> probably support a substantive due process
> claim; conduct intended to injure in some
> way unjustifiable by any government interest
> is the sort of official action most likely
> to rise to the conscience-shocking level.
> Historically, this guarantee of due process
> has been applied to deliberate decisions of
> government officials to deprive a person of
> life, liberty, or property.
>
> . . . .
>
> Rules of due process are not, however,
> subject to mechanical application in
> unfamiliar territory. Deliberate
> indifference that shocks in one environment
> may not be so patently egregious in another,
> and our concern with preserving the
> constitutional proportions of substantive

> due process demands an exact analysis of
> circumstances before any abuse of power is
> condemned as conscience shocking.

Lewis, 523 U.S. at 849, 850 (citations omitted).

Plaintiffs assert that President Trump's arbitrary decision, plainly inconsistent with all available data, to exclude men and women who are transgender from military service serves no legitimate interest and cannot be reconciled with the liberty and equality protected by the Constitution.  Pls.' Mot. 28, ECF No. 40-2.  Plaintiffs also argue that it is egregiously offensive to actively encourage transgender service members to reveal their status and serve openly, only to use the revelation to destroy those service members' careers.  Id. at 29; see also Pls.' Reply 30, ECF No. 66 (referring to the maneuver as a "bait and switch").

"[T]he Fifth Amendment itself withdraws from Government the power to degrade or demean . . . ."  Windsor, 133 S. Ct. at 2695.  An unexpected announcement by the President and Commander in Chief of the United States via Twitter that "the United States Government will not accept or allow Transgender individuals to serve in any capacity in the U.S. Military" certainly can be considered shocking under the circumstances.  Am. Compl. ¶¶ 94-95.  According to news reports provided by Plaintiffs, the Secretary of Defense and other military

officials were surprised by the announcement.  Id. ¶¶ 96-97,
104.  The announcement also drew swift criticism from retired
generals and admirals, senators, and more than 100 Members of
Congress.  Id. at ¶¶ 100-102.  A capricious, arbitrary, and
unqualified tweet of new policy does not trump the methodical
and systematic review by military stakeholders qualified to
understand the ramifications of policy changes.

Defendants argue that the President did not actually
announce a policy decision, and it was rational for the
President to order the military to study the issue further.  The
Court agrees that it could find an order for further study to be
rational, but as already discussed, the Court finds that the
President's Memorandum is not a request for a study but an order
to implement the Directives contained therein.

Courts are reminded to be "reluctant to expand the concept
of substantive due process" and "exercise the utmost care
whenever we are asked to break new ground in this field, lest
the liberty protected by the Due Process Clause be subtly
transformed into the policy preferences of [judges]."  Hawkins
v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999).  Proceeding with
full recognition of that caution, the Court finds that
Plaintiffs have stated a plausible claim sufficient to withstand
a motion to dismiss.

b.   <u>Violation of Statute</u>

Pursuant to 10 U.S.C. § 1074(a)(1), members of the United States armed services, including active duty and reserve members, are entitled to medical care in military treatment facilities.  Plaintiffs allege that the President cannot override a duly-enacted statute by denying necessary medical care to a group of service members he happens to disfavor.  Am. Compl. ¶ 169, ECF. No. 39.  Plaintiffs also allege that the DoD's actions in implementing and enforcing the Sex Reassignment Surgery Directive are not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2). <u>Id.</u>

Defendants do not dispute that the military has a statutory obligation to provide medically-necessary treatment, nor that surgical procedures are sometimes necessary to treat transgender individuals who have been diagnosed with gender dysphoria. Defendants argue, however, that the Interim Guidance, which is the operative policy at this point in time, is consistent with the statutory provision and that the exception to the surgical ban <u>may</u> mean that the statute will not be contravened after the Sex Reassignment Surgical Directive is implemented on March 23, 2018.  Defendants assert that the statute does not create a private cause of action to sue the military in civilian court over the denial of medical treatment.  Further Defendants assert

that the DoD has broad discretion to shape the scope of services provided at military facilities, citing 10 U.S.C. § 1074(a)(1) and § 1073(a)(b).

Plaintiff's allegations in support of their statutory claim are conclusory.  They alleged that "DoD's actions in implementing and enforcing the ban are not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2)." Am. Compl. ¶ 168. And that "Defendants, including the President, cannot act in contravention of a validly enacted statute. Their actions in establishing, implementing, and enforcing the ban on surgical care are ultra vires."  Am. Compl. ¶ 169.

Perhaps Plaintiffs could assert an adequate and plausible statutory claim.  They have not done so here.  The Court shall dismiss the statutory claim without prejudice to the ability of Plaintiffs to seek to file an amendment that adequately asserts such a claim if they can do so.


IV.   CONCLUSION

For the foregoing reasons:

    1.    Plaintiffs' Motion for Preliminary Injunction
          [ECF No. 40] is GRANTED.

    2.    By separate Order, the Court shall issue a
          Preliminary Injunction.

    3.    Defendants' Motion to Dismiss [ECF No. 52] is
          GRANTED IN PART and DENIED IN PART.

a) The Court hereby dismisses without prejudice Count III – Violation of 10 U.S.C. § 1074.

b) Counts I and II remain pending.

5.   Plaintiff shall arrange a case planning conference to be held by December 15, 2017, to discuss the scheduling of further proceedings.

SO ORDERED, on <u>Tuesday, November 21, 2017</u>.


_____/s/_____
Marvin J. Garbis
United States District Judge