## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BROCK STONE, *et al.*, <br><br>               *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>               *Defendants*. | Case 1:17-cv-02459-MJG <br><br> Hon. Marvin J. Garbis |

## DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION

Defendants Donald J. Trump, in his official capacity as President of the United States; James Mattis, in his official capacity as Secretary of Defense; Dr. Mark Esper, in his official capacity as Secretary of the Army; Richard Spencer, in his capacity as Secretary of the Navy; and Heather Wilson, in her official capacity as Secretary of the Air Force, hereby move, through their counsel, for an order from this Court dissolving the preliminary injunction entered on November 21, 2017. Defendants' arguments in support of their motion to dissolve the preliminary injunction are fully set forth in the attached Memorandum of Points and Authorities and the exhibits attached thereto.

Dated: March 23, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

BRINTON LUCAS
Counsel to the Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan B. Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

Counsel for Defendants

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

BROCK STONE, *et al.*,

        *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

        *Defendants*.

Case 1:17-cv-02459-MJG

Hon. Marvin J. Garbis

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

   I.     History of Policies Concerning Transgender Service Before 2017 ........................... 2

   II.    Development Of The Department's New Policy ...................................................... 4

   III.   The Department's New Policy ............................................................................ 6

ARGUMENT ........................................................................................................................ 8

   I.     Plaintiffs Cannot Demonstrate A Likelihood Of Success On The Merits ................. 9

       A.   The Current Challenge To The 2017 Presidential Memorandum Is Moot ......... 9

       B.   The New Policy Withstands Constitutional Scrutiny ...................................... 11

          1.  The New Policy Is Subject To Highly Deferential Review .................... 11

          2.  The New Policy Survives Highly Deferential Scrutiny ......................... 17

              A. Military Readiness ..................................................................... 18

              B. Order, Discipline, Leadership, And Unit Cohesion .................... 22

              C. Disproportionate Costs ............................................................. 27

          3.  The New Policy Is Consistent With This Court's Prior Reasoning ........ 29

   II.    Plaintiffs Have Not Satisfied The Equitable Factors For A Preliminary Injunction  32

       A.   Plaintiffs Have Not Established Irreparable Injury .......................................... 32

       B.   Plaintiffs Have Not Established The Remaining Equitable Factors ................. 32

CONCLUSION ................................................................................................................... 34

## INTRODUCTION

Last November, this Court entered a preliminary injunction forbidding the enforcement of several directives in a Presidential Memorandum from August 2017 concerning military service by transgender individuals (2017 Memorandum). Dkt. 84. The Court understood these directives to institute a categorical "transgender service member ban" that it believed "was not driven by genuine concerns regarding military efficacy." Dkt. 85 (Op.), at 5, 43. On that understanding, the Court issued a preliminary injunction precluding Defendants from enforcing those specific directives. Dkt. 84.

The bases for that preliminary injunction no longer exist. Last month, the Secretary of Defense, with the agreement of the Secretary of Homeland Security, sent the President a memorandum recommending that the President revoke his 2017 Memorandum so that the military can implement a new policy on transgender service. Mattis Memorandum, Exhibit 1. After an extensive review of the issue, the Department of Defense concluded that maintaining the policy on transgender service put in place by Secretary Carter in 2016 would pose substantial risks to military readiness and therefore proposed to adopt a new policy. *Id.* at 1–2. Far from a categorical ban based on transgender status, this new policy, like the Carter policy before it, would turn on the medical condition of gender dysphoria and contain a nuanced set of exceptions allowing some transgender individuals, including every individual Plaintiff here, to serve. *Id.* at 2–3. Along with this memorandum, Secretary Mattis sent the President a 44-page report providing a detailed explanation for why, in the professional, independent judgment of the Defense Department, this new policy is necessary to further military interests. Department of Defense Report and Recommendations on Military Service by Transgender Persons (Feb. 2018) (Report), Exhibit 2. The President then issued a new memorandum on March 23, 2018, revoking his 2017 Memorandum, thus allowing the military to implement its preferred policy. Presidential Memorandum (2018 Memorandum), Exhibit 3.

In light of these changed circumstances, the preliminary injunction should be dissolved. Simply put, Plaintiffs can no longer meet any of the four criteria for this form of relief. On the merits, their challenge to the revoked 2017 Memorandum is no longer a live controversy and, in any event, the military's new policy is constitutional. Plaintiffs—who may continue serving under the Department's new policy—cannot establish that they would suffer any cognizable injury from the new policy, much less an irreparable one. And given the Department's judgment that retaining the Carter policy would pose risks to military readiness, the balance of the equities and the public interest strongly cut against prolonging this state of affairs.

To be clear, Defendants respectfully maintain that the Court's preliminary injunction, which addressed only certain directives in the President's 2017 Memorandum, does not extend to the Department's new policy. But in an abundance of caution, Defendants urge this Court to dissolve the preliminary injunction in order to permit the military to implement the policy it believes will best ensure our Nation's defense. To the extent that Plaintiffs may seek to challenge that new policy, that independent controversy should not be litigated under the shadow of a preliminary injunction of a Presidential Memorandum that is no longer in effect.

## BACKGROUND

### I.    History Of Policies Concerning Transgender Service Before 2017

For decades, military standards presumptively barred the accession and retention of certain transgender individuals. Report 7. This approach was consistent with the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association (APA), which treated "transsexualism" as a disorder. *Id.* at 10. Those standards also contained other presumptively disqualifying conditions not limited to transgender individuals, such as a history of various genital or chest surgeries or conditions requiring the use of certain hormone therapies. *Id.* at 10–11. In addition, the military's retention standards at various points generally

permitted the discharge of service members with "transsexualism" or "sexual gender and identity disorders." *Id.* at 11.

In 2013, the APA published the fifth edition of the DSM, which replaced the term "gender identity disorder" (itself a substitute for "transsexualism" in the fourth) with "gender dysphoria." *Id.* at 10, 12. The change reflected the APA's conclusion that, by itself, identification with a gender different from one's biological sex—*i.e.*, transgender status—was not a disorder. *Id.* at 12. As the APA stressed, "not all transgender people suffer from gender dysphoria." *Id.* at 20 (brackets omitted). Instead, the mental condition of "gender dysphoria" was defined in the DSM as a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months duration" and "associated with clinically significant distress or impairment." *Id.* 12–13.

In the wake of these changes, Secretary Carter ordered the creation of a working group in July 2015 to study the possibility of "welcoming transgender persons to serve openly," and instructed it to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." *Id.* at 13. As part of this review, the Department commissioned RAND to study the issue. *Id.* The resulting RAND report concluded that allowing transgender service members to serve in their preferred gender would limit deployability, impede readiness, and impose costs on the military, but dismissed these burdens as "negligible," "marginal," or "minimal." Dkt. 40-35, at xii, 39–42, 46–47, 69–70; *accord* Report 14.

After this review, Secretary Carter ordered the Department on June 30, 2016, to adopt a new policy. First, the military had until July 1, 2017, to revise its accession standards. Report 14. Under this revision, a history of "gender dysphoria," "medical treatment associated with gender transition," or "sex reassignment or genital reconstruction surgery" would be disqualifying unless an applicant provided a certificate from a licensed medical provider that the applicant had been stable or free from associated complications for 18 months. *Id.* at 15. Second, and effective immediately, current service

members could not be discharged based solely on their "gender identity" or "expressed intent to transition genders," Dkt. 40-4, at 4, but instead, if diagnosed with gender dysphoria, could transition genders, Report 14.  Transgender service members who did not meet the clinical criteria for gender dysphoria, however, had to continue serving in their biological sex.  *Id.* at 15.

