IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BROCK STONE, *et al.*,

Plaintiffs,

vs.

DONALD J. TRUMP, *et al.*,

Defendants.

Case No. 1:17-cv-02459-MJG

**EXPERT DECLARATION OF GEORGE RICHARD BROWN, MD, DFAPA
IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE THE
PRELIMINARY INJUNCTION**

1.      I, George R. Brown, have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2.      My professional background and qualifications are set forth in my previous declaration dated September 13, 2017. *See* ECF No. 40-32. A copy of that declaration is attached as Ex. A.

3.      The purpose of this supplemental declaration is to offer my expert opinion on the "Department of Defense Report and Recommendations of Military Service By Transgender Persons," which I refer to in this declaration as the "Implementation Report." A copy of the Implementation Report is attached as Ex. B.

4.      I have knowledge of the matters stated in this declaration and have collected and cite to relevant literature concerning the issues that arise in this litigation.

5.      As noted in my previous declaration, I am being compensated at an hourly rate for actual time devoted, at the rate of $400 per hour for work that does not involve depositions or court testimony (e.g., review of materials, emails, preparing reports); $500 per hour for

1

depositions (there is a half-day fee for depositions); $600 per hour for in-court testimony; and $4000 per full day spent out of the office for depositions and $4800 per full day out of the office for trial testimony. Travels days necessary for work are billed at half the "work day" rate plus expenses. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

### THE IMPLEMENTATION REPORT REJECTS THE OVERWHELMING MEDICAL CONSENSUS REGARDING TRANSGENDER IDENTITY AND TREATMENT FOR GENDER DYSPHORIA

6.      Although the Implementation Report refers to a study conducted by a "Panel of Experts," the referenced panel does not appear to have included any experts in treating gender dysphoria or any medical experts at all. The Implementation Report indicates that the panel consulted with such experts, but the Implementation Report appears to have consistently disregarded what those experts say. *See* Ex. B, Implementation Report at 17.

7.      As a result, the Implementation Report relies on notions of gender dysphoria and transgender identity that have no basis in fact, science, or medicine and that have been rejected by the mainstream medical community.

8.      In my previous declaration, I explained that arguments that the mental health of transgender persons could justify prohibiting such individuals from serving in the military are wholly unfounded and unsupported in medical science. *See* Ex. A, Sept. 13, 2017 Brown Decl. ¶¶ 72–76. Being transgender—and living in accordance with one's gender identity—is not a mental defect or disorder. To the extent the misalignment between gender identity and assigned birth sex creates clinically significant distress (gender dysphoria), that distress is curable through appropriate medical care that allows the individual to live consistently with their gender identity.

2

9.      Only a subset of transgender people have gender dysphoria. If a transgender person is able to live in accordance with their gender identity from an early age, they may never develop gender dysphoria as an adult. If a transgender person develops gender dysphoria, they can receive appropriate transition-related care that resolves the clinically significant distress. For transgender people who have resolved symptoms of gender dysphoria, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (2013) ("DSM-5") provides a separate "post-transition" diagnostic subtype to reflect that the gender dysphoria is in remission and that the person may only need a maintenance dose of cross-sex hormones.

10.      The Implementation Report turns this understanding on its head by requiring transgender people to live in accordance with the sex assigned to them at birth.

11.      The Implementation Report directly contradicts the medical consensus about the nature of gender dysphoria by treating every transgender person who lives according to the person's gender as having a disabling mental health condition even when the person no longer experiences gender dysphoria. The medical community has definitively rejected that view. In response to the Implementation Report, the American Psychological Association stated that it "is alarmed by the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care." *See* Ex. C, APA Statement Regarding Transgender Individuals Serving in Military. The American Medical Association released a similar statement reaffirming that "there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service" and expressing concern that the Implementation Report "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care." *See* Ex. D, AMA Letter to Secretary James Mattis. The American

Psychiatric Association also released a statement denouncing the Implementation Report and reiterating that "[t]ransgender people do not have a mental disorder; thus, they suffer no impairment whatsoever in their judgment or ability to work." *See* Ex. E, APA Statement.

