## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| PETTY OFFICER FIRST CLASS BROCK STONE, | ) |
|     (Anne Arundel County, Maryland) | ) |
| STAFF SERGEANT KATE COLE, | ) |
| STAFF SERGEANT JOHN DOE 1, | ) |
| AIRMAN FIRST CLASS SEVEN ERO GEORGE, | ) |
| PETTY OFFICER FIRST CLASS TEAGAN GILBERT, | ) |
| TECHNICAL SERGEANT TOMMIE PARKER, | ) |
| TEDDY D'ATRI, | ) |
| RYAN WOOD, | ) |
| NIKO BRANCO, | ) |
| JOHN DOE 2, | ) |
| JANE ROE 1, | ) |
| JOHN DOE 3, by his next friends and mother and father | ) |
| JANE ROE 2 and JOHN DOE 4[*] | ) |
|     *and* | ) |
| AMERICAN CIVIL LIBERTIES UNION | ) |
| OF MARYLAND, INC., | ) |
| 3600 Clipper Miller Road, Suite 350 | ) |
| Baltimore, MD 21211 | ) |
| | ) |
|             Plaintiffs, | ) |
| | ) |
|     v. | )    Case No. 17-cv-02459 |
| | ) |
| DONALD J. TRUMP, | ) |
| in his official capacity as | ) |
| President of the United States | ) |
| 1600 Pennsylvania Avenue NW | ) |
| Washington, D.C. 20500 | ) |
| | ) |
| JAMES MATTIS, | ) |
| in his official capacity as Secretary of Defense | ) |
| U.S. Department of Defense | ) |

---

[*] On September 29, 2017, the Court granted a joint motion to waive the original Plaintiffs' obligation under Local Rule 102.2(a) to provide addresses, and to permit Plaintiff Doe to proceed anonymously. *See* Order, ECF 50. Concurrently with the filing of the Motion for Leave to File a Second Amended Complaint, Plaintiffs are moving similarly to waive their obligations and those of new plaintiffs D'Atri, Wood, Branco, Doe 2, Roe 1, Doe 3, Roe 2, and Doe 4 under Local Rule 102.2(a) to provide addresses in the caption of this complaint, on the basis of their objectively reasonable fear that publicizing their home addresses would subject them to harassment (potentially including violence) and threats. For similar reasons, Plaintiffs are concurrently moving to permit new plaintiffs Doe 2, Roe 1, Doe 3, Roe 2, and Doe 4 to proceed anonymously.

1400 Defense Pentagon                              )
Washington, D.C. 20301                             )
                                                   )
MARK ESPER,                                        )
in his official capacity as Secretary of the       )
U.S. Department of the Army                         )
101 Army Pentagon                                  )
Washington, D.C. 20301                             )
                                                   )
RICHARD SPENCER,                                   )
in his official capacity as Secretary of the       )
U.S. Department of the Navy                         )
1200 Navy Pentagon                                 )
Washington D.C. 20350                              )
                                                   )
HEATHER WILSON                                     )
in her official capacity as Secretary of the       )
U.S. Department of the Air Force                    )
1690 Air Force Pentagon                            )
Washington, D.C. 20330                             )
                                                   )
KIRSTJEN NIELSEN                                   )
in her official capacity as Secretary of           )
Homeland Security                                  )
Nebraska Avenue Complex                            )
3801 Nebraska Ave NW,                              )
Washington, D.C. 20016-2075                        )
                                                   )
PAUL ZUKUNFT                                       )
in his official capacity as Commandant of the      )
U.S. Coast Guard                                   )
2700 Martin Luther King Jr. Avenue SE              )
Washington, D.C. 20593-7000                        )
                                                   )
                      Defendants.                  )

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

1.      Thousands of transgender service members are serving honorably in this

country's Armed Forces. Some perform critical roles in intelligence analysis, disaster relief,

medical care, and pre-deployment training at bases in the United States. Others have deployed to

combat zones in Iraq and Afghanistan. Many transgender service members have received awards for their service, and some have served for decades. All have answered the selfless call of service to our nation by putting themselves in harm's way to protect the rights and freedoms fundamental to this country.

2.      Thousands more transgender Americans wish to answer the call to service. Some consider it their patriotic duty. Some come from families with a tradition of military service. Others see the benefits that a military career could bring to their lives. All are willing to make great sacrifices for the benefit of our country.

3.      Six of the Plaintiffs in this case ("Serving Plaintiffs") are transgender service members. Petty Officer Stone has served in the U.S. Navy for 11 years, including a nine-month deployment to Afghanistan, and is currently assigned to a unit at Fort Meade, in Maryland. Staff Sergeant Cole has served in the U.S. Army for almost ten years, including a one-year deployment to Afghanistan where she served as a team leader and designated marksman. Staff Sergeant Doe 1 has served for approximately six years on active duty in the U.S. Air Force, where he was awarded "Airman of the Year" for his flight. Airman First Class George has been enlisted in the Air National Guard since 2015. He is training as a nurse, and intends to seek a commission in the U.S. Army. Petty Officer Gilbert has served in the U.S. Navy for 13 years, including a one-year deployment to Afghanistan, and currently serves as an information and space systems technician. Technical Sergeant Parker served in the Marine Corps for four years and has served in the Air National Guard for 26 years, now working as a fuel technician.

4.      Six additional Plaintiffs ("Enlisting Plaintiffs") are transgender individuals who wish to join the military. Niko Branco is seeking to join the Army. Teddy D'Atri, John Doe 2, and Jane Roe 1 are seeking to join the Air Force. Ryan Wood is seeking to join the Marine

Corps. John Doe 3 is a minor who wishes to join the Coast Guard when he is age eligible. Each of them has taken concrete steps to prepare to enlist and serve their country. As a minor, John Doe 3 is represented by Jane Roe 2 and John Doe 4 as his mother and father and next friends (together with the Serving Plaintiffs and Enlisting Plaintiffs, the "Individual Plaintiffs").

5.    At the culmination of a thorough process of research and analysis, the Department of Defense ("DoD") concluded in 2016 that there was no basis for the military to exclude men and women who are transgender from openly serving their country, subject to the same fitness requirements as other service members. This review process carefully considered and rejected the notion that medical costs, military readiness, or other factors presented any plausible reason to discriminate against service members who are transgender, many of whom had already been serving with honor in silence for decades. Accordingly, the Secretary of Defense issued a directive (the "Open Service Directive") that service members who are transgender be permitted to serve openly without fear of discharge; that these service members receive medically necessary health care, as do others who serve their country; and that, beginning on July 1, 2017, men and women who are transgender be permitted to enlist in the military subject to stringent enlistment standards. The starting date for new enlistments was subsequently postponed for six months to January 1, 2018.

6.    On the morning of July 26, 2017, President Trump declared on Twitter that the Serving and Enlisting Plaintiffs and all other men and women who are transgender would no longer be allowed either to join or to continue serving in the military "in any capacity." This pronouncement was posted under the handle @realDonaldTrump:



7.    The Trump Administration has provided no evidence that this pronouncement was based on any analysis of the actual cost and disruption allegedly caused by allowing men and women who are transgender to serve openly. News reports indicate that the Secretary of Defense and other military officials were surprised by President Trump's announcement, and that his actual motivations were purely political, reflecting a desire to accommodate legislators and advisers who bear animus and moral disapproval toward men and women who are transgender.

8.    On August 25, 2017, President Trump formalized his ban in a Memorandum for the Secretary of Defense and the Secretary of Homeland Security, with the subject "Military Service by Transgender Individuals" (the "Transgender Service Member Ban"). President Trump directed the Secretary of Defense to "return to" the pre-2016 policy of banning enlistment and service by men and women who are transgender, which he described as "generally prohibit[ing] openly transgender individuals from accession into the United States military and authoriz[ing] the discharge of such individuals." President Trump further banned the use of government resources to fund "sex-reassignment surgical procedures" for service members regardless of cost

or medical necessity. President Trump ordered Secretary of Defense James Mattis to develop a "plan for implementing" the directives by February 21, 2018, so they could be fully implemented by March 23, 2018.

9.      President Trump delayed the operation of some of his directives, but their impact was felt immediately. Planned medical treatment was canceled, treatment plans were modified, and recommendations and requests for new treatment were denied to service members who are transgender. Military recruiters were reportedly confused as to how or whether to enlist transgender individuals. The six-month preparation period only served as a brief delay to the full implementation of President Trump's unequivocal policy pronouncement.

10.      Four federal courts—including this Court—issued preliminary injunctions prohibiting the White House and the military from taking any action to enforce President Trump's ban. As a result of those injunctions, the Open Service policy remained in effect, and the military began accepting transgender recruits on January 1, 2018. Three of the Enlisting Plaintiffs submitted applications to join the military shortly thereafter.

11.      On February 22, 2018, Secretary Mattis submitted to the President an implementation plan, which set forth a two-pronged approach for banning transgender individuals from the military. First, transgender individuals who "require or have undergone gender transition" are automatically disqualified from military service. Second, all other transgender individuals may serve only "*in their biological sex* (emphasis added)."

12.      Secretary Mattis's implementation plan remained secret until March 23, 2018, when President Trump issued a second Memorandum acknowledging receipt of the implementation plan and authorizing Secretary Mattis to proceed with his plans for implementation.

13.     As a consequence of the Transgender Service Member Ban and the Department of Defense's plan to implement it, thousands of Americans already serving their country—many of whom publicly revealed that they are transgender after DoD formally welcomed their service in June 2016—have been told that they are unfit to serve and a burden whose presence imposes "disproportionate costs."  All transgender Americans who wish to enlist in the military have had the doors to military service shut in their faces. The few service members who are allowed to remain will face an uncertain future in which the Department of Defense has implemented the President's ban by calling into question their physical fitness and mental stability simply because they are transgender—to the alarm of the mainstream medical community.

14.     When President Trump first announced his Ban via Twitter, he cast aside the rigorous, evidence-based policy of the Open Service Directive, and replaced it with discredited myths and stereotypes, uninformed speculation, and animus against people who are transgender. Defendants then sought to reverse-engineer a post-hoc justification to shore up the conclusions President Trump had already reached.

