**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| BROCK STONE, et al., | |
| Plaintiffs, | |
| v. | Case No. 1:17-cv-02459-MJG |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR
FOR SUMMARY JUDGMENT, AND MEMORANDUM IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................. 3

    A.    DoD's Historical Ban on Military Service by Transgender People ........................ 3

    B.    The Open Service Directive ................................................................................ 4

    C.    Defendants' Transgender Service Member Ban .................................................. 7

    D.    This Court's Injunction ...................................................................................... 8

    E.    The Defense Department's Implementation of the Transgender Service
        Member Ban ...................................................................................................... 9

    F.    Plaintiffs' Second Amended Complaint, and Defendants' Motion to
        Dismiss and Motion for Summary Judgment Before the Close of
        Discovery ........................................................................................................ 11

ARGUMENT ........................................................................................................ 14

I.    This Court Has Jurisdiction Over Plaintiffs' Claims. ....................................... 14

    A.    The Enlisting Plaintiffs Have Standing to Challenge the Implementation of
        the Enlistment Ban. .......................................................................................... 16

    B.    Defendants Have Failed to Show that the Serving Plaintiffs' Claims Are
        Moot. ............................................................................................................... 18

            1.    *Plaintiffs' Challenges to the Retention Ban Are Not Moot.* ..................... 20

            2.    *Plaintiffs' Challenges to the Surgery Ban Are Not Moot.* ....................... 23

            3.    *Plaintiffs' Challenge to the Enlistment Ban Is Not Moot.* ...................... 24

    C.    The Court Has Jurisdiction to Award Declaratory Relief Against President
        Trump ............................................................................................................... 25

II.    Plaintiffs' Cross-Motion For Summary Judgment On Their Equal Protection
    Claim Should Be Granted. ................................................................................ 26

    A.    Plaintiffs Are Entitled to Summary Judgment Because Defendants Are
        Implementing President Trump's Concededly Unconstitutional Decision
        to Ban Transgender Service. ............................................................................ 27

B.      Plaintiffs Are Also Entitled to Summary Judgment Because the Implementation Plan, Even if It Is Regarded as an Independent Policy, Fails Equal Protection Scrutiny. ....................................................... 30

        1.      *The Implementation Plan Is Subject To Heightened Scrutiny, Not the "Highly Deferential" Rubber-Stamp Review Defendants Propose.* ....................................................................................... 30

        2.      *The Implementation Plan's Enlistment Ban Violates Equal Protection Under any Standard.* ............................................... 34

                a)      The Enlistment Ban Is Not Rationally Related to the Implementation Plan's Stated Concern About Fitness to Serve. ....................................................................... 35

                b)      The Enlistment Ban Is Not Rationally Related to the Implementation Plan's Stated Concern About Deployability. ............................................................. 38

                c)      The Enlistment Ban Is Not Rationally Related to the Implementation Plan's Stated Concern About Costs. ................... 41

                d)      The Enlistment Ban Is Not Rationally Related to the Implementation Plan's Stated Concerns About Unit Cohesion and Privacy. ............................................... 41

                e)      Defendants' Stated Concern About "Proceeding Cautiously" Is Not A Rational Justification For The Enlistment Ban. ............ 43

III.    Defendants' Motion to Dismiss and Motion For Summary Judgment Before The Completion Of Discovery Should Be Denied. .................................................. 44

        A.      Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) Should Be Denied. ............................................................................. 46

        B.      The Court's Review Is Not Limited to the "Administrative Record." ................. 46

        C.      Viewing The Full Record, Judgment in Defendants' Favor Could Not Be Granted Because It Would Require the Court to Resolve Numerous Genuine Disputes of Material Fact in Their Favor. ............................................. 48

        D.      At Minimum, Plaintiffs Are Entitled to Complete Discovery so They Can Obtain Further Evidence Regarding Defendants' Intent. ..................................... 49

CONCLUSION ....................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995)...........................................................................................17

*Adarand Constructors, Inc. v. Slater,*
528 U.S. 216 (2000) (per curiam).....................................................................18

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)...........................................................................................45

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
531 U.S. 356 (2001)...........................................................................................40

*Beck v. McDonald,*
848 F.3d 262 (4th Cir. 2017) ............................................................................14

*Berkley v. United States,*
287 F.3d 1076 (Fed. Cir. 2002)..........................................................................34

*Bostic v. Schaefer,*
760 F.3d 352 (4th Cir. 2014) ............................................................................40

*Brock-Smith v. Titan Indem. Co.,*
2018 WL 2321120 (D. Md. May 22, 2018).......................................................28

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).....................................................................................28, 44

*Christian Legal Soc. v. Martinez,*
561 U.S. 661 (2010)...........................................................................................32

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
473 U.S. 432 (1985)..................................................................................... *passim*

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982)...........................................................................................20

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)...........................................................................................21

*Clinton v. City of New York,*
524 U.S. 417 (1998)...........................................................................................25

*Cook v. Colgate Univ.*,
    992 F.2d 17 (2d Cir. 1993).................................................................15

*Crawford v. Cushman*,
    531 F.2d 1114 (2d Cir. 1976)............................................................40

*De La Fuente v. Lamone*,
    2017 WL 2439143 (D. Md. June 5, 2017)..........................................15

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ..........................................................41

*Doe 1 v. Trump*,
    275 F. Supp. 3d 167 (D.D.C. 2017)........................................8, 30, 31, 47

*Doe v. Boyertown Area Sch. Dist.*,
    2017 WL 3675418 (E.D. Pa. Aug. 25, 2017) ......................................42

*Equal Access Educ. v. Merten*,
    305 F. Supp. 2d 585 (E.D. Va. 2004) .................................................17

*Ingle ex rel. Estate of Ingle v. Yelton*,
    439 F.3d 191 (4th Cir. 2006) .............................................................49

*Evans v. Techs. Applications & Serv. Co.*,
    80 F.3d 954 (4th Cir. 1996) ...............................................................49

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000).....................................................................19, 21

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) .........................................................31

*Goldman v. Weinberger*,
    475 U.S. 503 (1986)..........................................................................33

*Hamilton v. Mayor & City Council of Balt.*,
    807 F. Supp. 2d 331 (D. Md. 2011).............................................44, 45

*Harrods v. Sixty Internet Domain Names*,
    302 F.3d 214 (4th Cir. 2002) .............................................................45

*Honig v. Doe*,
    484 U.S. 305 (1988)..........................................................................19

*Hunter v. Underwood*,
    471 U.S. 222 (1985)..............................................................26, 28, 30

*Karnoski v. Trump*,
2018 WL 1784464 (W.D. Wash. Apr. 13, 2018) ............................................................. *passim*

*Kerns v. United States*,
585 F.3d 187 (4th Cir. 2009) ................................................................................15

*Khan v. Children's Nat'l Health Sys.*,
188 F. Supp. 3d 524, 529 (D. Md. 2016) ................................................................16

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
No. 17-05205 (S.D.N.Y. May 23, 2018) ...........................................................21, 26

*Kobe v. Haley*,
666 F. App'x 281 (4th Cir. 2016) (per curiam) ...................................................16

*Lee v. Weisman*,
505 U.S. 577 (1992) ............................................................................................17

*Loc. 1764, Amalgamated Transit Union v. WMATA*,
2015 WL 1471967 (D. Md. Mar. 30, 2015) ..........................................................46

*Log Cabin Republicans v. United States*,
716 F. Supp. 2d 884 (C.D. Cal. 2010) ............................................................43, 50

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................................16

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
286 F. Supp. 3d 704 (D. Md. 2018) ................................................................31, 42

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................................................44, 45

*Miccosukee Tribe of Indians of Fla. v. United States*,
2010 WL 337653 (S.D. Fla. Jan. 22, 2010) ..........................................................47

*Moore v. Blibaum & Assocs., P.A.*,
693 F. App'x 205 (4th Cir. 2017) .......................................................................22

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ............................................................................25

*In re Naval Chaplaincy*,
697 F.3d 1171 (D.C. Cir. 2012) ..........................................................................17

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) ......................................................................................18, 19

*Newport Pac. Inc. v. Cty. of San Diego*,
   200 F.R.D. 628 (S.D. Cal. 2001) ..............................................................47

*Pedersen v. Office of Pers. Mgmt.*,
   881 F. Supp. 2d 294 (D. Conn. 2012)........................................................44

*Perry v. Brown*,
   671 F.3d 1052 (9th Cir. 2012) ...................................................................43

*Pisano v. Strach*,
   743 F.3d 927 (4th Cir. 2014) .....................................................................49

*Romer v. Evans*,
   517 U.S. 620 (1996)....................................................................................35

*Rostker v. Goldberg*,
   453 U.S. 57 (1981)………………………………………………………………32, 33

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016)................................................................................16

*Stone v. Trump*,
   280 F. Supp. 3d 747 (D. Md. 2017) .............................................................3

*Students & Parents for Privacy v. U.S. Dep't of Educ.*,
   2016 WL 6134121 (N.D. Ill. Oct. 18, 2016)...............................................42

*In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*,
   145 F.3d 1422 (D.C. Cir. 1998)..................................................................47

*In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*,
   156 F.3d 1279 (D.C. Cir. 1998)..................................................................47

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014)................................................................................16

*Todd v. Prince George's Cty., Md.*,
   2015 WL 2129702 (D. Md. May 6, 2015)................................................19, 21

*Tolan v. Cotton*,
   134 S. Ct. 1861 (2014)..............................................................................3, 5

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2012 (2017)................................................................................20

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973)....................................................................................27

*United States Parole Comm'n v. Geraghty*,
    445 U.S. 388 (1980)..................................................................................................15

*United States v. Concentrated Phosphate Exp. Ass'n*,
    393 U.S. 199 (1968)..............................................................................20, 21, 22, 24

*United States v. Virginia*,
    518 U.S. 515 (1996).................................................................... *passim*

*Wall v. Wade*,
    741 F.3d 492 (4th Cir. 2014) .................................................................20

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...............................................................42

*Works v. Colvin*,
    519 F. App'x 176 (4th Cir. 2013) (per curiam) ......................................49

## Other Authorities

Fed. R. Civ. P. 56(d) ...........................................................................13, 45, 49

S. Rep. No. 103-112 (1993)..................................................................43

# INTRODUCTION

In July 2017, when President Trump announced on Twitter his decision to ban transgender individuals from serving in the military "in any capacity," he claimed to have based his decision on concerns about military effectiveness.  ECF 40-22.  As this Court later found, that was not true: President Trump's abrupt action was based on no evidence at all, and "was not driven by genuine concerns regarding military efficacy."  ECF 85, at 43 (internal quotation marks omitted).  The Court further concluded that President Trump's directive to the Department of Defense ("DoD") to develop an "implementation plan" was "not a request for a study but an order to implement the Directives contained therein."  *Id.* at 50.  This Court—and three others— enjoined enforcement and implementation of the President's act of discrimination.  ECF 85.

DoD has now issued the Implementation Plan that the President directed, together with a report purporting to justify the conclusions the President had already reached.  But while DoD has made cosmetic changes, the bottom line is the same: transgender individuals are deemed unfit to serve and categorically barred from enlisting.  Anyone who has completed a gender transition is denied the ability to serve their country, even if they have completed any needed surgery, their gender dysphoria has been treated successfully, their stability has been certified and confirmed, and they meet every other qualification for service.

Plaintiffs are all transgender individuals who are currently serving their country or seeking the chance to do so.  The newly added Plaintiffs are several transgender individuals (the "Enlisting Plaintiffs") who wish to serve, and now or in the near future would be eligible to serve, but for the Ban as implemented.  Two of them, Niko Branco and Ryan Wood, have—contrary to Defendants' assertions—already met every requirement for enlistment under the Open Service Directive.  The Enlisting Plaintiffs unquestionably have standing to challenge Defendants' unconstitutional attempt to bar them from service.  And the claims of the original Plaintiffs (the

"Serving Plaintiffs"), whose standing this Court has already found, are not mooted by a "grandfather" provision in the Implementation Plan, which on its face casts doubt on how meaningful that protection is, and overtly threatens to withdraw it.

