IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BROCK STONE, *et al.*,

        Plaintiffs,

v.                           CIVIL NO.: GLR-17-2459

DONALD J. TRUMP, *et al.*,

        Defendants.

\*\*\*\*\*\*

## MEMORANDUM OPINION

This case was referred to me for all discovery and related scheduling matters on May 7, 2018 (*See* ECF No. 152, re-assigned on May 7, 2018). Pending now before me are three motions: (1) Plaintiffs' motion to compel discovery (ECF No. 177), (2) Plaintiffs' motion for judicial determination of privilege (ECF No. 178), and (3) Defendants' motion for a protective order (ECF No. 179). This litigation resulted from the ban on transgender persons serving in the military which was first announced on social media by President Donald Trump. Plaintiffs allege the ban instituted by President Trump and the Trump administration violates the Equal Protection component of the Fifth Amendment's Due Process Clause, violates substantive due process, and violates 10 U.S.C. § 1074 by denying medical treatment to military personnel (ECF No. 39).

### Introduction

On July 26, 2017, President Trump published three tweets which collectively stated:

> After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow [t]ransgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and

1

> overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgenders in the military would entail. Thank you.

ECF No. 39 at 4.

The facts in this case are set forth in great detail by the Court in its November 21, 2017 Memorandum and Order adopted herein, and summarized for simplicity sake. The issue of service by transgender military members has been addressed by previous administrations. On September 20, 2011, the military policy of "Don't Ask, Don't Tell" ended, which allowed gay, lesbian, and bisexual service members to serve openly. However, transgender persons were still banned from service until June 2016. On June 30, 2016, Secretary of Defense Ashton Carter issued a policy allowing transgender service members to serve openly so long as the individuals could meet the standards for military readiness.

Prior to June 30, 2016, the policy instituted by Secretary Carter allowing transgender service members went through extensive review by a working group consisting of representatives of the Armed Forces, Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and medical specialists from across the Department of Defense ("DoD"). ECF No. 85. The working group performed a systematic review including commissioning studies and meetings with transgender service members, outside experts, medical personnel, military leaders, allied militaries and others. After a year-long study the working group concluded that open service by transgender service members would not impose any significant burdens on readiness, deployability, or unit cohesion. In contrast, President Trump announced a ban on transgender service via Twitter, stating only that he consulted with "my Generals and military experts." After his July 26, 2017 tweets, President Trump issued a Presidential Memorandum again stating his administration's position banning transgender military service in August 2017.

Defendants state in their opposition that President Trump revoked his August 2017 Memorandum allowing the Secretaries of Defense and Homeland Security to "exercise their authority to implement any appropriate policies concerning military service by transgender individuals" resulting in the 2018 Presidential Memorandum. ECF 188-27 at 11.

Plaintiffs allege that President Trump proclaimed, based upon political or unconstitutional reasons, a ban on transgender service without the proper justification that would be found through the deliberative process. Plaintiffs seek materials related to the deliberative process, if any, that existed prior to the tweets or subsequently that resulted in the Trump administration's policy banning transgender service and negative accession, denying medical benefits and requiring discharge of current transgender service members. At the preliminary injunction stage, this Court ruled that Plaintiffs have established a likelihood of success at least as to the Equal Protection claim. ECF 85 at 42.

**The Motion to Compel**

Plaintiffs have moved to compel the production of three categories of documents.

(1) Deliberative materials regarding the President's July 2017 tweets and August 2017 Memorandum;

(2) Deliberative materials regarding the activities of the DoD's so-called panel of experts and its working groups (the "Panel") tasked with developing a plan to study and implement the President's decision; and

(3) Deliberative materials regarding the DoD's implementation Plan and the President's acceptance of the Plan in his March 23 Memorandum, including any participation or interference in that process by anti-transgender activities and lobbyists.

ECF 177-3 at 7.

In response, Defendants first argue that this Court should defer any decisions regarding the motion to compel for recognition of a deliberative process privilege because of pending dispositive and other motions and recent developments. ECF 184 at 4, correcting 177-27. The Court disagrees except as noted below. Local Rule 104.3 directs the parties to continue discovery despite the existence of a dispute. Loc.R. 104.3 (D.Md. 2016). This rule obviously applies to a discovery dispute and here, Defendants point out pending motions and multiple discovery issues as a basis to stay a decision by this Court. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). When a dispositive motion has the potential to dispose of the case, it is within the Court's discretion to stay discovery pending resolution of that motion. *Tilley v. United States*, 270 F.Supp.2d 731, 734 n.1 (M.D.N.C. 2003) (citations omitted). In this case, discovery was referred to me. As the parties appear to be very litigious and more objections and motions are expected, there are no justifiable reasons to stay decisions on the discovery disputes pending the outcome of the dispositive motions or for any other proffered reasons. Defendants request to stay discovery proceedings is DENIED except as noted below.

