IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BROCK STONE, et al.,                          :

     Plaintiffs,                          :

v.                                            :          Civil Action No. GLR-17-2459

DONALD J. TRUMP, et al.,                      :

     Defendants.                          :

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on four Motions: (1) Defendants President Donald J. Trump, Secretary of Defense Mark T. Esper,[1] Acting Secretary of the Army Ryan McCarthy,[2] Acting Secretary of the Navy Richard V. Spencer, Secretary of the Air Force Heather Wilson, Acting Secretary of Homeland Security Kevin McAleenan,[3] and Commandant of the U.S. Coast Guard Karl L. Schultz's[4] Partial Motion for Judgment on the Pleadings and Motion to Partially Dissolve the Preliminary Injunction ("Motion for Judgment on the Pleadings") (ECF No. 115); (2) Defendants' Motion to Dissolve the Preliminary Injunction ("Motion to Dissolve") (ECF No. 120); (3) Defendants' Motion to

---

[1] On July 23, 2019, the Senate confirmed Esper as the Secretary of Defense. Accordingly, the Court substitutes Esper for James Mattis. <u>See</u> Fed.R.Civ.P. 25(d).

[2] On June 24, 2019, President Trump appointed McCarthy Acting Secretary of the Army. Accordingly, the Court substitutes McCarthy for Esper. <u>See</u> Fed.R.Civ.P. 25(d).

[3] On April 11, 2019, President Trump appointed McAleenan Acting Secretary of Homeland Security. Accordingly, the Court substitutes McAleenan for Nielsen. <u>See</u> Fed.R.Civ.P. 25(d).

[4] On June 1, 2018, President Trump appointed Schultz Commandant of the U.S. Coast Guard. Accordingly, the Court substitutes Schultz for Paul Zukunft. <u>See</u> Fed.R.Civ.P. 25(d).

Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, Defendants' Motion for Summary Judgment (ECF No. 158); and (4) Plaintiffs'[5] Cross-Motion for Summary Judgment (ECF No. 163).[6] This case involves equal protection and substantive due process challenges to President Trump's policy regarding transgender persons' enlistment and service in the military. The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will: deny without prejudice in part and deny as moot in part Defendants' Motion for Judgment on the Pleadings; grant Defendants' Motion to Dissolve; grant in part and deny in part Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, Defendants' Motion for Summary Judgment; and deny without prejudice Plaintiffs' Cross-Motion for Summary Judgment.

---

[5] Plaintiffs are six current service members, named infra at 7; six prospective service members, named infra at 9–10; and an organization, the American Civil Liberties Union of Maryland, Inc.

[6] Also pending before the Court are Plaintiffs' Motion to Lift Stay of Compliance with the Magistrate Judge's Memorandum Opinion and Order (ECF No. 239) and Defendants' Motion for Reconsideration, Motion to Continue to Stay Compliance with the Magistrate Judge's Memorandum Opinion and Order, and Request for an Administrative Stay (ECF No. 257). The Court will address both of these Motions in a forthcoming Memorandum Opinion.

# I.  BACKGROUND[7]

## A.  <u>Factual Background</u>

### 1.  **Pre-June 2016 Transgender Military Service Policy**

At some point before 1981, the U.S. Department of Defense (the "DoD") implemented a policy that barred transgender men and women from enlisting or serving openly in the military. (2d Am. Compl. ¶ 128, ECF No. 148). This policy applied to transgender individuals regardless of their fitness to serve or their need for medical treatment. (<u>Id.</u> ¶ 129). The DoD based this policy on its conclusion that "Sexual Gender and Identity Disorders" rendered transgender service members "administratively unfit" to serve in the military. (Brown Decl. ¶¶ 48–56, ECF No. 40-32).

### 2.  **The Open Service Directive**

In 2016, the DoD completed a thorough analysis of military costs, readiness, and other factors, concluding that "there was no basis for the military to exclude men and women who are transgender from openly serving their country, subject to the same fitness requirements as other service members." (2d Am. Compl. ¶ 5). On June 30, 2016, then-Secretary of Defense Ashton Carter issued the Open Service Directive, which permitted transgender persons currently in the military to serve openly effective immediately and permitted the accession[8] of transgender individuals starting on July 1, 2017. (<u>Id.</u> ¶ 139,

---

[7] Unless otherwise noted, the Court takes the following facts from Plaintiffs' Second Amended Complaint, (ECF No. 148), and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555–56 (2007)).

[8] Accession is "the process of bringing new enlisted recruits and officer candidates into the military." (2d Am. Compl. ¶ 141).

141). The Open Service Directive also permitted in-service gender transition and covered necessary medical care and treatment to transgender individuals beginning on October 1, 2016. (Pls.' Mot. Prelim. Inj. Ex. 1 at 2, 6, ECF No. 40-4).[9] On June 30, 2017, then-Secretary of Defense James Mattis ("Secretary Mattis") deferred implementation of the accession component of the Open Service Directive until January 1, 2018. (Pls.' Mot. Prelim. Inj. Ex. 8, ECF No. 40-11; see 2d Am. Compl. ¶ 162).

### 3. The President's Tweets and August 2017 Memorandum

On July 26, 2017, President Trump published a series of Tweets[10] stating, "After consultation with my Generals and military experts, . . . the United States Government will not accept or allow . . . Transgender individuals to serve in any capacity in the U.S. Military." (2d Am. Compl. ¶ 147). On August 25, 2017, President Trump formalized the policy announced in his Tweets in a "Memorandum for the Secretary of Defense and the Secretary of Homeland Security" (the "August 2017 Memorandum" or the "Ban"). (Id. ¶ 158; Compl. Ex. C ["Aug. 2017 Mem."], ECF No. 1-4). The August 2017 Memorandum dictated a "return to the longstanding policy and practice on military service by transgender individuals that was in place prior to June 2016" (the "Retention Directive") effective January 1, 2018, (Aug. 2017 Mem. §§ 1(b), 2(a), 3), and directed the military to "maintain the currently effective policy regarding accession of transgender individuals into military service beyond January 1, 2018" (the "Accession Directive"), (id. § 2(a)). In

___

[9] Citations to Exhibit 1 to Plaintiffs' Motion for Preliminary Injunction refer to the pagination the Court's Case Management/Electronic Case Files ("CM/ECF") system assigned.

[10] A Tweet is a short message posted on the social media website Twitter.

addition, the August 2017 Memorandum prohibited "all use of DoD or [Department of Homeland Security] resources to fund sex-reassignment surgical procedures for military personnel, except to the extent necessary to protect the health of an individual who has already begun a course of treatment to reassign his or her sex" effective March 23, 2018 (the "Sex-Reassignment Surgery Directive"). (Id. §§ 1(b), 2(b), 3). The August 2017 Memorandum also tasked the Secretary of Defense, in consultation with the Secretary of Homeland Security, with developing a plan to implement these directives (the "Implementation Plan") by February 21, 2018. (Id. § 3).

### 4.     The Implementation Plan

On September 14, 2017, Secretary Mattis issued Terms of Reference, which directed the Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff to lead the development of the Implementation Plan and to convene a Panel of Experts (the "Panel") from within DoD to conduct a study to "inform the Implementation Plan." (Pls.' Cert. Conf. Counsel Ex. 20 at 2–3, ECF No. 177-24; Pls.' Opp'n Defs.' Mot. Dissolve Prelim. Inj. Ex. 4 at 1–2, ECF No. 139-5).[11] The Panel held thirteen meetings over the course of ninety days, conferring with military and civilian medical professionals, commanders of transgender service members, and transgender service members. (Defs.' Mot. Dissolve Prelim. Inj. Ex. 2 ["DoD Report"] at 18, ECF No. 120-2). On January 11, 2018, the Panel provided Secretary Mattis with its recommendations. (Pls.' Mem. Opp'n

---

[11] Citations to Exhibit 20 to Plaintiffs' Certificate of Conference of Counsel refer to the pagination CM/ECF assigned.

Defs.' Mot. Dismiss Summ. J. & Cross-Mot. ["Pls.' Opp'n & Cross-Mot."] at 10, ECF No. 163-2).

On February 22, 2018, Secretary Mattis submitted to President Trump the Implementation Plan, which recommended changes to the transgender service policy set forth in the August 2017 Memorandum. (2d Am. Compl. ¶¶ 176–77). The Implementation Plan consisted of a "short memo" (the "Mattis Memorandum") and a forty-four page "unsigned document" entitled "Department of Defense Report and Recommendations on Military Service by Transgender Persons" (the "DoD Report"). (Id. ¶ 176).

The Implementation Plan recommended adopting a policy that: (1) transgender individuals who "require or have undergone gender transition" are disqualified from military service, except under certain "limited circumstances," (Id. ¶ 177; Defs.' Mot. Dissolve Prelim. Inj. Ex. 1 ["Mattis Mem."] at 2, ECF No. 120-1; DoD Report at 32); and (2) all other transgender individuals "without a history or diagnosis of gender dysphoria, who are otherwise qualified for service," may serve only "in their biological sex." (2d Am. Compl. ¶ 177; Mattis Mem. at 2; DoD Report at 4). There are three "limited circumstances" under which transgender individuals who require or have undergone transition may serve in the military. First, they may serve "if they have been stable for [thirty-six] months in their biological sex prior to accession." (Mattis Mem. at 2; see also DoD Report at 42). Second, if a service member is diagnosed with gender dysphoria after acceding into the military, the individual "may be retained if they do not require a change of gender and remain deployable within the applicable retention standards." (Mattis Mem. at 2; see also DoD Report at 42). Third, service members diagnosed with gender dysphoria between the

effective date of the Open Service Directive and the effective date of the Implementation Plan may "continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria" (the "Grandfather Provision"). (Mattis Mem. at 2; see also DoD Report at 42). The Grandfather Provision further states that it "is and should be deemed severable" from the Implementation Plan "should [DoD's] decision to exempt these Service members be used by a court as a basis for invalidating the entire policy." (2d Am. Compl. ¶ 178; DoD Report at 43). In addition, transgender service members serving under the Grandfather Provision must "not be deemed to be non-deployable for more than [twelve] months or for a period of time in excess of that established by Service policy (which may be less than [twelve] months)." (2d Am. Compl. ¶ 215; DoD Report at 6).

On March 23, 2018, President Trump issued a second memorandum (the "March 2018 Memorandum") that "revoke[s]" the August 2017 Memorandum and permits the Secretary of Defense to proceed with the Implementation Plan. (2d Am. Compl. ¶¶ 12, 179–80 (alteration in original); Defs.' Mot. Dissolve Prelim. Inj. Ex. 3 ["Mar. 2018 Mem."] at 1, ECF No. 120-3).

## B.    Procedural Background

On August 28, 2017, six transgender individuals who are current service members—Plaintiffs Brock Stone, Kate Cole, John Doe 1, Seven Ero George, Teagan Gilbert, and Tommie Parker (collectively, the "Current Service Members")—and the American Civil Liberties Union of Maryland, Inc. (the "ACLU") sued Defendants. (ECF No. 1). On September 14, 2017, Plaintiffs filed a First Amended Complaint. (ECF No. 39). In the First Amended Complaint, Plaintiffs alleged that the Ban violates: (1) the Equal Protection

component of the Due Process Clause of the Fifth Amendment to the United States Constitution; (2) Fifth Amendment substantive due process; and (3) 10 U.S.C. § 1074 (2018), which entitles current and certain former members of the military to medical care. (1st Am. Compl. at 32, 36, 38, ECF No. 39).

Also on September 14, 2017, Plaintiffs filed a Motion for a Preliminary Injunction. (ECF No. 40). On November 21, 2017, this Court granted Plaintiffs' Motion for Preliminary Injunction, concluding that Plaintiffs had established a likelihood of success on the merits of their equal protection claim.[12] (Nov. 21, 2017 Mem. & Order at 52–53, ECF No. 85). The same day, this Court issued a Preliminary Injunction, enjoining the August 2017 Memorandum's Accession Directive, Retention Directive, and Sex-Reassignment Surgery Directive. (Prelim. Inj. at 1–2, ECF No. 84).[13]

Defendants filed an Answer to Plaintiffs' First Amended Complaint on December 15, 2017. (ECF No. 96). On March 1, 2018, Defendants filed their Motion for Judgment

---

[12] The Court also dismissed Plaintiffs' 10 U.S.C. § 1074 claim. (Nov. 21, 2017 Mem. & Order at 53, ECF No. 85).