## II.     Development Of The Department's New Policy

Before the Carter accession standards took effect on July 1, 2017, the Deputy Secretary of Defense directed the Services to assess their readiness to begin accessing transgender individuals into the Military Services.  Dkt. 40-11.  "Building upon that work and after consulting with the Service Chiefs and Secretaries," Secretary Mattis "determined that it [was] necessary to defer the start of [these] accessions" so that the military could "evaluate more carefully the impact of such accessions on readiness and lethality."  *Id.*  Based on the recommendation of the services and in the exercise of his independent discretion and judgment, he therefore delayed the implementation of the new accession standards on June 30, 2017, until January 1, 2018.  *Id.*; *see* Report 4.  He also ordered the Under Secretary of Defense for Personnel and Readiness to lead a review, which would "include all relevant considerations" and last for five months, with an end date of December 1, 2017.  Dkt. 40-11.  Secretary Mattis explained that this study would give him "the benefit of the views of the military leadership and of the senior civilian officials who are now arriving in the Department," and that he "in no way presupposes the outcome of the review."  *Id.*; *see* Report 17.

While that review was ongoing, the President stated on Twitter on July 26, 2017, that "the United States Government will not accept or allow transgender individuals to serve in any capacity in the U.S. Military."  Op. 4.  The President then issued his 2017 Memorandum on August 25, 2017, calling for, *inter alia*, "further study" into the risks of maintaining the Carter policy in its entirety.

Report 17.[1]  In response, Secretary Mattis established a Panel of Experts on September 14, 2017, to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  Report 17.  The Panel consisted of the members of senior military leadership who had "the statutory responsibility to organize, train, and equip military forces" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force."  *Id.* at 18.  Specifically, the Panel was chaired by the Under Secretary of Defense for Personnel and Readiness (or an official performing those duties) and included the Under Secretaries of the Military Departments (or officials performing those duties), the Armed Services' Vice Chiefs, and Senior Enlisted Advisors.  *Id.*

In 13 meetings over the span of 90 days, the Panel met with military and civilian medical professionals, commanders of transgender service members, and transgender service members themselves.  *Id.*  It reviewed information about gender dysphoria, its treatment, and its effects on readiness, unit cohesion, and military resources.  *Id.*  It received briefing from three working groups or committees dedicated to issues involving personnel, medical treatment, and military lethality.  *Id.* It drew on the military's experience with the Carter policy to date and considered evidence supporting and cutting against its recommendations.  *Id.*  And, unlike those responsible for the Carter policy, it did not "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness," but made "no assumptions."  *Id.* at 19.  Exercising its professional military judgment, the Panel provided Secretary Mattis with recommendations.  *Id.*

After considering the Panel's recommendations, along with additional information, Secretary Mattis, with the agreement of the Secretary of Homeland Security, sent the President a memorandum in February 2018 proposing a new policy consistent with the Panel's conclusions.  *Id.*; *see* Mattis

---

[1] This filing does not describe the Memorandum and ensuing litigation given the Court's familiarity.

Memorandum.  The memorandum was accompanied by a 44-page report setting forth in detail the bases for the Department of Defense's recommended new policy.  Mattis Memorandum 3; *see* Report.

## III.   The Department's New Policy

In his memorandum, Secretary Mattis explained why departing from certain aspects of the Carter policy was necessary.  "Based on the work of the Panel and the Department's best military judgment," the Department had concluded "that there are substantial risks associated with allowing the accession and retention of individuals with a history or diagnosis of gender dysphoria and require, or have already undertaken, a course of treatment to change their gender."  Mattis Memorandum 2. It had also found "that exempting such persons from well-established mental health, physical health, and sex-based standards … could undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality."  *Id.*

Although the prior administration had concluded otherwise largely on the basis of the RAND report, "that study contained significant shortcomings."  *Id.*  Among other defects, it relied on "limited and heavily caveated data to support its conclusions"; failed to "meaningfully grapple with the effect of accommodating gender transitions on unit readiness, perceptions of fairness and equity, safety from injury in gender-specific training and competition, and reasonable expectations of privacy"; and did not seriously address "the limits of our knowledge concerning the capacity of cross-sex hormone therapy, sex reassignment surgery, and similar interventions to fully remedy the serious mental health concerns associated with gender dysphoria."  *Id.*  "In short, this policy issue has proven more complex than the prior administration or RAND assumed."  *Id.*

Accordingly, "in light of the Panel's professional military judgment and [his] own professional judgment," Secretary Mattis proposed a policy that continued some aspects of the Carter policy and departed from others.  *Id.*; *see id.* at 2–3; Report 4–6, 33–43.  Like the Carter policy, the new policy does not draw lines on the basis of transgender status, but presumptively disqualifies from military

service individuals with a certain medical condition, gender dysphoria. *Compare* Report 4–6, 19, *with* Dkt. 40-4. The key difference between the two policies is the exceptions to that presumptive disqualification.

Under the new policy, as under the Carter policy, individuals who "identify as a gender other than their biological sex" but who do not suffer clinically significant "distress or impairment of functioning in meeting the standards associated with their biological sex"—and therefore have no history or diagnosis of gender dysphoria—may serve if "they, like all other persons, satisfy all standards and are capable of adhering to the standards associated with their biological sex." Report 4.

Individuals who both are "diagnosed with gender dysphoria, either before or after entry into service," and "require transition-related treatment, or have already transitioned to their preferred gender," are presumptively "ineligible for service." *Id.* 5. This presumptive bar is subject to both individualized "waivers or exceptions" that generally apply to all Department and Service-specific standards and policies as well as a categorical reliance exception for service members who relied on the Carter policy. *Id.* Specifically, service members "who were diagnosed with gender dysphoria by a military medical provider after the effective date of the Carter policy, but before the effective date of any new policy," including those who entered the military "after January 1, 2018," "may continue to receive all medically necessary care, to change their gender marker in the Defense Enrollment Eligibility Reporting System (DEERS), and to serve in their preferred gender, even after the new policy commences." *Id.* at 5–6.

Individuals who "are diagnosed with, or have a history of, gender dysphoria" but who neither require nor have undergone gender transition are likewise "generally disqualified from accession or retention." *Id.* This presumptive disqualification is subject to the same exceptions discussed above as well as two new categorical ones. *Id.* With respect to accession, individuals with a history of gender dysphoria may enter the military if they (1) can demonstrate "36 consecutive months of stability (i.e.,

absence of gender dysphoria) immediately preceding their application"; (2) "have not transitioned to the opposite gender"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.* With respect to retention, those diagnosed with gender dysphoria after entering the military may remain so long as they (1) can comply with Department and Service-specific "non-deployab[ility]" rules; (2) do "not require gender transition"; and (3) "are willing and able to adhere to all standards associated with their biological sex." *Id.*

On March 23, 2018, the President issued a new memorandum concerning transgender military service. 2018 Memorandum. The 2018 Memorandum revoked the 2017 Memorandum, thereby allowing the Secretaries of Defense and Homeland Security to "exercise their authority to implement any appropriate policies concerning military service by transgender persons." *Id.*

## ARGUMENT

"Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong." *Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) (plurality op.) (internal quotation marks, ellipsis, and citation omitted). Accordingly, courts regularly dissolve preliminary injunctions when changed circumstances undermine the basis for the interlocutory relief. *See, e.g.*, *Ctr. for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 276–79 (4th Cir. 2013) (discussing dissolution of injunction in response to amendment of challenged law). Ordinarily, "dissolution should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place"—*i.e.*, "[t]he familiar quartet" of "likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994). The changed circumstances here preclude Plaintiffs from satisfying any of these criteria.