12.     Decades of research have demonstrated that attempting to treat gender dysphoria by forcing transgender people to live in accordance with their sex assigned at birth—to "convert" them out of being transgender—is ineffective, unethical, and dangerous. The mainstream medical community overwhelmingly condemns this "conversion therapy."

13.     The Implementation Report appears to dispute the consensus of the mainstream medical community that gender dysphoria is amenable to treatment through social and medical transition. As noted in my previous declaration, the American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association all agree that medical treatment for gender dysphoria is medically necessary and effective. *See* American Medical Association, Resolution 122 (A-08) (2008); American Psychiatric Association, Position Statement on Discrimination Against Transgender & Gender Variant Individuals (2012); Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline (2017); American Psychological Association Policy Statement on Transgender, Gender Identity and Gender Expression Nondiscrimination (2009). *See* Ex. A, Sept. 13, 2017 Brown Decl. ¶ 34.

14.     Sixty years of clinical experience and data have demonstrated the efficacy of treatment for the distress resulting from gender dysphoria (see, for example, the recently published multi-country, long-term follow up study: Tim C. van de Grift et al., *Effects of Medical Interventions on Gender Dysphoria and Body Image: A Follow-Up Study*, 79 Psychosomatic Med. 815 (Sept. 2017)). The Implementation Report asserts that this evidence is

unreliable because there are no "double-blind" scientific studies regarding the efficacy of surgical care for gender dysphoria. But medical standards of care are not determined solely by double-blind studies, especially in the context of surgery. Double-blind studies with "sham" surgeries are often impossible or unethical to conduct.

14.     If the military limited all medical care to surgical procedures supported by prospective, controlled, double-blind studies, then only a very few medical conditions would ever be treated. For example, one of the most common surgical procedures performed in the United States is a tonsillectomy, with over 530,000 cases completed a year, using multiple, competing surgical techniques. However, a review of the evidence base for this very common procedure, including when to apply it and the best surgical techniques to utilize, is not supported by "double blind" controlled studies in spite of the common use of this treatment over centuries. *See* Reginald F. Baugh et al., *Clinical Practice Guideline: Tonsillectomy in Children*, 144 Otolaryngology–Head and Neck Surgery S1 (2011)). Baugh and coauthors noted: "While there is a body of literature from which the guidelines were drawn, significant gaps remain in knowledge about preoperative, intraoperative, and postoperative care in children who undergo tonsillectomy." *Id.* at S22.

15.     Similarly, acute appendicitis is one of the most common causes of acute abdominal pain in the United States. However, it remains unclear whether the common approach of appendectomy is superior to nonsurgical treatment with antibiotics in many patients. A recent Cochrane review was inconclusive: "We could not conclude whether antibiotic treatment is or is not inferior to appendectomy. Because of the low to moderate quality of the trials, appendectomy remains the standard treatment for acute appendicitis." *See* Ingrid M. H.A. Wilms et al.,

*Appendectomy Versus Antibiotic Treatment for Acute Appendicitis*, Cochrane Database of Systematic Rev. (2011).

16.     By insisting that treatment for gender dysphoria—unlike treatment for virtually every other medical condition—be supported by "double blind" studies, the Implementation Report holds the robust medical consensus surrounding treatment for gender dysphoria to an impossible standard—and a standard that few if any medical conditions are required to meet.

17.     The Implementation Report also mischaracterizes a recent decision by the U.S. Department of Health & Human Services Center for Medicare and Medicaid Services ("CMS"). *See* Ex. B, Implementation Report at 24–26. In 2014, an impartial adjudicative board in the Department of Health & Human Services concluded, based on decades of studies, that surgical care to treat gender dysphoria is safe, effective, and not experimental. *See* Ex. F, NCD 140.3, Transsexual Surgery. The decision specifically noted that, regardless of whether the studies were randomized double-blind trials, there was sufficient evidence to prove "a consensus among researchers and mainstream medical organizations that transsexual surgery is an effective, safe and medically necessary treatment for [gender dysphoria]." *Id.* at 20. Ever since the adjudicative board's decision, Medicare has provided coverage for transition-related surgery based on patients' individual needs.