15.     Transgender people have been serving openly for the past year and a half. They have been deploying across the globe, serving with distinction as critical members of their units. That dispositive reality cannot be nullified by President Trump's tweets or the efforts of the Department of Defense to satisfy the whims of a President who had already made up his mind.

16.     Plaintiffs bring this action to right this unconstitutional wrong.

## THE PARTIES

### Plaintiff Stone

17.     Petty Officer First Class Brock Stone is a 34-year-old man.

18.     Petty Officer Stone is assigned to a unit at Fort Meade, Maryland through at least August 2020, and resides off-base with his wife in Anne Arundel County.

19.     Petty Officer Stone has served in the U.S. Navy for 11 years, including a nine-month deployment to Afghanistan. Petty Officer Stone was awarded an achievement medal in connection with his deployment, and  has received multiple other commendations, including a flag letter of commendation and multiple recommendations for early promotion. He has received extensive and costly training and is skilled in his field. He plans to serve until he completes 20 years of active duty service time. His current contract expires in 2023, and if he is not able to reenlist he will not be able reach that goal.

20.     Petty Officer Stone is transgender.

21.     Petty Officer Stone publicly revealed his transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

22.     Pursuant to his evaluation by DoD medical personnel, Petty Officer Stone receives hormones as a medically necessary part of his gender transition.

23.     Since arriving at Fort Meade in July 2017, Petty Officer Stone has received medically necessary treatment related to his gender transition at Walter Reed National Military Medical Center in Bethesda, Maryland. He was close to finalizing a medical treatment plan that included surgery at the time he was transferred to Fort Meade.

24.     Before President Trump issued his Transgender Service Member Ban, Petty Officer Stone planned and expected that his treatment plan at Fort Meade would include medically necessary surgery in 2018. Despite months of effort by Petty Officer Stone, his treatment plan has yet to be fully approved.

25.     Petty Officer Stone is a member of the ACLU of Maryland.

**<u>Plaintiff Cole</u>**

26.     Staff Sergeant Kate Cole is a 27-year-old woman.

27.    Staff Sergeant Cole is currently stationed at Fort Polk, Louisiana. She recently completed Drill Sergeant School, and is scheduled to complete a transfer to Fort Benning, Georgia in the coming month, where she will begin serving as a Drill Sergeant

28.    Staff Sergeant Cole has served in the U.S. Army for approximately ten years, including a one-year deployment to Afghanistan where she served as a team leader and designated marksman. Staff Sergeant Cole intends to serve until she completes 20 years of active duty service time. Her current contract expires in 2021, and if she is not able to reenlist she will not be able to reach that goal.

29.    Staff Sergeant Cole is transgender.

30.    Staff Sergeant Cole publicly revealed her transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

31.    Pursuant to her evaluation by DoD medical personnel, Staff Sergeant Cole is receiving hormones as a medically necessary part of her gender transition and has undergone medically necessary surgery.

32.    Staff Sergeant Cole's treatment plan includes additional,  medically-necessary surgical care related to her transition in the future. She is currently awaiting the completion of her transfer to Fort Benning in order to plan that care, so as to be consistent with her responsibilities in her new command.

**<u>Plaintiff Doe 1</u>**

33.    Staff Sergeant John Doe 1 (referred to as Senior Airman John Doe in the First Amended Complaint) is a 25-year-old man.

34.    He was recently promoted to his current rank from Senior Airman.

35.     Staff Sergeant Doe 1 is in the process of transferring to Luke Air Force Base in Arizona, where he will officially start in June 2018.

36.     Staff Sergeant Doe 1 has served for approximately six years on active duty in the U.S. Air Force, where he is pursuing cryogenics certification. He was awarded "Airman of the Year" for his flight. He plans to serve until he reaches 20 years of active duty service time. His current service contract ends in 2021, and if he is not able to reenlist he will not be able to reach that goal.

37.     Staff Sergeant Doe 1 has deployed to Qatar for a six-month deployment.

38.     Staff Sergeant Doe 1 is transgender.

39.     Staff Sergeant Doe 1 publicly revealed his transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

40.     Pursuant to his evaluation by DoD medical personnel, Staff Sergeant Doe 1 receives hormones as a medically necessary part of his gender transition, and has undergone medically necessary surgery. He does not currently anticipate requiring any further surgery related to his transition.

**Plaintiff George**

41.     Airman First Class Seven Ero George is a 41-year-old man.

42.     Airman First Class George is stationed at Selfridge Air National Guard Base, Michigan.

43.     Airman First Class George is in the Air National Guard, where he serves in the base security force. He is also a member of the base Honor Guard, performing military funeral honors for deceased veterans, retirees, and active duty members; providing dignified transfers; and performing color guard details.

10

44.     Airman First Class George is transgender.

45.     Airman First Class George publicly revealed his transgender status to military

personnel following, and in reliance upon DoD's June 2016 Open Service Directive.

46.     Airman First Class George receives hormones as a medically necessary part of his

gender transition and has undergone medically necessary surgery.

47.     Airman First Class George intends to pursue a commission in the U.S. Army

Nurse Corps. He has completed one civilian degree in nursing, works as a nurse, and is pursuing

a second degree in the same field.

48.     Airman First Class George is currently eligible for a commission under the Open

Service Directive: (1) he has been stable without clinically significant distress or impairment as

the result of gender dysphoria in social, occupational, or other important areas of functioning for

more than 18 months; (2) he has completed all medical treatment associated with his gender

transition, been stable in his preferred gender for more than 18 months, and has been stable on

cross-sex hormones post-gender transition for more than 18 months; and (3) more than 18

months has elapsed since the date of his most recent surgery and no functional limitations or

complications persist, nor is any additional surgery required. Airman First Class George has been

attempting to update his gender marker in the U.S. military's personnel database, but the process

has been repeatedly delayed for unexplained reasons. Airman First Class George plans to apply

for a commission without an updated gender marker during the next application cycle, which

begins in May, 2018.

**Plaintiff Gilbert**

49.     Petty Officer First Class Teagan Gilbert is a 31-year-old woman.

50.     Petty Officer Gilbert is a reservist stationed in Phoenix, Arizona.

51.     Petty Officer Gilbert has served in the U.S. Navy for more than 13 years, including a one-year deployment to Afghanistan. She is currently in the Naval Reserve working as an information and space systems technician.

52.     Petty Officer Gilbert is transgender.

53.     Petty Officer Gilbert publicly revealed her transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

54.     Pursuant to her evaluation by DoD medical personnel, Petty Officer Gilbert receives hormones as a medically necessary part of her gender transition and plans to seek approval for medically indicated surgical treatment in the future.

55.     Petty Officer Gilbert has approximately one year of course work left in her undergraduate degree at Arizona State University, after which she intends to apply to commission as an officer.

56.     Petty Officer Gilbert's goal is to serve in the military for at least 20 years.

**Plaintiff Parker**

57.     Technical Sergeant Tommie Parker is a 54-year-old woman.

58.     Technical Sergeant Parker is stationed at Stewart Air National Guard Base, New York and has served in the Marine Corps for four years and the Air National Guard for 26 years, including deployments to Okinawa (with the Marine Corps) and Germany (with the Air National Guard). Her Air National Guard service time includes twelve years and counting on active duty. It is Technical Sergeant Parker's goal to serve in the military for at least 20 years of active duty service time. She now works as a fuel technician.

59.     Technical Sergeant Parker is transgender.

60.     Technical Sergeant Parker publicly revealed her transgender status to military personnel following, and in reliance upon, DoD's June 2016 Open Service Directive.

61.     Pursuant to her evaluation by DoD medical personnel, Technical Sergeant Parker receives hormones as a medically necessary part of her gender transition.

**Plaintiff Teddy D'Atri**

62.     Plaintiff Teddy D'Atri is a 21-year-old man.

63.     Plaintiff D'Atri currently works at an electronics store.

64.     Plaintiff D'Atri is seeking to enlist in the Air Force, where he hopes to work as either an aerial gunner or in the security force. He has been actively working with a recruiter since July 2017. Due in part to the confusion and uncertainty with certain recruiters regarding the operative policy on transgender enlistees, Plaintiff D'Atri switched recruiters in October 2017.

65.     Plaintiff D'Atri is transgender.

66.     Plaintiff D'Atri has received hormones as a medically necessary part of his gender transition since August 2017. In connection with his gender transition, he is currently pursuing medically indicated surgery, which he anticipates undergoing in August 2018. He intends to enlist as quickly as possible following that surgery.

67.     Plaintiff D'Atri is currently in the process of updating his civilian paperwork to reflect his male gender. He intends to submit paperwork to update his gender marker with both the DMV and the Social Security Administration.

68.     Plaintiff D'Atri intends to seek a waiver through the process afforded by the Open Service Directive to either waive or reduce the 18-month periods to enlist, in whole or in part, and has been advised by his recruiter that he is eligible for such a waiver.

**Plaintiff Wood**

69.    Plaintiff Ryan Wood is a 24-year-old man.

70.    Plaintiff Wood currently works as a firefighter and is certified as both a firefighter and an emergency medical technician.

71.    Plaintiff Wood is seeking to enlist in the Marine Corps. He initiated the enlistment process in January of this year, immediately after the ban on accessions was lifted. Since then, he has been actively working with his recruiter and medical professionals to provide all of the necessary documentation to be medically cleared for service.

72.    Plaintiff Wood is transgender.

73.    Plaintiff Wood has received hormones as a medically necessary part of his gender transition for approximately seven years and had medically indicated surgery in connection with his transition in 2012. He does not anticipate requiring any further surgical treatment in connection with his gender transition.

74.    Plaintiff Wood meets the requirements for enlistment under the Open Service Directive. Plaintiff Wood has (1) been stable without clinically significant distress or impairment as the result of gender dysphoria in social, occupational, or other important areas of functioning for more than 18 months; (2) has completed all medical treatment associated with his gender transition, been stable in his preferred gender for more than 18 months, and has been stable on cross-sex hormones post-gender transition for more than 18 months; and (3) more than 18 months has elapsed since the date of his most recent surgery and no functional limitations or complications persist, nor is any additional surgery required.