On the merits, the Second Amended Complaint alleges, and unrefuted evidence establishes, that the original Transgender Service Member Ban and its Implementation Plan are both unconstitutional. Defendants do not even attempt to address the former, effectively conceding this Court's finding that it was motivated by discrimination, not legitimate military concerns. That reality dooms the Implementation Plan as well. Although Defendants insist that the new policy is independent of President Trump's original decision, the record clearly establishes otherwise. Secretary Mattis has faithfully *implemented* the Commander-in-Chief's directives. Indeed, on the key question of new enlistments, Secretary Mattis instructed his putatively independent "Panel of Experts" to simply follow the President's direction.

But even if the origins of the Implementation Plan were ignored, it still could not withstand scrutiny. The "Panel of Experts" report is riddled with inaccuracies and illogic that betray its discriminatory animus. Among many glaring irrationalities, Defendants repeatedly justify the enlistment ban based on alleged limitations associated with surgical treatment, even though anyone attempting to enlist under the Open Service Directive must demonstrate that they *have already completed all necessary surgery*. And strikingly, in response to the Panel's raw speculation about harms to "unit cohesion," the service chiefs of the Army, Navy, Air Force, and Marine Corps have unanimously testified that they are not aware of any issues of unit cohesion, disciplinary problems, or morale related to the open service of transgender men and women.

It is thus Plaintiffs, not Defendants, who are entitled to summary judgment. But at a minimum, it would be impossible to grant summary judgment for *Defendants* without resolving

disputed issues of fact in their favor.  Remarkably, moreover, Defendants argue that there is no genuine dispute of material fact *while withholding material facts from Plaintiffs*.  Discovery is ongoing, and cannot be completed until this Court resolves significant privilege disputes.  Under blackletter civil procedure rules, Defendants' summary judgment motion is obviously premature.

In Defendants' view, President Trump's unconstitutional act of discrimination has been effectively laundered, and this Court should now play the role of a powerless rubber stamp. They are wrong.  The Court should deny Defendants' motions, grant Plaintiffs' cross-motion for summary judgment, and reaffirm that the steps Defendants have taken to exclude transgender individuals from military service are unconstitutional.

## FACTUAL BACKGROUND[1]

### A.    DoD's Historical Ban on Military Service by Transgender People

Starting some time before 1981, DoD barred men and women who are transgender from military service.  DoD's policy categorically excluded individuals who had had a "change of sex" from enlisting, and it prohibited persons who are transgender from serving openly, regardless of whether they required any ongoing medical treatment and regardless of their fitness to serve. ECF 40-32 (Brown Decl.), ¶¶ 39–58; ECF 40-35 (RAND Report), at 1.  The historical ban on military service by people who are transgender was based on the military's conclusion that so-called "Sexual Gender and Identity Disorders" rendered a service member "administratively unfit."  ECF 40-32, ¶¶ 48–56.

---

[1] "When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true, and the complaint is viewed in the light most favorable to the plaintiff."  *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017).  At the summary judgment stage, "reasonable inferences should be drawn in favor of the nonmoving party."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014).

The consensus of the medical community is that being transgender is not a mental disorder and "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  ECF 40-32, ¶ 25; Decl. of Augustus Golden ("Golden Decl."), Ex. 1 (APA Position Statement).  However, when transgender people are unable to live consistently with their gender identity, they may experience "gender dysphoria," a diagnostic term used to describe the clinically significant distress a transgender person can experience from the incongruity between their gender identity and the sex assigned to them at birth.  ECF 40-32, ¶ 26. If a transgender person is able to live consistently with his or her gender identity, he or she may never develop gender dysphoria.  ECF 139-19 (Brown Supp. Decl.), ¶ 9.  If a transgender person does develop gender dysphoria, appropriate transition-related treatment resolves the clinically significant distress by enabling the person to live consistently with their gender identity.  *Id.*  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (2013) ("DSM-V") accordingly provides a "post-transition" diagnostic subtype for when a person's gender dysphoria is in "remission."  Golden Decl., Ex. 2.

By categorically prohibiting transgender people from serving even when they transitioned and were stable in their gender, the military's historical ban treated transgender people differently from people with other curable medical conditions.  ECF 40-32, ¶ 39.

**B.      The Open Service Directive**

On July 13, 2015, then-Secretary of Defense Ashton Carter acknowledged that the existing ban on military service by transgender people was "an outdated, confusing, inconsistent approach that's contrary to our value of service and individual merit [and that is] causing uncertainty that distracts commanders from our core missions."  ECF 40-31.  Secretary Carter created a DoD working group to study "the policy and readiness implications of welcoming transgender persons to serve openly."  *Id.*  This DoD Working Group included representatives of

military leadership, including the Joint Chiefs of Staff; the service secretaries; and personnel, training, readiness, and medical specialists. *See id.*; ECF 40-37 (Carson Decl.), ¶¶ 1, 8–10. Over the next year, the Working Group performed a systematic review of military service by transgender people—including meeting with transgender service members deployed throughout the world, and consulting with outside experts, medical professionals, and others. *See* ECF 40-37, ¶ 10; ECF 40-8, at 4/17.[2]

Following its "thoughtful and deliberate" review (ECF 40-8, at 3/17), the DoD Working Group concluded that "[o]pen service by transgender service members would not impose any significant burdens on readiness, deployability, or unit cohesion," ECF 40-38 (Wilmoth Decl.), ¶ 23.[3] The Secretary of Defense agreed, determining that:

> open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity.

---

[2] Secretary Carter's order directed the Working Group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness, unless and except where objective, practical impediments are identified." ECF 40-31. That mandate did not mean, as the Implementation Plan insinuates, that "standards were adjusted or relaxed to accommodate service by transgender persons." ECF 120-2, at 19. Rather, instead of simply assuming that the medical needs of transgender service members were inconsistent with generally applicable standards for fitness or deployability, the Working Group conducted an evidence-based assessment to determine whether those prior assumptions were actually true. ECF 139-29 (Carson Supp. Decl.), ¶ 7.

[3] DoD also commissioned a study by the Forces and Resources Policy Center of the non-partisan RAND National Defense Research Institute ("RAND"), which conducted an "extensive literature review"; examined data from inside and outside DoD; studied policies of foreign militaries that permit open service by persons who are transgender; and reviewed DoD's instructions on enlistment, retention, separation, and deployment. ECF 40-35, at 2–3. RAND concluded that the impact on military readiness from open service would be "negligible," and that associated health care costs would represent "an exceedingly small proportion" of DoD's overall health care expenditures. *Id.* at xi–xii, 31, 70.

ECF 40-4 (DTM 16-005).  On June 30, 2016, the Secretary issued a directive rescinding the historical policy of discriminating against men and women who are transgender (the "Open Service Directive").  *Id.*

The Open Service Directive announced that individuals wishing to join the military (a process known as "accession," applicable to both new enlistees and officer candidates) would not be prohibited from doing so solely because they are transgender.  *See generally* ECF 40-4, at Attachment.  However, the Directive set out stringent accession requirements beyond those applicable to current service members, to "ensure that those entering service are free of medical conditions or physical defects that may require excessive time lost from duty."  *Id.* § 2(a).  Namely, "[a] history of gender dysphoria" was disqualifying "unless, as certified by a licensed medical provider, the [prospective enlistee] ha[d] been stable without clinically significant distress or impairment in social, occupational, or other important areas of functioning for [at least] 18 months."  *Id.* § 2(a)(1).  "A history of sex reassignment or genital reconstruction surgery" was also disqualifying unless at least 18 months had passed since the surgery, no further surgery was required, and "no functional limitations or complications persist[ed]."  *Id.* § 2(a)(3).  Finally, a history of any medical treatment "associated with gender transition" was disqualifying, unless the enlistee had "completed all medical treatment" associated with the transition; had been "stable" in the transition for 18 months; and had been stable on any hormones for 18 months.  *Id.* § 2(a)(2).[4]  The new accessions policy was scheduled to go into effect on July 1, 2017, a date that was subsequently extended to January 1, 2018.  ECF 40-11.

---

[4] The Open Service Directive's enlistment policy is comparable to the enlistment standards for individuals with abnormal menstruation, dysmenorrhea, and endometriosis—all of whom may enlist if their conditions are adequately managed through hormone medication.  ECF 139-19, ¶ 33 (citing DoDI 6130.03, Enclosure 4 §§ 14(a), (d), (e)).

### C.    Defendants' Transgender Service Member Ban

On July 26, 2017, President Trump abruptly rescinded the Open Service Directive, announcing that transgender persons would not be permitted to serve in the military "in any capacity." ECF 40-22.  While the President asserted that he had "consult[ed] with [his] Generals and military experts," *id.*, the announcement came as a surprise to the Secretary of Defense and other military officials.  *See* ECF 40-12; Golden Decl., Ex. 3 at USDOE00037695 (Gen. Dunford "was not consulted" before the Tweets); Golden Decl., Ex. 4 at 6 (due to President Trump's growing frustration with Secretary Mattis, who "refus[ed] to enact a ban," the "president finally went around him and tweeted it").  In fact, the President later stated that he had done the military a "great favor" by personally intervening to resolve this "confusing issue."  ECF 40-12.

The primary motivation for President Trump's ban was based not on evidence, but on moral disapproval and political calculation; for example, Representative Vicky Hartzler pushed for the Ban based on her moral disapproval of transgender individuals.  *See* ECF 40-2 at 10–11; *see also* Golden Decl., Ex. 5 (REP. HARTZLER 066–67, filed under seal).

On August 25, 2017, the President issued a memorandum with three directives formalizing his Tweets, comprising bans on enlistments, retention, and military funding for sex-reassignment surgery (together, the "Transgender Service Member Ban").  ECF 40-21.  President Trump ordered Secretary Mattis to propose a "plan for *implementing*" those directives by February 21, 2018.  ECF 40-21, § 3 (emphasis added); *see also* ECF 60-5 (Interim Guidance) ("Not later than February 21, 2018, I will present the President with a *plan to implement the [August 25, 2017] policy and directives*." (emphasis added)).

On August 28, 2017, Plaintiffs filed the instant lawsuit, alleging that the Ban violates their rights to equal protection and substantive due process under the Fifth Amendment because it discriminates against them and other transgender persons on the basis of invidious stereotypes,

irrational fears, animus, and moral disapproval, which are not permissible bases for differential

treatment.  ECF 1, ¶ 142.  Plaintiffs alleged that Defendants lacked any rational basis for

imposing the Ban—much less a basis that would survive the heightened scrutiny applicable to

discrimination against transgender people.  *Id*. ¶¶ 141–42.  Plaintiffs further alleged that the Ban

is so arbitrary as to be an abuse of governmental authority.  *Id*. ¶ 147.  On September 14, 2017,

Plaintiffs filed a first amended complaint containing similar allegations.  ECF 39.

   **D.**     **This Court's Injunction**

   On November 21, 2017, this Court ruled that Plaintiffs had established a likelihood of

success on their claim that President Trump's decision to ban transgender persons from military

service violates equal protection, that Plaintiffs would be irreparably harmed absent preliminary

injunctive relief, and that the public interest and balance of hardships weighed in favor of

granting injunctive relief.  ECF 85, at 46 (finding all *Winter* factors weigh in favor of granting a

preliminary injunction).  In finding a likely equal protection violation, the Court observed that

President Trump's discriminatory decision to issue the Transgender Service Member Ban "'was

not driven by genuine concerns regarding military efficacy.'"  *Id*. at 43 (quoting *Doe 1 v. Trump*,

275 F. Supp. 3d 167, 213 (D.D.C. 2017)).  The Court further rejected Defendants' contention

that the case was not ripe for review in light of DoD's conduct of a study at President Trump's

direction: "The Court cannot interpret the plain text of the President's [August 25, 2017]

Memorandum as being a request for a study to determine whether or not the directives should be

implemented.  Rather, it *orders the directives to be implemented by specified dates*."  *Id*. at 29

(emphasis added).  The Court ordered that Defendants "shall not enforce or implement the []

policies and directives encompassed in President Trump's [August 25, 2017] Memorandum."

ECF 84, at 1.

**E.      The Defense Department's Implementation of the Transgender Service Member Ban**

Shortly after President Trump's Twitter announcement of the Ban on July 26, 2017, DoD began studying how to implement the Ban.  Among other steps, the Army quickly gathered data on its 108 service members who had come forward as transgender, and estimated the amount of time it would take to for all of those service members to be "eliminated" from service through attrition or involuntary discharge.  *See* ECF 139-4, at Slides 12–13.