The deliberative process privilege "encourages free-ranging discussion of alternatives; prevents public confusion that might result from the premature release of such nonbinding deliberations; and insulates against the chilling effect likely were officials to be judged not on the basis of their final decisions, but for matters they considered before making up their minds." *City of Va. Beach v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1252–53 (4th Cir. 1993) (internal quotation marks and citation omitted). To justify application of the deliberative process privilege, "the government must show that, in the context in which the materials [were] used, the

4

documents [were] both predecisional and deliberative." *Id.* at 1253 (internal quotation marks and citation omitted). *Predecisional* documents are those "prepared in order to assist an agency decisionmaker in arriving at his decision," *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975), and *deliberative* documents are those that "reflect[ ] the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes," *City of Va. Beach*, 995 F.2d at 1253 (internal quotation marks and internal citation omitted). The privilege thus protects "recommendations, draft documents, proposals, suggestions, and other *subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.*" *Id.* (emphasis added) (citation omitted). But "the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Ethyl Corp. v. U.S. E.P.A.*, 25 F.3d 1241, 1248 (4th Cir. 1994). In addition, "since the prospect of disclosure is less likely to make an advisor omit or fudge raw facts than opinions, purely factual material does not fall within the exemption unless it is inextricably intertwined with policymaking processes such that revelation of the factual material would simultaneously expose protected deliberation." *City of Va. Beach*, 995 F.2d at 1253 (internal quotation marks and citations omitted).

Defendants assert that the deliberative process privilege applies to the categories of documents Plaintiffs are asking the Court to compel. Plaintiffs argue that this privilege does not apply at all when a plaintiff's cause of action turns on the government's intent. *In Re Subpoena Duces Tecum Served on the Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C.Cir. 1998). The privilege is simply inapplicable where government intent is at the heart of the issue. *McPeek v. Ashcroft*, 202 F.R.D. 332, 335 (D.C.Cir. 2001). The Court agrees with Plaintiffs that each of the categories of compelled documents is likely to contain evidence reflecting Defendants' intent. It

also could not be more clear that the Defendants' intent – whether it was for military purposes or whether it was purely for political and discriminatory purposes – is at the very heart of this litigation.

On July 27, 2017, after Secretary Mattis announced a delay in implementing the plan for accession and retention of transgender personnel, President Trump took to Twitter to go a step further and announce to the world that transgender personnel will no longer be able to serve or continue to serve in the military defense of our country. This Court previously observed that President Trump's tweets did not emerge from a policy review, nor did the Presidential Memorandum identify any policymaking process or evidence demonstrating that the revocation of transgender rights was necessary for any legitimate national interest. ECF No. 85 at 43. In fact, the only evidence that is before the Court regarding any review panel, investigatory body, or discussions regarding transgender service occurred well after the fact of the Presidential tweets and Memorandum. The Court agrees with Plaintiffs that the optics of the tweets and corresponding sudden activity lend themselves to a showing that the decision was made and the panel was formed to justify and enforce that decision. It is also evident that a previous panel under a previous Secretary of Defense did extensive studies *before a decision was rendered*, incorporating the military leadership and transgender representatives just a few years before President Trump's tweets. That panel found no justifiable reason to deny transgender personnel the honor of military service. It is hard for this Court to believe circumstances regarding readiness and deployability have changed so dramatically since that time.

Defendants argue that the Policy Statement of 2018 renders the prior tweets and earlier Presidential Memorandum moot. The Court finds that argument unpersuasive. But for the initial July 2017 tweets and Presidential Memorandum of August 2017, the Memorandum of March

2018 would not exist. The panel that was formed to consider transgender service was not formed until after the President's tweets occurred and according to President Trump after discussion with "my Generals and military experts." Thus, the Motion to Compel disclosure of the three categories of documents described by Plaintiff is GRANTED.

**Motion for Protective Order**

Defendants have moved for a protective order under Fed.R.Civ.P. 26(c)(1) to preclude discovery directed at the President of the United States and preclude discovery from other sources that seek information concerning presidential communications and deliberations. ECF No. 179. Also, in support of their motion, Defendants request that this Court stay a decision pending resolution of ECF No. 115. Defendants argue that if the President is dismissed from the action and is a non-party, he would have no obligation to respond to interrogatories or requests for production of documents. ECF No. 179 at 10.

Plaintiffs have supplemented their motion to compel with ECF No. 200-1, a decision rendered by the U.S. District Court in the Western District of Washington, *Karnoski v. Trump*, No. C17-1297-MJP, 2018 WL 3608401 (W.D.Wash. July 27, 2018), a companion case where the District Court granted Plaintiffs' motion to compel and denied the motion for a protective order. The *Karnoski* case is based upon the same basic facts and the pending discovery motions were, at least as discernible from the opinion, the same as presented here. The District Court, relying on language in *Nixon*, denied the protective order because Defendants had failed to assert executive privilege and to produce a single document or a privilege log. ECF No. 200-1 at 11.

A President's communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual. *United States v. Nixon*, 418 U.S. 683, 715 (1974). While the President is not above the law, the Judiciary must afford Presidential

confidentiality the greatest possible protection, recognizing the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties. *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 368 (2004). The right to production of relevant evidence in civil proceedings does not have the same "constitutional dimensions" as it does in the criminal context. *Nixon*, 418 U.S. at 711.