[13] Three different federal district courts in California, Washington, and Washington, D.C. also entered preliminary injunctions prohibiting enforcement of President Trump's July 26, 2017 Twitter announcement or certain directives in the August 2017 Memorandum. Stockman v. Trump, No. EDCV 17-1799 JGB (KKx), 2017 WL 9732572, at *16 (C.D.Cal. Dec. 22, 2017) (enjoining enforcement of "the Accession, Retention, and Sex Reassignment Surgery Directives"); Karnoski v. Trump, No. C17-1297-MJP, 2017 WL 6311305, at *10 (W.D.Wash. Dec. 11, 2017) (enjoining the defendants from "taking any action relative to transgender individuals that is inconsistent with the status quo that existed prior to President Trump's July 26, 2017 announcement"), appeal dismissed, No. 17-36009, 2017 WL 8229552 (9th Cir. Dec. 30, 2017); Doe 1 v. Trump, 275 F.Supp.3d 167, 177, 217 (D.D.C. 2017) (enjoining enforcement of the "Accession and Retention Directives, corresponding with sections 1(b) and 2(a) of the [August 2017 Memorandum]"), vacated sub nom. Doe 2 v. Shanahan, 755 F.App'x 19 (D.C. Cir. 2019)

on the Pleadings. (ECF No. 115). Plaintiffs filed an Opposition on March 9, 2018. (ECF No. 117). On March 16, 2018, Defendants filed a Reply. (ECF No. 118).

On March 23, 2018, Defendants filed their Motion to Dissolve.[14] (ECF No. 120). Plaintiffs filed an Opposition on April 23, 2018. (ECF No. 139). On May 11, 2018, Defendants filed a Reply. (ECF No. 159).

On April 27, 2018, Plaintiffs filed a Second Amended Complaint for Declaratory and Injunctive Relief (the "Second Amended Complaint"), which adds six prospective service members as Plaintiffs: Teddy D'Atri, Ryan Wood, Niko Branco, John Doe 2, Jane

---

[14] Also in March 2018, the defendants moved to dissolve the preliminary injunctions in Stockman, Karnoski, and Doe 2. Defendants' Motion to Dissolve the Preliminary Injunction, Stockman v. Trump, No. 17-cv-1799-JGB-KK (C.D.Cal. Mar. 23, 2018), ECF No. 82; the defendants' Motion to Dissolve the Preliminary Injunction, Karnoski v. Trump, No. 17-cv-1297-MJP (W.D.Wash. Mar. 23, 2018), ECF No. 215; Defendants' Motion to Dissolve the Preliminary Injunction, Doe 2 v. Shanahan, No. 17-cv-1597 (CKK) (D.D.C. Mar. 23, 2018), ECF No. 96. In Stockman and Doe 2, the district courts denied the motions to dissolve the preliminary injunctions. Stockman v. Trump, 331 F.Supp.3d 990, 1004 (C.D.Cal. 2018); Doe 2 v. Trump, 315 F.Supp.3d 474, 498 (D.D.C. 2018), rev'd sub nom. Doe 2 v. Shanahan, No. 18-5257, 2019 WL 102309 (D.C. Cir. Jan. 4, 2019). In Karnoski, the court struck the defendants' motion. Karnoski v. Trump, No. C17-1297-MJP, 2018 WL 1784464, at *14 (W.D.Wash. Apr. 13, 2018). The defendants appealed in each of these cases. See Stockman v. Trump, No. 18-56539 (9th Cir. Nov. 16, 2018); Doe 2 v. Shanahan, No. 18-5257 (D.C. Cir. Aug. 27, 2018); Karnoski v. Trump, No. 18-35347 (9th Cir. Apr. 30, 2018).

On January 4, 2019, the United States Court of Appeals for the District of Columbia Circuit vacated without prejudice the preliminary injunction the district court had entered. Doe 2, 2019 WL 102309, at *1. On January 22, 2019, the United States Supreme Court issued an order staying the preliminary injunctions in Karnoski and Stockman. Trump v. Karnoski, No. 18A625 (U.S. Jan. 22, 2019) (order staying preliminary injunction); Trump v. Stockman, No. 18A627 (U.S. Jan. 22, 2019) (same). On June 14, 2019, the United States Court of Appeals for the Ninth Circuit vacated the Karnoski court's order striking the defendants' motion to dissolve the preliminary injunction and remanded for further proceedings. Karnoski v. Trump, 926 F.3d 1180, 1207 (9th Cir. 2019). The Ninth Circuit, consistent with the Supreme Court, also stayed the preliminary injunction while the district court reconsidered the defendants' motion. Id.

Roe 1, and John Doe 3, by his next friends and mother and father, Jane Roe 2 and John Doe 4 (collectively, the "Prospective Service Members"; together with "Current Service Members," the "Individual Plaintiffs"). (2d Am. Compl. ¶ 4). The Second Amended Complaint also adds allegations regarding the preliminary injunctions this and other federal district courts issued and the Implementation Plan, (id. ¶¶ 173–86, 194, 199, 201–04, 208–09, 214–16, 220, 224–25, 236), and removes Count III, the 10 U.S.C. § 1974 claim.

On May 11, 2018, Defendants filed their Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, Defendants' Motion for Summary Judgment. (ECF No. 158). Plaintiffs filed their Opposition and Cross-Motion for Summary Judgment on May 25, 2018. (ECF No. 163). Defendants filed their Reply and Opposition to Plaintiffs' Cross-Motion for Summary Judgment on June 15, 2018. (ECF No. 176). On July 6, 2018, Plaintiffs filed their Reply in support of their Cross-Motion for Summary Judgment. (ECF No. 190). Defendants filed a Surreply to Plaintiffs' Cross-Motion for Summary Judgment on August 1, 2018.[15] (ECF No. 203).

On March 7, 2019, the Court entered an Order staying the Preliminary Injunction in this case. (ECF No. 249). The policy, as set forth in the Implementation Plan, went into effect on April 12, 2019. (See Mar. 8, 2019 Notice, ECF No. 250).

**C.    Discovery Disputes**

On May 4, 2018, the Court referred this case to a United States Magistrate Judge ("USMJ") for all discovery. (ECF No. 152). On June 15, 2018, Plaintiffs filed a Motion to

---

[15] Plaintiffs did not oppose Defendants' filing of a Surreply. (Aug 1, 2018 Order, ECF No. 202).

Compel Supplemental Interrogatory Answers and Production ("Motion to Compel"). (ECF No. 177-1). In their Motion to Compel, Plaintiffs sought deliberative materials regarding: (1) President Trump's Tweets and the August 2017 Memorandum; (2) the Panel; and (3) the Implementation Plan and President Trump's acceptance of the Implementation Plan. (Pls.' Mot. Compel at 1, ECF No. 177-1). The same day, Plaintiffs filed a Motion for a Judicial Determination of Privilege Claims, (ECF No. 178 (sealed)), regarding a PowerPoint presentation that the Army inadvertently produced and Defendants sought to clawback on the theory that it, too, is protected by deliberative process privilege. (Defs.' Objs. Magistrate Judge's Mem. Op. & Order at 5, ECF No. 209). On June 18, 2018, Defendants filed a Motion for a Protective Order to preclude discovery directed at the President and other sources concerning presidential communications and deliberations. (ECF No. 179).

On August 14, 2018, the USMJ issued a Memorandum Opinion and Order on these Motions. (Aug. 14, 2018 Mem. Op., ECF No. 204; Aug. 14, 2018 Order, ECF No. 205). The USMJ granted Plaintiffs' Motion to Compel and dismissed Plaintiffs' Motion for a Judicial Determination of Privilege Claims as moot. (Aug. 14, 2018 Mem. Op. at 11; Aug. 14, 2018 Order ¶¶ 1–3). The USMJ also granted Defendants' Motion for a Protective Order as to the President, but denied the Protective Order as to those who communicate with the President. (Aug. 14, 2018 Mem. Op. at 11; Aug. 14, 2018 Order ¶¶ 1–3). Defendants filed Objections to the USMJ's Memorandum Opinion and Order and moved to stay the Order. (ECF Nos. 208, 209). On September 10, 2018, at the request of the parties, the Court

entered an Order suspending discovery-related deadlines. (Sept. 10, 2018 Order, ECF No. 213).

On November 30, 2018, the Court overruled Defendants' Objections to the USMJ's Memorandum Opinion and Order. (Nov. 30, 2018 Mem. Op. at 22, ECF No. 227; Nov. 30, 2018 Order at 1, ECF No. 228). The Court also stayed compliance with the USMJ's Order pending the United States Court of Appeals for the Ninth Circuit's resolution of a similar discovery dispute in Karnoski v. Trump, No. C17-1297-MJP (W.D.Wash.). (Nov. 30, 2018 Mem. Op. at 22; Nov. 30, 2018 Order at 1).

## II.    DISCUSSION

### A.    Motion to Dissolve

Defendants do not state under which Federal Rule of Civil Procedure they seek dissolution of the Preliminary Injunction. Even though a preliminary injunction is not a "final order," courts have applied Rule 60(b)(5) to dissolve or modify preliminary injunctions. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 60 F.3d 823, 1995 WL 406612, at *2–3 (4th Cir. 1995) (unpublished table opinion); Centennial Broad., LLC v. Burns, 433 F.Supp.2d 730, 733 (W.D.Va. 2006) (footnote omitted) (noting that "[a]lthough a preliminary injunction is not a 'final' order or judgment for the purposes of Rule 60(b), courts nonetheless apply the general equitable principles set forth in Rule 60(b)(5)"). Rule 60(b)(5) provides for relief from a final judgment "if it is no longer equitable that the judgment should have prospective application." A party seeking dissolution of a preliminary injunction as "no longer equitable" bears the burden of establishing that "a significant change in circumstances" warrants dissolution of the

preliminary injunction. <u>L.J. v. Wilbon</u>, 633 F.3d 297, 304–05 (4th Cir. 2011) (quoting <u>Rufo v. Inmates of Suffolk Cty. Jail</u>, 502 U.S. 367, 383 (1992)). To satisfy this burden, the party must establish "a significant change either in factual conditions or in law" that makes "enforcement of the [preliminary injunction]. . . detrimental to the public interest." <u>Id.</u> at 305 (quoting <u>Rufo</u>, 502 U.S. at 384). The Court's analysis under Rule 60(b)(5) is a "flexible" one and it "focuses on the particular facts of the case." <u>United States v. Welsh</u>, No. 5:11-HC-2209-D, 2017 WL 7805581, at *5 (E.D.N.C. Mar. 16, 2017) (citing <u>Thompson v. HUD</u>, 404 F.3d 821, 830 (4th Cir. 2005)), <u>aff'd</u>, 879 F.3d 530 (4th Cir. 2018), <u>cert. denied</u>, 139 S.Ct. 1168 (2019).

Defendants maintain that the Court should dissolve the Preliminary Injunction because the President has revoked the August 2017 Memorandum, and therefore, Plaintiffs can no longer establish the equitable factors for issuing a preliminary injunction. Plaintiffs counter that the Implementation Plan is merely the formal execution of the Ban and not a change in circumstances that warrants dissolution of the Preliminary Injunction.[16] The Court is persuaded that Defendants have established a significant change in circumstances for at least two reasons.

First, the Implementation Plan does not suffer from the same procedural defects as the August 2017 Memorandum. Plaintiffs take issue with the Ban because President Trump

---

[16] Plaintiffs also contend that, under the voluntary cessation exception to mootness, the Court still retains the power to determine the legality of the Ban even though President Trump revoked it. As the Court explains, <u>infra</u> at 21, President Trump's revocation of the Ban and adoption of the Implementation Plan is sufficient to establish that Defendants will not revert to the challenged conduct. As a result, the voluntary cessation exception to the mootness doctrine does not apply here.

allegedly did not consult with military officials before he announced it on Twitter and formalized it in the August 2017 Memorandum. This is not the case with the Implementation Plan. The Panel conducted a study of transgender military service that reviewed evidence collected while the Open Service Directive was in place and drafted a report with the results of its study. (See DoD Report). Secretary Mattis relied on the Panel's report—the DoD Report—in drafting his February 2018 Memorandum to President Trump describing the Implementation Plan. Then, in the March 2018 Memorandum, President Trump rescinded the August 2017 Memorandum and authorized the military to carry out the Implementation Plan. Although the parties dispute whether the Panel and its study were truly independent, the evidence in the record reflects that the Implementation Plan was at least a product of military judgment, unlike President Trump's Tweets and the August 2017 Memorandum.

Second, despite Plaintiffs' characterization of the Implementation Plan as an "execution of" the Ban, this is not the case. The Ban did just that—barred all transgender individuals from serving in the military. The Implementation Plan, by contrast, contains provisions that permit some transgender individuals who have already enlisted to continue to serve and receive transition-related medical treatment. It also contains provisions that permit transgender individuals who intend to enlist to serve, as long as they do so in their biological sex. This is not to say that the Implementation Plan does not bar a significant number of transgender individuals from serving in the military. Rather, this is to acknowledge that there are differences between the August 2017 Memorandum and the Implementation Plan. Indeed, the Preliminary Injunction enjoined the Retention Directive,

Accession Directive, and Sex-Reassignment Surgery Directive in the August 2017 Memorandum; these directives are absent from the Implementation Plan. Thus, while the Implementation Plan bars many transgender individuals from military service, it is not the blanket transgender service ban set forth in the August 2017 Memorandum. Thus, the Court concludes that Defendants have established a significant change in the factual circumstances.