I.      **Plaintiffs Cannot Demonstrate A Likelihood of Success On The Merits**

A.      **The Current Challenge To The 2017 Presidential Memorandum Is Moot**

To start, Plaintiffs are no longer likely to succeed because their challenge is moot.  A case is moot "'when it is impossible for a court to grant any effectual relief to the prevailing party,'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013), and that is true here.  The only relief Plaintiffs seek is a declaration that the "directives encompassed in President Trump's Memorandum [from] August 25, 2017," are unconstitutional and an injunction of their enforcement.  Dkt. 39, at 40.  But because the 2017 Memorandum has been revoked, a declaration from this Court as to the constitutionality of that Memorandum would amount to an advisory opinion.

If Plaintiffs fear *future* injury from the new policy, which they have not challenged, those harms would stem from the independent action of the Secretaries of Defense and Homeland Security in implementing that policy rather than the 2017 or 2018 Memoranda.  *But see infra* Part II.A (explaining why Plaintiffs cannot show any injury from the new policy on the current record).  If Plaintiffs decide to challenge the Department's new policy once it is implemented, courts can assess the constitutionality of that policy at that time under the framework provided in the Administrative Procedure Act (APA), including the rule that any review would be limited to the administrative record, *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  In the meantime, this Court should hold that the current challenge is moot and dissolve the preliminary injunction.

Nor can Plaintiffs find refuge in the doctrine that "a defendant's voluntary cessation of a challenged practice" does not necessarily moot the case.  *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982).  When the government repeals and replaces one of its policies, the relevant question is "whether the new [policy] is sufficiently similar to the repealed [one] that it is permissible to say that the challenged conduct continues," or, put differently, whether the policy "has been 'sufficiently altered so as to present a substantially different controversy from the one … originally decided.'"  *Ne.*

9

*Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993).  When a new policy has "changed substantially," the voluntary cessation exception does not apply, as there is "no basis for concluding that the challenged conduct [is] being repeated."  *Id.*

Any dispute over the new policy "present[s] a substantially different controversy" than Plaintiffs' challenge to the 2017 Memorandum.  *Id.*  The target of Plaintiffs' complaint was a "categorical ban on service" in the face of what they described as "a thorough process of research and analysis" by former military leadership. Dkt. 39, at 3, 21.  Likewise, the Court's preliminary injunction rested on "the breadth of the exclusion" it believed the President had ordered—*i.e.*, a blanket "transgender service member ban"—and on its view that the President's "tweets" were not the result of "any considered military policy process."  Op. 5, 23, 43; *see* Op. 44 (adopting analysis of *Doe v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017)).  The Department's new policy, by contrast, contains several exceptions allowing some transgender individuals, including every individual Plaintiff here, to serve, and it is the product of independent military judgment following extensive study.  *See infra* Parts I.B.3, II.A.

At a minimum, the replacement of an alleged categorical exclusion with a more nuanced regime presents a substantially different controversy.  In *Department of Treasury v. Galioto*, 477 U.S. 556 (1986) (per curiam), a lower court held that a federal statute barring all former mental patients who were involuntarily committed from purchasing firearms was unconstitutional on the ground that it created an "irrebuttable presumption" that anyone involuntarily committed was permanently a threat "no matter the circumstances."  *Id.* at 559 (citation omitted).  During the appeal, Congress amended the law to allow anyone prohibited from purchasing firearms to seek individualized relief from the Treasury Department.  *Id.*  Concluding that "no 'irrebuttable presumption' now exists since a hearing

is afforded to anyone subject to firearms disabilities," the Supreme Court held the issue moot. *Id.*[2] This case is no different. Because Plaintiffs sought an injunction precluding enforcement of the 2017 Memorandum—and thereby effectively maintain the Carter policy, which, like the new policy, treats gender dysphoria as presumptively disqualifying, Op. 14—the heart of their challenge was necessarily limited to the (allegedly) categorical nature of that Memorandum. With that issue no longer live, the appropriate course is to dissolve that injunction.[3]

### B.      The New Policy Withstands Constitutional Scrutiny

In all events, Plaintiffs are not entitled to a preliminary injunction barring implementation of the new policy. To justify such relief, they would have to prove that the new policy likely violates equal protection principles. *See* Op. 42. They cannot do so. Even though this Court found it likely that the 2017 Memorandum was subject to and could not survive intermediate scrutiny, neither of those conclusions is justified with respect to the new policy.

### 1.      The New Policy Is Subject To Highly Deferential Review

On its face, the new policy triggers rational basis review. That policy, like the Carter policy before it, draws lines on the basis of a medical condition (gender dysphoria) and an associated treatment (gender transition), not transgender status. *Compare* Report 3–5, *with* Dkt. 40-4, at 4–5. *See generally* Op. 8 n.9. Such classifications receive rational basis review, which is why no one ever challenged the Carter policy on grounds that it was subject to heightened scrutiny. *See, e.g., Bd. of*

---

[2] The district court addressing Washington's challenge to the executive orders barring entry of certain foreign nationals took a similar tack. *Washington v. Trump*, No. 17-0141, 2017 WL 1045950 (W.D. Wash. Mar. 16, 2017) (Robart, J.). It held that its preliminary injunction against the first order did not extend to the second because of a new exception for lawful permanent residents and certain foreign nationals and a clarification that individuals could seek asylum. *Id.* at *3, *4.

[3] If, however, the Court concludes both that the challenge to the 2017 Memorandum still presents a live controversy and that at least some of the Plaintiffs would have standing to challenge the new policy, *but see infra* Part II.A, enjoining the 2017 Memorandum would not redress any of their purported injuries. If the new policy itself would necessarily disqualify any of those Plaintiffs from military service, an injunction against the (non-existent) 2017 Memorandum would fail to cure that harm.

*Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 365–68 (2001); *Geduldig v. Aiello*, 417 U.S. 484, 494–97 & n.20 (1974). Given that courts should be "reluctant to establish new suspect classes"—a presumption that "has even more force when the intense judicial scrutiny would be applied to the 'specialized society' of the military"—there is no basis for departing from rational basis review here. *Thomasson v. Perry*, 80 F.3d 915, 928 (4th Cir. 1996) (en banc).[4]

But even assuming *arguendo* that the new policy would trigger intermediate scrutiny outside of the military context, that context, unquestionably applicable here, requires a far less searching form of review. While the government is not "free to disregard the Constitution" when acting "in the area of military affairs," it is equally true that "the tests and limitations to be applied may differ because of the military context." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981). For instance, judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations destined for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). The same is true for the constitutional "rights of servicemembers" more generally, including those within the Due Process Clause. *Weiss v. United States*, 510 U.S. 163, 177 (1994); *see also Solorio v. United States*, 483 U.S. 435, 448 (1987) (listing "variety of contexts" where deferential review applied). In short, "constitutional rights must be viewed in light of the special circumstances and needs of the armed forces," and "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." *Beller v. Middendorf*, 632 F.2d 788, 810–11 (9th Cir. 1980) (Kennedy, J.) (rejecting due-process challenge to Navy regulation requiring discharge of gay and lesbian service members).

---

[4] Even if the new policy could be characterized as turning on transgender status, such classifications warrant rational basis review, not intermediate scrutiny. *See, e.g., Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227–28 (10th Cir. 2007) (rational basis review applies to classifications on the basis of transgender status, even in civilian context). Although this Court disagrees, Defendants respectfully reiterate this position to preserve the issue for further review. Defendants agree with the Court, however, that strict scrutiny is inappropriate. *See* Op. 43–44.