18.     In the document referenced by the Implementation Report, CMS decided to continue covering surgery based on patients' individual needs and refrain from issuing national standards regarding how to determine medical necessity in individualized cases. *See* Ex. G, CMS Report. The Implementation Report incorrectly states that CMS "found insufficient scientific evidence to conclude that such surgeries improve health outcomes for persons with gender dysphoria." Ex. B, Implementation Report at 24 n.82. In fact, the decision specifically clarified

that "GRS [gender reassignment surgery] may be a reasonable and necessary service for certain beneficiaries with gender dysphoria," but "[t]he current scientific information is not complete for CMS to make a [national coverage determination] that identifies *the precise patient population* for whom the service would be reasonable and necessary." Ex. G, CMS Report at 54 (emphasis added). In particular, CMS expressed concern that the Medicare population includes "older adults [who] may respond to health care treatments differently than younger adults." *Id*. at 57. These differences can be due to, for example, multiple health conditions or co-morbidities, longer duration needed for healing, metabolic variances, and impact of reduced mobility." *Id*. The CMS memorandum concluded that the appropriateness of surgical care for this population should be determined on an individualized basis. Indeed, most medical and surgical care provided to patients should be individualized, taking into account each patient's unique clinical circumstances.

## INDIVIDUALS WHO HAVE UNDERGONE GENDER TRANSITION ARE MEDICALLY FIT TO ENLIST

19.     To justify prohibiting transgender people from serving even if they have resolved the distress associated with gender dysphoria, the Implementation Report attempts to use a transgender person's history of gender dysphoria as a proxy for *other* mental health conditions such as anxiety, depression, and suicidal behavior.

20.     Statistically, transgender people as a group are at greater risk of experiencing those conditions as a result of the stressors inherent in being prevented from transitioning or obtaining medical care throughout all, or much, of their lives. Some studies have documented that these health disparities can persist even after transition-related treatment because of the continuing effects of discrimination and the reality that gender dysphoria-specific treatments are not panaceas for all problems that a person may experience in their life (nor were these

treatments designed to be).  *See, e.g.*, Ex B, Implementation Report at 25 (citing Cecilia Dhejne et al., *Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*, 6 PloS One, 6 (2011)).  But there is no evidence to support the notion that every individual transgender person is at risk of developing one of these conditions, particularly for those who have been treated early in their lives, as opposed to those who never received treatment or who may have come to treatment much later in life, such as the transgender veterans studied by my research group and cited in the Implementation Report at 21 n.60 (citing George R. Brown & Kenneth T. Jones, *Mental Health and Medical Health Disparities in 5135 Transgender Veterans Receiving Healthcare in the Veterans Health Administration: A Case-Control Study*, 3 LGBT Health 128 (2016)).

21.     Under the Open Service policy, all prospective military service members must undergo a rigorous examination to identify any pre-existing mental health diagnoses that would preclude enlistment.  There is no reason to use a person's transgender status as a proxy for depression, anxiety, or suicidal ideation because the military directly screens for those conditions.  Anyone with a history of suicidal behavior—whether transgender or not—is categorically barred from enlisting.  *See* DoDI 6130.03, Enclosure 4 § 29(n). [1] Anyone with a history of anxiety or depression—whether transgender or not—is barred from enlisting unless, *inter alia*, they have been stable and without medical treatment for 24 consecutive months or 36 consecutive months respectively.  *See id.* §§ 29(f), (p).  As a result, any transgender individual who actually has one of those conditions is already screened out without a need for a categorical ban.

---

[1] On March 30, 2018, DOD issued new regulations, which will go into effect on May 6, 2018. The U.S. Military Entrance Processing Command has not yet issued guidance applying the new regulations.

22.     There is no medical basis for using a transgender person's history of gender dysphoria as a proxy for other medical conditions that the person does not actually have. This approach is akin to assuming non-transgender female applicants are, or should be considered, clinically depressed, as it is well known that depressive disorders are about twice as common in non-transgender females than in non-transgender males. *See* Paul R. Albert, *Why Is Depression More Prevalent in Women?* 40 J. of Psychiatry & Neuroscience 219–21 (2015)). If a transgender individual who seeks to enlist in the military has already transitioned, no longer experiences gender dysphoria, and has been screened for other mental health conditions (including depression, anxiety, and suicidal ideation) there is no reason to conclude that individual is at elevated risk of developing one of these comorbidities in the future.