**Plaintiff Branco**

75.    Plaintiff Niko Branco is a 24-year-old man.

14

76.    Plaintiff Branco currently works as an animal control officer for a police department.

77.    Plaintiff Branco intends to enlist in the Army, and has been working toward that goal since before President Trump announced the Ban on July 26, 2017. Due to uncertainty over the scope of the Ban, Plaintiff Branco put these attempts on hold following its announcement, but has been actively working with a recruiter since the lifting of the accessions ban at the beginning of 2018. He recently resubmitted his medical paperwork in order to pursue enlistment and is awaiting a final date for undergoing a physical examination and signing an enlistment contract.

78.    Plaintiff Branco is transgender.

79.    Plaintiff Branco publicly revealed his transgender status to family and friends approximately six years ago. He has received hormones as a medically necessary part of his gender transition for approximately three and a half years, and underwent medically indicated surgery in connection with his transition two years ago. He does not anticipate requiring any further surgical treatment in connection with his gender transition.

80.    A licensed medical provider would certify that: (1) Plaintiff Branco has been stable without clinically significant distress or impairment as the result of gender dysphoria in social, occupational, or other important areas of functioning for 18 months; (2) Plaintiff Branco has completed all medical treatment associated with his gender transition, has been stable in his preferred gender for 18 months, and has been stable on cross-sex hormones post-gender transition for 18 months; and (3) more than 18 months has elapsed since the date of his most recent surgery and no functional limitations or complications persist, nor is any additional

surgery required. Accordingly, Plaintiff Branco meets the requirements for enlistment under the Open Service Directive.

81.    Plaintiff Branco has changed his gender marker on his birth certificate.

82.    Plaintiff Branco's goal is to serve in the Army in for 20 years.

**Plaintiff Doe 2**

83.    Plaintiff John Doe 2 is a 24-year old man.

84.    Plaintiff Doe 2 currently works as a package handler for a shipping company.

85.    Plaintiff Doe 2 is seeking to enlist in the Air Force. He has been working with a recruiter since January 2018.

86.    Plaintiff Doe 2 is transgender.

87.    Plaintiff Doe 2 has received hormones as a medically necessary part of his gender transition for approximately six years. He had medically indicated surgery in connection with his transition approximately one year ago. He does not currently anticipate requiring any further surgical treatment in connection with his gender transition.

88.    Plaintiff Doe 2 is actively seeking a waiver through the process afforded by the Open Service Directive to either waive or reduce the 18-month stability period to enlist, in whole or in part, in his individual case for applicable reasons.

89.    Plaintiff Doe 2 has updated his civilian paperwork to reflect his male gender, including his passport, driver's license, and paperwork with Social Security Administration. He has not updated his birth certificate due to a legal prohibition on doing so in his birth state.

**Plaintiff Roe 1**

90.    Plaintiff Jane Roe 1 is a 27-year-old woman.

91.    Plaintiff Roe 1 currently works at a coffee shop.

16

92.    Plaintiff Roe 1 is transgender.

93.    Plaintiff Roe 1 is seeking to enlist in the Air Force. She hopes to work in para-rescue and fire protection. Plaintiff Roe 1 has actively been seeking enlistment since early January 2018. After initially being informed by a recruiter that she should wait to enlist until the Department of Defense's policy on transgender enlistment was clarified, Plaintiff Roe 1 once again engaged a recruiter upon learning that a transgender individual had successfully enlisted.

94.    Due in part to the confusion displayed by military recruiters regarding the current policy on transgender enlistees, Plaintiff Roe 1 has temporarily halted her attempts to enlist in order to prepare for her upcoming surgery. Plaintiff Roe 1 fully intends to resume her efforts to enlist in the U.S. military once her surgery is complete.

95.    Plaintiff Roe 1 revealed her transgender identity to family and friends approximately nine years ago. She has received hormones as a medically necessary part of her gender transition for approximately eight and a half years. She underwent medically indicated surgery in connection with her transition on April 11, 2018, and is scheduled to have an additional surgery in two and a half months. After that upcoming surgery, she does not anticipate requiring any further surgical treatment in connection with her transition.

96.    Plaintiff Jane Roe 1 intends to request a waiver through the process afforded by the Open Service Directive to either waive or reduce the 18-month periods to enlist, in whole or in part, in her individual case for applicable reasons.

**Plaintiff John Doe 3, by his Next Friends and Mother and Father Jane Roe 2 and John Doe 4**

97.    Plaintiff John Doe 3 is a 15-year-old boy. He is represented in this action by Jane Roe 2 and John Doe 4 as his mother and father and next friends.

98.    Plaintiff Doe 3 is transgender.

99.    Plaintiff Doe 3 revealed to his family that he was transgender in January 2018. He has been undergoing therapy and is in the process of initiating the use of hormone blockers as a medically necessary part of his gender transition.

100.    Plaintiff Doe 3 intends to join the Coast Guard when he becomes of age, either by applying to the Coast Guard Academy or simply by enlisting.

101.    Plaintiff Doe 3 intends to update his civilian documentation to reflect his male gender in the coming year.

102.    Plaintiff Doe 3's parents, Jane Roe 2 and John Doe 4, support his plan to enlist in the Coast Guard, and have authorized his participation in this lawsuit.

### **Plaintiff ACLU of Maryland**

103.    Plaintiff American Civil Liberties Union of Maryland, Inc. ("ACLU of Maryland") is an affiliate of the American Civil Liberties Union, a non-profit, nationwide, nonpartisan membership organization with over 1,500,000 members.

104.    Plaintiff ACLU of Maryland's growing membership comprises over 42,000 Maryland members, including one or more men and women who are transgender and either currently serve in the U.S. military or intend to volunteer for service in the U.S. military.

105.    The ACLU of Maryland litigates cases in which government officials have attempted to discriminate against men and women who are transgender, and therefore the ACLU of Maryland has a direct interest in challenging the ban at issue in this case.

106.    The ACLU of Maryland's interest in protecting both its members and other men and women who are transgender from discrimination on the basis of sex and transgender status is

both germane and fundamental to the organization's purpose of furthering the principles of liberty and equality embodied in the Constitution and the nation's civil rights laws.

**Defendants**

107.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity. In that capacity, he issued the Transgender Service Member Ban on August 25, 2017, and the memorandum of March 23, 2018.

108.    Defendant James Mattis is the Secretary of Defense and is sued in his official capacity. DoD is responsible for providing the military forces needed to deter war and protect the security of the United States. At all times relevant to this Complaint, Defendant Mattis was acting as an employee and agent of the United States. In that capacity, Defendant Mattis is responsible for supervising the branches of the U.S. Armed Forces; for promulgating, implementing, and enforcing the policies and regulations that govern military service in all branches of the U.S. Armed Forces; and for ensuring the legality of these policies and regulations. In this role, he is responsible for the maintenance and enforcement of Department of Defense Instruction ("DoDI") 1300.28, which establishes DoD policies regarding transgender service members. In his official capacity, Defendant Mattis provided Defendant Trump with the report and recommendations that underlie the March 23 memorandum and the Implementation Plan.

109.    Defendant Mark Esper is the Secretary of the Army and is sued in his official capacity. The Department of the Army is the DoD branch that defends the land mass of the United States, its territories, commonwealths, and possessions. At all times relevant to this Complaint, Defendant Esper was acting as an employee and agent of the United States. In that capacity, Defendant Esper has overall responsibility for the Army and for the Army's

development, administration, and enforcement of policies and regulations that affect service by

transgender service members. These policies and regulations include Army publications and

directives implementing DoD policy governing transgender service members.

110.    Defendant Richard Spencer is the Secretary of the Navy and is sued in his official

capacity. The Department of the Navy is the DoD branch that maintains, trains, and equips

combat-ready maritime forces. At all times relevant to this Complaint, Defendant Spencer was

acting as an employee and agent of the United States. In that capacity, Defendant Spencer has

overall responsibility for the Navy and Marine Corps and  those services' development,

administration, and enforcement of policies and regulations that affect service by transgender

service members. These policies and regulations include Navy and Marine Corps publications

and directives implementing DoD policy governing transgender service members.

111.    Defendant Heather Wilson is the Secretary of the Air Force and is sued in her

official capacity. The Department of the Air Force is the DoD branch that provides the U.S.

military with air and space capability. At all times relevant to this Complaint, Defendant Wilson

was acting as an employee and agent of the United States. In that capacity, Defendant Wilson has

overall responsibility for the Air Force and for the Air Force's development, administration, and

enforcement of policies and regulations that affect service by transgender service members.

These policies and regulations include Air Force publications and directives implementing DoD

policy governing transgender service members.

112.    Defendant Kirstjen Nielsen is the Secretary of Homeland Security and is sued in

her official capacity. The Department of Homeland Security is responsible for the United States

Coast Guard. At all times relevant to this Complaint, Defendant Nielsen was acting as an

employee and agent of the United States. In that capacity, Defendant Nielsen is responsible for

supervising the Coast Guard; for promulgating, implementing, and enforcing the policies and regulations that govern military service in the Coast Guard; and for ensuring the legality of these policies and regulations. In this role, she is responsible for the maintenance and enforcement of all policies regarding transgender members of the Coast Guard. In her official capacity, Defendant Nielsen consulted with Defendant Mattis on the recommendations that underlie the March 23 memorandum and the Implementation Plan, and agreed with them.

113.    Defendant Admiral Paul Zukunft is the Commandant of the Coast Guard and is sued in his official capacity. The Coast Guard is the branch of the U.S. Armed Forces responsible for maritime homeland security, but also has a peacetime role of maritime law enforcement. At all times relevant to this Complaint, Defendant Zukunft was acting as an employee and agent of the United States. In that capacity, Defendant Zukunft has overall responsibility for the Coast Guard and for the Coast Guard's development, administration, and enforcement of policies and regulations that affect service by transgender service members. These policies and regulations include Coast Guard publications and directives implementing any policy governing transgender service members.

**JURISDICTION AND VENUE**

114.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the United States Constitution, the laws of the United States, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

115.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff Stone and Plaintiff ACLU of Maryland reside in this District, and because a substantial part of the events or omissions giving rise to this action occurred and are occurring in this District.