After President Trump issued his formal Transgender Service Member Ban on August 25, 2017, Secretary Mattis directed the Under Secretary for Personnel and Readiness and the Vice Chairman of the Joint Chiefs of Staff to assemble "a panel of experts" to "develop[] an Implementation Plan on military service by transgender individuals, to effect the policy and directives in [the] Presidential Memorandum."  *See* ECF 139-5 (Sept. 14, 2017 "Terms of Reference" re "Implementation of Presidential Memorandum on Military Service by Transgender Individuals").  Secretary Mattis's "Terms of Reference" illustrate the limited scope of the task: DoD's "Panel of Experts" was assigned to conduct a study to "inform the Implementation Plan," *i.e.*, the Plan implementing the President's directives.  *Id.* at USDOE00000443.  With respect to accessions, the Panel's mandate was particularly limited. Secretary Mattis explained that DoD had been "direct[ed]" to "prohibit[] accession of transgender individuals into military service," and instructed the Panel simply to "update" the accessions policy's guidelines "to reflect currently accepted medical terminology."  *Id.*  DoD officials acknowledged that the Department had "received formal guidance from the White House reference to transgender personnel serving in the military" and committed to "develop a [sic] implementation plan to meet the President's intent"—i.e., a ban on military service by

people who are transgender.  Golden Decl., Ex. 6 at USDOE00213057 (Sept. 14, 2017 Talking

Points); *see also* ECF 40-22 (Tweets).

The "Panel of Experts" provided its recommendations for how to implement the Ban on

January 11, 2018.  Political appointees at DoD then considered the recommendations, "as well as

additional information within the Department," and prepared an Implementation Plan for

Secretary Mattis to deliver to the President on February 22, 2018.  ECF 120-2, at 18.  The

recommendations were prepared "*[p]ursuant to* [the President's] memorandum of August 25,

2017."  ECF 120-3, at 1 (emphasis added).  Asked at a Press Briefing whether Secretary Mattis

was "proud of the recommendations he[] made to the [P]resident," DoD's chief spokesperson

answered: "The way that this was done, is it [sic] was a coordinated effort with the White House

as well as the Department of Justice."  ECF 139-7 (Mar. 29, 2018 DoD Press Briefing), at 10.

The Implementation Plan (ECF 120-1, 120-2, 120-3) proposes a two-pronged approach

governing new enlistments.  First, transgender individuals who "require or have undergone

gender transition" are disqualified from military service, without regard to whether they are

otherwise fit to serve.  ECF 120-2, at 32.  Second, all other transgender individuals are permitted

to serve only "*in their biological sex.*"  *Id.* (emphasis added).  Together, these provisions

effectively exclude all transgender individuals from being able to enlist.  ECF 148, ¶ 177.

In accordance with the President's instruction in the August 25 memorandum to

"determine how to address transgender individuals currently serving in the United States

military," ECF 40-21, § 3, the Implementation Plan contains a "grandfather" clause, which

permits service members diagnosed with gender dysphoria since the Open Service Directive took

effect and prior to the effective date of the Implementation Plan to "continue to serve in their

preferred gender and receive medically necessary treatment for gender dysphoria," ECF 120-1, at

2.  However, Defendants threaten to terminate the grandfather provision depending on how this and related litigation play out: "[S]hould [DoD's] decision to exempt these Service members be used by a court as a basis for invalidating the entire policy, this exemption is and should be deemed severable from the rest of the policy."  ECF 120-2, at 43.

President Trump endorsed this Implementation Plan in a memorandum issued on March 23, 2018.  ECF 120-3.  The March 23 memorandum states that, "pursuant to" the August 2017 Transgender Service Member Ban, DoD had submitted to the President a proposed policy that disqualifies "transgender persons with a history or diagnosis of gender dysphoria" from serving in the military "except under certain limited circumstances."  *Id.* at 1.  The March 23, 2018 memorandum then purports to "revoke" the August 2017 memorandum and any other directives the President may have made regarding military service by transgender individuals.  *Id.* § 1.  On the basis of the March 23 memorandum and the associated Implementation Plan, Defendants immediately moved to dissolve the preliminary injunction this Court had entered.  ECF 120. That motion is fully briefed and pending.

**F.     Plaintiffs' Second Amended Complaint, and Defendants' Motion to Dismiss and Motion for Summary Judgment Before the Close of Discovery**

After Defendants published their February 22 Implementation Plan on March 23, Plaintiffs promptly moved for leave to file a second amended complaint.  ECF 135.  That motion was granted, and the second amended complaint was filed, on April 27, 2018.  ECF 147, 148. Among other things, the second amended complaint added six individual plaintiffs who are transgender and who have taken concrete steps to enlist in the Armed Forces:

• Niko Branco seeks to join the Army.  ECF 148, ¶ 4.  Mr. Branco is eligible to enlist under the Open Service Directive because he has submitted a signed certification from licensed physicians that: (1) he has been stable for more than 18 months while

being on hormones and since his transition-related surgery; and (2) he does not require any additional surgeries.  ECF 139-32 (Branco Decl.), ¶ 16; Branco Supp. Decl. (attached hereto), ¶ 2.[5]

- Teddy D'Atri seeks to join the Air Force.  ECF 148, ¶ 4.  Mr. D'Atri is tentatively scheduled to undergo medically necessary surgery in August 2018, and he will not require any further surgery after that procedure.  ECF 139-34 (D'Atri Decl.), ¶¶ 6, 8.

- Ryan Wood seeks to join the Marine Corps.  ECF 148, ¶ 4.  Mr. Wood is eligible to enlist under the Open Service Directive because he has submitted a signed certification from a licensed physician that: (1) he has been stable for more than 18 months while being on hormones and since his transition-related surgery; and (2) he does not require any additional surgeries.  ECF 139-36 (Wood Decl.), ¶ 10; Wood Supp. Decl. (attached hereto), ¶¶ 3–5.[6]

- John Doe 2 seeks to join the Air Force.  ECF 148, ¶ 4; ECF 140-1 (Doe 2 Decl.). John Doe 2 underwent medically necessary top surgery approximately one year ago and intends to seek a waiver of the 18-month stability period requirement through the process afforded him under the Open Service Directive.  ECF 140-1, ¶ 14.

- Jane Roe 1 seeks to join the Air Force.  ECF 148, ¶ 4.  Jane Roe 1 is tentatively scheduled for facial feminization surgery in July 2018, and she will not require any

---

[5] Defendants submitted a declaration by a Sgt. Osburn dated May 11, 2018 stating that Plaintiff Branco had not yet submitted all required paperwork.  *See* Osburn Decl., Ex. 3 to Defs.' Motion for Summary Judgment (filed under seal).  On May 17, Sgt. Osburn informed Plaintiff Branco that in fact all necessary paperwork was submitted.  Branco Supp. Decl., ¶ 4.

[6] Defendants submitted a declaration stating that Plaintiff Wood underwent transition-related surgery in November 2017.  Flores Decl., Ex. 4 to Defs.' Motion for Summary Judgment (filed under seal), ¶ 10.  That is incorrect; Plaintiff Wood's last transition-related surgery was in 2012. Wood Supp. Decl., ¶ 5.

further surgery after that procedure.  ECF 140-2 (Roe 1 Decl.), ¶¶ 8, 10.  Moreover, she intends to seek a waiver of the 18-month stability period requirement through the process afforded her under the Open Service Directive.  *Id.* ¶ 13.

- John Doe 3 is a 15-year-old minor who wishes to join the Coast Guard as soon as he is age-eligible.  ECF 148, ¶ 4.  He visited the U.S. Coast Guard Academy, took a tour, and talked to a Coast Guard cadet, who informed John Doe 3 and his family about the application process and pursuing a career in the U.S. Coast Guard.  ECF 140-3 (Doe 3 Decl.), ¶ 8.

On May 11, 2018, Defendants filed the instant Motion.  ECF 158.  Although framed as a motion to dismiss or, in the alternative, a motion for summary judgment, the Motion largely avoids addressing the allegations in the Second Amended Complaint, and relies heavily on factual claims.  Discovery in this case, however, is ongoing; Defendants have yet to complete their document productions or to supply interrogatory responses that comply with Rule 33(d). Rule 56(d) Decl. of Marianne F. Kies (attached hereto), ¶¶ 7, 35.  The parties have not exchanged expert disclosures.  *Id.* ¶¶ 37–38.  There are also live disputes regarding many of Defendants' privilege assertions, as well as the adequacy of their privilege logs.  *See, e.g.*, *id.* ¶¶ 19–21, 23–25, 28, 32.  Plaintiffs have served a motion to compel, to which Defendants have not yet responded.  *See, e.g.*, Golden Decl., Ex. 7 (Apr. 23, 2018 Motion to Compel); ECF 152. Neither Plaintiffs nor Defendants have taken a single deposition in this case; indeed, due to Defendants' pervasive assertions of privilege for information critical to this case, Plaintiffs have been unable to determine which witnesses to depose and on what subjects.  Kies Decl., ¶¶ 37–38.

— 13 —

**ARGUMENT**

Under President Trump's directives and the Department of Defense's Implementation

plan, Plaintiffs Stone, Cole, Doe 1, George, Gilbert, and Parker (the "Serving Plaintiffs") remain

vulnerable, stigmatized, and at risk of discharge from the military, solely because they are

transgender.  They are now joined by Plaintiffs D'Atri, Wood, Branco, Doe 2, Roe 1, and Doe 3,

who wish to enlist in the military but are prohibited from doing so under the Implementation

Plan (the "Enlisting Plaintiffs").  Defendants' assertion that these individuals nevertheless lack

standing to pursue their claims, or that the claims are somehow now "moot," is based on a

misinterpretation of governing law and a misstatement of the facts.  On the merits, the

Transgender Service Member Ban and Implementation Plan are unconstitutional, and it is

Plaintiffs—not Defendants—who are entitled to summary judgment on Plaintiffs' Equal

Protection claim.  At a minimum, it would be impossible to render judgment in Defendants'

favor at this stage without resolving disputed issues of material fact, and it would be particularly

inappropriate to reach such a conclusion while discovery is incomplete and Defendants continue

to withhold evidence relevant to Plaintiffs' claims.

**I.      This Court Has Jurisdiction Over Plaintiffs' Claims.**

"A defendant may challenge subject-matter jurisdiction [under Rule 12(b)(1)] in one of

two ways: facially or factually."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).  Where,

as here, Defendants assert what is essentially a facial challenge to the existence of subject-matter

jurisdiction,[7] "the facts alleged in the complaint are taken as true, and the motion must be denied

---

[7] For the vast majority of Defendants' jurisdictional arguments, Defendants merely cite Plaintiffs' allegations and assert that, as they have pleaded their claims, Plaintiffs lack standing or their claims are moot.  As to Plaintiffs Branco and Wood only, Defendants have submitted sealed (continued…)

if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *compare De La Fuente v. Lamone*, 2017 WL 2439143, at *4 (D. Md. June 5, 2017) ("Here, defendants argue, *inter alia*, that it is apparent from the face of the Complaint that the case is now moot.  This challenge is a facial challenge, given that it is made on the basis of the four corners of the Complaint." (internal citations omitted)), *with Kerns*, 585 F.3d at 192 (in a factual challenge, the defendant asserts that "the jurisdictional allegations of the complaint [are] not true" (internal quotation marks omitted)).

When a plaintiff has demonstrated standing as of the filing of the complaint, their ongoing interest in the litigation is assessed under the mootness doctrine.  *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396–97 (1980); *see also Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993) (explaining that the standing doctrine applies "as of the outset of the litigation," and mootness applies "throughout the life of the lawsuit").  This Court has already determined that the Serving Plaintiffs have standing to challenge the retention ban (ECF 40-21, § 1); that Plaintiff Stone has standing to challenge the ban on funding for sex-reassignment surgeries (*id.* § 2(b)); and that Plaintiff George has standing to challenge the enlistment ban (*id.* § 2(a)).  ECF 85, at 33, 38.  Because the Enlisting Plaintiffs plainly have standing to assert their claims, and Defendants' voluntary cessation of their unlawful conduct does not moot the Serving Plaintiffs' claims, Defendants' jurisdictional arguments should be rejected.

---

declarations addressing their eligibility for service.  *See* Osburn Decl., Ex. 3; Flores Decl., Ex. 4. Those declarations are inaccurate, as explained below.