This Court recognizes a distinction between discovery involving the President in a criminal proceedings versus a civil proceeding. As the Court stated in *Cheney*,

> Contrary to the District Court's and the Court of Appeals' conclusions, *Nixon* does not leave them the sole option of inviting the Executive Branch to invoke executive privilege while remaining otherwise powerless to modify a party's overly broad discovery requests. Executive privilege is an extraordinary assertion of power "not to be lightly invoked." Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives. This inquiry places courts in the awkward position of evaluating the Executive's claims of confidentiality and autonomy, and pushes to the fore difficult questions of separation of powers and checks and balances. These "occasion[s] for constitutional confrontation between the two branches" should be avoided whenever possible.

542 U.S. at 389–90 (internal citations omitted). In recognizing this distinction, this Court looks to *Cheney* for guidance to avoid the impending collision between two branches of government. The question here is whether this Court can "explore other avenues, short of forcing the Executive to invoke privilege." *Id.* at 390. In evaluating these other avenues, the Court is mindful to look back at the facts and how the transgender policy was announced.

On June 30, 2017, one day before the Carter policy allowing transgender service was to become effective, Secretary Mattis instituted a six month delay in enacting the new policy. On July 27, 2017, President Trump tweeted transgender persons would no longer be able to serve in

the military and as for any deliberative process, simply stated this policy occurred after consulting with "my Generals and military experts." There is no evidence to support the concept that "my Generals and military experts" would have the information Plaintiffs request. There is no evidence provided to this Court that "my Generals and military experts" are identified, in fact do exist, or that they would be included in document requests and interrogatories propounded to the Executive Branch, excluding the President. By tweeting his decisions to the world, the President has, in fact narrowed the focus of Plaintiffs' inquiries to the President himself. The Presidential tweets put the President front and center as the potential discriminating official.

So looking at the whole picture here, there was a fully researched and deliberated policy supporting military service by transgender persons set to go in effect on July 1, 2017. Secretary Mattis exercised his authority to delay enactment for six months. On July 27, 2017, President Trump took to Twitter. Whether his Presidential tweets took "my Generals and military experts," along with the Trump administration, by surprise and whether these tweets were *sua sponte* made or the product of thoughtful discussion is unknown. Just as unknown is the basis for the decision – be it military "for the good of the service" or discriminatory and unconstitutional for some other reason. In August 2017, the Presidential Memo was issued. A panel was then assembled to review the issue of service by transgender persons and that panel made a recommendation which ultimately became the Presidential Memorandum of March 2018. The result: transgender persons were banned from military service.

Looking to the *Nixon* and *Cheney* decisions, the question then becomes whether there are other means for Plaintiffs to obtain the information they are entitled to under Fed.R.Civ.P. 26, and whether those other means place a burden on the Executive Branch with special considerations regarding the President. This Court takes the instructions of *Cheney* to apply

9

caution when steering the discovery train in a collision course with the function of the Executive Branch. Put more simply, the Court must determine whether there is an alternative to granting a protective order and whether justice so requires.

So many factors are unknown at this juncture in the litigation. It is unknown whether Plaintiffs can obtain the information necessary from the non-Presidential discovery to define the "intent" of the government with respect to the transgender ban. Defendants offer as an alternative, a stay of discovery with respect to the President, until the Motion to Dismiss the President as a party is decided. If the President, as the discriminating official, tweeted his transgender ban *sua sponte* as alleged, this Court sees no alternative to obtaining the intent of the government other than denying the protective order with respect to President Trump. *Cheney* instructs this Court, however, to give deference to the executive branch because "occasions for constitutional confrontation between the two branches should be avoided whenever possible." *Id.* at 389–90 (citing *Nixon*, 418 U.S. at 692).

In order to permit the appropriate discovery to which Plaintiffs are entitled, and to respect the burden placed upon the Executive Branch, and in particular President Trump, this Court will DENY in part and GRANT in part the Motion for a Protective Order.

For the reasons stated herein, the decision as to the Protective Order with respect to President Trump as a party is STAYED, pending the resolution of the Motion to Dismiss President Trump as a party. No interrogatories or document requests will be directed to President Trump as a party, but may be directed to other parties pursuant to this Memorandum Opinion. If the Motion to Dismiss is denied, the Court will revisit the issue of the protective order as to President Trump.

For the reasons stated herein, the Motion for a Protective Order as to the discovery from other sources that seeks information concerning presidential communications and deliberations is DENIED.

**Plaintiffs' Motion for Judicial Determination of Privilege Claims**

The Plaintiffs have filed a motion requesting the Court to determine whether two documents that appear to have been inadvertently provided during discovery are protected by the deliberative process privilege. ECF No. 178. This Court in this Opinion has granted Plaintiffs' motion to compel discovery and denied Defendants' motion for protective order regarding documents that were part of the deliberative process. Therefore, the Motion for Judicial Determination of privilege claims is DISMISSED as MOOT.

A separate Order will follow.

14 August 2018
Date

A. David Copperthite
United States Magistrate Judge