Because the August 2017 Memorandum is no longer in force, it is not in the public interest to continue enjoining directives that no longer exist. Cf. Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 911 F.2d 1331, 1335 (9th Cir. 1990) (in the context of mootness, concluding that "[i]t would be pointless to enjoin enforcement of a regional plan that is no longer in effect."). The Court, therefore, concludes that dissolution of the Preliminary Injunction is warranted. Accordingly, the Court will grant Defendants' Motion and dissolve the Preliminary Injunction.

**B.**     **Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, or, in the Alternative, Defendants' Motion for Summary Judgment & Plaintiffs' Cross-Motion for Summary Judgment**

Defendants advance two principal arguments for why the Court should dismiss Plaintiffs' claims or grant summary judgment in their favor. First, the Court lacks subject matter jurisdiction over Plaintiffs' claims because they lack standing and their challenge to the August 2017 Memorandum is moot. Second, Defendants are entitled to a highly deferential form of review, and therefore, Plaintiffs fail to state a plausible claim for relief,

or, alternatively, Defendants are entitled to summary judgment in their favor under such review. The Court first addresses the threshold issues of mootness and standing.[17]

### 1. Subject-Matter Jurisdiction

#### a. Rule 12(b)(1) Standard of Review

Rule 12(b)(1) governs motions to dismiss for mootness and for lack of standing, which pertain to subject matter jurisdiction. See CGM, LLC v. BellSouth Telecomm's, Inc., 664 F.3d 46, 52 (4th Cir. 2011); Akers v. Md. State Educ. Ass'n, 376 F.Supp.3d 563, 569 (D.Md. 2019). A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "challenges a court's authority to hear the matter brought by a complaint." Akers, 376 F.Supp.3d at 569. Under Rule 12(b)(1), "the plaintiff bears the burden of proving, by a preponderance of the evidence, the existence of subject matter jurisdiction." Id. (first citing Demetres v. E. W. Const., Inc., 776 F.3d 271, 272 (4th Cir. 2015); and then citing Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999)).

Defendants challenging a complaint under Rule 12(b)(1) may advance a "facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" Hasley v. Ward Mfg., LLC, No. RDB-13-1607, 2014 WL 3368050, at *1 (D.Md. July 8, 2014) (alteration in original) (quoting Kerns v. United

---

[17] "When a motion under Fed.R.Civ.P. 12 is 'based on more than one ground, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.'" Jeffrey Banks, Ltd. v. Jos. A. Bank Clothiers, Inc., 619 F.Supp. 998, 1001 (D.Md. 1985) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1350, at 548 (1969) (footnote omitted)).

States, 585 F.3d 187, 192 (4th Cir. 2009)); see also Wikimedia Found. v. NSA, 857 F.3d 193, 208 (4th Cir. 2017) (quoting Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017)).

When, as here, the defendants raise a largely facial challenge,[18] the Court affords the plaintiffs "the same procedural protection" they would receive on a Rule 12(b)(6) motion to dismiss. Wikimedia Found., 857 F.3d at 208 (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). As such, the Court takes the facts alleged in the complaint as true and denies the motion if the complaint alleges sufficient facts to invoke subject matter jurisdiction. See id.

With a factual challenge, which Defendants also raise, the plaintiffs bear the burden of proving the facts supporting subject matter jurisdiction by a preponderance of the evidence. U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009). In determining whether the plaintiffs have met this burden, the Court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)

_____

[18] Initially Defendants challenged Wood's and Branco's standing through sealed declarations, and attacked other Plaintiffs' standing based only on the allegations in the Second Amended Complaint. In their Reply, Defendants admit that their declaration regarding Wood contained a "typographical error" that, once corrected, no longer supports a factual challenge to Wood's standing. (Defs.' Reply Mem. Supp. Mot. Dismiss Pls.' 2d Am. Compl. at 17, ECF No. 176). As to Branco, Defendants submitted a May 11, 2018 declaration from Sergeant First Class Donald D. Osburn, II ("Sergeant Osburn"), which states that Branco has not yet submitted the paperwork necessary to enlist. (Osburn Decl. ¶ 3, ECF No. 160 (under seal)). On May 17, 2018, however, Sergeant Osburn informed Branco that he had submitted all the necessary paperwork, (Branco Supp. Decl. ¶¶ 4–6, ECF No. 163-14), and Defendants do not challenge this assertion. Thus, only Defendants' facial challenges to Branco's and Wood's standing remain.

17

(citing <u>Adams</u>, 697 F.2d at 1219). Nevertheless, the Court applies "the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." <u>Id.</u> (citing <u>Trentacosta v. Frontier Pac. Aircraft Indus., Inc.</u>, 813 F.2d 1553, 1559 (9th Cir. 1987)). The movants "should prevail only if the material jurisdictional facts are not in dispute and the [movants are] entitled to prevail as a matter of law." <u>Id.</u> (citing <u>Trentacosta</u>, 813 F.2d at 1558). Unlike under the summary judgment standard, however, the Court is permitted to decide disputed issues of fact, <u>Kerns</u>, 585 F.3d at 192, and weigh the evidence, <u>Adams</u>, 697 F.2d at 1219.

### b. Analysis

Article III of the Constitution limits the judicial authority of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; <u>Spokeo, Inc. v. Robins</u>, 136 S.Ct. 1540, 1547, <u>as revised</u>, (May 24, 2016). Thus, the threshold question in every federal case is whether the court has authority under Article III to entertain the suit. <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975). Both mootness and standing go to whether an Article III case or controversy exists in a given case. <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180 (2000).

### i. Mootness

At bottom, the Court concludes that Plaintiffs' challenge to the August 2017 Memorandum is moot. The Court will, therefore, dismiss Plaintiffs' claims to the extent they allege that the August 2017 Memorandum violated their constitutional rights.

"[T]he doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction," which extends only to actual cases or controversies. Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017) (alteration in original) (first quoting Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 763 (4th Cir. 2011); and then citing U.S. Const. art. III, § 2). In other words, "[w]hen a case or controversy ceases to exist—either due to a change in the facts or the law—'the litigation is moot, and the court's subject matter jurisdiction ceases to exist also.'" Id. (quoting S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs, 789 F.3d 475, 482 (4th Cir. 2015)). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Deal v. Mercer Cty. Bd. of Educ., 911 F.3d 183, 191 (4th Cir. 2018) (quoting Simmons, 634 F.3d at 763), reh'g denied, (Jan. 28, 2019). "Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)).

Defendants maintain that because President Trump revoked the August 2017 Memorandum, Plaintiffs' challenge to it is moot. Plaintiffs counter that because the Implementation Plan is "sufficiently similar" to the August 2017 Memorandum and "the challenged conduct continues," their claims are not moot. (Pls.' Opp'n & Cross-Mot. at 19). The Court does not find Plaintiffs' argument persuasive for at least two reasons.

First, as discussed above, the Implementation Plan permits at least some transgender individuals to serve in the military, unlike the August 2017 Memorandum, which set forth

19

an outright ban on transgender military service. For example, the Implementation Plan allows transgender individuals who do not have a "history or diagnosis of gender dysphoria" and "who are otherwise qualified for service" to serve "in their biological sex." (2d Am. Compl. ¶ 177; Mattis Mem. at 2; DoD Report at 4). Transgender individuals who require transition may serve in the military "if they have been stable for [thirty-six] months in their biological sex prior to accession." (2d Am. Compl. ¶¶ 11, 176–78; Mattis Mem. at 2; DoD Report at 42). Further, service members who were diagnosed with gender dysphoria between the effective date of the Open Service Directive and the effective date of the Implementation Plan may "continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria" under the Grandfather Provision. (2d Am. Compl. ¶¶ 11, 176–78; Mattis Mem. at 2). Again, this is not to say that the Implementation Plan does not bar a significant number of transgender individuals from serving in the military. This is to acknowledge that the August 2017 Memorandum—which banned all transgender military service—and the Implementation Plan are not one and the same.

Second, the March 2018 Memorandum "revoke[s]" the August 2017 Memorandum. (2d Am. Compl. ¶ 180 (alteration in original); Mar. 2018 Mem. at 1). It also "acknowledged receipt" of the Implementation Plan and authorized the Secretary of Defense and the Secretary of Homeland Security "to proceed with plans for implementation." (2d Am. Compl. ¶ 179; Mar. 2018 Mem. at 1). And, on April 12, 2019, the Implementation Plan went into effect. (See Mar. 8, 2019 Notice). Thus, Defendants' challenged conduct—at least with regard to the August 2017 Memorandum—does not continue.

Nevertheless, Plaintiffs contend that Defendants' "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (Pls.' Opp'n & Cross-Mot. at 20) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)). Under the voluntary cessation exception to the mootness doctrine, Plaintiffs maintain, Defendants bear the burden of establishing with an absolute certainty that the challenged conduct cannot be expected to recur, and that Defendants fail to meet this standard with regard to the Accession, Retention, and Sex-Reassignment Surgery Directives.

The voluntary cessation exception to the mootness doctrine prevents a defendant from "engag[ing] in unlawful conduct, stop[ping] when sued to have the case declared moot, then pick[ing] up where he left off." Deal, 911 F.3d at 192 (alterations in original) (quoting Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013)); see also Porter, 852 F.3d at 364 (explaining that the voluntary cessation exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after" (quoting ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 54–55 (1st Cir. 2013)). As a result, defendants asserting that their voluntary compliance moots a case bear the "formidable burden" of demonstrating that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Porter, 852 F.3d at 364 (quoting Laidlaw, 528 U.S. at 190); see also Deal, 911 F.3d at 191 ("[A] party asserting mootness bears a 'heavy burden of persuading' the court that 'subsequent events [make] it absolutely clear that the allegedly

wrongful behavior could not reasonably be expected to recur.'" (quoting Laidlaw, 528 U.S. at 189)).

The United States Court of Appeals for the Fourth Circuit has held that "a governmental entity's change of policy renders a challenge moot when the governmental entity 'has not asserted its right to enforce [the challenged policy] at any future time.'" Porter, 852 F.3d at 364 (quoting Telco Commc'ns, Inc. v. Carbaugh, 885 F.2d 1225, 1231 (4th Cir. 1989)). The Fourth Circuit has also held that "statutory changes that discontinue a challenged practice are 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.'" Valero Terrestrial Corp. v. Paige, 211 F.3d 112, 116 (4th Cir. 2000) (quoting Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994)). If, however, the defendants "openly announce[ ] [their] intention to reenact precisely the same provision after a lawsuit is dismissed, a court may still have jurisdiction despite statutory changes discontinuing the challenged conduct." Franco v. City of Seat Pleasant, No. GJH-18-2027, 2019 WL 1317340, at *4 (D.Md. Mar. 21, 2019) (internal quotation marks omitted) (quoting Valero, 211 F.3d at 116).

In this case, Defendants have met their burden. President Trump revoked the August 2017 Memorandum in his March 2018 Memorandum. The March 2018 Memorandum also authorized the military to proceed with the Implementation Plan, which does not contain any of the directives from the August 2017 Memorandum, and the Implementation Plan went into effect in April 2019. See Int'l Refugee Assistance Project v. Trump, 857 F.3d 554, 640 (4th Cir.), as amended, (May 31, 2017), as amended, (June 15, 2017) (concluding

22

that President Trump's new order restricting entry into the United States of individuals from certain countries "revoked the earlier order and rendered moot the challenge to the earlier order"), vacated and remanded sub nom. Trump v. Int'l Refugee Assistance, 138 S.Ct. 353 (2017).[19]

To support their argument that Defendants have failed to meet their burden, Plaintiffs point to the Grandfather Provision, which is severable "should [the DoD's] decision to exempt these [s]ervice members be used by a court as a basis for invalidating the entire policy." (DoD Report at 43). Plaintiffs' argument misses the mark. Plaintiffs narrowly focus on the Grandfather Provision instead of on the change in policy as a whole. Further, the fact that the Grandfather Provision is severable from the rest of the Implementation Plan demonstrates Defendants' intent to keep the other parts of the Implementation Plan, even if they cannot retain that provision.

Plaintiffs also contend that Defendants have failed to carry their burden because they have not made it "absolutely clear" that President Trump will not reissue the Ban. While President Trump retains the power to reinstitute the Ban, he has not "openly announce[d]" his intention to do so. See Franco, 2019 WL 1317340, at *4 (quoting Valero, 211 F.3d at 116) (concluding that the plaintiff's challenge to a special tax seeking declaratory and injunctive relief was moot because, "[a]lthough Defendants may have 'the

---

[19] The Supreme Court vacated and remanded International Refugee Assistance Project v. Trump because the order at issue "'expired on its own terms' on September 24, 2017," and therefore the case was rendered moot. Trump v. Int'l Refugee Assistance, 138 S.Ct. 353 (2017) (quoting Protecting the Nation From Foreign Terrorist Entry Into the United States, Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017)).

power to reenact' the special tax 'after the lawsuit is dismissed,' they have not announced any intention to do so").