12

This different standard of review is necessary not only because the Constitution itself commits military decisions to "the political branches directly responsible—as the Judicial Branch is not—to the electoral process," but also because "it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see Rostker*, 453 U.S. at 65–66.  That is particularly true with respect to the "'complex, subtle, and professional decisions as to the composition … of a military force,' which are 'essentially professional military judgments.'" *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  In sum, "'the special status of the military has required, the Constitution has contemplated, Congress has created, and the Supreme Court has long recognized' that constitutional challenges to military personnel policies and decisions face heavy burdens." *Thomasson*, 80 F.3d at 927 (brackets omitted).

Although the Supreme Court has expressly refused to attach a "label[]" to the standard of review applicable to military policies alleged to trigger heightened scrutiny, *Rostker*, 453 U.S. at 70, several features of its decisions in this area demonstrate that rational basis review most closely describes its approach in practice.  First, even though the Court has declined "to hypothesize or invent governmental purposes for gender classifications *post hoc* in response to litigation," *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1697 (2017) (internal quotation marks, brackets, and citation omitted), it has done so when military deference is required.  In *Schlesinger v. Ballard*, 419 U.S. 498 (1975), the Court upheld a statutory scheme under which male naval officers were subject to mandatory discharge for failing twice to be promoted within roughly 10 years of service, while female officers were afforded 13 years to obtain equivalent promotions. *Id.* at 499–505, 510.  The Court explained that in enacting this framework, "Congress may … quite rationally have believed" that female officers "had less opportunity for promotion than did their male counterparts," and that these different standards would address the imbalance. *Id.* at 577.  In response, the main dissent criticized the Court for "conjur[ing] up a legislative purpose which may have underlain the gender-based distinction." *Id.* at 511 (Brennan,

J.); *cf. Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975) ("mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme" with a civilian sex-based classification).

Similarly, in *Rostker*, the Supreme Court rejected an equal protection challenge to a statute exempting women from the requirement to register for the draft. 453 U.S. at 83. Even though the challenge had been filed in 1971, the Supreme Court relied on Congress's analysis of the issue nine years later, when it declined to amend the statute to permit the conscription of women at President Carter's urging. *See id.* at 60–63. In doing so, the Court expressly rejected the argument that it "must consider the constitutionality of the [relevant statute] solely on the basis of the views expressed by Congress in 1948, when the [law] was first enacted in its modern form," *id.* at 74—even though those views consisted solely of impermissible "sexual stereotypes," *Goldberg v. Rostker*, 509 F. Supp. 586, 597 n.15 (E.D. Pa. 1980). Instead, because Congress in 1980 had "thoroughly reconsider[ed] the question of exempting women from [the draft], and its basis for doing so," its views from that time were "highly relevant in assessing the constitutional validity of the exemption." *Rostker*, 453 U.S. at 75.

Second, whereas the Court has rejected certain evidentiary defenses of sex-based classifications in the civilian context, *see, e.g., Craig v. Boren*, 429 U.S. 190, 199–204 (1976), it has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including evidence from former military officials. In *Goldman*, the Court rejected a free-exercise challenge to the Air Force's prohibition of a Jewish officer from wearing a yarmulke while working as a clinical psychologist in an Air Force base hospital, even though that claim would have triggered strict scrutiny at the time had it been raised in the civilian context. 475 U.S. at 510; *see id.* at 506. The Court did so even in the face of "expert testimony" from a former Chief Clinical Psychologist to the Air Force that religious exceptions to a military dress code would "increase morale," and even though the "Air Force's assertion to the contrary [was] mere *ipse dixit*, with no support from actual experience or

14

a scientific study in the record." *Id.* at 509; *see* Br. for Pet'r at 21, *Goldman*, 475 U.S. 503 (No. 84-1097); 1985 WL 669072, at *21. In the Court's view, the beliefs of such "expert witnesses" were "quite beside the point," as current "military officials … are under no constitutional obligation to abandon their considered professional judgment." 475 U.S. at 509. The principal dissent criticized this approach as a "subrational-basis standard" requiring deference to the military "no matter how … unsupported" its decision may be. *Id.* at 515 (Brennan, J.).

In *Rostker*, the Supreme Court again declined to overrule the considered judgment of the political branches in the military context, even in the face of disagreement within those branches. President Carter had recommended that Congress require women to register for the draft, 453 U.S. at 60, and had provided "testimony of members of the Executive and the military in support of that decision," *id.* at 79. The lower court relied on this testimony to hold that Congress's refusal to require women to register was unconstitutional because "'military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it.'" *Id.* at 63 (citation omitted). But the Supreme Court reversed, noting that the lower court had "palpably exceeded its authority" in "relying on this testimony," as Congress had "rejected it in the permissible exercise of its constitutional responsibility." *Id.* at 81–82.

Third, whereas concerns about "administrative convenience" ordinarily cannot be used to survive intermediate scrutiny, *e.g.*, *Califano v. Goldfarb*, 430 U.S. 199, 205 (1977), they may play a significant role in cases involving military judgments. In *Rostker*, Congress "did not consider it worth the added burdens of including women in draft and registration plans," as "'training would be needlessly burdened by women recruits who could not be used in combat,'" and "administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards would also exist.'" 453 U.S. at 81 (citation omitted). The Court reasoned that it was not its place "to dismiss such problems as insignificant in the context of military preparedness." *Id.* Again,

the dissents criticized the Court for jettisoning the requirements of intermediate scrutiny.  *See id.* at 94 (Brennan, J.) ("This Court has repeatedly stated that the administrative convenience of employing a gender classification is not an adequate constitutional justification under the *Craig v. Boren* test."); *id.* at 85 (White, J.) (same).

Fourth, the political branches enjoy significant latitude to choose "among alternatives" in furthering military interests.  *Id.* at 72 (majority op.).  Again, in *Rostker*, President Carter and military leadership urged a sex-neutral alternative to draft registration that they believed "would materially increase [military] flexibility, not hamper it,'" but Congress rejected that proposal in favor of retaining its sex-based approach.  453 U.S. at 63; *see id.* at 70.  Invoking the "deference due" Congress in this area, the Court refused "to declare unconstitutional [that] studied choice of one alternative in preference to another."  *Id.* at 71–72.  And again, the principal dissent attacked the Court's approach as "significantly different from" its analysis in ordinary sex-discrimination cases, as the government had not shown that "a gender-neutral statute would be a less effective means" of accomplishing military objectives.  *Id.* at 94 (Brennan, J.).  All of this indicates an application of rational basis review. *See Nguyen v. INS*, 533 U.S. 53, 78 (2001) (O'Connor, J., dissenting) ("that other means are better suited to the achievement of governmental ends … is of no moment under rational basis review," while "under heightened scrutiny, the availability of sex-neutral alternatives to a sex-based classification is often highly probative") (collecting cases).

Finally, arguable inconsistencies resulting from line-drawing have not been enough to render military decisions invalid.  In *Goldman*, for example, the Court acknowledged that the Air Force had an "exception … for headgear worn during indoor religious ceremonies" and gave commanders "discretion" to allow "visible religious headgear … in designated living quarters."  475 U.S. at 509. Additionally, service members could "wear up to three rings and one identification bracelet," even if those items "associate[d] the wearer with a denominational school or a religious or secular fraternal

organization" and thereby served as "emblems of religious, social, and ethnic identity."  *Id.* at 518 (Brennan, J., dissenting).  Yet the Court deferred to the Air Force's judgment that creating an exception for a psychologist who wanted to wear religious headgear in a hospital on base "would detract from the uniformity sought by [its] dress regulations."  *Id.* at 510 (majority opinion).  Had this case occurred in the civilian context and strict scrutiny been applied, it is doubtful that the regulation would have been sustained.