23.     The Implementation Report distorts my own work by citing a recent study in which I documented that some transgender veterans who have received treatment after years of living in the shadows continue to have health disparities even after their gender dysphoria is resolved through treatment. *See* Ex. B, Implementation Report at 21 n.60. The veterans in my study were untreated veterans for a long period of time and survived—but did not thrive—while living an inauthentic life in the shadows on active duty. Many of the transgender veterans included in this large study had *never* received treatment for gender dysphoria. Clearly, the population group of transgender individuals in that study is not comparable to the population group of people who have already received medical care, resolved their gender dysphoria, and are coming to the military openly stating they are transgender.

24.     The Implementation Report also states that data regarding existing service members has called into question assumptions about the mental health of transgender service members. *See* Ex. B, Implementation Report 21. I have reviewed USDOE 2633-2664, which

appears to be a slide-show presentation of the data on which the Implementation Report relies. *See* Ex. H, USDOE 2633-2664. It should be noted that my career as an academic research psychiatrist, including conducting extensive research within the Department of Defense and the Department of Veterans Affairs for many years, enables me to critically assess research design, methodology, and outcomes.

25.     As an initial matter, none of the data relates to service members who have completed transition and are enlisting for the first time—the group of people who meet the Open Service standards and began the process of enlisting on or after January 1, 2018. The data are exclusively from service members who were diagnosed with gender dysphoria while already serving, in some cases well before any guidance was provided by DoD for treatment. Again, this means that the data reflects a group of people who were serving in the shadows for years before they were allowed to serve openly.

26.     Even with respect to these service members, the data is fundamentally flawed and presented in a grossly misleading manner. The study period for the data was for the 22-month period from October 1, 2015 to July 26, 2017. But Secretary Carter's Open Service Directive was not issued until June 30, 2016, and the military did not issue force-wide treatment protocols for gender dysphoria until October 1, 2016. As a result, for 12 out of the 22 months in the study, the service members were, with few exceptions, not serving openly and not receiving DoD-sanctioned treatments for gender dysphoria.

27.     If the purpose of the study is to draw conclusions about the health of transgender service members under the Open Service policy, it is fundamentally illegitimate to include data from before that policy went into effect and before those service members were allowed to receive health care under DoD guidelines to treat their gender dysphoria.

28.     For example, the Implementation Report cites data from the study for the proposition that transgender service members had an average of 28.1 mental health encounters over a 22-month period. *See* Ex. B, Implementation Report at 24; Ex. H, USDOE 2633-2664 at 8. But it is impossible to determine whether these mental health encounters occurred before or after the Open Service policy went into effect. If the utilization rate dropped once service members started receiving care for gender dysphoria, then the data would actually support the efficacy of the Open Service policy.

29.     The Implementation Report also ignores the critical fact that service members were required to meet with mental health providers numerous times to document their gender dysphoria as a precondition for receiving health care for gender dysphoria, and for continued access to cross-sex hormones. It is unknown how many of these visits were mandated/required, as opposed to visits voluntarily requested by service members for mental health care. As a result, without more specific data, there is no reason to conclude that mental health visits by transgender service members who are initiating transition-related care are a sign of co-morbid mental health conditions. The report is quite misleading is this regard, as it implies that all mental health visits by transgender service members were initiated for the treatment of mental illnesses, when this is far from the truth.

30.     Similarly, the Implementation Report cites data from the study for the proposition that service members with gender dysphoria are "eight times more likely to attempt suicide than Service members as a whole." Ex. B, Implementation Report at 12. In fact, the underlying data refers to "suicidal ideation," not actual suicide attempts. Ex. H, USDOE 2633-2664 at 9. Moreover, with respect to suicidal ideation, the data does not reveal whether the suicidal ideation was reported before or after the service member was allowed to serve openly and receive

treatment. Given the fundamental flaws with the study methodology and the low number of observed events, the data presented on this, and other, mental health questions are not interpretable in any meaningful way.