## FACTUAL ALLEGATIONS

**A.     Current Military Service by Men and Women Who Are Transgender**

116.    Transgender Americans have served, and continue to serve, in the military with distinction, including in combat. As of May 2014, the Williams Institute at UCLA School of Law estimated that men and women who are transgender account for approximately 8,800 active members of the U.S. Armed Forces. This figure may be even higher today in light of DoD's June 2016 Open Service Directive regarding transgender service.

117.    According to General Mark Milley, Chief of Staff for the Army, he has seen "precisely zero reports of issues of cohesion, discipline, morale, and all sorts of things" with respect to current military service of transgender men and women. Senate Armed Services Committee Holds Hearing on the Fiscal 2019 Budget Request for the Army Department, CQ Congressional Transcripts, p. 92 (Apr. 12, 2018).

118.    Admiral John M. Richardson, Chief of Naval Operations, and General Robert Neller, Commandant of the Marines, reported that they were not aware of any issues of unit cohesion, disciplinary problems, or morale related to the open service of transgender men and women. Senate Armed Services Committee Holds Hearing on Navy Posture, CQ Congressional Transcripts, pp. 77-78 (Apr. 19, 2018). General Neller confirmed that all the transgender Marines he has met "were ready and prepared to deploy." *Id*. at p. 79.

119.    Defendant Paul Zukunft, the Commandant of the U.S. Coast Guard, testified to Congress that all 17 transgender members of the Coast Guard are "carrying out the full scope of missions that we execute around the world today," that the Coast Guard is "committed to their continued service," and that the transgender members of the Coast Guard are "serving today with a passion to serve in an all voluntary service, and they're hitting the ball out of the park."  House

Appropriations Subcommittee on Homeland Security Holds Hearing on the Coast Guard Fiscal

2019 Budget Request, CQ Congressional Transcripts, p. 56 (Apr. 17, 2018).

120.    Men and women who are transgender also serve openly in civilian roles

supporting the U.S. military, including as contractors in combat zones.

**B.    Medical Treatment for Transgender Service Members**

121.    Pursuant to DoDI 1300.28 (§ 1.2(a)), "[t]ransgender persons . . . are subject to the

same standards and procedures as other members with regard to their medical fitness for duty,

physical fitness, uniform and grooming standards, deployability, and retention."

122.    The American Psychiatric Association and every other major mental health

organization recognize that being transgender is not a mental disorder and implies no impairment

in judgment, stability, reliability, or general social or vocational capabilities.

123.    Some men and women who are transgender, however, experience "gender

dysphoria," a diagnostic term used to describe the incongruence between a person's gender

identity and the gender that they were assigned at birth where such incongruence is accompanied

by clinically significant distress.

124.    As with all medical conditions, varying courses of treatment for gender dysphoria

may be medically necessary depending on the needs of the individual, as determined in

consultation with medical professionals. These treatments, often referred to as transition-related

care, may include social role transition, hormones, and surgery (sometimes called "sex

reassignment surgery" or "gender confirmation surgery"). The goal of the treatment is to align an

individual's outward expression of gender, body, and biochemistry with the person's gender

identity in order to eliminate the clinically significant distress.

125.    According to every major medical organization and the overwhelming consensus

among medical experts, treatments for gender dysphoria, including surgical procedures, are

effective, safe, and medically necessary when clinically indicated to alleviate the distress caused by the condition.

126.    In accordance with that medical consensus and contemporary standards of care, Medicare, Medicaid, and private insurance policies across the country routinely cover transition-related care as medically necessary treatment.

127.    The medical needs of transgender service members with gender dysphoria are not materially different from those of other service members. For example, the military provides routine psychological care to all service members around the globe, including men and women who are transgender. It also provides long-term hormone treatments for persons with diabetes and other endocrine disorders, and stocks cross-sex hormones in its dispensaries in the United States and abroad. The military further provides medically-indicated surgery to all service members, including chest and breast reconstruction, hysterectomy, and genital reconstruction, among other procedures that might be prescribed to treat gender dysphoria.

C.    **History of DoD Policy on Transgender Military Service**

1)    **Historical Regulatory Ban**

128.    Starting some time before 1981, DoD maintained and enforced a policy barring men and women who are transgender from enlisting or being retained in the U.S. Armed Forces.

129.    That policy prohibited men and women who are transgender from serving openly, whether or not they required any ongoing medical treatment and even if they were fit to serve. In contrast, non-transgender individuals, including those requiring medical interventions, were allowed to remain in military service if they could demonstrate their fitness to serve.

130.    Neither the policy nor the various service branch regulations that implemented it articulated a rationale for presuming that being transgender renders a service member administratively unfit.

### 2)    DoD Revisits and Studies the Regulations Regarding Transgender Military Service

131.    On July 13, 2015, then-Secretary of Defense Ashton Carter issued two directives aimed at updating DoD's existing transgender service member regulations, which the Secretary described as "an outdated, confusing, inconsistent approach that's contrary to our value of service and individual merit" that is "causing uncertainty that distracts commanders from our core missions." *Statement by Secretary of Defense Ash Carter on DOD Transgender Policy*, DoD (July 13, 2015), https://www.defense.gov/News/News-Releases/News-Release-View/Article/612778/.

132.    The Secretary's first directive established a working group to study "the policy and readiness implications of welcoming transgender persons to serve openly." The Acting Under Secretary of Defense for Personnel and Readiness led the group, which was comprised of leaders from the armed services; the Joint Staff; the service secretaries; and personnel, training, readiness and medical specialists from across DoD (with input from transgender service members, outside expert groups, and medical professionals outside the department).

133.    The Secretary's second directive ordered that "decision authority in all administrative discharges for those diagnosed with gender dysphoria or who identify themselves as transgender be elevated to" the Under Secretary, "who will make determinations on all potential separations."

134.    From July 2015 to June 2016, members of the working group and other senior leaders in DoD met with transgender service members deployed throughout the world, including individuals serving on aircrafts, submarines, and operating bases, as well as at the Pentagon. These individuals were determined to be high-quality additions to the U.S. Armed Forces, and DoD leaders observed that the ambiguity of existing regulations regarding the service of

transgender individuals put both the service members and their commanders in a difficult and fundamentally unfair position.

135.    The DoD working group also carefully examined medical, legal, and policy considerations associated with permitting transgender service members to serve openly in the Armed Forces. The working group reviewed data, studied the many allied militaries that already permit transgender service members to serve openly, and considered analogous examples from the public and private sectors in the United States. DoD observed, among other things, that the provision of medical care for men and women who are transgender is becoming common and normalized in public and private sectors alike.

136.    In conjunction with its working group efforts, DoD commissioned the RAND Corporation to analyze relevant data and studies to assist with DoD's own review. RAND's work was "sponsored by the Office of the Under Secretary of Defense for Personnel and Readiness and conducted within the Forces and Resources Policy Center of the RAND National Defense Research Institute, a federally funded research and development center sponsored by the Office of the Secretary of Defense, the Joint Staff, the Unified Combatant Commands, the Navy, the Marine Corps, the defense agencies, and the defense Intelligence Community." Agnes Gereben Schaefer et al., *Assessing the Implications of Allowing Transgender Personnel to Serve Openly*, RAND Corporation, at iii–iv (2016) (hereinafter, "RAND Report," attached as **Exhibit A** to Plaintiffs' original Complaint), ECF 1-2.

137.    Based on various factors, including its analysis of allied militaries and the expected rate at which American transgender service members would require medical treatment that would impact their fitness for duty or deployability, RAND concluded that there would be "minimal" readiness impacts from allowing transgender service members to serve openly. *See id.*

at xii, 2–3. Specifically, RAND estimated that 10 to 130 active component members each year could have reduced deployability as a result of gender transition-related treatments. This amount is negligible relative to the 102,500 non-deployable soldiers in the Army alone in 2015, 50,000 of them in the active component. *Impact of Transgender Personnel on Readiness and Health Care Costs in the U.S. Military Likely to Be Small*, RAND Press Room (June 30, 2016), https://www.rand.org/news/press/2016/06/30.html.

138.    RAND concluded that health care costs would represent "an exceedingly small proportion" of both Active Component and overall DoD health care expenditures. RAND Report, at xi–xii, 31. In so concluding, RAND observed that "[b]oth psychotherapy and hormone therapies are [already] available and regularly provided through the military's direct care system," and "[s]urgical procedures quite similar to those used for gender transition are already performed within the MHS for other clinical indications." *Id*. at 8. For instance, "[r]econstructive breast/chest and genital surgeries are currently performed on patients who have had cancer, been in vehicular and other accidents, or been wounded in combat." *Id*.

> ### 3)    Decision to Permit Transgender Service Members to be Subject to the Same Fitness Standards as Other Service Members

139.    Based on input from the DoD's working group and the RAND Corporation, including information and recommendations from the service secretaries and other Pentagon officials, Secretary Carter issued a directive and memorandum to all military departments regarding military service for transgender service members on June 30, 2016. The Open Service Directive announced that, "[e]ffective immediately, no otherwise qualified Service member may be involuntarily separated, discharged or denied reenlistment or continuation of service, solely on the basis of their gender identity." Further, "[t]ransgender Service members will be subject to the same standards as any other Service member of the same gender." Thus, "[a] Service

member whose ability to serve is adversely affected by a medical condition or medical treatment related to their gender identity should be treated, for purposes of separation and retention, in a manner consistent with a Service member whose ability to serve is similarly affected for reasons unrelated to gender identity or gender transition." The Open Service Directive is attached as **Exhibit B** to Plaintiffs' original Complaint, ECF 1-3.

140.    Citing the RAND Report, the Secretary of Defense explained the three principal reasons underlying the Open Service Directive: (1) the military's need to "avail ourselves of all talent possible" in order to remain "the finest fighting force the world has ever known"; (2) the Secretary's duty to transgender service members and their commanders to "provide them both with clearer and more consistent guidance than is provided by current policies"; and (3) as a matter of principle, "Americans who want to serve and can meet our standards should be afforded the opportunity to compete to do so." *Department of Defense Press Briefing by Secretary Carter on Transgender Service Policies in the Pentagon Briefing Room* (June 30, 2016), https://www.defense.gov/News/Transcripts/Transcript-View/Article/822347/departmentof-defense-press-briefing-by-secretary-carter-on-transgender-service/.