### A.   The Enlisting Plaintiffs Have Standing to Challenge the Implementation of the Enlistment Ban.

There is no question that the Enlisting Plaintiffs have alleged redressable injuries-in-fact under the Implementation Plan.  An injury-in-fact sufficient to establish standing must include "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "Imminent" injuries include future injuries, where "'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'"  *Kobe v. Haley*, 666 F. App'x 281, 294 (4th Cir. 2016) (per curiam) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)); *see also Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 529 (D. Md. 2016) ("[A plaintiff] need not demonstrate that it is literally certain that they will suffer harm . . . [Courts] have found standing based on a substantial risk [of harm]." (internal quotation marks omitted)).

Plaintiffs Branco's and Wood's injuries are not just imminent but immediate.  Both have made concrete efforts to enlist.  *See generally* ECF 139-32 (Branco); ECF 139-36 (Wood).  Both completed all anticipated surgery in connection with their gender transition more than 18 months ago.  ECF 139-32, ¶¶ 8–9; ECF 139-36, ¶ 6; Wood Supp. Decl., ¶ 5.  And both otherwise meet the requirements for accession established in the Open Service Directive.  *See* Branco Supp. Decl., ¶ 3; Wood Supp. Decl., ¶ 3.  But under the Implementation Plan, both would be barred from service because they were successfully treated for gender dysphoria.  Plaintiffs Branco and Wood are thus injured by the Implementation Plan in a straightforward manner, and a decision in their favor would redress that injury.

Defendants respond that Plaintiffs Branco and Wood "do not meet the Carter policy's accessions standards."  ECF 158, at 17.  Defendants do not actually provide evidence that they

"do not meet" those standards; their declarants just say that Branco and Wood have not yet provided "sufficient documentation" certifying their stability. *See* Osburn Decl., ¶¶ 3, 7–8; Flores Decl., ¶¶ 2, 13–16. In fact, Plaintiff Branco has provided all the required certifications. Branco Supp. Decl., ¶ 3. On May 17, 2018, Sgt. First Class Osburn—Defendants' declarant— informed Plaintiff Branco that the Army had all necessary information concerning his gender transition. *Id.* ¶ 4. Plaintiff Branco is thus eligible to serve pursuant to the Open Service Directive, and indisputably has standing to challenge the decision to bar him from service. Defendants are equally mistaken with respect to Plaintiff Wood. In their haste to avoid judicial review, Defendants have submitted an inaccurate declaration claiming that Plaintiff Wood underwent transition-related surgery last year. But Plaintiff Wood, who knows his own medical history, affirms that he has had no transition-related surgery since 2012. Wood Supp. Decl., ¶ 5.

The other Enlisting Plaintiffs likewise face a substantial risk of harm. Defendants focus on the fact that for some of the Enlisting Plaintiffs, the full 18 months have not elapsed since their completion of surgery. But courts routinely find that 18 months is a sufficiently short time period to demonstrate an impending injury. For example, a plaintiff had standing to challenge a university's admissions policies even though he did "not intend to apply . . . until next year," after completing a necessary "prerequisite." *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 595–96 (E.D. Va. 2004); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 212 (1995) (finding standing based on likelihood that plaintiff will bid on future construction contracts at least once per year without identifying any particular contract for which plaintiff intended to bid); *In re Naval Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (chaplains challenging discrimination in promotion process had standing because their "promotions will likely be considered by future selection boards"); *cf. Lee v. Weisman*, 505 U.S. 577, 584 (1992) (finding

"a live and justiciable controversy" even though the alleged injury-causing event was likely to occur at plaintiff's high school graduation, which was several years away when the complaint was filed).  Defendants have identified no authority supporting the notion that in order to challenge an unconstitutional enlistment ban, Plaintiffs must diligently continue planning for a military career, and challenge that ban only after the ink dries on their inevitable rejection.

Neither can Defendants defend their view that the hypothetical availability of waivers under the Implementation Plan deprives the Enlisting Plaintiffs of standing.  *See* ECF 158, at 17. This Court has rejected that exact argument, ruling that Plaintiff George had standing to challenge the enlistment ban in spite of Defendants' claim that he "could apply for a waiver." ECF 85, at 32.  The Court was correct, particularly in light of the fact that Plaintiffs are aware of no instance in which such a waiver was granted.  *See* ECF 66-5 (Fanning Decl.), ¶ 17 (Army); ECF 66-7 (Mabus Decl.), ¶ 15 (Navy); ECF 66-6 (James Decl.), ¶ 13 (Air Force).  Moreover, even if the grant of a hypothetical future waiver were not fanciful, Plaintiffs would be injured by this extra hurdle placed in their path.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

### B.    Defendants Have Failed to Show that the Serving Plaintiffs' Claims Are Moot.

The Serving Plaintiffs have already established their standing, as this Court has found. ECF 85, at 31, 33, 38.  Defendants have failed to satisfy their "heavy burden" of showing that intervening events have rendered the Serving Plaintiffs' claims moot.  *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam) (internal quotation marks omitted).  To carry that burden, Defendants must show that (i) "there is *no reasonable expectation* that the alleged

violation will recur," and (ii) "interim relief or events have *completely and irrevocably eradicated* the effects of the alleged violation." *Todd v. Prince George's Cty., Md.*, 2015 WL 2129702, at *3 (D. Md. May 6, 2015) (emphases added). Because the burden of demonstrating mootness rests on Defendants, "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000); *see also Honig v. Doe*, 484 U.S. 305, 601 n.6 (1988) (in mootness analysis, showing a "reasonable expectation" of recurrence does not require proof that recurrence is "more probable than not").

Here, Defendants have not even made a threshold showing that the challenged conduct has ceased, because the Implementation Plan causes many of the same fundamental harms as the August 2017 Transgender Service Member Ban it implements. ECF 148, ¶¶ 184–204. Because the Implementation Plan is "sufficiently similar" to the Ban, and Plaintiffs are disadvantaged "in the same fundamental way"—that is, by virtue of their transgender status—the challenged conduct continues and Plaintiffs' claims are not moot. *Ne. Fla. Chapter*, 508 U.S. at 662 & n.3. As the district court in the Western District of Washington concluded, "the 2018 Memorandum and the Implementation Plan do not substantively rescind or revoke the Ban, but instead threaten the very same violations that caused it and other courts to enjoin the Ban in the first place." *Karnoski v. Trump*, 2018 WL 1784464, at *6 (W.D. Wash. Apr. 13, 2018), *appeal filed*, No. 18-35347 (9th Cir. Apr. 30, 2018). Whatever differences exist between President Trump's directives and the proposed Implementation Plan, Defendants have failed to establish that the latter has "completely and irrevocably eradicated" the harms of the unconstitutional Ban it effectuates. *Todd*, 2015 WL 2129702, at *3.

— 19 —

Moreover, even if Defendants could show that the unconstitutional conduct has ceased, it is well-established that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (governor's repeal of policy did not moot case where "there is no clearly effective barrier that would prevent the [Department] from reinstating [its] policy in the future" (internal quotation marks omitted)).   Voluntary cessation cannot moot a claim unless the moving party satisfies the "heavy burden" of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968).   "[B]ald assertions of a defendant—whether governmental or private—that it will not resume a challenged policy fail to satisfy any burden of showing that a claim is moot." *Wall v. Wade*, 741 F.3d 492, 498 (4th Cir. 2014).   Defendants have not met their burden with respect to any of the directives.

### 1.   *Plaintiffs' Challenges to the Retention Ban Are Not Moot.*

This Court previously concluded that the Serving Plaintiffs had standing to challenge the retention ban because it threatens them with being "discharge[d] as administratively unfit *even if* they meet the military's demanding medical fitness standards." ECF 85, at 30.  The Court explained that, "[w]hile it is possible, as Defendants contend, that none of the Plaintiffs will be discharged on March 23, 2018, they certainly face a substantial risk of being discharged solely on the basis of being transgender." *Id.*  The Court further stated that the retention ban inflicted an injury-in-fact by revoking "a right they have had since June 2016, withdrawing the guarantee that protects their ability to serve on terms equal to those applied to others." *Id.*  Finally, the Court noted that Plaintiffs' "uncertainty, the destabilization of their lives and careers, and the stigma associated with being singled out as unfit for service" constituted "an additional alleged

harm that provides support to Plaintiffs' standing arguments." *Id.* at 31.

Defendants argue that Plaintiffs' challenges to this and other aspects of the Ban are moot because the President has purported to revoke his August 2017 memorandum, and the Serving Plaintiffs are protected by the "grandfather provision" of the Implementation Plan. To establish mootness, Defendants must make "absolutely clear" that, as a result of the Implementation Plan's "grandfather provision," the Serving Plaintiffs no longer face a substantial risk of being discharged because they are transgender. *Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203. They cannot meet that burden.

*First*, Defendants assert that Plaintiffs can only "speculate" that the grandfather clause will actually be revoked. ECF 158, at 11. Relying heavily on a standing case, *Clapper v. Amnesty International USA*, 568 U.S. 398, 408 (2013), Defendants argue that Plaintiffs must establish a "*certainly impending*" likelihood of rescission to show that their claims are not moot. ECF 158, at 10. However, *Clapper* articulates the required showing for standing, not mootness. *See Friends of the Earth, Inc.*, 528 U.S. at 190. On the issue of mootness, it is Defendants who must establish that "there is no reasonable expectation" that the exemption could be rescinded. *Todd*, 2015 WL 2129702, at *3. Defendants do not even attempt to make this showing.

Nor could they: on its face, the grandfather provision is severable, "should [the DoD's] decision to exempt these Service members be used by a court as a basis for invalidating the entire policy." ECF 120-2, at 43. The prospect of a court doing so was certainly not remote to DoD, which decided to specifically address it in the Implementation Plan. By that plan's very design, Defendants have left a Sword of Damocles hanging over the Serving Plaintiffs' heads, threatening to end their careers at any moment due to events beyond their control. This overt threat has unsurprisingly caused Plaintiffs significant stress, ECF 139-33 (Stone Decl.), ¶ 6; ECF

139-35 (Cole Decl.), ¶ 5; ECF 139-3 (George Decl.), ¶ 7; Doe 1 Decl. (filed under seal), ¶ 5;

ECF 139-38 (Gilbert Decl.), ¶ 5; ECF 139-39 (Parker Decl.), ¶ 4, a fact Defendants have not

attempted to rebut, and that would suffice to establish injury-in-fact even if standing, not

mootness, were the relevant question.  *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205, 206

(4th Cir. 2017) (plaintiff who "suffered and continues to suffer" from "emotional distress, anger,

and frustration" had "established the existence of an injury in fact").

     *Second*, even if the Implementation Plan had not itself threatened to rescind the

grandfathering provision, it is not "absolutely clear" that President Trump will refrain from

reissuing the Retention Ban, whether through a new set of abrupt and ill-considered tweets or

otherwise.  *See Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203.

     *Third*, even if the grandfather provision remains in place and the Court considers it

impossible to envision a scenario where President Trump changes his mind, Defendants fail to

address Plaintiffs' allegations that the grandfather provision may not protect their right to reenlist

after their current terms of service are over.  ECF 148, ¶¶ 178, 186, 199, 215–16.  Those

concerns are hardly speculative.  As alleged in the Second Amended Complaint, the

Implementation Plan does not explain how DoD intends to apply the grandfather provision to

reenlistment, and some transgender service members have already been told that they may not

reenlist under the revised policy.  *Id.* ¶ 178.  An internal Army document generated shortly after

the President's Twitter announcement reveals that the Army specifically examined how long it

would take to "eliminate[]" all its transgender service members through attrition or involuntary

discharge.  *See* ECF 139-4, at Slides 12–13.  There may well be other similar documents in

Defendants' files.  Plaintiffs have not yet had an opportunity to review the tens of thousands of

documents Defendants produced the week *after* filing their summary judgment motion, or any they plan to produce in the coming weeks.