In sum, the Court concludes that Plaintiffs' claims challenging the constitutionality of the August 2017 Memorandum are moot. Accordingly, the Court will grant Defendants' Motion to the extent it seeks to dismiss those claims.

### ii. Standing

In brief, the Court concludes that, except for George, Current Service Members lack standing to challenge the Implementation Plan, and will therefore dismiss their claims without prejudice. All Prospective Service Members, on the other hand, have standing to challenge the Implementation Plan, and the Court will not dismiss their claims on this basis.

Standing's "irreducible constitutional minimum" comprises three prongs. Spokeo, 136 S.Ct. at 1547 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. The party invoking federal jurisdiction bears the burden of establishing standing. Id. (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)). At the pleading stage, plausible factual allegations, which the Court accepts as true, may suffice to establish each element of standing. Id.; Beck, 848 F.3d at 270 (quoting Lujan, 504 U.S. at 561).

Although plaintiffs must establish standing for each claim and for each form of relief sought, Bostic v. Schaefer, 760 F.3d 352, 370 (4th Cir. 2014) (citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) ("The standing requirement applies to each claim

that a plaintiff seeks to press."), "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," id. (quoting Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006)).

Defendants primarily contend that Individual Plaintiffs fail to establish a concrete injury. To satisfy the injury-in-fact prong, a plaintiff must establish that he or she "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S.Ct. at 1548 (quoting Lujan, 504 U.S. at 560). To be particularized, an injury "must affect the plaintiff in a personal and individual way." Curtis v. Propel Prop. Tax Funding, LLC, 915 F.3d 234, 240 (4th Cir. 2019) (quoting Spokeo, 136 S.Ct. at 1548). To be concrete, an injury "must actually exist" and be "real, and not abstract." Dreher v. Experian Info. Sols., Inc., 856 F.3d 337, 344 (4th Cir. 2017) (quoting Spokeo, 136 S.Ct. at 1548). That is, an alleged injury cannot be "too speculative for Article III purposes." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Lujan, 504 U.S. at 564). Though a threatened injury is sufficient to confer standing, the injury must be "certainly impending," or there must be a "'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quoting Clapper, 568 U.S. at 409 n.5).

### aa. Current Service Members

Defendants maintain that because Current Service Members may continue to serve in the military and receive medically necessary treatment under the Implementation Plan, they have not suffered an actual injury. Plaintiffs counter that this Court already concluded that Current Service Members have standing to challenge the Ban in its Memorandum and

Order granting the Preliminary Injunction, and the Implementation Plan is merely a continuation of the Ban. As a result, Plaintiffs argue, the Court's inquiry should instead focus on whether Current Service Members' claims are moot. Plaintiffs' argument rests on the false premise that the Ban and the Implementation Plan are one and the same, and as the Court discussed above, they are not. This is not the end of the Court's standing inquiry, however.

Current Service Members amended their pleading to challenge the Implementation Plan. (See 2d Am. Compl. ¶¶ 176–86, 194, 199, 208–09, 214–16, 220, 224–25, 236). Generally, standing is determined "as of the time the action is brought.'" Aid for Women v. Foulston, 441 F.3d 1101, 1109 (10th Cir. 2006). However, when plaintiffs file a complaint in federal court and then, as here, voluntarily amend the complaint, "courts look to the amended complaint to determine jurisdiction." Daniels v. Arcade, L.P., 477 F.App'x 125, 130–31 (4th Cir. 2012) (quoting Rockwell Int'l Corp. v. United States, 549 U.S. 457, 473–74 (2007); see also Saleh v. Fed. Bureau of Prisons, No. CIV.A05CV02467PABKLM, 2009 WL 3158120, at *5 (D.Colo. Sept. 29, 2009) (noting that "standing is determined at the time the relevant claim is raised or party is joined" (discussing Riverside v. McLaughlin, 500 U.S. 44 (1991)). Accordingly, the Court will assess whether Current Service Members have standing to challenge the Implementation Plan via the allegations in the Second Amended Complaint. The Court addresses the types of injury Current Service Members allege in turn.

### 1.      Severability Clause

Plaintiffs first maintain that, based on the severability clause in the Grandfather Provision, Defendants can end the protections of the Grandfather Provision at any moment. Defendants counter that the future harm of Defendants possibly rescinding the Grandfather Provision is too speculative. The Court agrees with Defendants.

Here, to trigger the severability clause, the Grandfather Provision must "be used by a court as a basis for invalidating the entire policy." (DoD Report at 43). Thus, before the Grandfather Provision could be severed from the rest of the Implementation Plan, a court would have to: (1) declare that provision unlawful; and (2) conclude that the rest of the Implementation Plan would be lawful but for the Grandfather Provision. Plaintiffs do not allege that it is likely that a court would find the Grandfather Provision unlawful and the rest of the Implementation Plan lawful. Nor do they plead any facts that would permit the Court to infer that this situation is likely to occur. Instead, in their Opposition, they again argue that the burden is on Defendants under the mootness doctrine to establish that the Grandfather Provision will not be rescinded. But, as the Court addressed above, the Ban and the Implementation Plan are not one and the same, and Plaintiffs' challenge to the Ban is moot. Thus, the burden is on Plaintiffs to establish standing to challenge the Implementation Plan. Without plausible factual allegations that would permit the Court to infer that the severability provision is likely to be triggered, the Court concludes that Current Service Members fail to establish standing based on this purported injury.

## 2.    Medical Care

Plaintiffs plead that certain Current Service Members may be denied medically necessary treatment under the Implementation Plan. Defendants contend that Current Service Members' claims of standing related to the uncertain provision of medically necessary treatment are speculative. Plaintiffs assert that due to the severability clause and the possibility that President Trump could re-impose the transition-related-care ban, Current Service Members may not receive medically necessary care.[20] Plaintiffs also argue that because Defendants have not defined "medically necessary care" as used in the Grandfather Provision, Current Service Members could be denied such care based on the Implementation Report's speculation about the efficacy of surgical care to treat gender dysphoria. The Court disagrees with Plaintiffs.

Here, Current Service Members allege that they "may be denied medically necessary treatment" and that it is "unclear what care will still be provided." (2d Am. Compl. ¶¶ 193–94). The factual basis for this allegation is that the Implementation Plan "provides no details as to what will be considered 'medically necessary' or the process that will govern requests for such care" and "distort[s] . . . medical literature" about the medical treatment of gender dysphoria. (Id. ¶ 194). Plaintiffs do not, however, allege that Current Service Members have been denied medically necessary treatment or provide any factual

---

[20] Plaintiffs also assert that Defendants bear the burden of establishing that Current Service Members' challenge to the Sex-Reassignment Surgery Directive is moot. Like Current Service Members' other alleged injuries, because the Court concluded that their challenge to the Ban is moot, Current Service Members must demonstrate standing to challenge the Implementation Plan.

allegations that would permit the Court to infer that this is likely to occur. Nor do they plausibly plead that the Grandfather Provision is likely to be rescinded or that President Trump will likely re-impose the ban on surgical care for transgender service members. Left only with Plaintiffs' allegations that speculate about whether Current Service Members will receive medically necessary treatment under the Implementation Plan, which expressly states that they will receive such treatment, the Court concludes that Current Service Members fail to establish an injury in fact related to the denial of medically necessary treatment.

### 3.     Inability to Reenlist

Plaintiffs also contend that Defendants fail to address their allegations that the Grandfather Provision "may not protect their right to reenlist after their current terms of service are over." (Pls.' Opp'n & Cross-Mot. at 22) (citing 2d Am. Compl. ¶¶ 178, 186, 199, 215–16). To support their allegations, Plaintiffs point to an internal Army slideshow presentation "generated shortly after the President's Twitter announcement" which "reveals that the Army specifically examined how long it would take to 'eliminate[ ]' all its transgender service members through attrition or involuntary discharge."[21] (Id.) (citing Pls.' Mem. Opp'n Defs.' Mot. Dissolve Prelim. Inj. Ex. 3 at 12–13, ECF No. 139-4). Defendants counter with a Declaration from Stephanie A. Barna, Acting Assistant

---

[21] The Court notes that Plaintiffs cherry-pick the term "eliminat[e]" from a single slide and fail to provide the full context. The slide includes the word "elimination" in a list of ways transgender officers may leave the Army: "no clear end dates; separations occur due to promotion non-selection, attrition, elimination, and retirement." (Pls.' Mem. Opp'n Defs.' Mot. Dissolve Prelim. Inj. Ex. 3 at 12–13, ECF No. 139-4). In this context, the Court interprets the term to mean termination from employment with the military.

Secretary of Defense (Manpower and Reserve Affairs), who is responsible for "drafting and implementation" of the Implementation Plan. (Barna Decl. ¶¶ 1–2, ECF No. 176-1). Barna avers that "no exempted transgender [s]ervice member will be denied reenlistment if otherwise qualified." (Id. ¶ 6). Defendants also explain that the Army slideshow Plaintiffs cite, pre-dates the Implementation Plan, and therefore it is not a reflection of current military policy.

Here, Barna's Declaration specifically addresses how the Grandfather Provision in the Implementation Plan will be applied, removing the uncertainty surrounding whether Current Service Members will be allowed to reenlist. Plaintiffs do not produce any evidence to rebut Barna's statements, such as declarations from transgender service members who have been told that they may not reenlist. In addition, the Army slideshow, dated August 23, 2017, was created before the Implementation Plan. Plaintiffs assert that there "may well be other similar documents [like the slideshow] in Defendants' files." (Pls.' Opp'n & Cross-Mot. at 22). But they do not give the Court any reason to believe that this is the case. Even if this statement were true, the slideshow does not address whether transgender service members in the Army will be allowed to reenlist. (See Pls.' Mem. Opp'n Defs.' Mot. Dissolve Prelim. Inj. Ex. 3 at 12). It merely examines the personnel consequences of not permitting transgender service members to reenlist.

Plaintiffs also plead "[o]n information and belief" that "some service members who are transgender are already being told that they may not reenlist." (2d Am. Compl. ¶ 178). But because a complaint must plausibly state a claim, using "upon information and belief" as a pleading device survives a motion to dismiss only where "the facts are peculiarly

within the possession of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." <u>Malibu Media, LLC v. Doe</u>, No. PWG-13-365, 2014 WL 7188822, at *4 (D.Md. Dec. 16, 2014) (quoting <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010)). If transgender service members are being told that they may not be able to reenlist, such information is not exclusively within the possession of Defendants, and presumably those service members could share this information with Plaintiffs. Plaintiffs also do not plead factual information that would make it plausible for the Court to infer that transgender service members are being told that they may not be able to reenlist. In any event, as a factual challenge, Plaintiffs may not rely on the allegations contained in their pleadings alone to establish material jurisdictional facts. <u>Richmond, Fredericksburg & Potomac R.R. Co.</u>, 945 F.2d at 768 (citing <u>Trentacosta</u>, 813 F.2d at 1559).

Thus, the Court concludes that Current Service Members have not established an injury based on their inability to reenlist. Certain alleged injuries related to the inability to commission, however, dictate a different conclusion.

### 4. Inability to Commission

Both George and Gilbert allege that they intend to pursue a commission in the military and that they would be prohibited from commissioning under the Implementation Plan. (2d Am. Compl. ¶¶ 48, 55, 190, 219–20). Defendants contend that George's and Gilbert's assertions are too speculative to confer standing because neither has applied for a commission, and they have only provided a "vague description of future intent." (Defs.' Mot. Dismiss Summ. J. at 14, ECF No. 158). Relying again on Barna's Declaration,

Defendants contend that because DoD has not developed its policy related to commissioning under the Implementation Plan, any assertion that George or other service members would be barred from commissioning is too speculative. The Court disagrees with Defendants with regard to George.

Here, this Court previously concluded that George "is subject to a substantial risk that his attempt to accede into the military as a commissioned officer will be prohibited solely on the basis on his transgender status." (Mem. & Order at 33, ECF No. 85). Based on the allegations and evidence before the Court, this remains true. George alleges that he has undergone transition-related surgery and that he is "currently eligible for a commission under the Open Service Directive." (2d Am. Compl. ¶¶ 46, 48). George further alleges that he plans to apply for a commission in the U.S. Army Nurse Corps in May 2018. (Id. ¶¶ 47–48). George avers that "[b]ecause I have a prior Bachelor's degree in a different field [than nursing], I am eligible to commission immediately, even before completing my second Bachelor's in Nursing." (George Decl. ¶ 5, ECF No. 139-37). The Second Amended Complaint states that "DoD treats commissioning as an officer as a new accession," and therefore, transgender individuals who "would otherwise be eligible for commissions, would not be eligible as a result of President Trump's indefinite ban on new accessions" under the Implementation Plan. (2d Am. Compl. ¶ 219). These statements establish that George has a concrete plan to commission in the Army Nurse Corps and that under the Implementation Plan's ban on accessions of transgender individuals who have transitioned to their preferred gender, George faces a substantial risk that he will not be able to commission. Barna's statement that DoD "has not yet specifically resolved the issue" of

in-service commissioning, (Barna Decl. ¶ 7)[22]—what George seeks to do—does not rebut George's assertions. In the absence of a defined policy, the Court is left with the plain language of the Implementation Plan, which bans transgender individuals that have surgically transitioned to their preferred gender from serving, and Plaintiffs' allegations that such individuals would not be allowed to commission under the Implementation Plan.