Given the Court's substantial departure from core aspects of intermediate and even strict scrutiny in cases involving military deference, Defendants believe the most appropriate description of the applicable standard is rational basis review.  But at a minimum, even if the Court prefers to label the standard a peculiar form of "intermediate scrutiny," Op. 43, its substantive analysis of the new policy should track the Supreme Court's highly deferential approach in this area.  *See Rostker*, 453 U.S. at 69–70 (disavowing the utility of traditional scrutiny labels in cases involving military deference); *see also Goldman*, 475 U.S. at 528 (O'Connor, J., dissenting) ("No test for free exercise claims in the military context is even articulated, much less applied.").  Said differently, regardless of the standard of review the Court ultimately employs, the basic elements of traditional intermediate scrutiny should not apply in the instant case.

## 2.    The New Policy Survives Highly Deferential Scrutiny

The Department's new policy survives the applicable level of scrutiny.  As a threshold matter, certain aspects of the policy should not be at issue.  To start, its treatment of transgender individuals without gender dysphoria—who are eligible to serve in their biological sex—is consistent with the Carter policy and hence this Court's preliminary injunction.  *See* Dkt. 40-4, at 4.  Nor can those with gender dysphoria dispute being held to the same retention standards, including deployability requirements, as all other service members.  And the 36-month period of stability for accession—as opposed to the Carter policy's 18 months—is not constitutionally significant, especially since it "is the

same standard the Department currently applies to persons with a history of depressive disorder," whereas the 18-month period "has no analog with respect to any other mental condition listed in [the accession standards]." Report 42.

The only change in the policy that is even arguably legally significant is its presumptive disqualification of individuals with gender dysphoria who require or have undergone gender transition, along with the corollary requirement that service members generally serve in their biological sex, and that change easily survives the highly deferential review applicable here. In the Department's considered judgment, accommodating gender transition would create unacceptable risks to military readiness; undermine good order, discipline, and unit cohesion; and create disproportionate costs. Mattis Memorandum 2. There should be no dispute that avoiding those harms is at least an important government interest. Indeed, courts must "'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest,'" *Winter*, 555 U.S. at 24, and here, the Department has concluded that minimizing these risks is "absolutely essential to military effectiveness," Mattis Memorandum 2. Thus, the only issue is whether this Court should defer to the military's judgment that the new policy is necessary to effectuating that critical interest. *See, e.g.*, Report 32. That should not be a close question.

### a. Military Readiness

In the Department's professional military judgment, service by those who require or have undergone gender transition poses at least two significant risks to military readiness. First, in light of "evidence that rates of psychiatric hospitalization and suicide behavior remain higher for persons with gender dysphoria, even after treatment" (including sex reassignment surgery) compared to others, as well as "considerable scientific uncertainty" over whether these "treatments fully remedy … the mental health problems associated with gender dysphoria," the Department found that "the persistence of these problems is a risk for readiness." Report 32. This risk-based assessment—

grounded in an extensive review of evidence, including materials unavailable at the time the Carter policy was adopted—is a classic military judgment entitled to deference. *See id.* at 19–27.

For example, the Centers for Medicare and Medicaid Services issued a study in August 2016, over a month after the Carter policy was announced, concluding that there was "not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria." Report 24. Although this study was primarily concerned with Medicare beneficiaries, it "conducted a comprehensive review" of "the universe of literature regarding sex reassignment surgery," which consisted of "over 500 articles, studies, and reports" addressing a more general population. *Id.* Of these materials, only "33 studies" were "sufficiently rigorous to merit further review," and "[o]verall, the quality and strength of evidence" in even these studies "were low." *Id.* In fact, only "six studies" provided "useful information" on the efficacy of sex reassignment surgery in general, and "the four best designed and conducted" ones "did not demonstrate clinically significant changes or differences in psychometric test results" following the procedure. *Id.* And "one of the most robust" of those six studies, a Swedish "nationwide population-based, long-term follow-up" of those who had undergone the surgery, "found increased mortality [due to suicide and cardiovascular disease] and psychiatric hospitalization for patients who had undergone sex reassignment surgery as compared to a healthy control group." *Id.* at 25. As the Swedish study concluded, "post[-]surgical transsexuals are a risk group that need long-term psychiatric and somatic follow-up," and "[e]ven though surgery and hormonal therapy alleviates gender dysphoria, it is apparently not sufficient to remedy the high rates of morbidity and mortality found among transsexual persons." *Id.* at 26.

The need to "proceed cautiously" in this area is particularly compelling given the uniquely stressful nature of a military environment. *Id.* at 27. Although none of the available studies "account for the added stress of military life, deployments, and combat," *id.* at 24, preliminary data show that

19

service members with gender dysphoria are "eight times more likely to attempt suicide" and "nine times more likely to have mental health encounters" than service members as a whole, *id.* at 21–22. Thus, in Secretary Mattis's judgment, the Department should not risk "compounding the significant challenges inherent in treating gender dysphoria with the unique, highly stressful circumstances of military training and combat operations." Mattis Memorandum 2.

In short, the Department concluded that the military risks stemming from the uncertain efficacy of a particular medical treatment for a particular medical condition outweighed the possible benefits of allowing individuals with that condition to serve as a general matter. That is precisely the sort of analysis the military must perform with respect to any medical accession or retention standard, and the cautious approach it took here is hardly out of the norm. *See* Report 3 ("Given the life-and-death consequences of warfare, the Department has historically taken a conservative and cautious approach in setting the mental and physical standards for the accession and retention of Service members."). Indeed, even the Carter policy implicitly acknowledged that gender dysphoria or gender transition could impede military readiness by requiring applicants to demonstrate that they had been stable or had avoided complications for an 18-month period. Dkt. 40-4. Given that even administrative convenience concerns cannot be dismissed in this context, *see Rostker*, 453 U.S. at 81, then the military's assessment of the tolerable level of risk from a medical condition and its treatment should not be second-guessed.

Second, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by gender transition, "most persons requiring transition-related treatment could be non-deployable for a potentially significant amount of time." Report 35. In the military's view, that limitation on deployability itself posed a separate "readiness risk." *Id.* at 33. After documenting the restrictions associated with transition-related medical treatments—including reports by some commanders that some transitioning service members would be non-deployable for up to two-and-

20

half-years—the Department made an assessment that these burdens on military readiness were unacceptable. *Id.* at 33–35. In addition to being problematic, these limitations would more broadly harm the service members' units. After all, any "increase in the number of non-deployable military personnel places undue risk and personal burden" on those service members who are "qualified and eligible to deploy." *Id.* at 35. In addition to these personal costs, service members who are deployed "more often to backfill or compensate for non-deployable" ones may face risks to family resiliency. *Id.* All of this poses a "significant challenge for unit readiness." *Id.*

This analysis should not be controversial. Even Secretary Carter acknowledged that "[g]ender transition while serving in the military presents unique challenges associated with addressing the needs of the Service member in a manner consistent with military mission and readiness needs." Dkt. 40-4, at 5. So did RAND, which concluded that the relevant limitations on deployability would "have a negative impact on readiness." Report 34–35. Although RAND dismissed this harm as "minimal" due to its estimation of the "exceedingly small number of transgender Service members who would seek transition-related treatment," *id.*, in the Department's judgment, that was the wrong question: "The issue is not whether the military can absorb periods of non-deployability in a small population," but "whether an individual with a particular condition can meet the standards for military duty and, if not, whether the condition can be remedied through treatment that renders the person non-deployable for as little time as possible." *Id.* at 35. After all, "by RAND's standard, the readiness impact of many medical conditions that the Department has determined to be disqualifying—from bipolar disorder to schizophrenia—would be minimal because they, too, exist only in relatively small numbers." *Id.* RAND "failed to analyze the impact" on "unit readiness" at "the micro level" by taking a "macro" view of the entire military. *Id.* at 14. Given that even Congress may reject the military's own judgment based on legislative concerns about deployability, then military leadership between administrations should be able to differ over what limitations on deployability are acceptable. *See Rostker*, 453 U.S. at