31.     In short, transgender individuals should be screened and evaluated for mental health conditions the same way every other person is screened and evaluated. There is no medical basis to using a transgender individual's history of gender dysphoria as a proxy for other mental health conditions that they do not have.

### TRANSGENDER SERVICE MEMBERS WHO HAVE TRANSITIONED ARE PHYSICALLY FIT TO ENLIST AND DEPLOY

32.     As I explained in my previous declaration, the argument that cross-sex hormone treatment should be a bar to service for transgender individuals is not supported by medical science or current military medical protocols. Experts in the endocrine treatment of transgender people have previously advised military medical providers that cross-sex hormone treatments can be accomplished without difficulty, both before accession and after service has begun. *See* WPATH Timeline Guide for United States Armed Service Members Going Through Transgender Hormonal or Surgical Transition (Jan. 2017), https://www.wpath.org/newsroom/policies (attached as Ex. I).

33.     The military allows people with a history other medical conditions to enlist even when the condition is currently being managed by medication. Individuals with abnormal menstruation, dysmenorrhea, and endometriosis may enlist if their conditions are adequately managed through hormone medication. *See* DoDI 6130.03, Enclosure 4 §§ 14(a), (d), (e).[2]

---

[2] As noted previously noted, DOD issued new regulations on March 30, 2018, which will go into effect on May 6, 2018. *See supra* n.1. The U.S. Military Entrance Processing Command has not yet issued guidance applying the new regulations.

Individuals with Gastro-Esophageal Reflux Disease or high cholesterol may enlist if they are taking medication with no relevant side effects. *Id.* §§ 13(a), 25(i).

34.     The Implementation Report asserts that transgender service members receiving cross-sex hormone therapy would risk having their treatment disrupted if they are deployed. But the same concerns about interruptions apply to every service member who is deployed while taking medication. These concerns have not been a barrier to deployment for service members who require hormones for other medical conditions or who require medications for other mental health conditions that allow for deployment.

35.     Military policy also allows service members to take a range of medications, including hormones, while deployed in combat settings. Access to medication is predictable, as "[t]he Military Health Service maintains a sophisticated and effective system for distributing prescription medications to deployed service members worldwide." *See* M. Joycelyn Elders et al.*, Medical Aspects of Transgender Military Service*, 41 Armed Forces & Soc'y 199, 207 (Aug. 2014) (the "Elders Commission Report").

36.     Hormone therapy is neither too risky nor too complicated for military medical personnel to administer and monitor. The risks associated with use of cross-sex hormone therapy to treat gender dysphoria are low and not any higher than for the hormones that many non-transgender active duty military personnel currently take. The medications do not have to be refrigerated, and alternatives to injectables are readily available, further simplifying treatment plans. Clinical monitoring for risks and effects is not complicated and, with training and/or access to consultations, can be performed by a variety of medical personnel in the DoD, just as is the case in the VHA. This is the military services' current practice in support of the limited medical needs of their transgender troops in CONUS (Continental United States) and in

deployment stations worldwide. Guidance on this issue was provided in January 2017 to military medical providers who care for transgender service members and shows that stable, transitioned troops require only yearly laboratory monitoring for cross-sex hormone treatment (which is consistent with the yearly, routine laboratory health screenings that *all* active duty troops receive). *See* Ex. I, WPATH Timeline Guide.

37.     Transgender service members—including service members who receive hormone medication—are just as capable of deploying as service members who are not transgender. DoD rules expressly permit deployment, without need for a waiver, for a number of medical conditions that present a much more significant degree of risk in a harsh environment than simply being transgender. For example, hypertension is not disqualifying if controlled by medication, despite the inherent risks in becoming dehydrated in desert deployment situations. Heart attacks experienced while on active duty or treatment with coronary artery bypass grafts are also not disqualifying, if they occur more than a year preceding deployment. These are very serious, life-threatening medical conditions with a high rate of recurrence, yet these service members with cardiac disease are nonetheless allowed to stay on active duty and deploy under prescribed conditions.