141.    The Open Service Directive was to be implemented over the course of a 12-month period, from June 2016 to June 2017. Although transgender service members already in the military on June 30, 2016 were allowed to serve openly as soon as the Open Service Directive took effect, accession of transgender personnel—that is, the process of bringing new enlisted recruits and officer candidates into the military—did not begin immediately. The Policy gave the Department of Defense and the military services approximately one year to conduct training, and to start accepting transgender members into the military beginning on July 1, 2017.

142.    The enlistment requirements were stringent, providing, inter alia, that a history of gender dysphoria was disqualifying unless a licensed medical provider certified that the applicant had been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for 18 months.

143.    On September 30, 2016, DoD issued an "Implementation Handbook" to "assist our transgender Service members in their gender transition, help commanders with their duties and responsibilities, and help all Service members understand [Department] policy [allowing] the open service of transgender Service members." *Transgender Service in the U.S. Military: An Implementation Handbook*, DoD, at 8 (Sept. 30, 2016), *available at* https://www.defense.gov/Portals/1/features/2016/0616_policy/DoDTGHandbook_093016.pdf?v er=2016-09-30-160933-837. The Handbook explained to transgender service members that DoD's revised transgender service member policy "ensures your medical care is brought into the military health system (MHS), protects your privacy when receiving medical care, and establishes a structured process whereby you may transition gender when medically necessary." *Id*. at 17. The Handbook encouraged transgender service members to be "open and honest with your leadership when discussing the gender transition process," and further encouraged transgender service members to disclose their transgender status to colleagues. *Id*. at 20.

144.    The Handbook also provided guidance to commanders and non-transgender service members. *Id*. at 25–33. The topics in the Handbook include an overview of the gender transition approval process; guidance specific to transgender service members, commanders, and non-transgender service members, including communication, medical care, deployment and physical fitness, and privacy; frequently asked questions and answers; various potential scenarios and guidance on how to address them; and resources for further information. *See generally id*.

145.    Implementation training began shortly after the policy was announced. This training involved commanders, medical personnel, the operating forces, and recruiters. The training was directed to the entire joint force, in the United States and around the world.

146.    During this same timeframe, each of the service branches conducted a comprehensive review of regulations governing medical care, administrative separations, and manpower management, in order to ensure that service-level issuances were consistent with the DoD instructions.

**D.    Twitter Announcement of Categorical Ban on Service by Men and Women Who Are Transgender**

147.    On the morning of July 26, 2017, President Trump posted the following announcement on Twitter, under the handle @realDonaldTrump:



148.    The Trump Administration has provided no evidence that this about-face in policy was supported by any study of the issue or any consultation with military officers, DoD officials, other military experts, or medical or legal experts.

149.     Press reports indicate that President Trump's motivations in abruptly announcing a transgender ban were largely political, reflecting a desire to placate legislators and advisers who bear animus and moral disapproval toward men and women who are transgender. Rachel Bade & Josh Dawsey, *Inside Trump's Snap Decision to Ban Transgender Troops*, Politico (July 26, 2017, 2:07 PM), http://www.politico.com/story/2017/07/26/trump-transgender-military-ban-behind-the-scenes-240990; *see also, e.g*., Tom Porter, *Transgender Military Ban: The Rise of Anti-LGBT Hate Groups in Trump's White House*, Newsweek (July 26, 2017, 12:47 PM), http://www.newsweek.com/anti-lgbt-hate-groups-transgender-military-ban-trump-642218; Asawin Suebsaeng et al., *Trump Bows to Religious Right, Bans Trans Troops*, The Daily Beast (July 26, 2017, 12:33 PM), http://www.thedailybeast.com/trump-bows-to-religious-right-bans-trans-troops.

150.     According to subsequent media reports, "President Donald Trump's White House and Defense Department lawyers had warned him against the transgender military ban for days" and were "startl[ed]" when they "learned of the change in a series of tweets." Josh Dawsey, *John Kelly's Big Challenge: Controlling the Tweeter in Chief*, Politico (Aug. 4, 2017, 6:03 PM), http://www.politico.com/story/2017/08/04/trump-john-kelly-challenge-twitter-241343.

151.     President Trump's actions immediately caused the Serving Plaintiffs and other transgender service members to fear for their careers, the well-being of their family members and dependents, their health care and, in some cases, their safety.

152.     The President's actions were also experienced by the Serving Plaintiffs as a betrayal, in light of their actions to come out publicly to military personnel in reliance on the June 2016 directive.

153.    Close to 60 retired generals and flag officers from various military branches also found President Trump's tweet to undermine national security and military readiness, stating:

> This proposed ban, if implemented, would cause significant disruptions, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie . . . The military conducted a thorough research process on this issue and concluded that inclusive policy for transgender troops promotes readiness. . . . We could not agree more.

*Fifty-Six Retired Generals and Admirals Warn that President Trump's Anti-Transgender Tweets, if Implemented, Would Degrade Military Readiness*, Palm Ctr. (Aug. 1, 2017),

http://www.palmcenter.org/fifty-six-retired-generals-admirals-warn-president-trumps-anti-transgender-tweets-implemented-degrade-military-readiness/.

154.    Members of Congress were similarly "troubled" by President Trump's tweet on a bipartisan basis, with one Republican lawmaker (and former Navy SEAL) issuing the following statement:

> I am troubled that [DoD] seemed to be unaware of this potential policy change and how it was made public. I understand the DoD is in the middle of a review of relevant policies and I believe this ban is premature. There are heroic military members willing to put their lives on the line and give the ultimate sacrifice on our behalf, regardless of their gender identity. I support the ability for those who meet all military requirements, medical and otherwise, to have the opportunity to serve our great country.

*See* Rep. Scott Taylor (R-Va.), *Statement on Trump Transgender Ban* (July 26, 2017),

https://taylor.house.gov/media/press-releases/statement-trump-transgender-ban.

155.    Senator John McCain, Chairman of the Senate Committee on Armed Services; also repudiated President Trump's announcement, stating:

> The Department of Defense has already decided to allow currently-serving transgender individuals to stay in the military, and many are serving honorably today. Any American who meets current medical and readiness standards should be allowed to continue serving. There is no reason to force service members who are able to fight,

train, and deploy to leave the military—regardless of their gender identity. We should all be guided by the principle that any American who wants to serve our country and is able to meet the standards should have the opportunity to do so—and should be treated as the patriots they are.

*See* Sen. John McCain (R-Ariz.), *Statement by SASC Chairman John McCain on Transgender Americans in the Military* (July 26, 2017),

https://www.mccain.senate.gov/public/index.cfm/2017/7/statement-by-sasc-chairman-john-mccain-on-transgender-americans-in-the-military.

156.    The Department of Defense declined comment on President Trump's policy announcement, referring questions to the White House.

157.    The Secretary of Defense was on vacation at the time of President Trump's announcement on Twitter.

**E.    The Transgender Service Member Ban**

158.    Early Friday evening on August 25, 2017, President Trump issued his Transgender Service Member Ban in the form of a Memorandum for the Secretary of Defense and Secretary of Homeland Security. A copy is attached as **Exhibit C** to Plaintiffs' original Complaint, ECF 1-4.

159.    The Transgender Service Member Ban stated that in President Trump's own "judgment," DoD's decision to adopt the Open Service Directive "failed to identify a sufficient basis to conclude that terminating the Departments' longstanding policy and practice would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources, and there remain meaningful concerns that further study is needed to ensure that continued implementation of last year's policy change would not have those negative effects."

160.    The Transgender Service Member Ban therefore "direct[ed]" the Secretary of Defense and the Secretary of Homeland Security "to return to the longstanding policy and

practice on military service by transgender individuals that was in place prior to June 2016," until President Trump is personally persuaded that a change is warranted. Transgender Service Member Ban § 1(b).

161.    The Transgender Service Member Ban ordered that the policy banning enlistment of men and women who are transgender be extended, until a recommendation to the contrary is made "that I find convincing." *Id*. § 2(a). The Transgender Service Member Ban further ordered a "halt" to the use of DoD resources "to fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex." *Id*. § 2(b).

162.    The Transgender Service Member Ban specified that provisions banning men and women who are transgender from enlisting would take effect on January 1, 2018 (the date Defendant Mattis's directive delaying accessions was set to expire). It further provided that the provisions banning existing transgender service members from continued service and banning medically necessary health care would take effect on March 23, 2018. *Id*. § 3.

163.    The Transgender Service Member Ban further directed the Secretary of Defense, in consultation with the Secretary of Homeland Security, to submit to President Trump by February 21, 2018, a plan to implement the Transgender Service Member Ban and "determine how to address transgender individuals currently serving in the United States military." *Id*. § 3.

164.    The Transgender Service Member Ban gave the Secretary of Defense discretion to determine how to implement the Ban, but it did not leave discretion for the Secretary of Defense to determine whether to implement it.

### F. Fundamental Contradiction Between Transgender Service Member Ban and DoD's Own Considered Conclusions

165. Although the Transgender Service Member Ban purported to be based on President Trump's "judgment," that judgment appears to reflect nothing more than uninformed speculation, myths, and stereotypes that have already been rebutted by an extensive and rigorous evidence-based process.

166. For example, as justification for the Transgender Service Member Ban, President Trump stated that allowing men and women who are transgender to continue serving would be disruptive. But the 2016 study commissioned by DoD found that a transgender service member's care would have a substantial impact on readiness *only* if (1) that service member worked in an "especially unique" military occupation, (2) that occupation was "in demand at the time of transition," *and* (3) the service member needed to be available for "frequent, unpredicted mobilizations." RAND Report, at 43. "Having completed medical transition, a service member could resume activity in an operational unit if otherwise qualified." *Id.* Upon information and belief, the DoD's own working group reached similar conclusions in 2016. The American Medical Association similarly adopted a resolution that "there is no medically valid reason to exclude transgender individuals from service in the [United States] military."

167. Former high-ranking military personnel have indicated that the Transgender Service Member Ban—not the Open Service Directive—will cause serious disruption to the Armed Forces. *See Fifty-Six Retired Generals and Admirals Warn that President Trump's Anti-Transgender Tweets, if Implemented, Would Degrade Military Readiness, supra* ("This proposed ban, if implemented, would cause *significant disruptions*, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie, as well as non-transgender peers who would be forced to choose between reporting their comrades

or disobeying policy. As a result, *the proposed ban would degrade readiness*[.]") (emphases added)).