*Fourth*, the Serving Plaintiffs and other current service members continue to face a substantial risk of discharge because the Implementation Plan declares that post-transition hormone maintenance is incompatible with deployment.  ECF 120-2, at 33.  That stands in contrast to other medical conditions, where "military policy and practice allows service members to use a range of medications, including hormones, while in such [deployed] settings."  ECF 139-29, ¶ 16.  It also diverges from the Open Service Directive, under which transgender service members could deploy while taking hormones, similar to service members receiving hormones for other medical conditions.  *See infra* II.B.2.b (explaining why the Implementation Plan's assertions regarding deployability are irrationally discriminatory).  It appears likely that Plaintiffs will be improperly designated as nondeployable based on the Implementation Plan's unsupported conclusions regarding hormone maintenance.  ECF 148, ¶ 186.[8]

       2.     *Plaintiffs' Challenges to the Surgery Ban Are Not Moot.*

This Court previously determined that Plaintiffs Stone and Cole had standing to challenge President Trump's directive prohibiting the Department of Defense from funding sex-reassignment surgery as part of medically necessary treatment for gender dysphoria after March 23, 2018.  ECF 85, at 33–38.  At that time, Plaintiff Cole had an approved medical-treatment

---

[8] Defendants incorrectly assert that Plaintiffs' purported non-deployability arises from the new DoD Retention Policy for Non-Deployable Service Members, which is "different" from the Implementation Plan and, therefore, makes Plaintiffs' claims nonredressable.  ECF 158, at 12–13. Plaintiffs are not challenging the Retention Policy's requirement that service members may not be classified as non-deployable for over a year.  Plaintiffs *are* deployable and are fully capable of meeting that standard.  Plaintiffs' injuries plainly arise under the Implementation Plan and the DoD Report, which characterize hormone therapy as inconsistent with deployment, contrary to the facts.  ECF 120-2, at 33.

plan calling for two surgeries that could not be performed before the March 23 deadline.  *Id.*
Plaintiff Stone had a near-final treatment plan that called for two surgeries.  *Id.*

Defendants have not carried their burden of establishing that challenges to the surgery
ban are mooted by the Implementation Plan's statement that currently serving service members
will continue to receive medically necessary care for gender dysphoria.  *See* ECF 120-2, at 7–8.
That statement is part of the grandfather provision that the Implementation Plan explicitly
threatens to revoke, depending on the outcomes of legal challenges to the policy.  *Id.*  And, as
with the retention ban, it is not "absolutely clear" that President Trump will not change his mind
and re-impose a surgery ban for current service members.

Moreover, Defendants have not clearly stated that the grandfather provision's reference
to "medically necessary" care includes transition-related surgery.  Under the Open Service
Directive, "medically necessary" care was defined as "[t]hose health care services or supplies
necessary to prevent, diagnose, or treat an illness, injury, condition, disease, or its symptoms and
that meet accepted standards of medical care."  ECF 40-9, at 12.  By contrast, Defendants'
"Report" in support of their Implementation Plan ignores the consensus standards of medical
care and questions the efficacy of surgical care for treating gender dysphoria on the ground that it
is not supported by "double-blind" scientific studies—a standard that the military and medical
community do not apply to evaluate the efficacy of surgical treatment for other conditions.  ECF
120-2, at 24–27; ECF 139–19, ¶¶ 13–16.  Given the Report's extreme (though baseless)
skepticism regarding the efficacy of surgical treatment for gender dysphoria, Defendants have
not shown that they will still regard surgery included in a treatment plan as "medically necessary."

   3.   *Plaintiffs' Challenge to the Enlistment Ban Is Not Moot.*

In its previous decision enjoining the Transgender Service Member Ban, this Court
concluded that, as a result of the enlistment ban, "Plaintiff George is subject to a substantial risk

that his attempt to accede into the military as a commissioned officer will be prohibited solely on

the basis of his transgender status."  ECF 85, at 33.  The Court rejected Defendants' assertion

that Plaintiff George's plans to commission were too speculative to support standing.  *Id.*

Defendants have not established that Plaintiff George and other service members who

seek officer commissions will be unharmed by the Implementation Plan's ban on enlistments.

ECF 158, at 14.  Their motion conspicuously does not argue that Plaintiff George or others will

be able to apply for a commission.  Instead, Defendants contend that Plaintiff George's challenge

to the enlistment ban has been mooted because the Implementation Plan "revoked" the August

2017 Ban, including the accessions directive.  Whether or not the Implementation Plain is truly

independent of the August 2017 Ban, *but see infra* II.A, the end result remains the same: Plaintiff

George, who wishes to go through the accession process to obtain a commission, is harmed by

the Ban as implemented.  Given this continuing harm, Plaintiff George's claims cannot be moot.

### C.    The Court Has Jurisdiction to Award Declaratory Relief Against President Trump.

In their motion to dismiss, Defendants once again assert that this Court lacks authority to

grant declaratory relief against the President, rendering Plaintiffs' claims against him not

redressable.  ECF 158, at 19.  Plaintiffs comprehensively rebutted that unsupported argument in

their Opposition to Defendants' Partial Motion for Judgment on the Pleadings, and incorporate

those responses here in full.  ECF 117, at 4–10.  As Plaintiffs explained, the Supreme Court has

never held that a President is immune from suit seeking a *declaration* that his actions are

unlawful.  To the contrary, the Supreme Court has *affirmed* declaratory relief in a case that

named the President as a defendant.  *See Clinton v. City of New York*, 524 U.S. 417, 425 & n.9

(1998) (granting declaratory relief to plaintiffs in holding that the President may not exercise line

item veto); *see also, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir.

1974) (finding the President's failure to comply with his statutory duty to implement a pay increase for federal employees "a most appropriate instance for the use of declaratory decree."); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, No. 17-05205 (S.D.N.Y. May 23, 2018), ECF 72 (finding declaratory relief appropriate against President Trump, as "no government official" is "above the law").

Presented with the very same arguments as Defendants make here, the district court in *Karnoski* concluded that "not only does it have jurisdiction to issue declaratory relief against the President, but that this case presents a most appropriate instance for such relief." *Karnoski*, 2018 WL 1784464, at *13 (internal quotation marks omitted). President Trump is a proper defendant.

## II. Plaintiffs' Cross-Motion For Summary Judgment On Their Equal Protection Claim Should Be Granted.

Even drawing every factual inference in Defendants' favor, the Implementation Plan violates the Equal Protection Clause. This conclusion can be reached on two independent grounds. First, the evidence already in Defendants' purported "administrative record" clearly and indisputably establishes that the Implementation Plan was a product of, and is inextricably intertwined with, the original Transgender Service Member Ban, the unconstitutionality of which has been established and effectively conceded. Because Defendants' administrative record fails to establish that the Implementation Plan would have been developed without President Trump's unconstitutional directives, the Implementation Plan is just as unconstitutional as the directives it implements. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Once racial discrimination is shown to have been a substantial or motivating factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." (internal quotation marks omitted)).

Second, even if the Implementation Plan were truly independent of President Trump's directives, it is still unconstitutional on its own terms.  The Implementation Plan facially discriminates based on sex and transgender status, and therefore is subject to heightened scrutiny. *See* ECF 85, at 43–44.  The Implementation Plan cannot survive such scrutiny, because it lacks a justification that is substantially related to an important government objective.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  And under any standard, Defendants' decision to effectively ban transgender people from enlisting is "so attenuated" from Defendants' stated justifications "as to render [the Implementation Plan] irrational."  *Cf. City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 466 (1985); *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535–36 (1973) (invalidating law on rational-basis review because "even if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning [hippies] . . . we still could not agree with the Government's conclusion that the denial of essential federal food assistance . . . constitutes a rational effort to deal with these concerns").

### A.    Plaintiffs Are Entitled to Summary Judgment Because Defendants Are Implementing President Trump's Concededly Unconstitutional Decision to Ban Transgender Service.

This Court has already found that President Trump's discriminatory decision to issue the Transgender Service Member Ban "was not driven by genuine concerns regarding military efficacy."  ECF 85, at 43 (citation and internal quotation marks omitted).  Despite every opportunity to do so, Defendants have chosen to provide *no* evidence to support President Trump's original directives.  *See, e.g.*, ECF 107 (February 6, 2018 order memorializing counsel's representation that "[Defendants] will not be defending the policy now at issue but will be defending the policy to be disclosed on February 21, 2018").  Because Plaintiffs' claims challenging the August 2017 directives are not moot, *see supra* I.B, and Defendants refuse to defend the constitutionality of those directives, the Court should enter summary judgment

declaring that the August 2017 directives were unconstitutional.  *See Brock-Smith v. Titan Indem. Co.*, 2018 WL 2321120, at *2 (D. Md. May 22, 2018) ("[T]he party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him or her." (internal quotation marks omitted)).

The unconstitutionality of the Transgender Service Member Ban as President Trump originally conceived of it is also fatal to Defendants' implementation of the Ban.  Once unconstitutional discrimination "is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."  *Hunter*, 471 U.S. at 228.  Thus, in order to defeat summary judgment, Defendants must now come forward with evidence that would allow a factfinder to conclude that the Implementation Plan would still have been issued even if President Trump had never issued his unconstitutional directives.  Because Defendants have failed to satisfy their burden, Plaintiffs are entitled to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Defendants' own "administrative record" refutes any claim that the Implementation Plan would have been adopted in its current form without the President Trump's directives as a motivating factor.  The President's directives stated  that "[b]y February 21, 2018, the Secretary of Defense . . . shall submit to me a plan for implementing [the directives]."  ECF 40-21, § 3.  According to an internal DoD document, after it "received formal guidance from the White House reference to transgender personnel serving in the military," the next step was that "DOD w[ould] develop a [sic] implementation plan *to meet the President's intent*."  Golden Decl., Ex. 6

(emphasis added).  Another internal DoD document outlining a "T[ransgender] Policy

Development Timeline" *draws a literal straight line* through all of the steps connecting President

Trump's initial tweet to the Implementation Plan presented by Secretary Mattis.  *See* ECF 139-

10 (USDOE00101839), at Slide 1.

What Defendants have styled as an "independent multi-disciplinary review" was

designed, according to Secretary Mattis's own "Terms of Reference" directing that review, to

"inform the Implementation Plan" referenced in the August 2017 memorandum.  ECF 139-5;

AR330.  The Terms of Reference that Secretary Mattis provided to the putatively independent

Panel of Experts are especially damning with respect to the accession ban.  With respect to

"Accessions," the Terms of Reference document instructs in its entirety:

> Accessions:  The Presidential Memorandum directs DoD to
> maintain the policy currently in effect, which generally prohibits
> accession of transgender individuals into military service.  The
> Panel will recommend updated accession policy guidelines to
> reflect currently accepted medical terminology.

ECF 139-5.  This is not how one inaugurates an expert study designed to follow the evidence

while "ma[king] 'no assumptions' at all."  ECF 158, at 5 (quoting ECF 120-2, at 19).  It is a

statement about what DoD has been "direct[ed]" to do.  And it provides an extraordinarily

limited mandate to the Panel of Experts: to search for the most acceptable "terminology" to

describe the accession policy the President had "directed" the military to implement.

Unsurprisingly, that is exactly what the "Panel of Experts" did.  It developed a version of

the accession ban that accomplished what the President "directed" but that is reframed with

updated "terminology."  Defendants insist that the Implementation Plan departs from the

President's Ban because it discriminates based on a medical condition (gender dysphoria) rather

than a protected class (transgender people).  *See, e.g.*, ECF 158, at 6–7, 23.  That is facially

disingenuous, as even a cursory review of the Implementation Plan illustrates.  Defendants

— 29 —

propose to disqualify from service any transgender person, regardless of whether they have

gender dysphoria, who requires or has undergone gender transition.  ECF 120-1.

In short, Defendants' own administrative record demonstrates that President Trump's

directives inevitably shaped the Department of Defense's plans to implement them.  Whatever

post hoc justifications Defendants now propose, and whatever independent judgment Secretary

Mattis brought to bear on the issue, those additional justifications do not "render nugatory" the

original "purpose to discriminate." *Hunter*, 471 U.S. at 232.  Any Implementation Plan

Secretary Mattis adopted had to be approved by President Trump, who made his own intentions

crystal clear.  Even if Secretary Mattis did not share the President's animus and disregard of

military efficacy concerns, "the existence of a permissible motive" cannot "trump[] any proof of

a parallel impermissible motive." *Id.* at 231–32.  Because President Trump's decision to ban

transgender service has been found unconstitutional by this Court and effectively conceded by

Defendants, the plan to implement those unconstitutional directives is likewise unconstitutional.

> **B.     Plaintiffs Are Also Entitled to Summary Judgment Because the Implementation Plan, Even if It Is Regarded as an Independent Policy, Fails Equal Protection Scrutiny.**

Even examined on its own terms, on the assumption it had been developed independently,

the Implementation Plan fails any level of constitutional scrutiny.