Thus, the Court concludes that George establishes an injury in fact sufficient to give him standing to challenge the Implementation Plan. George's injury is also fairly traceable to the Implementation Plan because, by its plain language, George is barred from commissioning and, as a result, an order enjoining the Implementation Plan would redress his injury.

Gilbert's allegations and Declaration, by contrast, are too speculative to establish an injury in fact for at least two reasons. First, Gilbert has not undergone sex-reassignment surgery. Although Gilbert alleges that she "plans to seek approval for medically indicated surgical treatment in the future," she does not plead when she plans to do so. (2d Am. Compl. ¶ 54). Having neither undergone sex-reassignment surgery nor having a concrete plan to do so, Gilbert would not be categorically barred from service under the Implementation Plan. Second, Gilbert pleads that she "has approximately one year of course work left in her undergraduate degree at Arizona State University, after which she intends to apply to commission as an officer." (Id. ¶ 55). In her Declaration, she avers that

---

[22] Barna states that "exempted transgender cadets and midshipmen enrolled in the Service Academies will be able to commission" under the Grandfather Provision. (Barna Decl. ¶ 7). Because George is not enrolled in a service academy, this policy does not apply to him.

she "recently signed a re-enlistment contract, and at the end of that contract I will have served [eighteen] years, leaving me two years short of significant retirement benefits. If I were not able to sign an additional contract to serve out those two additional years, it would be at tremendous loss, both personally and financially." (Gilbert Decl. ¶ 6, ECF No. 139-38). Gilbert's Declaration, therefore, contemplates that she will not commission and will continue to serve as an enlisted service member. Given the contradictions in Gilbert's allegations and the statements in her Declaration, it is unclear whether Gilbert even intends to commission or, if she does, when she plans to do so. Thus, the Court concludes that Gilbert's alleged injury is too speculative to give her standing to challenge the Implementation Plan.

### 5.    Deployability Requirement

The Implementation Plan states that transgender service members "may not be deemed to be non-deployable for more than [twelve] months or for a period of time in excess of that established by Service policy (which may be less than [twelve] months)." (2d Am. Compl. ¶ 186) (quoting DoD Report at 43). As a result, Plaintiffs plead, "without providing any detail as to how such policies will be interpreted and applied," transgender service members "may face removal from the military." (Id.). Defendants contend that these allegations fail to satisfy all three prongs of the standing analysis. Defendants assert that the future harm of discharge is too speculative and that because these standards are based on the military's worldwide deployability requirement (the "Deployability Requirement"), not the Implementation Plan, any injury Current Service Members may suffer is not fairly traceable to the Implementation Plan. Therefore, Defendants argue, an

order enjoining the Implementation Plan would not redress their injury. Plaintiffs attempt to reframe their challenge, asserting that "Plaintiffs are not challenging the Deployability Requirement's requirement that service members may not be classified as non-deployable for over a year," but rather that "Plaintiffs' injuries plainly arise under the Implementation Plan and the DoD Report, which characterize hormone therapy as inconsistent with deployment, which is contrary to the facts." (Pls.' Opp'n & Cross-Mot. at 23 n.8). As a result, Plaintiffs maintain, "[i]t appears likely that Plaintiffs will be improperly designated as nondeployable based on the Implementation Plan's unsupported conclusions regarding hormone maintenance." (Id. at 23). The Court does not find Plaintiffs' argument persuasive.

The portions of the DoD Report Plaintiffs cite do not establish that transgender service members' discharge is "certainly impending" or that there is "substantial risk" that they will be discharged. Driehaus, 573 U.S. at 158 (quoting Clapper, 568 U.S. at n.5). The DoD Report states that "[t]ransition-related treatment that involves cross-sex hormone therapy or sex-reassignment surgery could render [s]ervice members with gender dysphoria non-deployable for a significant period of time—perhaps even a year—if the theater of operations cannot support the treatment." (DoD Report at 33) (emphasis added). The DoD Report goes on to state that, if the theater of operations does not allow a transgender service member to have access to a lab to test hormone levels, "then the [s]ervice member must be prepared to forego treatment, monitoring, or the deployment," (id.); it does not contemplate that a transgender service member would necessarily be discharged under these circumstances. In addition, the DoD Report concedes that the data

on how transition-related therapy may impact deployability is "limited" and "the periods of transition-related non-availability and the risks of deploying untreated [s]ervice members with gender dysphoria are uncertain." (Id. at 33–34). So, while these assertions may be contrary to the facts about hormone treatment for transgender individuals, as Plaintiffs contend, they do not establish that transgender service members will necessarily be deemed nondeployable and, as a result, discharged from the military. Moreover, Plaintiffs' own language—"may face removal from the military" and "it appears likely that" Plaintiffs will be deemed nondeployable based upon the DoD Report's statements— reveals the speculative nature of their injuries. Thus, the Court concludes that Current Service Members fail to establish an injury in fact related to the DoD Report's statements regarding deployability of transgender service members.

Further, Defendants correctly note that the Deployability Requirement applies to all service members. (Admin. Record Pt. 1 at 32, ECF No. 133-3). Thus, an order enjoining the Implementation Plan would not remove this deployability requirement or prevent the discharge of a service member due to a failure to meet this requirement. While the DoD Report's characterization of hormone therapy as "inconsistent with deployment" may be "contrary to the facts," the risk of discharge Current Service Members face is a result of the Deployability Requirement, not the Implementation Plan. The Court, therefore, concludes that Current Service Members' alleged injury—the threat of discharge due to non-deployability—is not fairly traceable to the Implementation Plan. Nor would an order enjoining the Implementation Plan redress Current Service Members' alleged injury.

Accordingly, the Court concludes that Current Service Members fail to establish standing related to the DoD Report's statements about transgender service members' deployability.

### 6.    Stigmatic Injury

Plaintiffs allege that they have suffered and continue to suffer stigmatic injury. Defendants contend that Current Service Members fail to establish standing based on stigmatic injury because they must have personally been denied equal treatment. Although the Court disagrees with Defendants' characterization of what is sufficient to establish stigmatic injury, it nevertheless concludes that Current Service Members fail to establish standing based on stigmatic injury.

Defendants rely on Allen v. Wright, 468 U.S. 737 (1984), for the proposition that Current Service Members must personally be denied equal treatment to demonstrate standing based on stigmatic injury. In Allen, parents of African-American schoolchildren sued to force the Internal Revenue Service to deny tax-exempt status to schools that discriminated on the basis of race. 468 U.S. 737, 739–40, 755 (1984), abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). The parents alleged that their children suffered "stigmatic injury, or denigration" due to the government's support of racially discriminatory institutions. Id. at 754. The U.S. Supreme Court held that the parents did not have standing. Id. It explained that a "stigmatizing injury often caused by racial discrimination" is the type of noneconomic injury that "is sufficient in some circumstances to support standing." Id. at 755. However, "such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by

the challenged discriminatory conduct. Id. (quoting Heckler v. Mathews, 465 U.S. 728, 740 (1984)).

As the United States District Court for the District of Columbia observed in Doe 2 v. Trump, the Supreme Court concluded that "such stigmatic injury did not support standing for the particular plaintiffs in Allen because their children had never applied to any of the private schools at issue, and therefore they had not been 'personally denied equal treatment.' Instead, they had merely alleged an 'abstract stigmatic injury' that would be equally applicable to 'all members' of an entire racial group, nationwide." 315 F.Supp.3d 474, 487 (D.D.C. 2018) (quoting Allen, 468 U.S. at 756), rev'd sub nom. Doe 2 v. Shanahan, 755 F.App'x 19 (D.C. Cir. 2019). Applying Allen to the Doe 2 plaintiffs, who are current service members that fall under the Grandfather Provision, the court concluded that they had standing to challenge the Implementation Plan because their stigmatic injury arose out of their unequal treatment under the Grandfather Provision. Id. The Doe 2 court explained, "These Plaintiffs are denied equal treatment because they will be the only service members who are allowed to serve only based on a technicality; as an exception to a policy that generally paints them as unfit." Id.

Here, Current Service Members could have pled that they have suffered and will suffer stigmatic injury because they are allowed to serve simply because they were in the military when the Open Service Directive was implemented and would not otherwise be permitted to serve under the Implementation Plan. Plaintiffs do not, however, make such allegations. Instead, Plaintiffs' stigmatic-injury allegations are either conclusory or relate to the Ban and DoD Report, not the Grandfather Provision. (See 2d Am. Compl. ¶¶ 199–

200, 214, 216). For example, Plaintiffs plead that they "face extraordinary stress, uncertainty, and stigma from the ban on transgender individuals from open service and the singling out their medical care for a ban on coverage" and that "[t]he stigma that the Serving Plaintiffs face has been increased by the [DoD] Report's use of stereotypes and conjecture to allege that persons with gender dysphoria, even after successful treatment, have higher rates of psychiatric needs, including the Implementation Report's treatment of gender dysphoria as a 'psychiatric disorder' or 'mental health condition.'" (Id. ¶¶ 199–200).

Moreover, Plaintiffs allege that "the inclusion of the [Grandfather Provision] does not address the injury from stigma," which contemplates that their stigma does not arise from the Grandfather Provision, as the Doe 2 plaintiffs asserted, but rather stems from President Trump's statements and statements in the DoD Report. Put simply, Current Service Members do not allege that they are permitted to serve based on a technicality due to the Grandfather Provision, and therefore, their service is on objectively unequal terms. Thus, the Court concludes, based on the allegations in the Second Amended Complaint, Current Service Members do not sufficiently plead a stigmatic injury. Because Current Service Members may be able to adequately allege stigmatic injury, however, the Court will dismiss their claims, except for George's, without prejudice.

In sum, George has demonstrated an injury in fact sufficient to confer standing to challenge the Implementation Plan based on the substantial risk that he will not be permitted to commission. All other Current Service Members have not established standing to challenge the Implementation Plan. Accordingly, the Court will grant in part

39

Defendants' Motion on this basis and dismiss Current Service Members' claims, with the exception of George's, without prejudice.

Because Stone, the only member of the ACLU identified in the Second Amended Complaint, does not have standing, the ACLU does not have associational standing. Moss v. Spartanburg Cty. Sch. Dist. Seven, 683 F.3d 599, 606 (4th Cir. 2012) ("For an organization to have standing, it must establish that at 'least one identified member had suffered or would suffer harm' from the defendant's conduct." (quoting Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009))). The Court will, therefore, grant Defendants' Motion as to the ACLU's lack of standing and dismiss the ACLU's claims without prejudice.

### bb.    Prospective Service Members

In brief, the Court concludes that all Prospective Service Members have standing to challenge the Implementation Plan.

### 1.    Branco and Wood

Defendants contend that because Branco and Wood would not meet the Open Service Directive's accession standards, any alleged injury they would suffer by not being able to join the military under the Implementation Plan would not be redressed by an order enjoining the Plan.[23] The Court disagrees.

---

[23] Defendants also argue that if Branco and Wood enlist while the Preliminary Injunction is still in place and the Implementation Plan has not gone into effect, they would be permitted to serve under the Grandfather Provision once the Implementation Plan takes effect. In essence, Defendants argue that if Branco and Wood do not enlist while they can, any injury they suffer would be self-inflicted, and self-inflicted harm is insufficient to establish standing. This argument is meritless. The only reason Branco and Wood had the

Here, Branco and Wood allege that they underwent transition-related surgery more than eighteen months ago, require no additional surgeries, and seek to join the military—Branco, the Army, and Wood, the Marine Corps. (2d Am. Compl. ¶¶ 71, 73, 77, 82). They also allege that they satisfy the enlistment requirements under the Open Service Directive. (Id. ¶¶ 74, 80, 203). Branco and Wood are "actively engaged [in] discussions with recruiters." (Id. ¶ 203). Wood began the enlistment process in January 2018, "immediately after" the military lifted the ban on accessions of transgender individuals as part of the Open Service Directive. (Id. ¶ 71). "Since then, [Wood] has been actively working with his recruiter and medical professionals to provide all of the necessary documentation to be medically cleared for service." (Id.). Similarly, Branco has "been actively working with a recruiter" since the military lifted the accessions ban "at the beginning of 2018." (Id. ¶ 77). "He recently resubmitted his medical paperwork in order to pursue enlistment and is awaiting a final date for undergoing a physical examination and signing an enlistment contract." (Id.). Yet, because Branco and Wood have transitioned to their preferred gender, they are barred from serving in the military under the Implementation Plan. This injury in fact is sufficient to give Branco and Wood standing to challenge the Implementation Plan because they face the substantial and very real, certainly impending risk that they will not be allowed to accede into the military. Driehaus, 573 U.S. at 158 (quoting Clapper, 568

_____

opportunity to enlist and avail themselves of the Grandfather Provision is because this Court and other federal district courts enjoined the August 2017 Memorandum and the Implementation Plan. Defendants aggressively fought to have those injunctions lifted so that the Implementation Plan could go into effect. Indeed, when courts either dissolved or stayed the preliminary injunctions, Defendants immediately notified the Court of their intention to proceed with the Implementation Plan and, in fact, did so.