82 (noting congressional concern that absorbing female inductees into noncombat positions would impede deployability of combat-ready soldiers); *cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (even in the civilian context, the government must review "the wisdom of its policy on a continuing basis, for example, in response to … a change in administrations") (citation, quotation marks, and ellipsis omitted).[5]

### b.   Order, Discipline, Leadership, and Unit Cohesion

The Department similarly disagreed with the RAND Report's analysis of "the intangible ingredients of military effectiveness"—namely, "leadership, training, good order and discipline, and unit cohesion."  Report 3.  While the RAND Report recognized that "unit cohesion" was "a critical input for unit readiness" and a "key concern" in any analysis of transgender service, it concluded that accommodating gender transition would likely have "no significant effect" based on the experiences of four foreign militaries that had "fairly low numbers of openly serving transgender personnel."  Dkt. 40-35, at 44–45.  By adopting this approach, however, RAND, in the Department's judgment, failed to "examine the potential impact on unit readiness, perceptions of fairness and equity, personnel safety, and reasonable expectations of privacy"—"all of which are critical to unit cohesion"—"at the unit and sub-unit levels."  Report 14.  Aside from the potential harms to unit cohesion stemming from limits on deployability, *see supra* Part I.B.2.a, accommodating gender transition would undermine the objectives served by the military's sex-based standards—"good order and discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality"—in several respects, Report 28.

First, the Department concluded that any accommodation policy that does not require full sex-reassignment surgery threatens to "erode reasonable expectations of privacy that are important in

---

[5] The RAND Report also underestimated the limitations on deployability associated with gender transition.  For example, it estimated that "as an upper bound," a total of 140 service members would seek "transition-related hormone therapy."  Dkt. 40-35, at xi.  In reality, of the 424 approved treatment plans that are available for study, 388 of those—or over 91%—include such treatment.  Report 31.

maintaining unit cohesion, as well as good order and discipline." *Id.* at 37.   As the Department explained, "[g]iven the unique nature of military service," service members must frequently "live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom." *Id.*  To protect its service members' reasonable expectations of privacy, the Department "has long maintained separate berthing, bathroom, and showering facilities for men and women while in garrison." *Id.*  Far from a suspect practice, the Supreme Court has acknowledged that it is "necessary to afford members of each sex privacy from the other sex in living arrangements."  *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).  Indeed, "[i]n the context of recruit training, this separation is even mandated by Congress."  Report 37 (collecting statutes).

Accommodating gender transition, the military reasoned, at least with respect to those individuals who have not undergone a complete sex reassignment, would "undermine" these efforts to honor service members' "reasonable expectations of privacy."  *Id.* at 36.  Allowing transgender service members "who have developed, even if only partially, the anatomy of their identified gender" to use the facilities of either their identified gender or biological sex "would invade the expectations of privacy" of the non-transgender service members who share those quarters.  *Id.* at 37.

Absent the creation of separate facilities for transgender service members, which may well be "logistically impracticable for the Department," not to mention unacceptable to transgender service members, the military would face competing, and irreconcilable, privacy demands.  *Id.*  For example, the Panel of Experts received a report from one commander who faced dueling equal opportunity complaints under the Carter policy over allowing a transgender service member who identified as a female but had male genitalia to use the female shower facilities—one from the female service members in the unit and one from the transgender service member.  *Id.*  And even "the Department's handbook implementing the Carter policy" described potential difficulties that policy would create with respect to expectations of privacy.  *Id.* at 38.  These concerns are consistent with reports from

commanding officers in the Canadian military that "they would be called on to balance competing requirements" by "meeting [a] trans individual's expectations … while avoiding creating conditions that place extra burdens on others or undermined the overall team effectiveness." *Id.* at 40.

In the Department's judgment, such collisions of privacy demands "are a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions." *Id.* at 37. Accommodating gender transition would mean the "routine execution of daily activities" could be a recurring source of "discord in the unit" requiring commanders "to devote time and resources to resolve issues not present outside of military service." *Id.* at 38.  And any delayed or flawed solution to these conflicts by commanders "can degrade an otherwise highly functioning team," as any "appearance of unsteady or seemingly unresponsive leadership to Service member concerns erodes the trust that is essential to unit cohesion and good order and discipline." *Id.*

In addition, accommodating gender transition, at least in the context of basic recruiting, puts the Department at risk of violating federal law.  As it observed, Congress has "required by statute that the sleeping and latrine areas provided for 'male' recruits be physically separated from the sleeping and latrine areas provided for 'female' recruits during basic training and that access by drill sergeants and training personnel 'after the end of the training day' be limited to persons of the 'same sex as the recruits' to ensure 'after-hours privacy for recruits during basic training.'" *Id.* at 29 (citing 10 U.S.C. §§ 4319, 4320 (Army); *id.* §§ 6931, 6932 (Navy); *id.* §§ 9319, 9320 (Air Force)).  Accommodating the gender transition of recruits, drill sergeants, or training personnel in the context of basic recruiting places the Department in jeopardy of contravening those statutory mandates.  The new policy advances the military's obvious interest in avoiding that legal risk.[6]

---

[6] The Department cannot assume that courts will construe these statutes to accommodate gender transition.  Instead, because these laws do not provide any specialized definition for "sex," "male," or "female," courts may conclude that the terms retain their ordinary meaning, *e.g.*, *Johnson v. United States*, 559 U.S. 133, 138 (2010), which turns on biology rather than gender identity, *see, e.g.*, *Oxford American*

Second, accommodating gender transition creates safety risks for, and perceptions of unfairness among, service members by applying "different biologically-based standards to persons of the same biological sex based on gender identity, which is irrelevant to standards grounded in physical biology." *Id.* at 36. For example, "pitting biological females against biological males who identify as female, and vice versa," in "physically violent training and competition" could pose "a serious safety risk." *Id.* In addition, both male and female service members who are not transgender would likely be frustrated by a "biological male who identifies as female" but "remain[s] a biological male in every respect" and yet is "governed by female standards" in "training and athletic competition," which tend to be less exacting than male training and athletic standards *Id.*

Again, these are legitimate concerns, as both Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for service members to address biological differences between the sexes. *Virginia*, 518 U.S. at 550 n.19 (citing statute requiring standards for women admitted to the service academies to "be the same as those … for male individuals, except for those minimum essential adjustments in such standards required because of physiological differences between male and female individuals"). Especially given that "physical competition[] is central to the military life and indispensable to the training … of warriors," Report 36, the Department's concerns about the risks in this area should not be ignored.