38.     Under the Department of Defense's generally applicable policies, service members may deploy with certain psychiatric conditions, if they demonstrate stability under treatment for at least three months. *See* DoDI 6490.07, Enclosure 3 § h(2); Dep't of Defense, Clinical Practice Guidance for Deployment-Limiting Mental Disorders and Psychotropic Medications (2013). Army regulations specifically provide that "[a] psychiatric condition controlled by medication should not automatically lead to non-deployment." *See* AR 40-501 § 5-14(8)(a).

39.     Instead of discussing these medical conditions, the Implementation Report compares cross-sex hormone therapy for gender dysphoria with other medical conditions that are plainly not comparable. For example, the Implementation Report states that "[a]ny DSM-5 psychiatric disorder with residual symptoms or medication side effects, which impair social or occupational performance, require a waiver for the Service member to deploy." Ex. B, Implementation Report at 34. As I previously explained, gender dysphoria is a treatable and curable condition. With medically appropriate care, it is possible for transgender service members to resolve the clinically significant gender dysphoria *without* any residual symptoms or impairment. Comparisons made to schizophrenia and bipolar disorder in the Implementation Report are inappropriate, as these two conditions constitute serious mental illnesses for which treatments are often ineffective and for which the notion of "cure" is nonsensical.

### SERVICE MEMBERS WHO TRANSITION WHILE IN SERVICE CAN MEET THE SAME RETENTION STANDARDS THAT APPLY TO NON-TRANSGENDER SERVICE MEMBERS

40.     As I explained in my previous report, service members who are diagnosed with gender dysphoria after already enlisting can transition while in service and still meet the same retention standards that apply to non-transgender service members. The military has generally applicable standards for determining whether a service member may continue to serve despite periods of limited non-deployability. If a transgender service member's limited period of non-deployability complies with those generally applicable standards, there is no reason why the service member should be automatically discharged simply because they were receiving surgery for gender dysphoria as opposed to a different medical condition. A determination of non-deployability must be based on the status of the individual and not on arbitrary, non-evidence based determinations. There is some evidence that the latter is occurring, based on the widely

disparate between-service data reported on days of limited duty for service members receiving treatment for gender dysphoria as reported by the various services. *See* Ex. H, USDOE 2633-2664 at 17. This DoD data strongly suggests that non-medical factors are playing an outsized role in determination of days spent in other than full-duty capacities for transgender service members on service-level treatment plans.

41.     Although the Implementation Report states that one commander predicted that transgender service members beginning a course of hormone therapy will be non-deployable for as long as two-and-a-half years, the Implementation Report does not cite any data to support that assertion. Ex. B, Implementation Report at 33–34. To the contrary, the presentation of the data states that service members initiating hormone therapy were non-deployable for 3–6 months in the Navy and for an average of 5–6 months in the Army and Air Force. Ex. H, USDOE 2633-2664 at 17. There is no medical basis for the Implementation Reports suggestion that cross-sex hormone therapy could render a transgender service member non-deployable for a full twelve months. Ex. B, Implementation Report at 23. In fact, expert guidance on this very issue was provided to military medical providers by WPATH in January 2017, as previously noted.

42.     There is also no basis to presume that surgical care for gender dysphoria will render transgender service members non-deployable for extended periods of time. The recovery time for non-genital surgeries, which are the most common procedures performed, is only 2–8 weeks. Ex. H, USDOE 2633-2664 at 19.

43.     Moreover, transgender service members can schedule medical procedures to ensure that they do not interfere with deployment. This approach is routinely done for other medically necessary procedures, such as orthopedic surgeries that allow for flexibility in the timing of the surgery. As the Implementation Report acknowledges, "[t]his conclusion was

echoed by some experts in endocrinology who found no harm in stopping or adjusting hormone therapy treatment to accommodate deployment during the first year of hormone use." Ex. B, Implementation Report at 34.

44. To be sure, there may be some transgender service members whose individualized medical needs make it impossible to transition while satisfying the military's generally applicable standards for deployment and retention. But those determinations can and should be made on a case-by-case basis depending on the individual's fitness to serve, as is done with other treatable conditions. There is no medical basis to conclude that all, or even most, service members undergoing treatment for gender dysphoria are categorically unfit to serve.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this *17*th day of April, 2018

George R. Brown, M.D.