168.    President Trump has similarly invoked alleged concerns about "unit cohesion." The RAND study noted that "[t]he underlying assumption [of these alleged concerns] is that if service members discover that a member of their unit is transgender, this could inhibit bonding within the unit, which, in turn, would reduce operational readiness." *Id*. at 44.

169.    To study the validity of this argument, RAND looked to, among other things, the experiences of foreign countries that permit open transgender military service. There are 18 such countries: Australia, Austria, Belgium, Bolivia, Canada, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Israel, the Netherlands, New Zealand, Norway, Spain, Sweden, and the United Kingdom. Observing that "there has been no significant effect of openly serving transgender service members on cohesion, operational effectiveness, or readiness" in foreign militaries that permit open transgender service, and that "direct interactions with transgender individuals significantly reduce negative perceptions and increase acceptance," the RAND study concluded: "[W]e anticipate a minimal impact on readiness from allowing transgender personnel to serve openly." *Id*. at 44–45, 47. Upon information and belief, the DoD's own working group reached similar conclusions in 2016.

170.    Senator Tammy Duckworth—an Iraq War Veteran, Purple Heart recipient and former Assistant Secretary of the Department of Veterans Affairs—has explained that the Transgender Service Member Ban, not the Open Service Directive, would "harm our military readiness":

> When I was bleeding to death in my Black Hawk helicopter after I was shot down, I didn't care if the American troops risking their lives to help save me were gay, straight, transgender, black, white or brown. All that mattered was they didn't leave me behind. If you

> are willing to risk your life for our country and you can do the job,
> you should be able to serve—no matter your gender identity or
> sexual orientation.

*See* Sen. Tammy Duckworth (D-Ill.), *Duckworth Statement on Reports Trump Administration Directing DOD to Discriminate Against Transgender Servicemembers* (Aug. 24, 2017), https://www.duckworth.senate.gov/news/press-releases/duckworth-statement-on-reports-trump-administration-directing-dod-to-discriminate-against-transgender-servicemembers.

171.    Finally, President Trump claimed that allowing transgender service members to continue service would be too expensive. The RAND Report's study found to the contrary. Namely, "even in the most extreme scenario that we were able to identify using the private health insurance data, we expect only a 0.13-percent ($8.4 million out of $6.2 billion) increase in [active component] health care spending." RAND Report, at 36. By contrast, total military spending on erectile dysfunction medicines amounts to $84 million annually, which, on information and belief, is almost forty times the cost of gender dysphoria related medical care for active duty transgender service members in 2017. Patricia Kime, *DoD Spends $84M a Year on Viagra, Similar Meds*, Military Times (Feb. 13, 2015), http://www.militarytimes.com/pay-benefits/military-benefits/health-care/2015/02/13/dod-spends-84m-a-year-on-viagra-similar-meds/.

172.    An August 2017 report by the Palm Center concluded that implementing the Transgender Service Member Ban would cost $960 million. *See* Aaron Belkin et al., *Discharging Transgender Troops Would Cost $960 Million*, Palm Center (Aug. 2017), *available at* http://www.palmcenter.org/wp-content/uploads/2017/08/cost-of-firing-trans-troops-3.pdf.

**G.    The Preliminary Injunctions**

173.    The six original Serving Plaintiffs and Plaintiff ACLU of Maryland filed the instant lawsuit on August 28, 2017, and filed a first amended complaint on September 14, 2017.

On November 21, 2017, this Court issued a preliminary injunction prohibiting the Defendants from taking any action to enforce the policies and directives encompassed in President Trump's August 25, 2017 Memorandum.

174.    Three other district courts issued similar preliminary injunctions.

175.    As a result of those injunctions, the Open Service policy remains in effect, and the military began accepting transgender recruits on January 1, 2018.

## H.    The Implementation Plan

176.    On February 22, 2018, Secretary Mattis presented the President with his implementation plan, consisting of a short memo ("Implementation Memo") and an unsigned document entitled "Department of Defense Report and Recommendations on Military Service by Transgender Persons" totaling 44 pages (the "Implementation Report") (together "the Implementation Plan").

177.    The Implementation Plan sets out a two-pronged approach to effectuate the President's ban on transgender individuals serving in the military. First, transgender individuals who "require or have undergone gender transition" are disqualified from military service. ECF 120-2 at 32. Second, all other transgender individuals may serve only "*in their biological sex*." Id. at 34 (emphasis added). Together, these provisions effectively exclude all transgender individuals from being able to enlist. Among other things, these provisions mean that transgender individuals may not serve in accordance with their gender identity or receive medically necessary transition-related care.

178.    The Implementation Plan also contains a "grandfather" clause exemption, which permits service members diagnosed with gender dysphoria since the Open Service Directive took effect and prior to the effective date of the Implementation Plan to "continue to receive all medically necessary treatment, to change their gender marker in DEERS, and to serve in their

preferred gender." The Implementation Plan states that the grandfather clause "is and should be deemed severable from" the remainder of the policy "should [DoD's] decision to exempt these Service members be used by a court as a basis for invalidating the entire policy." Implementation Report at 43. There are questions about the extent of protection this exception to the Ban will provide to current service members who are transgender and who were diagnosed in the specified time period. The Implementation Plan does not explain how DoD and the military services intend to interpret and apply this exemption. On information and belief, some service members who are transgender are already being told that they may not reenlist.

179.    On March 23, 2018, President Trump issued a new memorandum, acknowledging receipt of Secretary Mattis's implementation plan and authorizing Secretary of Defense and the Secretary of Homeland Security to proceed with the plans for implementation.

180.    President Trump's March 23rd memorandum states that it "revoke[s] [President Trump's] memorandum of August 25, 2017." In fact, however, President Trump's March 23 memorandum is the next step in enforcing and implementing the Transgender Service Member Ban.

## I.    Reaction of the Medical Community

181.    The Implementation Plan was quickly condemned by the mainstream medical community. On March 26, 2018, the American Psychological Association released a statement indicating it was "alarmed" by the Administration's "misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary healthcare." *See* Arthur C. Evans Jr., *APA Statement Regarding Transgender Individuals Serving in Military* (March 26, 2018), *available at* http://www.apa.org/news/press/releases/2018/03/transgender-military.aspx. The APA further stated that:

> Substantial psychological research shows that gender dysphoria is a treatable condition, and does not, by itself, limit the ability of individuals to function well and excel in their work, including in military service. The science is clear that individuals who are adequately treated for gender dysphoria should not be considered mentally unstable. […] No scientific evidence has shown that allowing transgender people to serve in the armed forces has an adverse impact on readiness or unit cohesion. What research does show is that discrimination and stigma undermine morale and readiness by creating a significant source of stress for sexual minorities that can harm their health and well-being.

*Id.*

182.     On March 28, 2018, the Palm Center released a joint statement by former U.S. Surgeons General M. Joycelyn Elders and David Satcher, stating:

> We are troubled that the Defense Department's report on transgender military service has mischaracterized the robust body of peer-reviewed research on the effectiveness of transgender medical care as demonstrating 'considerable scientific uncertainty.' In fact, there is a global medical consensus that such care is reliable, safe, and effective. […] A wide body of reputable, peer-reviewed research has demonstrated to psychological and health experts that treatments for gender dysphoria are effective. Research on the effectiveness of medical care for gender dysphoria was the basis of the American Medical Association's 2015 resolution that 'there is no medically valid reason to exclude transgender individuals from service in the U.S. military,' and we expressed our support for the resolution at the time of its passage. In light of last week's announcement concerning military policy for transgender service members, we underscore that transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care.

M. Joycelyn Elders and David Satcher, *Former Surgeons General Debunk Pentagon Assertions about Medical Fitness of Transgender Troops*, Palm Center (March 28, 2018), *available at*

http://www.palmcenter.org/former-surgeons-general-debunk-pentagon-assertions-about-medical-fitness-of-transgender-troops/.

183.     Expressing similar views, the American Medical Association on April 3, 2018

sent a letter to the Secretary of Defense on behalf of its members stating:

> We believe there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service. Transgender individuals have served, and continue to serve, our country with honor, and we believe they should be allowed to continue doing so. […] We support the finding of the RAND study conducted for the Department of Defense on the impact of transgender individuals in the military that the financial cost is negligible and a rounding error in the defense budget. It should not be used as a reason to deny patriotic Americans an opportunity to serve their country. We should be honoring their service.

James L. Madara, Letter to The Honorable James N. Mattis on Behalf of the American Medical

Association (April 3, 2018), *available at* https://searchlf.ama-

assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTER

S%2F2018-4-3-Letter-to-Mattis-re-Transgender-Policy.pdf.

**J.     Immediate and Irreparable Harm to the Serving Plaintiffs from the Transgender Service Member Ban**

184.     The Serving Plaintiffs and other transgender service members face immediate and

irreparable harm as a result of the Transgender Service Member Ban, including as implemented

through the Implementation Plan.

185.     Serving Plaintiffs and other transgender service members now face the reality

that, despite their years of commitment and training, their careers could prematurely end and

various benefits could be made permanently unavailable. Terminating the active service of the

Serving Plaintiffs and other transgender service members would also adversely affect their

retirement benefits, and could in some cases preclude eligibility for retirement benefits

altogether.

186.    The purported "grandfather" exemption to the DoD's attempt to implement the Transgender Service Member Ban leaves the Serving Plaintiffs vulnerable. The grandfather exemption specifically states that the Defendants can withdraw it immediately under certain circumstances that are beyond the Serving Plaintiffs' control, and thus does not remove the irreparable harm the Serving Plaintiffs face. In addition, the Implementation Report cautions that transgender service members "may not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12 months)" or may face removal from the military, without providing any detail as to how such policies will be interpreted and applied. *See* Implementation Report at 43. The Implementation Report's discussion of hormones suggests that transgender service members receiving hormones may be considered non-deployable, even though that is not how the military treats individuals prescribed hormones for other reasons. Therefore, even those transgender service members who are "protected" by the grandfather exemption are exposed to possible termination for arbitrary reasons related to their transgender status.