> *1.     The Implementation Plan Is Subject To Heightened Scrutiny, Not the "Highly Deferential" Rubber-Stamp Review Defendants Propose.*

This Court has already determined that discrimination against transgender persons in the

military requires heightened scrutiny under the Equal Protection Clause—both because

discrimination against transgender persons is a form of sex discrimination and because

classifications based on transgender status independently satisfy all the criteria for triggering

heightened scrutiny. *See* ECF 85, at 43–44 (adopting reasoning of *Doe 1*, 275 F. Supp. 3d at

208–10).  Subsequent legal developments have only fortified that conclusion.  *See Karnoski,*

2018 WL 1784464, at *1, *9–11 (holding that, "because transgender people have long been

subjected to systemic oppression and forced to live in silence, they are a protected class";

"[t]herefore, any attempt to exclude them from military service will be looked at with the highest

level of care"—specifically, "strict scrutiny"); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp.

3d 704 (D. Md. 2018) (holding that transgender status is "at least" a quasi-suspect classification);

*F.V. v. Barron*, 286 F. Supp. 3d 1131 (D. Idaho 2018) (same).

Defendants argue that rational basis review applies because the Implementation Plan

classifies based on a medical condition, as opposed to sex.  That argument is belied by the

language of the Plan itself, which bans transgender people from enlisting even if their gender

dysphoria has been fully treated through transition-related care, and even if they were able to

transition before developing gender dysphoria in the first place.  ECF 120-1.  Indeed, one of the

Implementation Plan's principal justifications for banning transgender people from enlisting is

that their presence in the military—and any gender nonconforming physical characteristics they

may have—are allegedly incompatible with the military's sex-based standards and would

interfere with unit cohesion.  ECF 120-2, at 35–41.  These arguments are specifically based on

sex, not medical condition.  *See Glenn v. Brumby*, 663 F.3d 1312, 1314 (11th Cir. 2011) (firing

employee because of her "intended gender transition" is sex discrimination); *Doe 1*, 275 F. Supp.

3d at 210 ("The defining characteristic of a transgender individual is that their inward identity,

behavior, and possibly their physical characteristics, do not conform to stereotypes of how an

individual of their assigned sex should feel, act and look.").

In Defendants' reply in support of their motion to dissolve the existing preliminary

injunction, they assert that Plaintiffs "conflate transgender with transition" because "only 'a

subset' of transgender individuals 'choose to *transition*, the term used to refer to the act of living and working in a gender different from one's sex assigned at birth.'" ECF 159, at 3–4 (quoting AR114 (RAND Report 6)).  To be sure, some transgender people may need to delay transition for a period of time, or attempt to suppress their identity, but *requiring* them to do so is discrimination.  ECF 120-1, at 3; *Cf. Christian Legal Soc. v. Martinez*, 561 U.S. 661, 689 (2010) (recognizing that even though lesbian, gay, and bisexual people can choose to be celibate, requiring them to do so is discrimination based on status).  As the district court in *Karnoski* concluded: "Requiring transgender people to serve in their 'biological sex' does not constitute 'open' service in any meaningful way, and cannot reasonably be considered an 'exception' to the Ban. Rather, it would force transgender service members to suppress the very characteristic that defines them as transgender in the first place." *Karnoski*, 2018 WL 1784464, at *6 (footnotes omitted).

Defendants' plea for "deference" does not affect the analysis.  Even if the Implementation Plan warranted deference,[9] that deference does not supplant heightened scrutiny.  In *Rostker v. Goldberg*, on which Defendants heavily rely, the Supreme Court explicitly rejected the government's request to apply rational-basis review rather than "the heightened scrutiny with which we have approached gender-based discrimination."  453 U.S. 57, 69 (1981).  The

---

[9] This Court previously determined that President Trump's Transgender Service Member Ban did not merit any deference because it was "[a] sharp departure from decades of precedent on the approach of the U.S. military to major personnel policy changes" and was imposed in the absence of "any considered military policymaking process."  ECF 85, at 43 (internal quotation marks omitted).  Defendants' attempts to legitimize their animus-driven policy as independent military judgment through a "process after-the-fact process" is similarly flawed and represents another sharp departure from military precedent: "an initial order that is tainted by an unconstitutional purpose cannot be cured by a later review that preserves the essence of the original."  ECF 149-1 (Br. of Retired Military Officers and Former National Security Officials as Amici Curiae), at 19–20 (citations omitted).

deference accorded to military decisionmaking is simply one factor to be taken into account as part of the heightened scrutiny standard.  *See id.* at 71.

Far from bolstering Defendants' case, the Supreme Court's reasoning for deferring to Congress in *Rostker* highlights ways in which the Implementation Plan is, in contrast, constitutionally suspect.  *Rostker* held that it was constitutional for Congress to require men, but not women, to register for the draft because—as a result of women's ineligibility for combat roles at the time—"men and women . . . are simply not similarly situated for purposes of a draft." *Id.* at 78.  There was no allegation in *Rostker* that the statute was motivated by animus, and the Court emphasized that "[t]his is not a case of Congress arbitrarily choosing to burden one of two similarly situated groups."  *Id.*  Here, by contrast, transgender people who have otherwise shown that they are qualified to serve *are* similarly situated with respect to other service members—and can meet the same standards of fitness and deployability that apply to everyone else—but are nevertheless singled out for different and unequal treatment.[10]

Defendants also rely on the "inconsistencies resulting from line-drawing" that the Supreme Court found to be constitutional in *Goldman v. Weinberger*, 475 U.S. 503 (1986).  ECF 158, at 27.  But that approval rested on a critically distinguishable fact: the policy at issue in *Goldman* was a component of a facially neutral rule, while the Implementation Plan is discriminatory on its face.  Policies that facially discriminate against a protected class are always

---

[10] Defendants note that the Court upheld the policy in *Rostker* based on the reasons given by Congress in 1980, instead of limiting its review to the reasons Congress provided when the statute was enacted in 1948.  ECF 158, at 25.  However, as part of the review in 1980, the rationale for excluding women from the draft was "extensively considered by Congress in hearings, floor debate, and in committee," where the justifications and motivations for the policy were out in the open for all to see.  453 U.S. at 72.  Here, by contrast, the policy was spontaneously announced by the President over Twitter and then the plan to implement the policy was developed behind closed doors and under the cloak of "deliberative process" privilege.

reviewed under heightened or strict scrutiny, even in the military context. *See Berkley v. United States*, 287 F.3d 1076, 1084–85, 1090–91 (Fed. Cir. 2002) (holding that strict scrutiny applied to military reduction-in-force order that explicitly treated female and minority officers differently, and explaining that military deference does not preclude constitutional review of unlawful policies). Heightened scrutiny unquestionably applies.

2. *The Implementation Plan's Enlistment Ban Violates Equal Protection Under any Standard.*

To survive heightened scrutiny, Defendants must show that the Implementation Plan is substantially related to an exceedingly important government objective. *Virginia*, 518 U.S. at 533. Such justification must be "genuine, not hypothesized or invented *post hoc* in response to litigation," and it may not "rely on overbroad generalizations about the different talents, capacities, or preferences" about transgender people. *Id.* For the reasons outlined here and in Plaintiffs' opposition to the Motion to Dissolve the Preliminary Injunction (ECF 139), Defendants cannot satisfy these requirements. Indeed, this Court has already found that Defendants created a policy that "set apart transgender service members to be treated differently from all other military service members," and that such a policy would not survive Equal Protection review under heightened scrutiny. ECF 85, at 42–44.

Even under rational basis review, however, the Implementation Plan's sweeping exclusion of transgender people from enlisting violates equal protection because it is not "rationally related to a legitimate governmental purpose." *City of Cleburne*, 473 U.S. at 447. Defendants fail to explain how most of their stated concerns about transgender service even apply to the individuals they wish to ban from enlisting: those who have completed transitioning and demonstrated the requisite stability to serve. And even when the stated concerns are arguably relevant to such individuals, the Implementation Plan does not rationally explain why it

— 34 —

applies to transgender people a standard the military does not apply to similarly situated groups. The "sheer breadth" of the ban on transgender enlistment "is so discontinuous with the reasons offered for it that the [Plan] seems inexplicable by anything but animus toward the class it affects." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

a)      The Enlistment Ban Is Not Rationally Related to the
         Implementation Plan's Stated Concern About Fitness to Serve.

In order to enlist under the Open Service Directive, transgender individuals must have completed all medical transition and have been without any symptoms of gender dysphoria for 18 months. *See* ECF 40-4, at Attachment. They must then pass the same rigorous mental and physical health screening that is applied to all other service members. *Id.* Anyone with a history of depression—whether transgender or not—is barred from enlisting unless they have been stable and without treatment for 36 months. *Id.* Anyone with a history of anxiety—whether transgender or not—is barred from enlisting unless they have been stable and without treatment for 24 months. *Id.* Anyone with a history of suicidal behavior—whether transgender or not—is permanently disqualified. *Id.* By definition, any transgender person who is able to enlist under the Open Service Directive has been evaluated by the military and deemed physically and mentally fit for service.[11]

The Implementation Plan nevertheless excludes transgender people who have transitioned from enlisting even when they satisfy these rigorous requirements and have demonstrated the same mental and physical fitness as any other applicant. ECF 120-1. The Implementation Plan reached that conclusion even though DoD did not receive *any* evidence

---

[11] Defendants state that the Open Service Directive's "18-month period of stability for accessions" with respect to gender dysphoria had "no analog with respect to any other mental condition," which allegedly require longer delays before enlistment is allowed. ECF 158, at 3 n.4. If that is a problem—and Defendants do not explain why it would be—the rational response would be to alter the length of the stability period, not to issue a blanket ban.

indicating that transgender people are incapable of meeting the same mental and physical fitness standards as everyone else.  Kies Decl., Ex. S (USDOE00081113–16).  Indeed, since the military began accepting applications from transgender recruits beginning on January 1, 2018, at least two transgender individuals have already successfully met those standards and enlisted.  Golden Decl., Ex. 8.

The Implementation Report (ECF 120-2) asserts that a ban of transgender individuals who have undergone transition-related surgery in the past is necessary because of alleged "scientific uncertainty" with respect to whether transition-related surgeries "fully remedy . . . the mental health problems associated with gender dysphoria."  ECF 120-2, at 32.  This alleged scientific "uncertainty" simply does not exist.  If a transgender person is able to live consistently with his or her gender identity (i.e., has undergone a gender transition), he or she may never develop gender dysphoria.  ECF 139-19, ¶ 9.  If a transgender person does develop gender dysphoria, appropriate transition-related care resolves the clinically significant distress.  *Id.*  The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (2013) ("DSM-V") accordingly provides a "post-transition" diagnostic subtype to reflect when a person's gender dysphoria is in "remission."  *Id.*  Notably, the American Psychological Association has expressed "alarm[]" over "the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care."  ECF 139-22.

In support of its "scientific uncertainty" conclusion, the Report principally relies on a recent decision by the U.S. Department of Health & Human Services Center for Medicare and Medicaid Services ("CMS") for the proposition that there is "insufficient scientific evidence to conclude that [transgender medical] surgeries improve health outcomes for person with gender

dysphoria."  *See* ECF 120-2, at 24 n.82.  To the contrary, the CMS report found that "surgical care to treat gender dysphoria is safe, effective, and not experimental."  ECF 139-19, ¶ 17. Consistent with standard medical practice, as well as the Open Service Directive, the CMS report endorsed individualized treatment plans to treat gender dysphoria.  *Id.*; *see also* Golden Decl., Ex 9, at 10 ("Perhaps the most misleading aspect of the Implementation Report's discussion is the suggestion that the 2016 CMS review undercuts the case for inclusive policy and the provision of medically necessary care.").  In any event, there is no rational relationship between the alleged uncertainty about how to *prospectively* identify which individuals will benefit from surgery and a policy that excludes transgender people from serving after they have already had surgery, have demonstrated stability, and have shown they can meet the same mental and physical fitness standards as everyone else.  Because of historical patterns of discrimination, transgender people as a class experience higher rates of depression, anxiety, and, as a result, suicidal ideation.  ECF 139-19, ¶¶ 19–22.  But the military has neutral policies to screen for all of these conditions before enlistment.  There is no medical basis for using a transgender person's history of gender dysphoria as a proxy for other medical conditions that the person does not actually have.  *Id.* Defendants' arguments are akin to saying that because depression is twice as common in women than in men, the military could simply treat all women as at risk for depression and categorically unfit for service.  *Id.*

The Report's only other "evidence"—"preliminary data" regarding the experiences of current service members with gender dysphoria—likewise has no logical relationship to the decision to ban transgender people from enlisting *after* their gender dysphoria has been treated. The data collected as part of the Department of Defense's review all stemmed from the 22-month period from October 1, 2015 to July 26, 2017.  *See* ECF 139-19, ¶ 26.  The transgender service

members during those time periods were either (a) serving before the Open Service Directive

went into effect and had been able to receive treatment for only a limited period or (b) just

beginning their transition process.  *See id.*  Either way, the transgender service members were not

evaluated after having sufficient time to complete their transition and demonstrate stability—18

months as required by the Open Service Directive.  *See id.*, ¶ 28.[12]

Put simply, it is irrational to cite mental health experiences of a group that is *currently*

*transitioning and experiencing gender dysphoria*, to draw conclusions about a group comprised

entirely of people who *successfully transitioned, and no long experience gender dysphoria*.