U.S. at 409 n.5); (see Nov. 21, 2017 Mem. & Order at 33) (concluding that George had standing to challenge the Accession Directive because he "is subject to a substantial risk that his attempt to accede into the military as a commissioned officer will be prohibited solely on the basis of his transgender status").

Defendants also argue that because Branco and Wood can seek a "waiver or exception" to the Implementation Plan, they must first seek waivers—and have their waiver applications denied—to have standing. (DoD Report at 5).[24] Defendants are mistaken. Branco and Wood are barred from military service under the Implementation Plan, unless they obtain waivers. No other class of individuals is categorically barred from military service or is required to seek waivers to serve. Thus, even if Branco and Wood are not ultimately barred from military service, they will have to confront a barrier to entry purely based on their status as transgender individuals, which Plaintiffs contend violates the Equal Protection component of the Fifth Amendment's Due Process Clause. This is sufficient to establish an injury in fact for the purposes of standing at this stage in the litigation. See Bostic v. Schaefer, 760 F.3d 352, 372 (4th Cir. 2014) (noting that "in equal protection cases . . . '[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, . . . [t]he "injury in fact" . . . is the denial of equal treatment resulting from the imposition of the barrier'"

---

[24] Under the Implementation Plan, "each accession standard may be waived in the discretion of the accessing Service based on that Service's policies and practices, which are driven by the unique requirements of different Service missions, different Service occupations, different Service cultures, and at times, different Service recruiting missions." (DoD Report at 10).

(alterations in original) (quoting <u>Ne. Fla. Chapter of Associated Gen. Contractors of America v. City of Jacksonville</u>, 508 U.S. 656, 666 (1993))).

As for the other standing prongs, these injuries are fairly traceable to the Implementation Plan because it sets forth the provisions that bar Branco and Wood from serving in the military and an order enjoining the Implementation Plan would redress their injuries of not being permitted to join the military or having to seek a waiver to do so.

Thus, the Court concludes that Branco and Wood have standing to challenge the Implementation Plan.

### 2. Doe 2, D'Atri, and Roe 1

Similarly, Defendants contend that because Doe 2, D'Atri, and Roe 1 would not meet the Open Service Directive's accession standards, any alleged injury they would suffer by not being able to join the military would not be redressed by an order enjoining the Implementation Plan. Again, the Court disagrees.

Here, Doe 2, D'Atri, and Roe 1 allege that they will be injured by the Implementation Plan because, under its terms, they would not be permitted to join the military. Doe 2 underwent transition-related surgery approximately one year after Plaintiffs filed the Second Amended Complaint. (2d Am. Compl. ¶ 87). Roe 1 was scheduled to undergo a second transition-related surgery in June or July 2018, and D'Atri was scheduled to undergo transition-related surgery in August 2018. (<u>Id.</u> ¶¶ 66, 95). Doe 2 plans to enlist in the Air Force, and has been working with a recruiter since January 2018. (<u>Id.</u> ¶ 85). D'Atri is "seeking to enlist in the Air Force" and "has been actively working with a recruiter since July 2017." (<u>Id.</u> ¶ 64). Roe 1 "intends to enlist in the Air Force, and has been

43

seeking to enlist since January 2018." (Id. ¶ 93). She temporarily halted her efforts because she is undergoing transition-related surgeries. (Id. ¶¶ 94–95). She plans to resume her efforts to enlist after her second surgery in June or July 2018. (Id. ¶¶ 95–96). All three planned to seek a waiver to reduce or eliminate the eighteen-month pre-enlistment stability period under the Open Service Directive. (Id. ¶¶ 68, 88, 96). D'Atri's recruiter even advised him that he is eligible for the waiver. (Id. ¶ 68).

Because Doe 2 underwent transition-related surgery and D'Atri and Roe 1 were scheduled to undergo transition-related surgery (and indeed have done so if the surgeries went according to plan), all three of them would be banned from military service under the Implementation Plan. Under the Open Service Directive, however, they would be eligible to serve if they waited eighteen months, or sooner if they obtained a waiver. Thus, their injury of not being permitted to join the military is fairly traceable to the Implementation Plan and an order enjoining the policy would redress their injury. The Court, therefore, concludes that Doe 2, D'Atri, and Roe 1 have standing to challenge the Implementation Plan.

### 3.  Doe 3

Defendants assert that Doe 3's alleged injury—not being allowed to join the Coast Guard—is too speculative to confer standing because he is not eligible to enlist in the Coast Guard for another two to three years. Plaintiffs counter that the Implementation Plan "will plainly prevent" Doe 3 from enlisting, which affords him standing to challenge the policy. (Pls.' Reply Mem. Supp. Cross-Mot. Summ. J. at 5, ECF No. 190). The Court finds Defendants' argument unconvincing.

44

Defendants rely on McConnell v. FEC, 540 U.S. 93 (2003), for the proposition that Doe 3's injury is "too remote temporally to satisfy Article III." Id. at 226. As the United States Court of Appeals for the Sixth Circuit has explained, however, the Supreme Court's conclusion in McConnell did not rest on temporality. Thomas More Law Ctr. v. Obama, 651 F.3d 529, 538 (6th Cir. 2011) (citing McConnell, 540 U.S. at 226), abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519 (2012). Rather, the Supreme Court concluded that the plaintiffs did not have standing because it "could not know whether the McConnell plaintiffs would even suffer an injury six years later." Id. (citing McConnell, 540 U.S. at 226). The Sixth Circuit observed that "[t]he challenged provision would affect the McConnell plaintiffs only if the following things happened in an election six years later: (1) a challenger ran in the primary or election; (2) the plaintiff created an advertisement mentioning the challenger; (3) the advertisement did not identify the plaintiff by name; and (4) the broadcasters attempted to charge McConnell more than their lowest unit rate for his ads." Id. (citing McConnell, 540 U.S. at 224–25). Put simply, "[s]tanding depends on the probability of harm, not its temporal proximity." Orangeburg, S.C. v. FERC, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (alteration in original) (quoting 520 Michigan Ave. Assocs., Ltd. v. Devine, 433 F.3d 961, 962 (7th Cir. 2006)); see also Pub. Citizen, Inc. v. Trump, 361 F.Supp.3d 60, 82 (D.D.C. 2019) (concluding that the plaintiffs' statements that they "plan to purchase new vehicles in the next five to seven years" and that they specifically wanted to purchase vehicle-to-vehicle-communications-equipped vehicles were sufficient to establish standing to challenge Executive Orders and agency

guidance that delayed implementation of a proposed rule on vehicle-to-vehicle communications).

Here, Doe 3 is a fifteen-year-old who revealed to his family that he is transgender in January 2018 and "has been undergoing therapy and is in the process of initiating the use of hormone blockers as a medically necessary part of his gender transition." (2d Am. Compl. ¶¶ 97, 99). Doe 3 alleges that he has "a concrete plan to enlist in the military" and that he intends to join the U.S. Coast Guard once he is of age. (Id. ¶¶ 100, 204). As Defendants correctly note, individuals cannot join the Coast Guard until they are eighteen years old, or seventeen years old with parental consent, see 10 U.S.C. § 505(a). As a result, Defendants maintain, this two-to-three-year timeline renders Doe 3's injury too remote in time to be certainly impending. But, as discussed above, temporality is not the focus of the Court's analysis. Doe 3 alleges that he intends to join the Coast Guard when he reaches enlistment age, and, at this stage in the litigation, the Court must accept Doe 3's allegations as true. See Wikimedia Found., 857 F.3d at 208. In addition, Doe 3's injury is not contingent on a chain of future possible events; it relies on a single future event—the inevitable denial of his application to enlist in the Coast Guard because of his transgender status. While Doe 3's injury will occur two to three years in the future, it is not "too speculative" to confer standing to challenge the Implementation Plan. See Pub. Citizen, 361 F.Supp.3d at 82. To be sure, Doe 3 could serve in his biological sex under the Implementation Plan. He has, however, already begun transition-related medical treatment. Thus, the Court can plausibly infer that Doe 3 requires gender transition, that he is transitioning to his preferred gender, and that he will not be stable for thirty-six months in

46

his biological sex before applying to enlist in the Coast Guard. As a result, under the Implementation Plan, Doe 3 would be barred from enlisting in the Coast Guard when attempts to do so. Doe 3, therefore, sufficiently alleges an injury in fact. Further, an order enjoining the Implementation Plan would redress his injury of not being permitted to join the Coast Guard, and his injury is fairly traceable to the Implementation Plan. Thus, Doe 3 has standing to challenge the Implementation Plan.

In sum, the Court concludes that all Prospective Service Members have standing to challenge the Implementation Plan. Accordingly, the Court will deny Defendants' Motion to the extent it seeks to dismiss their claims for lack of standing.

### 2. 12(b)(6) Motion to Dismiss or, in the Alternative, for Summary Judgment

#### a. Conversion of Defendants' Motion

Defendants style their Motion as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-

2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of

discovery." Hamilton v. Mayor of Baltimore, 807 F.Supp.2d 331, 342 (D.Md. 2011) (quoting Young v. UPS, No. DKC-08-2586, 2011 WL 665321, at *20 (D.Md. Feb. 14, 2011)). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

Here, Plaintiffs oppose conversion of Defendants' Motion into one for summary judgment because the parties have not completed discovery. To support their position, Plaintiffs submitted a Rule 56(d) affidavit from Attorney Marianne F. Kies (the "Kies Declaration"). (Kies Decl., ECF No. 163-16). Defendants argue that Plaintiffs have not satisfied Rule 56(d)'s requirement of establishing that they "cannot present facts essential to justify [their] opposition."[25] (Defs.' Reply & Opp'n Pls.' Cross-Mot. at 48, ECF No. 176). Defendants then challenge the substance of Plaintiffs' requests for additional discovery, arguing that much of the information Plaintiffs seek is "immaterial or unavailable on the basis of privilege" and that, because deference to military decisions is

---

[25] Defendants also assert that Plaintiffs' request for additional discovery is "inconsistent" with their Cross-Motion for Summary Judgment. The Court disagrees. Plaintiffs' Cross-Motion for Summary Judgment is based on the premise that the Ban and Implementation Plan are not entitled to any deference, and therefore, fail to pass muster under heightened scrutiny. As a result, Plaintiffs contend, they do not need additional discovery to establish that the Ban and Implementation Plan violate the Fifth Amendment's Equal Protection component. Alternatively, Plaintiffs maintain that they need additional discovery to establish how much deference the Court should afford the Implementation Plan. Thus, Plaintiffs argue in the alternative, which they are permitted to do.

"constitutionally-mandated," any discovery requests related to whether the Implementation Plan is the product of independent military judgment are not sufficient to create a genuine dispute of material fact. (Id. 48–49).[26] Defendants' arguments are flawed in at least three respects.

First, as discussed below, the level of deference, if any, to which Defendants' decisions related to the Implementation Plan are entitled turns on whether and to what extent the record supports Secretary Mattis's recommendations to President Trump. Second, as Plaintiffs note, discovery in this case is ongoing and there are unresolved disputes pertaining to several of Defendants' assertions of presidential communications privilege and deliberative process privilege. Third, Kies details, with sufficient specificity, information Plaintiffs would seek in discovery that could create genuine disputes of material fact. This information includes: "all documents and communications" the Panel received; "the identity of all persons" involved in developing the Implementation Plan; "all documents and communications within Defendants' possession that were received from outside parties opposed to military service by transgender individuals"; "all documents and communications" related to the functioning of the Panel, including but not limited to, research, analysis, and recommendations underlying the Implementation Plan; "directives underlying the Implementation Plan"; and "potential alternatives" to the Implementation

_____

[26] Defendants also argue that Plaintiffs are not entitled to additional discovery because this case should be reviewed on the administrative record. But the case Defendants cite for this proposition, Camp v. Pitts, 411 U.S. 138 (1973) (per curiam), involved judicial review of an agency action under the Administrative Procedure Act. Id. at 140. Plaintiffs, by contrast, bring a facial constitutional challenge to the Implementation Plan. Camp, therefore, is inapposite.