Third, the Department was concerned that exempting transgender service members from uniform and grooming standards associated with their biological sex would create additional friction

---

*English Dictionary* 622 (1980) (defining "sex" as "either of the two main groups (*male* and *female*) into which living things are placed according to their reproductive functions, the fact of belonging to these"); *id.* at 401 (defining "male" as "of the sex that can beget offspring by fertilizing egg cells produced by the female"); *id.* at 237 (defining "female" as "of the sex that can bear offspring or produce eggs"); *Webster's Third New International Dictionary* 836, 1366, 2081 (1993) (similar). That is likely given that Congress has confirmed this understanding by prohibiting discrimination on the basis of "gender identity" in addition to, rather than within, discrimination on the basis of "sex" or "gender." *See, e.g.*, 18 U.S.C. § 249(a)(2); 42 U.S.C. § 13925(b)(13)(A).

in the ranks.  As it explained, "allowing a biological male to adhere to female uniform and grooming standards" would "create[] unfairness for other males who would also like to be exempted from male uniform and grooming standards as a means of expressing their own sense of identity."  *Id.* at 31; *cf.* Mattis Memorandum 3 ("The men and women who serve voluntarily accept limitations on their personal liberties—freedom of speech, political activity, freedom of movement—in order to provide the military lethality and readiness necessary to ensure American citizens enjoy their personal freedoms to the fullest extent.").  This is likely to be particularly true in cases where the standards prohibit non-transgender service members from expressing core aspects of their identity.  And in the military's judgment, policies that "creat[e] unfairness, or perceptions thereof," threaten to "adversely affect unit cohesion and good order and discipline."  Report 36.

Given these concerns, the Department concluded that accommodating gender transition "risks unnecessarily adding to the challenges faced by leaders at all levels, potentially fraying unit cohesion, and threatening good order and discipline."  *Id.* at 40.  And because of "the vital interests at stake—the survivability of Service members, including transgender persons, in combat and the military effectiveness and lethality of our forces"—the Department decided to take a cautious approach to accommodating gender transition.  *Id.* at 40–41.

This careful military judgment merits significant deference.  "Not only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy."  *Goldman*, 475 U.S. at 507–08; *see also Thomasson*, 80 F.3d at 926 (recognizing judgments about "the attainment of unit cohesion" as based on "the particular exigencies of military life" and entitled to "deference").  Indeed, the Supreme Court has repeatedly deferred to similar judgments in this military context in the past.  For example, one of its bases for upholding the sex-based exemption in *Rostker* was that it could not dismiss Congress's concerns about

"'administrative problems such as housing and different treatment with regard to … physical standards'" in the "context of military preparedness." 453 U.S. at 57. Likewise, in *Goldman*, the Court deferred to the military's view that "the wearing of religious apparel such as a yarmulke … would detract from the uniformity sought by the dress regulations." 475 U.S. at 509–10. And it did so even though in each case, others, including current and former military officials, disagreed. *See supra* pp. 14–15. There is no reason why the military's judgment here should be treated any differently.

### c.   Disproportionate Costs

Finally, the Department explained that under its experience with the Carter policy, accommodating gender transition was "proving to be disproportionately costly on a per capita basis." Report 41. Specifically, since the Carter policy's implementation, the medical costs for service members with gender dysphoria have "increased nearly three times" compared to others. *Id.* And that is "despite the low number of costly sex reassignment surgeries that have been performed so far"—"only 34 non-genital sex reassignment surgeries and one genital surgery"—which is likely to increase as more service members with gender dysphoria avail themselves of these procedures. *Id.* Notably, "77% of the 424 Service member treatment plans available for review"—*i.e.*, approximately 327 plans—"include requests for transition-related surgery" of some kind. *Id.*

Several commanders also reported that providing transition-related treatment for service members in their units "had a negative budgetary impact because they had to use operations and maintenance funds to pay for the Service members' extensive travel throughout the United States to obtain specialized medical care." *Id.* This is not surprising given that "gender transition requires frequent evaluations" by both a mental health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services." *Id.* at 41 n.164. Service members therefore "may have significant commutes to reach their required specialty care," and those "stationed

in more remote locations face even greater challenges of gaining access to military or civilian specialists within a reasonable distance from their duty stations." *Id.*

In light of the military's general interest in maximizing efficiency through minimizing costs, the Department decided that its disproportionate expenditures on accommodating gender transition could be better devoted elsewhere. *See id.* at 3, 41. Such a conclusion is not to be second-guessed. Even when the alleged constitutional rights of service members are involved, judgments by the political branches as to whether a benefit "consumes the resources of the military to a degree … beyond what is warranted" are entitled to significant deference. *Middendorf v. Henry*, 425 U.S. 25, 45 (1976) (no due process right to counsel at summary courts-martial).

*       *       *

In sum, the Department had significant concerns that "accommodating gender transition could impair unit readiness; undermine unit cohesion, as well as good order and discipline, by blurring the clear lines that demarcate male and female standards and policies where they exist; and lead to disproportionate costs." Report 5. It therefore made a "military judgment" that no longer providing a general accommodation for gender transition was "a necessary departure from the Carter policy." *Id.* at 32. In doing so, it was "well aware that military leadership from the prior administration, along with RAND, reached a different judgment on these issues." *Id.* at 44. But the Department's latest review of the issue revealed that "the realities associated with service by transgender individuals are more complicated than the prior administration or RAND had assumed." *Id.* In fact, even RAND had "concluded that allowing gender transition would impede readiness, limit deployability, and burden the military with additional costs," but dismissed "such harms [as] negligible in light of the small size of the transgender population." *Id.* But given "the various sources of uncertainty in this area, and informed by the data collected since the Carter policy took effect," the Department was "not convinced that these risks could be responsibly dismissed or that even negligible harms" (at the macro

28

level) "should be incurred given [its] grave responsibility." *Id.* It therefore "weighed the risks associated with maintaining the Carter policy against the costs of adopting a new policy that was less risk-favoring," and concluded that "the various balances struck" by the new policy "provide the best solution currently available." *Id.* That careful cost-benefit analysis by the Defense Department easily survives the highly deferential form of review applicable here.

### 3. The New Policy Is Consistent With This Court's Prior Reasoning

The Department's new policy also addresses all of the concerns that this Court held justified enjoining the enforcement of its understanding of the 2017 Memorandum's directives. None of the reasons the Court gave for either eschewing a deferential form of review or for deeming those directives to be likely unconstitutional applies to this new policy.

In reviewing the 2017 Memorandum, this Court agreed that "deference is owed to military personnel decisions and to the military's policymaking process," but declined to apply that deferential form of review based on its conclusion that the challenged directives emerged in "the absence of any considered military policymaking process." Op. 43. The same cannot be said about the new policy.

Likewise, all of "the unusual factors" that caused this Court to rule that the 2017 Memorandum would likely fail intermediate scrutiny are absent here. *Doe*, 275 F. Supp. 3d at 212; *see* Op. p. 44 (adopting *Doe* court's equal protection analysis). In other words, even if an ordinary form of intermediate scrutiny applied, the new policy would survive it.[7]

First, whereas this Court was troubled by the sheer breadth of the 2017 Memorandum—which it understood to "ban[] the accession, and permit[] the discharge, of an entire category of individuals from the military solely because they are transgender," *Doe*, 275 F. Supp. 3d at 211–12; Op. 30–33— the new policy is considerably narrower. To start, it permits those service members diagnosed with gender dysphoria by a military medical provider between the effective date of the Carter policy and

---

[7] It would *a fortiori* survive rational basis review. *Cf.* Op. 44 (ruling otherwise as to the Memorandum).

the effective date of the new policy to continue to serve in their preferred gender and receive any medically necessary procedure.  Report 43.  That significant exception alone makes this policy far more nuanced than this Court's understanding of the policy set forth in the 2017 Memorandum.  As for applicants and service members going forward, the new policy does not turn "solely" on whether "they are transgender," *Doe*, 275 F. Supp. 3d at 211, but, like the Carter policy, on whether they have a history or diagnosis of gender dysphoria, a medical condition that is not coterminous with transgender status, *see* Op. 8 n.9; Report 4–6, 20.  And even then, individuals with a history or diagnosis of this medical condition are not barred from military service across the board, but may instead qualify for a number of categorical exemptions in addition to the possibility of individualized waivers.  *See* Report 4–6.  In short, the new policy cannot be fairly characterized as one "banning all transgender individuals from serving in the military."  *Doe*, 275 F. Supp. 3d at 215.