187.    Plaintiff Petty Officer Stone has served in the U.S. Navy for 11 years, which included a nine-month deployment to Afghanistan. Petty Officer Stone was awarded an achievement medal in connection with his deployment, and he has received multiple other commendations, including a flag letter of commendation and multiple recommendations for early promotion. Despite this lengthy service and deployment, and the fact that he has received extensive and costly training in his field, he faces the prospect that he will be forced out of the U.S. Navy pursuant to the Transgender Service Member Ban.

188.    Plaintiff Staff Sergeant Cole has served in the U.S. Army for nearly a decade, which included a one-year deployment to Afghanistan. Despite her lengthy service, experience

as a team leader, designated marksman, and Cavalry Scout, she faces the prospect that she will be forced out of the U.S. Army pursuant to the Transgender Service Member Ban.

189.    Plaintiff Senior Airman Doe 1 has served for approximately six years in the U.S. Air Force, which included a deployment to Qatar. Despite his service and the fact that he was awarded "Airman of the Year" for his flight, he faces the prospect that he will be forced out of the U.S. Air Force pursuant to the Transgender Service Member Ban.

190.    Plaintiff Airman First Class George has served in the Air National Guard for two and a half years and intends to pursue a commission in the U.S. Army. Despite his service as base security force, he may be prohibited from commissioning in the U.S. Army and faces the prospect that he will be forced out of the Air National Guard pursuant to the Transgender Service Member Ban.

191.    Plaintiff Petty Officer Gilbert has served in the U.S. Navy for 13 years, which included a one-year deployment to Afghanistan. Despite her lengthy service and her specialized knowledge as an information and space systems technician, she faces the prospect that she will be forced out of the U.S. Navy pursuant to the Transgender Service Member Ban.

192.    Plaintiff Technical Sergeant Parker has served in the U.S. Marine Corps for four years and the Air National Guard for 26 years, which included deployments to Japan and Germany. Despite her lengthy service, she faces the prospect that she will be forced out of the Air National Guard pursuant to the Transgender Service Member Ban.

193.    In addition, many transgender service members, including Plaintiffs Stone, Cole, Doe 1, Gilbert, and Parker, may be denied medically necessary treatment that, in many cases, has already been recommended by military medical professionals.

194.    While the Implementation Report claims that transgender service members who meet certain limited criteria relating to the date their gender dysphoria was diagnosed "may continue to receive all medically necessary [care]," the Implementation Report provides no details as to what will be considered "medically necessary" or the process that will govern requests for such care. In light of the Implementation Report's distortion of medical literature regarding the efficacy of care for gender dysphoria and rejection of the views of the mainstream medical community, it is unclear what care will still be provided.

195.    Each transgender service member who is denied medically necessary treatment will suffer serious harm.

196.    The Serving Plaintiffs may also face irreparable harm to their education as a result of the Transgender Service Member Ban and the Implementation Plan.

197.    Plaintiff Cole currently benefits from the Army's tuition assistance, which permits her to take college classes through the University of Maryland - University College. If she is discharged, she will no longer be eligible for tuition assistance.

198.    The Transgender Service Member Ban and the Implementation Plan may prevent Plaintiff Gilbert from being accepted to Officer Candidate School after finishing her coursework at Arizona State University.

199.    The Serving Plaintiffs and other transgender service members also face extraordinary stress, uncertainty, and stigma from the ban on transgender individuals from open service and the singling out their medical care for a ban on coverage. While the Serving Plaintiffs and some other current service members may be covered by the "grandfather" exemption in the Implementation Plan, the scope of that protection is unclear and the clause is subject to severance. At any time, the exemption could be rescinded or disregarded, and the

military will be "authorized to discharge" every transgender service member. The stigma that the Serving Plaintiffs and other transgender service members face has been increased by the Implementation Report's use of stereotypes and conjecture to allege that persons with gender dysphoria, even after successful treatment, have higher rates of psychiatric needs, including the Implementation Report's treatment of gender dysphoria as a "psychiatric disorder" or "mental health condition."  The Implementation Report even invites speculation whether transgender service members "can meet the standards for military duty," and suggests that decreases in military readiness can be blamed on transgender service members' medical needs, fueling anti-transgender sentiment.

200.    Even as the Serving Plaintiffs wait for the Transgender Service Member Ban to be further implemented via the Implementation Plan and subsequent directives, they face significant uncertainty and concern about their careers and their futures, must plan for potential discharge, and experience the stigma of being told their service to their country is not valued or wanted, and that their medical care needs are not real or necessary.

**K.    Immediate and Irreparable Harm to the Enlisting Plaintiffs from the Transgender Service Member Ban**

201.    The Enlisting Plaintiffs and other transgender Americans who wish to join the U.S. military face immediate and irreparable harm as a result of the Transgender Service Member Ban, including as implemented through the Implementation Plan.

202.    Each Enlisting Plaintiff and other potential recruits who are transgender will be denied the right to join the U.S. military solely based on characteristics associated with their transgender identity, regardless of whether they are capable of meeting enlistment standards. They have lost access to careers and opportunities that are available to all other Americans.

203.     Plaintiffs D'Atri, Wood, Branco, Doe 2, Roe 1, and Doe 3, will all be barred entirely from serving openly in the military because they are transgender. Plaintiffs D'Atri, Wood, Branco, and Doe 2 are all actively engaged with discussions with recruiters and face the imminent harm of being denied the opportunity to enlist. Under the terms of the Open Service Directive, Plaintiffs Wood and Branco are currently eligible to enlist, and are not prohibited from enlisting due to either their gender identity or their medical history. Plaintiffs D'Atri and Doe 2 expect to be qualified over the anticipated life of this litigation.

204.     Plaintiffs Roe 1 and Doe 3, while earlier in the process, each have a concrete plan to enlist in the military. Each of the Enlisting Plaintiffs would be disqualified from military service under the terms of the Implementation Plan.

## LEGAL CLAIMS

## COUNT I (Against All Defendants)

### VIOLATION OF THE EQUAL PROTECTION COMPONENT OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

205.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

206.     The equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution protects all persons, including members of the Armed Forces.

207.     President Trump issued the Transgender Service Member Ban, directing that: (i)  current policy providing that transgender status is not a basis for discharge is rescinded, and service members who are transgender are barred from serving in the U.S. Armed Forces, irrespective of their ability to demonstrate their fitness to serve (§ 1(b)); (ii) enlistment in the military or commissioning as an officer by men and women who are transgender is prohibited,

irrespective of their ability to demonstrate their fitness to serve, including the strict accession requirements adopted by DoD (§ 2(a)); and (iii) currently serving transgender service members are denied medically necessary surgical care, including in cases where individuals are stable in their gender transition and able to demonstrate their fitness to serve on the same basis as other service members (§ 2(b)).

208.    In compliance with the directives of the Transgender Service Member Ban, the Department of Defense's Implementation Plan disqualifies transgender individuals from military service, subject to an uncertain "grandfather" exemption offering incomplete protection.

209.    The policies set out in the Transgender Service Member Ban and the Implementation Plan violate Plaintiffs' right to equal protection.

### i.    Rescission of Protection Against Discharge of Existing Service Members (Directive Section 1(b) of the Ban)

210.    Section 1(b) of the Transgender Service Member Ban directed the Secretary of Defense to "return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016," indefinitely. Section 1(a) described the policy being reinstated as one under which the military is "authorized [to] discharge" service members on the basis of their transgender status.

211.    Section 1(b) thus established a broad ban on service by men and women who are transgender, with immediate and longer-term impacts on those currently serving.

212.    Section 3 of the Transgender Service Member Ban required the Secretary of Defense, in implementing the Transgender Service Member Ban, to determine by February 21, 2018 how to "address" currently serving transgender men and women. Although these service members were permitted to continue serving until this determination was made, transgender service members were immediately impacted by the Transgender Service Member Ban.

213.    All service members who are transgender immediately have grave reason to fear for their careers, and must reevaluate career plans that were premised on the Open Service Directive. Serving Plaintiffs and other service members who are transgender experience significant stress and psychological harm caused by this impending threat to their military service.

214.    Service members who are transgender were and are also immediately injured by the stigma created by the Transgender Service Member Ban. Even if some transgender service members are permitted to continue serving under the Implementation Plan, they now serve in a military where the Commander-in-Chief has announced that their service is unwanted and unwelcome, they are potentially subject to discharge at any time solely on the basis of their transgender status or characteristics associated with the status, their medically necessary care could be withheld, and they may be held to entirely different standards on issues such as deployability and career development that differ from standards applied to other service members. Any transgender service member permitted to remain in the military will necessarily be treated as, and experience the harms associated with, a form of second-class status.

215.    The Implementation Plan has not cured this harm. The Implementation Plan attempts to circumvent scrutiny on this issue by including a grandfather clause that purportedly exempts current openly serving transgender service members from immediate discharge. However, the scope of protection under the grandfather exemption is unclear, and the Implementation Plan specifically states that this clause may be severed in certain circumstances. Additionally, the Implementation Plan states that transgender service members serving under the grandfather exemption must "not be deemed to be non-deployable for more than 12 months or for a period of time in excess of that established by Service policy (which may be less than 12

months).” The Implementation Report states that hormone treatments for transgender service members “could render [them] non-deployable for a significant period of time—*perhaps even a year*” (emphasis added), despite the fact that the military does not consider hormones used to treat other conditions as disqualifying from deployment. This suggests that Defendants intend to develop standards or interpretations that would differentially impact transgender service members, creating a backdoor to the grandfather clause that Defendants may open at any time.

216.    Furthermore, the inclusion of a grandfather exemption does not address the injury from stigma. Transgender service members will still be treated as a suspect group, subject to a set of standards different from those governing other service members. The Implementation Report contains unsubstantiated allegations that can be used to blame transgender service members for poor unit performance, by claiming that the mere presence of a transgender service member may harm unit cohesion and military readiness. Transgender service members will be marked as unwanted by their Commander-in-Chief, and their presence in the military may be attributed to “judicial interference” rather than their qualifications, hard work, personal sacrifice, and patriotism.

### ii.    Ban on New Enlistments and Commissions (Directive Section 2(a) of the Ban)

217.    Section 2(a) of the Transgender Service Member Ban directed the Secretary of Defense to “maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018.”