There is no medical uncertainty about the fitness of transgender people seeking to enlist under

the Open Service directive; the alleged "uncertainty" voiced by the Implementation Report is

simply stigma and "vague, undifferentiated fear."  *Cleburne*, 473 U.S. at 449.  The Constitution

requires more when the government seeks to discriminate between two similarly situated groups.

    b)    The Enlistment Ban Is Not Rationally Related to the
          Implementation Plan's Stated Concern About Deployability.

Defendants' invocation of supposed limitations on deployability for transgender service

members is also irrational.  The Implementation Report's assertions regarding the deployability

of transgender service members focus almost entirely on the deployability of service members

who are in the process of gender transition and may require monitoring while initiating hormones,

or may be nondeployable for limited periods of time while recovering from transition-related

---

[12] Even with respect to service members in the process of transition, the Implementation Report also grossly mischaracterizes the underlying data.  The Report represents that service members with gender dysphoria are "eight times more likely to attempt suicide than Service members as a whole."  ECF 120-2, at 12.  In fact, the underlying data refer to "suicidal ideation," not actual suicide attempts.  ECF 139-27 (USDOE00002633), at 2641.  The Implementation Report also uses mental health visits as a proxy for unfitness, but "ignores the critical fact that service members were required to meet with mental health providers numerous times to document their gender dysphoria as a precondition for receiving health care for gender dysphoria, and for continued access to cross-sex hormones."  ECF 139-19, ¶ 29.

surgery.  ECF 120-2, at 32–34.  Once again, these stated concerns are irrelevant for transgender individuals who have completed their transitions before enlisting under the Open Service Directive.  It is entirely irrational to invoke deployability limitations relating to transition surgery as a reason to deny enlistment to a group that the military determines *will not need further surgery*.

The only deployability limitation suggested by the Report that even arguably relates to people who have already transitioned is its reference to hormones taken as part of long-term medication management.  ECF 120-2, at 33.  Defendants' purported concern ignores the military's well-established "effective system for distributing prescribed medications to deployed service members across the globe, including those in combat settings."  ECF 139-29, ¶ 16.  Individuals with abnormal menstruation, dysmenorrhea, and endometriosis may all enlist if their conditions are adequately managed through hormone medication.  ECF 139-19, ¶ 33 (citing DoDI 6130.03, Enclosure 4 §§ 14(a), (d), (e)).  And "military policy and practice allows service members to use a range of medications, including hormones, while in such [deployed] settings."  ECF 139-29, ¶ 16.

Most strikingly, the Implementation Plan inexplicably ignores a detailed "white paper" memorandum regarding hormones and deployability that the Panel of Experts transmitted to Secretary Mattis on January 11, 2018, together with its proposed recommendations.  That memo explained that "the long-term monitoring requirements, adverse outcomes, and deployment opportunities" for transgender service members receiving cross-sex hormone maintenance "are similar to other common hormone-based therapies" provided to other service members who are able to deploy.  AR3068; *accord* ECF 139-19, ¶ 36 ("The risks associated with use of cross-sex hormone therapy to treat gender dysphoria are low and not any higher than for the hormones that

many non-transgender active duty military personnel currently take.  The medications do not

have to be refrigerated, and alternatives to injectables are readily available, further simplifying

treatment plans.").  The "white paper" noted that there are many non-transgender service

members with diagnostic codes for "low testosterone and low estrogen conditions who are

receiving testosterone and estrogen therapy" and that "*[i]ndividuals who are stable on their

regimens are deployable.*"  AR3074 (emphasis added).  In 2016–17 alone, 352 men and 19

women deployed while receiving hormones for these conditions.  *See id.*  During the same period,

602 service members were deployed while receiving hormones for hypothyroidism.  AR3073.

Remarkably, the Implementation Report makes no attempt to explain why the same

methods for providing hormones to other service members cannot be used to provide hormones

to service members who are transgender.  Instead, the Implementation Report simply *ignores* the

memorandum entirely.  Without any discussion of other service members who receive hormones,

the Implementation Report's analysis is fatally incomplete, if not intentionally misleading.

In short, Defendants' stated concerns "ma[k]e no sense in light of how the [military]

treat[s] other groups similarly situated in relevant respects."  *Bd. of Trs. of Univ. of Ala. v.

Garrett*, 531 U.S. 356, 366 n.4 (2001); *cf. City of Cleburne*, 473 U.S. at 450 ("[T]he expressed

worry about fire hazards, the serenity of the neighborhood, and the avoidance of danger to other

residents fail rationally to justify singling out a home [for people with disabilities] for the special

use permit, yet imposing no such restrictions on the many other uses freely permitted in the

neighborhood."); *Crawford v. Cushman*, 531 F.2d 1114, 1123 (2d Cir. 1976) ("Why the Marine

Corps should choose, by means of the mandatory discharge of pregnant Marines, to insure its

goals of mobility and readiness, but not to do so regarding other disabilities equally destructive

of its goals, is subject to no rational explanation."); *Bostic v. Schaefer*, 760 F.3d 352, 382 (4th

Cir. 2014) (rejecting justification that is "so underinclusive" that its real motivation "must have 'rest[ed] on an irrational prejudice'" (quoting *City of Cleburne*, 473 U.S. at 450)).

> c) The Enlistment Ban Is Not Rationally Related to the Implementation Plan's Stated Concern About Costs.

The Implementation Report asserts that "transition-related treatment is also proving to be disproportionately costly." ECF 120-2, at 41. Defendants once again do not explain how the cost of "transition-related treatment" justifies a ban on enlistees who have already transitioned, and will have to demonstrate that they will not require the surgeries that are the focus of Defendants' cost concern. It is entirely irrational to invoke the cost of transition-related surgery as a reason to deny enlistment to people who can demonstrate *that they will not need such surgery*.[13]

> d) The Enlistment Ban Is Not Rationally Related to the Implementation Plan's Stated Concerns About Unit Cohesion and Privacy.

The Implementation Report drops any pretense of conducting an evidence-based assessment when it argues that transgender people must be excluded from the military to ensure unit cohesion and protect the privacy of non-transgender service members. The Report's speculation is contrary to the experiences of actual transgender service members and their units. ECF 139-33, ¶ 5; ECF 139-35, ¶ 4; ECF 139-37, ¶ 6; Doe 1 Decl. ¶¶ 2, 4 (filed under seal); ECF 139-38, ¶ 4; ECF 139-39, ¶ 3. Indeed, after the Implementation Plan was released, every single

---

[13] Moreover, the Report offers no support for its conclusion that the cost of providing transition-related care is "disproportionate." ECF 120-2, at 41. Indeed, at no point does the Report actually quantify the cost of care, or compare it to the cost of other treatments the military routinely provides to service members. Neither does the Report undermine the conclusion reached by the RAND study that such costs are negligible relative to the military's overall health care budget. *See* ECF 40-35, at xi–xii; *see, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011) (where interest in "cost savings and reducing administrative burdens" "depend[s] upon distinguishing between homosexual and heterosexual employees, similarly situated," it "cannot survive rational basis review"); ECF 40-26.

service chief testified that they have seen no evidence of unit cohesion and morale being hurt by transgender troops. *See, e.g.*, Golden Decl., Ex. 10.

Defendants respond to this complete absence of evidence by noting that "reports of such issues would not have come up to the level of those officials due to limitations in the Carter policy on reporting information relating to transgender service members." ECF 159, at 16 n.4; ECF 120-2, at 37. But this response just underscores the point. Without any evidence concerning alleged invasions of privacy or harm to unit cohesion, the Implementation Report simply engages in raw speculation. Despite 18 months of the Open Service Directive with more than 1,000 service members serving openly during some or all of that period, and a clear effort to find evidence of impairment to unit cohesion, the Report produces only a single anecdote about a single service member—and the details are so sparse that it is impossible even to tell how the issue was resolved. ECF 120-2, at 37.

When similar hypothetical concerns have been raised as justifications for excluding transgender people from restrooms and locker rooms in the civilian context, the courts have repeatedly found that those concerns had no actual basis in fact. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046–47 (7th Cir. 2017); *M.A.B.*, 286 F. Supp. 3d at 724–25; *Doe v. Boyertown Area Sch. Dist.*, 2017 WL 3675418, at *52–53 (E.D. Pa. Aug. 25, 2017), *appeal docketed*, No. 17-3113 (3d Cir. Sept. 28, 2017); *Students & Parents for Privacy v. U.S. Dep't of Educ.*, 2016 WL 6134121, at *28–29 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted by* 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017).

The Report's unsupported speculation about supposed invasions of privacy is eerily similar to the long-since debunked argument for excluding gay people from the military. The central justification for "Don't Ask, Don't Tell" was that it would undermine unit cohesion

because "heterosexuals who would prefer not to have someone of the same sex find them sexually attractive" would be forced "to share the most private facilities together, the bedroom, the barracks, the latrines, and showers" with fellow service members who are gay.  S. Rep. No. 103-112, at 283 (1993) (statement of Gen. Colin Powell).  Actual experience demonstrated that those concerns were unfounded.  *See Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 954 (C.D. Cal. 2010), *vacated on other grounds*, 658 F.3d 1162 (9th Cir. 2011); ECF 139-17 (Jan. 25, 2018 Decl. of Adm. Michael Mullen).[14]  The military's successful integration of women into the military, despite similar purported privacy concerns, further undercuts Defendants' position.  *See Virginia*, 518 U.S. at 540, 557 (rejecting argument that "the absence of privacy" is sufficient to preclude the admission of women to Virginia Military Institute).

Far from constituting a rational basis for reversing course and banning transgender persons from serving, the Report's unsupported speculation illustrates that the driving force behind the ban is policymakers' own prejudice, discomfort, or moral disapproval.

> e) Defendants' Stated Concern About "Proceeding Cautiously" Is Not A Rational Justification For The Enlistment Ban.

Defendants repeatedly defend the Implementation Plan's ban on new enlistment as justified by a need to "proceed cautiously."  ECF 120-2, at 27; ECF 158, at 29.  This is not a rational reason for precipitously *changing* the status quo and instituting a categorical ban.  *See Perry v. Brown*, 671 F.3d 1052, 1090 (9th Cir. 2012) ("[T]here could be no rational connection between the asserted purpose of '*proceeding* with caution' and the enactment of an absolute ban,

---

[14] The Report attempts to poke holes in the RAND Report's reliance on the experiences of the militaries of our allies as a basis for predicting that allowing transgender persons to serve would not negatively affect unit cohesion.  But in deciding to proceed with the Open Service Directive DoD did not rely solely on RAND or on the experiences of other militaries.  DoD also relied on its own extensive experience after the repeal of "Don't Ask, Don't Tell."  *See, e.g.*, ECF 39, ¶ 86.  DoD now has an additional 18 months of experience under the Open Service Directive itself.

unlimited in time, on same-sex marriage in the state constitution."), *vacated and remanded on other grounds sub nom. Hollingsworth v. Perry*, 570 U.S. 693 (2013).

Without any objective grounding in the views of the medical community, and in the face of "dispositive realit[y]" (*United States v. Virginia*, 518 U.S. at 550) that transgender people *are already* serving ably and honorably, Defendants' rote invocation of caution is an insufficient reason to justify such a sweeping and discriminatory exclusion.  *Cf. Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 345–46 (D. Conn. 2012) ("Categorizing a group of individuals as a "vast untested social experiment"  . . . to justify their exclusion. . . until long-term evidence is available to establish that such a group will not have a harmful effect upon society is a rationale, which, if allowed to withstand constitutional scrutiny, would eviscerate the doctrine of equal protection by permitting discrimination until equal treatment is proven, by some unknown metric, to be warranted.").