Plan the Panel considered and "dissenting opinions voiced within" the Panel. (Kies Decl. ¶¶ 41, 43, 46, 48, 50, 51, 55). Kies avers that this information could counter Defendants' assertions that, as a product of independent military judgment, the Implementation Plan is entitled to deference. (Id. ¶¶ 42, 44, 47, 50, 53, 57). To be sure, some of the items listed in the Kies Declaration may not be material to Plaintiffs' claims, but Plaintiffs are entitled to any discovery relevant to their claims. See Adams Hous., LLC v. City of Salisbury, 672 F.App'x 220, 223 (4th Cir. 2016) (explaining that a plaintiff must have an "adequate opportunity . . . to present its case" before the court can grant summary judgment).

Thus, the Court concludes that Plaintiffs' Rule 56(d) affidavit sufficiently establishes that additional discovery is necessary. Accordingly, the Court will construe Defendants' Motion as a motion to dismiss.

### b. Rule 12(b)(6) Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom. Goss v. Bank of America, NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### c. Analysis

#### i. Fifth Amendment Equal Protection Claim

The Fifth Amendment's Due Process Clause contains an equal protection component that prohibits denying to any person the equal protection of the laws. United States v. Windsor, 570 U.S. 744, 774 (2013). This constitutional protection applies to those who serve in the United States military. See Frontiero v. Richardson, 411 U.S. 677, 690–91 (1973). To state an equal protection claim, the plaintiffs must allege: (1) that they have

been "treated differently from others with whom [they are] similarly situated"; and (2) that "the unequal treatment was the result of intentional or purposeful discrimination." Martin v. Duffy, 858 F.3d 239, 252 (4th Cir. 2017) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)), cert. denied, 138 S.Ct. 738 (2018). Plaintiffs must plead "sufficient facts to satisfy each of these requirements in order to state a cognizable equal protection claim." Id. (citing Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)). If the plaintiffs make this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. (quoting Morrison, 239 F.3d at 654).

### aa.    Prima Facie Equal Protection Claim

With regard to the first prong—different treatment—Plaintiffs allege that the Implementation Plan subjects transgender service members "to a set of standards different from those governing other service members." (2d Am. Compl. ¶ 216). Specifically, it "categorically bans '[t]ransgender persons who require or have undergone gender transition,' and disqualifies all '[t]ransgender persons with a history or diagnosis of gender dysphoria from military service.'" (Id. ¶ 220). Plaintiffs further allege that under the Implementation Plan "transgender service members will be held to different standards to receive medically necessary care than all other members of the U.S. military, even where a transgender service member seeks the very same or substantially equivalent medical procedures." (Id. ¶ 225).

As to the second prong, Plaintiffs plead that the Implementation Plan discriminates against them and other transgender individuals "on the basis of invidious stereotypes, irrational fears, and moral disapproval." (Id. ¶ 228). Plaintiffs' factual allegations support

this statement. For example, Plaintiffs allege that the American Psychological Association (the "APA"), the American Medical Association, and the Palm Center[27] all "quickly condemned" the Implementation Plan as inconsistent with the medical and psychological research on transgender individuals. (Id. ¶¶ 181–83). For example, the APA stated: "No scientific evidence has shown that allowing transgender people to serve in the armed forces has an adverse impact on readiness or unit cohesion." (Id. ¶ 181) (quoting Arthur C. Evans Jr., APA Statement Regarding Transgender Individuals Serving in Military, Am. Psychological Ass'n (Mar. 26, 2018), https://www.apa.org/news/press/releases/2018/03/transgender-military.

Thus, the Court concludes that Plaintiffs plausibly allege that the Implementation Plan violates Equal Protection component of the Fifth Amendment's Due Process Clause.

### bb. Level of Scrutiny

Unsurprisingly, the parties dispute the applicable level of scrutiny. Defendants maintain that a highly deferential form of rational basis review applies. Plaintiffs counter that heightened scrutiny applies and that deference to military decision-making is only one factor to consider in the analysis. The Court agrees with Plaintiffs.

Defendants principally rely on Rostker v. Goldberg, 453 U.S. 57 (1981), for the proposition that they are entitled to deferential rational basis review. Defendants misread Rostker. Rostker involved an equal protection challenge to the Military Selective Service

---

[27] The Palm Center is an independent, non-profit research institute that conducts research on "sexual minorities in the military." About, Palm Center, https://www.palmcenter.org/about/ (last visited Aug. 19, 2019).

Act's (the "MSSA") male-only draft registration requirement. Id. at 63. In Rostker, the Supreme Court expressly rejected the government's argument that rational basis review should apply in the area of military affairs and national security. Id. at 68–70. Instead, as Plaintiffs correctly note, the Rostker Court applied heightened scrutiny. Id. at 87 ("By now it should be clear that statutes like the MSSA, which discriminate on the basis of gender, must be examined under the 'heightened' scrutiny.'"). Citing Schlesinger v. Ballard, 419 U.S. 498 (1975), a case that upheld naval regulations creating different promotion requirements for female officers, the Rostker Court explained that Schlesinger "did not purport to apply a different equal protection test because of the military context, but did stress the deference due congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance." Id. at 71. In simpler terms, "Congress is [not] free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause." Id. at 67. After detailing the legislative history of Congress's decision not to require women to register for the draft, which included both houses of Congress "adduc[ing] extensive testimony and evidence concerning the issue," through hearings that "built on other hearings held the previous year addressed to the same question," the Supreme Court concluded that Congress's decision to exempt women from the draft was not the "accidental by-product of a traditional way of thinking about females" and was therefore constitutional. Id. at 72, 74 (internal quotation marks omitted) (quoting Califano v. Webster, 430 U.S. 313, 320 (1977)). Thus, Rostker does not dictate rational

basis review in this case, nor does it require that the Court blindly defer to military decisions. Instead, the Court's review of military policy,

> involves the careful assessment of a number of factors, including whether the policy is facially neutral, whether it targets a suspect class, whether the class is similarly situated to others affected, whether the policy was motivated by animus, whether it infringes upon a fundamental right (and, if so, how), what military purposes are furthered by the policy, whether those purposes are legitimate, and whether Congress or the Executive used considered professional judgment and accommodated the servicemembers' rights in a reasonable and evenhanded manner, given the rights at issue.

Doe 2 v. Shanahan, 917 F.3d 694, 704 (D.C. Cir. 2019) (Wilkins, J., concurring).

Trump v. Hawaii, 138 S.Ct. 2392 (2018), another case on which Defendants rely, does not alter this conclusion. Though Defendants cherry-pick several quotes from the opinion to support their argument for applying a highly deferential standard of review, the fact remains that Trump v. Hawaii involved judicial review of the President's power over immigration. 138 S.Ct. at 2420. To be sure, the Supreme Court noted that a deferential standard of review applies "across different contexts and constitutional claims," but all the cases it discussed involved immigration law. See id. at 2419. Further, the policy at issue in Trump v. Hawaii was facially neutral and, as a result, the Court applied rational basis review. Id. at 2420. As the Court will explain below, that is not the case here.

The Court next rejects Defendants' argument that rational basis review applies because the Implementation Plan is based on a medical diagnosis—gender dysphoria—and not transgender status. As the Ninth Circuit observed, the Implementation Plan itself states: "Transgender persons with a history or diagnosis of gender dysphoria are disqualified from

military service, except under [certain] limited circumstances"; that "Transgender persons who require or have undergone gender transition are disqualified from military service"; and that "Transgender persons without a history or diagnosis of gender dysphoria . . . may serve . . . in their biological sex." Karnoski v. Trump, 926 F.3d 1180, 1201 (9th Cir. 2019) (per curiam); (see also Mattis Mem. at 2–3). By its plain language, then, the Implementation Plan discriminates on the basis of transgender status. In addition, the Implementation Plan categorically bars transgender individuals who have transitioned to their preferred gender—a recommended treatment to alleviate the distress gender dysphoria causes. (See 2d Am. Compl. ¶ 125). Thus, contrary to Defendants' assertions that the Implementation Plan discriminates on the basis of gender dysphoria, it bars transgender individuals who presumably no longer suffer from the symptoms of this medical condition because they have received treatment to alleviate it. The Court, therefore, concludes that the Implementation Plan discriminates on the basis of transgender status, not a medical condition.

Finally, the Court must determine the applicable level of scrutiny. In M.A.B. v. Bd. of Educ. of Talbot Cty., 286 F.Supp.3d 704 (D.Md. 2018), a case involving, in part, an equal protection challenge to a school district's policy barring a transgender student from using locker rooms that aligned with his gender identity, the Court held that transgender discrimination is sex-based discrimination and that transgender status is "at least a quasi-suspect classification." Id. at 718–22. As a result, the Court applied heightened scrutiny to the policy. Id. at 722. Although M.A.B. was not in the military context, as addressed above, the Court does not apply a different equal protection test to military policy. Rostker, 453

U.S. at 72. Additionally, this Court previously determined that heightened scrutiny applied to the Ban, (Nov. 21, 2017 Mem. & Order at 43–44), and the Court sees no reason to depart from that determination in assessing the Implementation Plan. The Court, therefore, concludes that heightened scrutiny applies to the Implementation Plan, with the appropriate level of deference to the military's evaluation of the evidence underlying the Implementation Plan. See Rostker, 453 U.S. at 83.

But, the level of deference to which Defendants are entitled in this case remains to be seen. To determine how much deference, if any, the Court should afford the Implementation Plan, the Court must be able to assess the evidence the Panel gathered and the military's evaluation of that evidence. Plaintiffs are, therefore, entitled to discovery on this issue. Because it is unclear what level of deference the Court should apply to the Implementation Plan, the Court declines to consider whether the Implementation Plan passes muster under heightened scrutiny at this time.

Accordingly, the Court will deny Defendants' Motion as to Plaintiffs' equal protection claim. The Court will also deny without prejudice Plaintiffs' Cross-Motion for Summary Judgment on their equal protection claim.

### ii. Fifth Amendment Substantive Due Process Claim

Defendants attack the substance of Plaintiffs' due process allegations, arguing that they fail to allege a cognizable liberty or property interest, and even if they did, Plaintiffs fail to allege "how Defendants have intruded upon such interest."[28] (Defs.' Mot. Dismiss

---

[28] Defendants assert two additional arguments. First, Defendants contend that Plaintiffs' substantive due process claims fail for the same reasons as their equal protection

Summ. J. at 43). Plaintiffs, for their part, rely on this Court's previous rejection of Defendants' attempt to dismiss their substantive due process claims. Because, Plaintiffs assert, they plausibly allege that the Implementation Plan suffers from the same constitutional defects as the Ban, the Court should deny Defendants' Motion as to their substantive due process claim. The Court's earlier conclusion that the Ban and the Implementation Plan are not one and the same forecloses this argument. The Court agrees with Defendants that Plaintiffs fail to adequately allege a substantive due process claim.

Where, as here, the alleged conduct involves executive action, the Court addresses the arbitrariness of the challenged actions as a "threshold question." Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). First, the Court must examine "whether the challenged conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Id. (quoting Lewis, 523 U.S. at 847 n.8). If the alleged conduct does not satisfy this test, the Court need not consider the nature of the asserted liberty or property interest. Id. If it does, the Court turns to the nature of the interest asserted and its appropriate level of protection. Id.

---

claims, namely, that the Implementation Plan is subject to a highly deferential form of review. The Court rejects this argument for the same reasons it did as to Plaintiffs' equal protection claim. Second, Defendants assert that to the extent Plaintiffs allege that reliance on the Open Service Directive created a protected interest in opportunities and benefits, this claim fails. Because the Court concludes that Plaintiffs fail to adequately allege a substantive due process claim, the Court declines to address this argument.

### aa. Arbitrariness of the Action

Executive conduct that "shock[s] the conscience" is "fatally arbitrary in the constitutional sense." Id. at 742. Conduct that meets this standard involves "abusing [executive] power, or employing it as an instrument of oppression." Id. (alteration in original) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992)). Although intentional conduct "most likely" satisfies this standard, such conduct alone is not enough. Id. (quoting Lewis, 523 U.S. at 849). The conduct must also be "intended to injure in some way unjustifiable by any government interest." Id. (quoting Lewis, 523 U.S. at 849). Additionally, "because specific conduct that in one context would meet the test might not in another, application of this standard 'demands an exact analysis of circumstances.'" Id. (quoting Lewis, 523 U.S. at 850). In conducting its analysis, the Court must exercise "self-restraint" and "utmost care," carefully scrutinizing the circumstances "before any abuse of power is condemned as conscience shocking." Waybright v. Frederick Cty., 528 F.3d 199, 205 (4th Cir. 2008) (first quoting Collins, 503 U.S. at 125; and then quoting Lewis, 523 U.S. at 850).