Second, the reasons for this nuanced policy are neither "hypothetical" nor "extremely overbroad."  *Id.* at 212.  Instead, they are rooted in extensive studies, *see, e.g.*, Report 19–27; experience under the Carter policy, *see, e.g.*, *id.* at 8, 34, 37, 41; and the considered professional judgment of military officials, *see, e.g.*, *id.* at 4, 18, 32, 41, 44.  And even where the new policy appears to sweep broadly, the Department explained why it does so.  For example, the Department considered, but rejected, allowing individuals who had undergone "a full sex reassignment surgery" to serve.  Report 31.  As it explained, that measure would be "at odds with current medical practice, which allows for a wide range of individualized treatment" for gender dysphoria.  *Id.*  It also would have little practical effect, as the "rates for genital surgery are exceedingly low—2% of transgender men and 10% of transgender women."  *Id.*  In fact, only 22 service members have requested a waiver for that procedure so far, which has occurred only once (for a twenty-third individual).  *Id.*  And in any event, this measure would not address concerns about "the inconclusive scientific evidence that transition-related treatment restores persons with gender dysphoria to full mental health."  *Id.* at 41.  Such careful

reasoning, resting in part on a recognition of the significant diversity of treatments for gender dysphoria, cannot be cast as "unsupported, 'overbroad generalizations about the different talents, capacities, or preferences,' of transgender individuals.'" *Doe*, 275 F. Supp. 3d at 212.

Third, the "military concerns" underlying the new policy were not "studied and rejected by the military itself." *Id.* at 213.  To be sure, the former officials responsible for the Carter policy may object to the Department's current approach, but, as *Rostker* and *Goldman* illustrate, such disagreement does not alter the deferential analysis required here.  *See supra* pp. 14–15; *cf. Winter*, 555 U.S. at 17 (deferring to the military's judgment in the face of the plaintiffs' "scientific studies, declarations from experts, and other evidence").   Indeed, in issuing its injunction, the *Doe* court stressed that the "additional studies" could "be undertaken" and that the Carter policy could "be reevaluated," 275 F. Supp. 3d at 215, and it crafted its order to permit the military to "conduct[] studies" and "gather[] advice or recommendations," *id.* at 217.  All of this presumes the ability to adopt a different policy. Now that the military has completed its latest review, its "previous study cannot forever bind future administrations" from changing course.  *Id.* at 215.

Finally, far from being "abruptly announced," the new policy was accompanied by "the formality [and] deliberative processes" that this Court expected.  *Doe*, 275 F. Supp. 3d at 213.  The Department's independent reexamination of the Carter policy—begun without any direction from the President and well before his July 25, 2017 statement on Twitter—was an extensive deliberative process lasting over seven months and involving many of the Department's high-ranking officials as well as experts in a variety of subjects.  *See* Mattis Memorandum 1–2; Report 17–18.  The Department considered evidence that both supported and cut against its approach, including the materials underlying, and the military's experience with, the Carter policy itself, and thoroughly explained why it was departing from that policy to some extent.  *See, e.g.*, Report 18, 44.  And while much of this deliberative process occurred while litigation was ongoing, the same was true in *Rostker*, and that did

31

not render Congress's decisionmaking suspect.  *See supra* p. 14.  In short, while some may disagree with the Department's conclusions, they cannot fairly dispute that those good-faith judgments were "'driven by genuine concerns regarding military efficacy.'"  Op. 43.

## II.    Plaintiffs Have Not Satisfied The Equitable Factors For A Preliminary Injunction

Even if Plaintiffs could establish a live controversy in which they were likely to succeed, the preliminary injunction would still have to be dissolved.  Plaintiffs have not demonstrated that they meet any of the equitable factors necessary for maintaining this relief in light of the revocation of the 2017 Memorandum and the military's proposal of a new policy.

### A.    Plaintiffs Have Not Established Irreparable Injury

To start, Plaintiffs have not shown that they would suffer an irreparable injury from the new policy.  In fact, they would not even have standing to challenge it.  All six individual Plaintiffs would qualify for the new policy's reliance exception—and would therefore be able to continue serving in their preferred gender, apply for commissions, and receive medical treatment—because each received a diagnosis of gender dysphoria from a military medical provider during the time the Carter policy was in effect.  *See* Op. 15–21; Dkt. 39, at 6–10; Report 43.  Accordingly, these Plaintiffs would not sustain any injury under the new policy, let alone an irreparable one.  The same can be said for the ACLU of Maryland, whose associational standing rests on "the injuries experienced by Stone."  Op. 30 n.14.  This lack of any cognizable harm from the new policy here is reason alone to dissolve the injunction.

### B.    Plaintiffs Have Not Established the Remaining Equitable Factors

In contrast to the absence of any irreparable harm associated with dissolving the preliminary injunction, maintaining this order will force the Defense Department to adhere to a policy that it has concluded poses "substantial risks" and threatens to "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality."  Mattis Memo 2; *see also, e.g.*, Report 32–35, 41, 44.  These "specific, predictive judgments"

from "senior" military officials—including the Secretary of Defense himself—"about how the preliminary injunction would reduce the effectiveness" of the military merit significant deference. *Winter*, 555 U.S. at 27.  After all, the military is not "required to wait until the injunction actually results in an inability" to effectively prepare "for the national defense before seeking its dissolution."  *Id.* at 31 (internal quotation marks, brackets, and ellipsis omitted).  "Should the judiciary interfere with that intricate mix of morale and discipline that fosters unit cohesion," for example, "it is simply impossible to estimate the damage that a particular change could inflict upon national security," as "'there is no way to determine and correct the mistake until it has produced the substantial and sometimes irreparable cost of military failure.'"  *Thomasson*, 80 F.3d at 926 (brackets omitted).

Although this Court held that the equities favored granting a preliminary injunction with respect to the 2017 Memorandum, that was due to its belief that, "[o]n the record before [it]," there was "no support for the claim that the ongoing service of transgender people would have any negative effect[] on the military at all."  Op. 45.  The record now before the Court is very different.  The Defense Department has documented the risks associated with the Carter policy and explained why, in its professional military judgment, it was "necessary" to depart from that framework.  Report 32.  Plaintiffs, by contrast, have not even shown a constitutionally cognizable injury, let alone an irreparable one.  Although "military interests do not always trump other considerations," in this case, "the proper determination of where the public interest lies" here should not be difficult.  *Winter*, 555 U.S. at 26.  It is Secretary Mattis's "professional judgment," supported by the recommendations and military judgment of the Panel of Experts, that "these policies will place the Department of Defense in the strongest position to protect the American people, to fight and win America's wars, and to ensure the

survival and success of our Service members around the world," Mattis Memorandum 3, and Plaintiffs have offered no basis for why the military should be precluded from adopting them.

## CONCLUSION

This Court should dissolve the preliminary injunction issued on November 21, 2017.  In light of the Department of Defense's judgment that maintaining the Carter policy poses substantial risks to military readiness, Defendants respectfully request a ruling on this motion as soon as possible and no later than May 23, 2018.

Dated: March 23, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

BRETT A. SHUMATE
Deputy Assistant Attorney General

BRINTON LUCAS
Counsel to the Assistant Attorney General

JOHN R. GRIFFITHS
Branch Director

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Ryan B. Parker*
RYAN B. PARKER
Senior Trial Counsel
ANDREW E. CARMICHAEL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Telephone: (202) 514-4336
Email: ryan.parker@usdoj.gov

Counsel for Defendants