218.    In so stating, Section 2(a) prohibited men and women who are transgender from enlisting and serving openly in the United States Armed Forces. The Open Service Directive had determined that men and women who are transgender would not be disqualified, subject to rigorous accession criteria, at the end of a phase-in period on July 1, 2017. Defendant Mattis

49

delayed new enlistments for a further six months on the asserted basis that further study was warranted.

219.    DoD treats commissioning as an officer as a new accession. Thus, candidates who would otherwise be eligible for commissions, would not be eligible as a result of President Trump's indefinite ban on new accessions.

220.    The Department of Defense has implemented the ban by disqualifying transgender individuals from open service. The Implementation Plan categorically bans "[t]ransgender persons who require or have undergone gender transition," and disqualifies all "[t]ransgender persons with a history or diagnosis of gender dysphoria" from military service. The only people who are actually able to serve under the Implementation Plan are people who are not transgender at all.

### iii.    Ban on Medically Necessary Care (Directive Section 2(b) of the Ban)

221.    Section 2(b) of the Transgender Service Member Ban directed the Secretary of Defense to "halt all use of DoD or DHS resources to fund sex-reassignment surgical procedures for military personnel," except "to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex."

222.    Transgender service members who require medically necessary care to treat gender dysphoria are entitled to care on an equal basis to what is provided to non-transgender service members with medical conditions requiring comparable medically necessary care.

223.    Many of the same or substantially equivalent surgical procedures banned by the Transgender Service Member Ban are covered by the military when used to treat other medical conditions. The Transgender Service Member Ban singled out transgender service members for

different treatment by denying them coverage for medically necessary care that is inherently related to their transgender status and gender nonconformity.

224.    The Implementation Plan fails to cure this immediate harm. While the Implementation Plan claims that transgender service members who meet certain limited criteria relating to the date their gender dysphoria was diagnosed "may continue to receive all medically necessary care," the Implementation Plan provides no details as to what will be considered "medically necessary" or the process that will govern requests for and provision of such care. In light of the Implementation Report's distortion of medical literature regarding the efficacy of care for gender dysphoria and rejection of the views of the mainstream medical community, it is unclear what care will still be provided.

225.    Under the Implementation Plan, transgender service members will be held to different standards to receive medically necessary care than all other members of the U.S. military, even where a transgender service member seeks the very same or substantially equivalent medical procedures.

*       *       *

226.    The Defendants' actions of adopting, implementing, and enforcing each of the policies in the Transgender Service Member Ban, whether through the Implementation Plan or via other means, discriminate against Serving Plaintiffs and Enlisting Plaintiffs and other men and women who are transgender on the basis of sex, which is subject to, and fails, heightened scrutiny under the Fifth Amendment.

227.    The Defendants' actions of adopting, implementing, and enforcing each of the policies in the Transgender Service Member Ban, whether through the Implementation Plan or via other means, discriminate against the Serving Plaintiffs and Enlisting Plaintiffs and other

men and women who are transgender on the basis of their transgender status, which is independently subject to, and fails, heightened scrutiny under the Fifth Amendment.

       a.     Men and women who are transgender, as a class, have historically been subject to discrimination.

       b.     Men and women who are transgender, as a class, have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society.

       c.     Men and women who are transgender, as a class, exhibit immutable or distinguishing characteristics that define them as a discrete group.

       d.     Men and women who are transgender, as a class, are a minority with relatively little political power.

228.    The Defendants' actions of adopting, implementing, and enforcing each of the policies in the Transgender Service Member Ban, whether through the Implementation Plan or via other means, discriminate against Serving and Enlisting Plaintiffs and other transgender individuals on the basis of invidious stereotypes, irrational fears, and moral disapproval, which are not permissible bases for differential treatment under any standard of review.

229.    As a result of the policies, practices, and conduct of the Defendants, men and women who are transgender, including Serving Plaintiffs and Enlisting Plaintiffs and members of Plaintiff ACLU of Maryland, have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, threatened disruption of their military service (including loss of promotion and other career opportunities), and violations of their constitutional right to equal protection. Defendants' conduct continues to

violate the equal protection rights of men and women who are transgender on a daily basis and is the proximate cause of widespread harm among Plaintiffs.

230.    Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to equal protection.

## COUNT II (Against All Defendants)

### VIOLATION OF SUBSTANTIVE DUE PROCESS

231.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

232.    The substantive component of the Fifth Amendment's Due Process Clause includes not only the privileges and rights expressly enumerated by the Bill of Rights, but also includes the fundamental rights implicit in the concept of ordered liberty.

233.    The Fifth Amendment bars certain government actions regardless of the fairness of the procedures used to implement them, particularly conduct that is so arbitrary as to constitute an abuse of governmental authority.

234.    As a result of the Transgender Service Member Ban and the Implementation Plan, men and women who are transgender, including Serving Plaintiffs and Enlisting Plaintiffs, have suffered, or will imminently suffer, a violation of their right to substantive due process because, due to their transgender status, and without any reasoned basis, they are denied an opportunity to demonstrate their continued fitness for duty; the ability to enlist in the U.S. Armed Forces despite being fit to serve; and/or the opportunity to receive medical care on an equal basis as service members and enlistees who are not transgender. Moreover, the Transgender Service Member Ban and the Implementation Plan unfairly and indefensibly strip the Serving Plaintiffs

and other transgender service members of opportunities and benefits previously recognized by DoD's Open Service Directive, on which they relied.

235.    President Trump issued the Transgender Service Member Ban, directing that: (i) transgender status is a basis for discharge, and current service members who are transgender are barred from serving in the U.S. Armed Forces, irrespective of their ability to demonstrate their fitness to serve (§ 1(b)); (ii) enlistment in the military or commissioning as an officer by men and women who are transgender is prohibited, irrespective of their ability to demonstrate their fitness to serve (§ 2(a)); and (iii) currently serving transgender service members are denied medically necessary surgical care, including in cases where individuals are stable in their gender transition and able to demonstrate their fitness to serve on the same basis as other service members (§ 2(b)).

236.    The Department of Defense's Implementation Plan enforces and implements the Transgender Service Member Ban by (i) subjecting transgender service members to discharge, (ii) prohibiting transgender recruits from enlisting or commissioning, and (iii) denying medically necessary treatments to transgender service members. The Implementation Plan's "grandfather" clause fails to offer meaningful protection from these harms: the clause is limited to exempting a subsection of transgender service members and enlistees, is not clearly defined, and may be rescinded at any time.

237.    Each of these policies—as well as the Transgender Service Member Ban and the Implementation Plan as a whole— is arbitrary and inconsistent with available data, serves no legitimate government interest, and therefore violates Plaintiffs' rights to substantive due process.

238.    The Defendants directly and proximately caused, and continue to cause, the violation of Plaintiffs' rights to substantive due process under the law.

239.    As a result of the policies, practices, and conduct of the Defendants, men and women who are transgender, including Serving Plaintiffs and Enlisting Plaintiffs and members of Plaintiff ACLU of Maryland, have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, disruption of their military service (including loss of promotion and other career opportunities), and violations of their constitutional right to substantive due process. Defendants' conduct continues to violate the substantive due process rights of men and women who are transgender on a daily basis and is the proximate cause of widespread harm among Plaintiffs.

240.    Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to substantive due process.

## RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment that the policies and directives encompassed in President Trump's Memorandum for the Secretary of Defense and the Secretary of Homeland Security, dated August 25, 2017 and entitled "Military Service by Transgender Individuals" and in Secretary Mattis's February 22, 2018, memorandum regarding "Military Service by Transgender Individuals" violate the equal protection component of the Fifth Amendment to the U.S. Constitution, and are invalid on their face and as applied to Plaintiffs;

B.    Issue a declaratory judgment that the policies and directives encompassed in President Trump's Memorandum for the Secretary of Defense and the Secretary of Homeland Security, dated August 25, 2017 and entitled "Military Service by Transgender Individuals," and in Secretary Mattis's February 22, 2018, memorandum regarding "Military Service by Transgender Individuals," violate the Fifth Amendment's guarantee of substantive due process, and are invalid on their face and as applied to Plaintiffs;

C.    Issue an Order permanently enjoining Defendants Mattis, Esper, Spencer, Wilson, Nielsen, and Zukunft from implementing and enforcing the policies and directives encompassed in President Trump's Memorandum for the Secretary of Defense and the Secretary of Homeland Security, dated August 25, 2017 and entitled "Military Service by Transgender Individuals," and in Secretary Mattis's February 22, 2018, memorandum regarding "Military Service by Transgender Individuals."

D.    Award reasonable attorneys' fees and allowable costs of court; and

E.    Award such other and further relief as it may deem appropriate and in the interests of justice.

Dated: April 23, 2018

David M. Zionts*
Carolyn F. Corwin*
Mark H. Lynch (Bar No. 12560)
Augustus Golden*
Jeff Bozman*
Marianne F. Kies (Bar No. 18606)
Christopher J. Hanson*
Joshua D. Roselman*
Peter J. Komorowski (Bar No. 20034)
Mark Neuman-Lee*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5987
dzionts@cov.com
ccorwin@cov.com
mlynch@cov.com
agolden@cov.com
jbozman@cov.com
mkies@cov.com
chanson@cov.com
jroselman@cov.com
pkomorowski@cov.com
mneumanlee@cov.com

Mitchell A. Kamin*
Nicholas A. Lampros*
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
mkamin@cov.com
nlampros@cov.com

Sara D. Sunderland*
COVINGTON & BURLING LLP
One Front Street
San Francisco, California 94111
Telephone: (415) 591-7004
Facsimile: (415) 591-6091
ssunderland@cov.com

Respectfully submitted,

 /s/ Marianne F. Kies

Deborah A. Jeon (Bar No. 06905)
David Rocah (Bar No. 27315)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF MARYLAND
3600 Clipper Mill Road, #350
Baltimore, MD 21211
Telephone: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org

Joshua A. Block*
Chase B. Strangio*
James Esseks*
Leslie Cooper*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2627
Fax: 212-549-2650
jblock@aclu.org
cstrangio@aclu.org
jesseks@aclu.org
lcooper@aclu.org

*Attorneys for Plaintiffs*

*Admitted pro hac vice*