### III.   Defendants' Motion to Dismiss and Motion For Summary Judgment Before The Completion Of Discovery Should Be Denied.

Even if the Court declines to grant summary judgment to Plaintiffs at this stage, there is certainly no merit to *Defendants*' motion to dismiss and motion for summary judgment, made even as they withhold key discovery.  Unlike Plaintiffs' summary judgment motion, Defendants' motions raise disputed issues of material fact, which Plaintiffs are entitled to explore during discovery.  Defendants' motions must therefore be denied.

Summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex*, 477 U.S. at 323.  The nonmovant "bears the burden of demonstrating that disputes of material fact preclude the entry of judgment as a matter of law."  *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (citing *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering a motion for summary judgment, the court "must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party." *Hamilton*, 807 F. Supp. 2d at 343 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).  Moreover, "summary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986); *see* Fed. R. Civ. P. 56(d); *Harrods v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

Defendants' argument that they are entitled to summary judgment rests on the premise that the Court may consider only their carefully limited "administrative record."  ECF 158, at 2 n.1.  That is incorrect.  Where, as here, a plaintiff lodges a facial constitutional challenge, no such limitations exist.  The existing record, while incomplete, supports Plaintiffs' cross-motion for summary judgment, but at a minimum it reveals genuine disputes of material fact on issues central to Plaintiffs' constitutional arguments (including animus and the nature of the government's decisionmaking process), precluding summary judgment for Defendants.  And in any event, Defendants have withheld material discovery on the basis of privilege claims that Plaintiffs have challenged, thereby precluding Plaintiffs from the opportunity to oppose Defendants' summary judgment motion to the full extent.  *See generally* Kies Declaration.  That motion should be denied because at a minimum it is premature.

**A.      Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) Should Be Denied.**

As a threshold matter, Defendants have not filed a real motion to dismiss for failure to state a claim.  Apart from a conclusory statement in the introductory paragraph, Defendants' Motion is replete with references to the record and various pieces of evidence, but it is devoid of any reference to Rule 12(b)(6), and it does not grapple with the allegations in the complaint. With one narrow exception noted below, Defendants' Rule 12(b)(6) motion should be denied on that ground alone.  *Loc. 1764, Amalgamated Transit Union v. WMATA*, 2015 WL 1471967, at *9 (D. Md. Mar. 30, 2015) ("raising [an] argument in a [summary fashion] without any legal citation, [will not] demonstrate that [granting movant's motion] is justified, much less required.").

Defendants do devote some, albeit minimal, effort to arguing Plaintiffs' challenge to Defendants' actions on the basis of substantive due process should be dismissed.  ECF 158, at 41–43.  Defendants previously moved to dismiss Plaintiff's substantive due process claim against the Transgender Service Member Ban, and this Court soundly rejected their argument. ECF 84, at 1.  Plaintiffs plausibly allege that the Implementation Plan is inextricably intertwined with the original Ban, and so suffers from the same fundamental constitutional defects.  *See, e.g.*, ECF 148, ¶¶ 231–40.  This Court must accept those allegations as true, *Twombly*, 550 U.S. at 572, and Defendants' motion to dismiss the substantive due process claim must be denied.

Implicitly acknowledging they have no Rule 12(b)(6) arguments, Defendants quickly pivot to their alternative request for summary judgment.  That motion is equally meritless, for the reasons that follow.

**B.      The Court's Review Is Not Limited to the "Administrative Record."**

Defendants argue in a footnote, without citation to any authority, that the Court is limited to reviewing the "administrative record" they recently compiled.  ECF 158, at 2 n.1; *see* ECF

133.  Defendants then devote pages to arguing that certain files in the administrative record—

which is, on its face, incomplete[15]—entitle them to summary judgment.  ECF 158, at 23–40.

Defendants are wrong.  A court's review is restricted to an administrative record only

when adjudicating claims brought pursuant to the Administrative Procedure Act ("APA").  *See,*

*e.g.*, *In re Subpoena Duces Tecum Served on Office of Comptroller of Currency*, 156 F.3d 1279,

1279 (D.C. Cir. 1998).  Plaintiffs have not brought an APA claim.  Instead they have brought

constitutional claims challenging Defendants' discriminatory intent in imposing and

implementing the Transgender Service Member Ban.  ECF 148, ¶¶ 205–40.  Accordingly—as

the district courts in the related *Doe* and *Karnoski* cases have already held—Plaintiffs are entitled

to full discovery.  ECF 143-1 (explaining that because "Plaintiffs assert claims under the Fifth

Amendment to the United States Constitution," the APA's limitations on discovery do not

apply); ECF 143-2 ("[T[here is no reason for discovery to be confined to the administrative

record" because Plaintiffs "raise direct constitutional claims."); *see In re Subpoena Duces Tecum*

*Served on Office of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir.), *reh'g in part*, 156

F.3d 1279 (D.C. Cir. 1998); *see also Miccosukee Tribe of Indians of Fla. v. United States*, 2010

WL 337653, at *2 (S.D. Fla. Jan. 22, 2010) ("[D]iscovery related to the Plaintiff's equal

protection claim is not limited by the APA Act nor the agency record, but rather requires

independent review."); *Newport Pac. Inc. v. Cty. of San Diego*, 200 F.R.D. 628, 639 (S.D. Cal.

2001) ("[T]he evidence Plaintiffs seek . . . , namely that of a discriminatory intent, does not

typically lay dormant in an administrative record.").

---

[15] Defendants have withheld "privileged" materials from the "administrative record," but they
failed to provide any log of the withheld materials.

**C.      Viewing The Full Record, Judgment in Defendants' Favor Could Not Be Granted Because It Would Require the Court to Resolve Numerous Genuine Disputes of Material Fact in Their Favor.**

Even if this Court concluded that Plaintiffs are not entitled to judgment as a matter of law on their equal protection claim, there is at least a genuine dispute of material fact as to whether the Implementation Plan was in fact developed through an "independent" process, as Defendants claim—a key point for, among others, Plaintiffs' argument that the Implementation Plan is tainted by the August 2017 Ban. ECF 158, at 23. As discussed at length in Part II, Plaintiffs have adduced evidence—including DoD's "Terms of Reference" for the Ban—that the outcome of the "extensive study" was predetermined and that the process was influenced by third parties with an anti-transgender agenda. For similar reasons, at a minimum there is a genuine issue of fact as to whether the justifications for banning transgender service members were "invented *post hoc* in response to litigation," *United States v. Virginia*, 518 U.S. at 533. Contrary to Defendants' assertion, Plaintiffs do not claim that any change to the Open Service Directive would be unconstitutional. *See* ECF 158, at 49–50. They do claim—and there is at least a genuine dispute—that the change in policy at issue here was motivated by unconstitutional considerations.

Other documents Defendants have disclosed at a minimum create material fact issues as to both the independence of the Panel of Experts' recommendations and the validity of those recommendations. For example, Defendants produced a heavily redacted dissent by one of the Panel's members, revealing the dissenter's belief that "[t]he recommendations are [redacted] are not supported by the data provided to the panel in terms of military effectiveness, lethality, or budget constraints, and are likely not consistent with applicable law." Kies Decl., Ex. S. He continued: "during the course of our panel, neither the transgender service members, the military doctors, nor the civilian doctors suggested that a person serving outside of their birth gender

— 48 —

would necessarily be unable to meet medical or physical standards." These snippets alone create a factual dispute regarding the nature of the process used to develop the Panel's recommendations and the rationality of its conclusions.

This Court has already found that President Trump's decision to issue the Transgender Service Member Ban "was not driven by genuine concerns regarding military efficacy." ECF 85, at 43 (citation and internal quotation marks omitted). To withstand heightened scrutiny, any new justification for the Ban must be "genuine, not hypothesized or invented post hoc in response to litigation." *United States v. Virginia*, 518 U.S. at 533; *see Karnoski*, 2018 WL 1784464, at *12. Defendants' motions center on their claim that they have "revoked" the unconstitutional Ban and replaced it with an "independent" regime wholly unaffected by discriminatory animus. This claim turns on material facts that are plainly in dispute.

###### D.    At Minimum, Plaintiffs Are Entitled to Complete Discovery so They Can Obtain Further Evidence Regarding Defendants' Intent.

At a minimum, Plaintiffs are entitled to further discovery into, *inter alia*, the process by which the Implementation Plan was developed. Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be [postponed] when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition.'" *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (quoting *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (generally, "summary judgment is appropriate only after adequate time for discovery." (internal quotation marks omitted)). Rule 56(d) "is intended as a safeguard against a premature grant of summary judgment"; thus, "[courts] should construe the rule liberally[.]" *Works v. Colvin*, 519 F. App'x 176, 182 (4th Cir. 2013) (per curiam) (internal quotation marks omitted).

There is no question that Plaintiffs have been deprived of essential discovery. It is

unclear whether Defendants have even finished their document productions in this case as of the time of this filing.  Kies Decl., ¶ 35.  Defendants have yet to correct their interrogatory answers to comply with Federal Rule of Civil Procedure 33(d), precluding Plaintiffs from identifying key documents in the existing productions.  *Id.* ¶ 7.  Multiple deficiency letters Plaintiffs have sent to Defendants have gone unanswered.  *Id.* ¶¶ 29–29.  No depositions have occurred in this case, and the parties have not yet exchanged expert reports.  *Id.* ¶¶ 37–38.  And, despite the centrality of their intent to this case, Defendants refuse to disclose thousands of documents that touch on their deliberations.  Golden Decl., Ex. 7.  Plaintiffs' motion to compel regarding deliberative process privilege is currently pending.

Just as important, Defendants refuse even to discuss the validity of their privilege assertions for communications that went through the White House, claiming that they need not even *log* such communications and that it is premature to meet and confer regarding their assertions until the Court rules on their pending motion to dissolve the injunction against the President.  Kies Decl., ¶¶ 20, 28.  Plaintiffs have plausibly alleged that the Transgender Service Member Ban was improperly motivated, and evidence before this Court suggests that the White House influenced the purportedly independent DoD study.  ECF 139–7.  Plaintiffs know through third-party discovery that White House staffers discussed the Ban with certain Members of Congress, and understand from public reports that the White House may have influenced the work of the "Panel of Experts."  It would be fundamentally unfair for judgment to be entered in favor of Defendants prior to resolving the numerous privilege disputes.  Defendants are prepared to move forward promptly with completion of discovery once these disputes are resolved.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Cross-Motion for Summary Judgment should be granted and Defendants' Motion to Dismiss or for Summary Judgment should be denied.

Dated: May 25, 2018

Respectfully submitted,

 /s/   Marianne F. Kies

David M. Zionts*
Carolyn F. Corwin*
Mark H. Lynch (Bar No. 12560)
Augustus Golden*
Jeff Bozman*
Marianne F. Kies (Bar No. 18606)
Christopher J. Hanson*
Joshua Roselman*
Peter J. Komorowski (Bar No. 20034)
Mark Neuman-Lee*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, DC 20001
Telephone: (202) 662-6000
Fax: (202) 778-5987
dzionts@cov.com
ccorwin@cov.com
agolden@cov.com
jbozman@cov.com
mkies@cov.com
chanson@cov.com
jroselman@cov.com
pkomorowski@cov.com
mneumanlee@cov.com

Mitchell A. Kamin*
Nicholas A. Lampros*
COVINGTON & BURLING LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
mkamin@cov.com
nlampros@cov.com

Sara D. Sunderland*
COVINGTON & BURLING LLP
One Front Street
San Francisco, California 94111
Telephone: (415) 591-7004
Facsimile: (415) 591-6091

Deborah A. Jeon (Bar No. 06905)
David Rocah (Bar No. 27315)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF MARYLAND
3600 Clipper Mill Road, #350
Baltimore, MD 21211
Telephone: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
rocah@aclu-md.org

Joshua A. Block*
Chase B. Strangio*
James Esseks*
Leslie Cooper*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2627
Fax: 212-549-2650
jblock@aclu.org
cstrangio@aclu.org
jesseks@aclu.org
lcooper@aclu.org

*Attorneys for Plaintiffs*

ssunderland@cov.com

*\* Admitted pro hac vice*