Here, Plaintiffs merely allege that the Ban and the Implementation Plan are "arbitrary and inconsistent with available data" and "serve[ ] no legitimate government interest." (2d Am. Compl. ¶ 237). To be sure, the alleged conduct Plaintiffs initially challenged—President Trump's Tweets announcing the Ban and August 2017 Memorandum formalizing it—was, as this Court concluded, sufficient to satisfy the "shocks the conscience" standard. (Nov. 21, 2017 Mem. & Order at 49–50). Because Plaintiffs' challenge to the Ban is moot, however, the Court focuses its analysis on the

allegations surrounding the Implementation Plan. The Second Amended Complaint lacks any allegations surrounding the Implementation Plan that would permit the Court to plausibly infer conscience-shocking, or even intentional, conduct on the part of Defendants in the recommendation and adoption of the Implementation Plan. As a result, Plaintiffs' substantive due process claim fails the threshold inquiry.

### bb.    Protected Liberty or Property Interest

Even assuming that Plaintiffs adequately alleged conscience-shocking conduct, however, they fail to plead a cognizable liberty or property interest.

Several courts have addressed whether service members or prospective service members have a property interest in their employment with the military. Whether an individual has a property interest in employment with the military depends on the individual's status. For example, "courts have universally held that reservists do not have property interests in their continued employment." Perez v. United States, 850 F.Supp. 1354, 1362 (N.D.Ill. 1994); see, e.g., Sims v. Fox, 505 F.2d 857, 861 (5th Cir. 1974); May v. Gray, 708 F.Supp. 716, 720 (E.D.N.C. 1988) (citing Sims, 505 F.2d at 861); Pauls v. Sec'y of the Air Force, 457 F.2d 294, 295 (1st Cir. 1972); Coppedge v. Marsh, 532 F.Supp. 423, 429 (D.Kan. 1982); Woodward v. Moore, 451 F.Supp. 346, 347 (D.D.C. 1978). Relying on 10 U.S.C. § 681(a),[29] these courts have concluded that reservists serve at the

---

[29] 10 U.S.C. § 681(a) states that: "Except as otherwise provided in this title, the Secretary concerned may at any time release a Reserve under his jurisdiction from active duty."

pleasure of the Secretary of the branch of the military involved, and, therefore, they "can have no legitimate expectation of continued employment." <u>Perez</u>, 850 F.Supp. at 1362.

Courts have reached similar conclusions in cases involving military officers who asserted property interests in their employment with the military. <u>Id.</u> "It is well-established law that military officers serve at the pleasure of the President and have no constitutional right to be promoted or retained in service and that the services of an officer may be terminated with or without reason." <u>Id.</u> (quoting <u>Pauls</u>, 457 F.2d at 297).

Likewise, courts have also concluded that "there is no constitutional right to enlist or re-enlist in the armed forces." <u>Id.</u>; <u>see</u> <u>Lindenau v. Alexander</u>, 663 F.2d 68, 72 (10th Cir. 1981) ("It is well established that there is no right to enlist in this country's armed services."); <u>see also</u> <u>Holdiness v. Stroud</u>, 808 F.2d 417, 424 (5th Cir. 1987) (noting that the plaintiff "did not have a property or liberty interest protected by the due process clause in continued military service in the National Guard, nor did he have a constitutionally protected right to re-enlist" (footnote omitted)); <u>Nieszner v. Mark</u>, 684 F.2d 562, 564 (8th Cir. 1982) ("[T]here is no constitutional right to be commissioned in the Air Force Reserve or to serve in the Armed Forces at all." (citations omitted)); <u>Mangino v. Dep't of Army</u>, 818 F.Supp. 1432, 1435 (D.Kan. 1993) ("Because it is clearly established law that there is no right to enlist or reenlist in the armed forces, plaintiff cannot state a claim based upon some property interest in being employed by the Army."), <u>aff'd</u>, 17 F.3d 1437 (10th Cir. 1994); <u>Gant v. Binder</u>, 596 F.Supp. 757, 767 (D.Neb. 1984) ("The fact that a soldier might be able to reenlist does not, by itself, create a protected expectation or entitlement."); <u>Shaw v. Gwatney</u>, 584 F.Supp. 1357 (E.D.Ark. 1984), <u>aff'd in part and vacated in part</u>, 795 F.2d

1351 (8th Cir. 1986). Nor is there a protected property interest in continued military service. Spadone v. McHugh, 842 F.Supp.2d 295, 304 (D.D.C. 2012) (quoting Wilhelm v. Caldera, 90 F.Supp.2d 3, 8 (D.D.C. 2000)).

The Fourth Circuit, relying on 10 U.S.C. § 1169,[30] has held that enlisted service members have no property interest in continued employment with the military. Guerra v. Scruggs, 942 F.2d 270, 278 (4th Cir. 1991); Tatum v. United States, No. RDB-06-2307, 2007 WL 2316275, at *5 (D.Md. Aug. 7, 2007), aff'd, 272 F.App'x 251 (4th Cir. 2008) ("The fact that the Secretary of the Navy retained the discretion to proscribe procedures for discharging [the plaintiff] vitiates any claim to a property right he had in his enlisted status and benefits."). But see Perez, 850 F.Supp. at 1362 (concluding that an enlisted service member had a "limited" property interest in his continued employment with the Navy); May, 708 F.Supp. at 721 (concluding that a former Army private had a "property interest in continued military employment").

Here, Plaintiffs plead that Defendants have denied them "an opportunity to demonstrate their continued fitness for duty" and "the ability to enlist in the U.S. Armed Forces despite being fit to serve." (2d Am. Compl. ¶ 234). Plaintiffs further allege that they have suffered "loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, disruption of their military service

---

[30] 10 U.S.C. § 1169 provides:
> No regular enlisted member of an armed force may be discharged before his term of service expires, except—
> (1) as prescribed by the Secretary concerned;
> (2) by sentence of a general or special court martial; or
> (3) as otherwise provided by law.

(including loss of promotion and other career opportunities), and violations of their constitutional right to substantive due process." (Id. ¶¶ 229, 239). Plaintiffs also plead that their retirement benefits or eligibility for retirement benefits could be impacted, and that the Implementation Plan strips them of "opportunities and benefits previously recognized by DoD's Open Service Directive." (Id. ¶ 234). Notably, Plaintiffs' claims regarding the loss of salary, benefits, medical care, and opportunities all stem from an alleged entitlement or constitutional right to military service, which the case law, discussed above, clearly states does not create a property interest. Plaintiffs' allegations of "loss of liberty" and "violations of their constitutional right to substantive due process" are conclusory. The Second Amended Complaint is devoid of any plausible factual allegations that would give rise to a protected liberty interest. Thus, Plaintiffs fail to adequately allege a legally cognizable liberty or property interest.

In sum, the Court concludes that Plaintiffs fail to sufficiently allege a substantive due process claim. The Court will, therefore, grant Defendants' Motion to the extent it seeks to dismiss this claim. The Court will, however, dismiss it without prejudice.

## C.     Motion for Judgment on the Pleadings

### 1.     Rule 12(c) Standard of Review

Defendants move under Rule 12(c) for judgment on the pleadings.[31] "Under Rule 12(c), a party may move for judgment on the pleadings any time after the pleadings are

_____

[31] On April 27, 2018, Plaintiffs filed a Second Amended Complaint. Typically, an amended complaint moots a pending motion for judgment on the pleadings because the amended pleading supersedes the original complaint. See Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 456 n.4 (2009) ("Normally, an amended complaint

closed, as long as it is early enough not to delay trial." <u>Prosperity Mortg. Co. v. Certain Underwriters at Lloyd's</u>, No. GLR-12-2004, 2013 WL 3713690, at *2 (D.Md. July 15, 2013). The pleadings are closed when the defendant files an answer. <u>See</u> <u>Burbach Broad. Co. of Del. v. Elkins Radio Corp.</u>, 278 F.3d 401, 405 (4th Cir. 2002). A Rule 12(c) motion is governed by the same standard as Rule 12(b)(6) motions to dismiss. <u>Id.</u> at 406.

**2.    Analysis**

Defendants move to dissolve the Preliminary Injunction as to President Trump and to dismiss him as a Defendant because the Court cannot issue declaratory or injunctive relief against him. Because the Court will dissolve the Preliminary Injunction, the Court will deny as moot Defendants' request to dissolve the Preliminary Injunction as to the President. Because Plaintiffs' arguments focus only on the propriety of declaratory relief against President Trump,[32] the Court's analysis will focus on whether the Court can issue a declaratory judgment against the President.

---

supersedes the original complaint."). In certain circumstances, however, "Defendants should not be required to file a new motion [for judgment on the pleadings] simply because an amended pleading was introduced while their motion was pending. <u>See</u> <u>Venable v. Pritzker</u>, No. GLR-13-1867, 2014 WL 2452705, at *5 (D.Md. May 30, 2014), <u>aff'd</u>, 610 F.App'x 341 (4th Cir. 2015) (quoting <u>Buechler v. Your Wine & Spirit Shoppe, Inc.</u>, 846 F.Supp.2d 406, 415 (D.Md. 2012)). If the issue the original motion addresses remains at issue in the new pleading, the court simply may consider the motion as being addressed to the amended pleading. <u>Id.</u> (quoting <u>Buechler</u>, 846 F.Supp.2d at 415). In this case, because President Trump is still a Defendant, and Plaintiffs still seek injunctive and declaratory relief against him, the Court will apply Defendants' Motion to the Second Amended Complaint.

[32] Plaintiffs state that they do not object to "modifying the preliminary injunction so that it does not run against the President, so long as President Trump's subordinates remain enjoined from implementing his unconstitutional directives." (Pls.' Opp'n Defs.' Partial Mot. J. Pleadings at 2, ECF No. 117).

Defendants contend that: (1) courts may not issue a declaratory judgment against the President in his official capacity and in the performance of discretionary actions where a declaratory judgment entered against subordinate Executive Branch officials would afford Plaintiffs complete relief; and (2) because a judgment against the other Defendants would give Plaintiffs the relief they seek, the Court should dismiss President Trump as a Defendant. Plaintiffs counter that Defendants conflate the appropriateness of declaratory versus injunctive relief and that only a declaratory judgment that President Trump violated Plaintiffs' constitutional rights would provide them full relief.

Defendants primarily rely on Justice Scalia's concurring opinion in <u>Franklin v. Massachusetts</u>, 505 U.S. 788 (1992) (plurality), for the proposition that courts cannot issue a declaratory judgment against the President. <u>Id.</u> at 827 (Scalia, J., concurring). There, Justice Scalia stated, "I think we cannot issue a declaratory judgment against the President. It is incompatible with his constitutional position that he be compelled personally to defend his executive actions before a court." <u>Id.</u> He opined that "[p]ermitting declaratory or injunctive relief against the President personally . . . would produce needless head-on confrontations between district judges and the Chief Executive." <u>Id.</u> at 828. But as this Court noted in <u>D.C. v. Trump</u>, "Six years after Justice Scalia's statement in <u>Franklin</u>, in <u>Clinton v. New York</u>, the Supreme Court expressly stated that a declaratory judgment against the President could redress the plaintiff's injuries." 291 F.Supp.3d 725, 751–52 (D.Md. 2018) (citing <u>Clinton v. New York</u>, 524 U.S. 417, 433 n.22 (1998) (noting that, having found an injury-in-fact, traceability and redressability were "easily satisfied" because "each injury is traceable to the President's cancellation of [certain act provisions],

and [it] would be redressed by a declaratory judgment that the cancellations are invalid"), rev'd and remanded on other grounds by In re Trump, 928 F.3d 360 (4th Cir. 2019). Thus, this Court concluded that ordering the plaintiffs' requested injunctive or declaratory relief would not violate the separation of powers doctrine. Id. at 751.

Similarly, the defendants in CASA de Maryland, Inc. v. Trump, 355 F.Supp.3d 307 (D.Md. 2018), sought to dismiss President Trump from that case "due to the separation of powers concerns that would arise from a court enjoining the President." Id. at 328. Acknowledging that, in general, courts do not have the power "to enjoin the President in the performance of his official duties," this Court declined to dismiss President Trump from the case because "none of the authority cited by Defendants requires that the President be dismissed at [the motion to dismiss] stage." Id. at 328–29 (quoting Franklin, 505 U.S. at 802–03).

The Court agrees with the sound reasoning of D.C. v. Trump and CASA de Maryland, Inc. v. Trump. Thus, at this juncture, the Court will deny without prejudice Defendants' Motion to the extent it seeks to dismiss President Trump from the case.

## III.    CONCLUSION

For the foregoing reasons, the Court will: deny without prejudice in part and deny as moot in part Defendants' Partial Motion for Judgment on the Pleadings and Motion to Partially Dissolve the Preliminary Injunction (ECF No. 115); grant Defendants' Motion to Dissolve the Preliminary Injunction (ECF No. 120); grant in part and deny in part Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, Defendants' Motion for Summary Judgment (ECF No. 158), construed as a

motion to dismiss; and deny without prejudice Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 163). A separate Order follows.

Entered this 20th day of August, 2019.

_____/s/_____
George L. Russell, III
United States District Judge
