No. 20-_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*In re* DONALD J. TRUMP, *et al.*,

*Petitioners.*

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES OF AMERICA; MARK T. ESPER, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF DEFENSE; U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security,

*Petitioners–Defendants*,

v.

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON,

*Respondent*,

RYAN KARNOSKI; CATHRINE SCHMID; D.L.; LAURA GARZA; HUMAN RIGHTS CAMPAIGN; GENDER JUSTICE LEAGUE; LINDSEY MULLER; TERECE LEWIS; PHILLIP STEPHENS; MEGAN WINTERS; JANE DOE; CONNER CALLAHAN; AMERICAN MILITARY PARTNER ASSOCIATION,

*Real-Parties-in-Interest–Plaintiffs*,

STATE OF WASHINGTON,

*Real-Party-in-Interest–Intervenor-Plaintiff.*

## PETITION FOR A WRIT OF MANDAMUS TO THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON AND MOTION FOR STAY PENDING THIS PETITION AND THE PETITION IN NO. 20-70365

SCOTT G. STEWART
*Deputy Assistant Attorney General*

MARK R. FREEMAN
MARK B. STERN
MARLEIGH D. DOVER
BRAD HINSHELWOOD
DENNIS FAN
ASHLEY A. CHEUNG
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-2494*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ............................................................................. 1

STATEMENT ................................................................................................................ 5

ARGUMENT ............................................................................................................... 13

I.   THIS COURT SHOULD EXERCISE ITS MANDAMUS AUTHORITY TO QUASH
     THE DEPOSITIONS OF CABINET SECRETARIES AND OTHER HIGH-
     RANKING MILITARY OFFICIALS .................................................................. 13

II.  THIS COURT SHOULD DIRECT THE DISTRICT COURT TO TERMINATE
     DISCOVERY AND PROCEED TO THE MERITS, AND, AT A MINIMUM, STAY
     ALL FURTHER DISCOVERY PENDING THIS COURT'S GUIDANCE ..................... 29

CONCLUSION ............................................................................................................ 35

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                       **Page(s)**

*Chappell v. Wallace,*
    462 U.S. 296 (1983) ........................................................................................................18

*In re Cheney,*
    544 F.3d 311 (D.C. Cir. 2008) ......................................................................................15

*Cheney v. U.S. Dist. Court for the Dist. of Columbia,*
    542 U.S. 367 (2004) ........................................................................................................13

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ........................................................................................................17

*In re Commodity Futures Trading Comm'n,*
    941 F.3d 869 (7th Cir. 2019) ........................................................................................15

*In re Department of Commerce,*
    139 S. Ct. 16 (2018) ........................................................................................................28

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ............................................................................................ 16, 21

*In re FDIC,*
    58 F.3d 1055 (5th Cir. 1995) ........................................................................................15

*Franklin Sav. Ass'n v. Ryan,*
    922 F.2d 209 (4th Cir. 1991) ........................................................................................15

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ............................................................................................................24

*Goldman v. Weinberger,*
    475 U.S. 503 (1986) ........................................................................................................18

*Hernandez v. Tanninen,*
    604 F.3d 1095 (9th Cir. 2010) ......................................................................................14

*Karnoski v. Trump*,
   926 F.3d 1180 (9th Cir. 2019) ................................2, 3, 6, 11, 13, 18, 19, 22, 29, 30, 33

*Kyle Eng'g Co. v. Kleppe*,
   600 F.2d 226 (9th Cir. 1979) ......................................................................... 1, 15

*Lederman v. N.Y.C. Dep't of Parks & Recreation*,
   731 F.3d 199 (2d Cir. 2013) ...............................................................16, 17, 25

*In re McCarthy*,
   636 F. App'x 142 (4th Cir. 2015) .................................................................15

*Munaf v. Geren*,
   553 U.S. 674 (2008) ......................................................................................18

*NEC Corp. v. United States*,
   151 F.3d 1361 (Fed. Cir. 1998) ...................................................................14

*Orloff v. Willoughby*,
   345 U.S. 83 (1953) ........................................................................................18

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ..........................................................................................3

*Simplex Time Recorder Co. v. Secretary of Labor*,
   766 F.2d 575 (D.C. Cir. 1985) .....................................................................15

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ............................................................................ 3, 29

*In re United States (Bernanke)*,
   542 F. App'x 944 (Fed. Cir. 2013) ......................................................... 15, 17

*In re United States (Holder)*,
   197 F.3d 310 (8th Cir. 1999) ........................................................................15

*In re United States (Jackson)*,
   624 F.3d 1368 (11th Cir. 2010) ................................................... 15, 16, 18, 25

*In re United States (Kessler)*,
   985 F.2d 510 (11th Cir. 1993) ..........................................................15, 16, 25

*United States v. Morgan*,
  313 U.S. 409 (1941) ................................................................................1, 11, 16, 17, 22

*United States v. U.S. Dist. Court for the N. Mariana Islands*,
  694 F.3d 1051(9th Cir. 2012) .................................................................... 16, 25

*U.S. Bd. of Parole v. Merhige*,
  487 F.2d 25 (4th Cir. 1973) ................................................................................15

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ..............................................................................................16

*William Jefferson & Co. v. Board of Assessment & Appeals No. 3 for Orange Cty.*,
  482 F. App'x 273 (9th Cir. 2012) ......................................................................16

**Statutes:**

All Writs Act,
  28 U.S.C. § 1651 .....................................................................................................1

10 U.S.C. § 154..................................................................................................... 7, 26

10 U.S.C. § 8035 ....................................................................................................6

**Rule:**

Fed. R. App. P. 21 ...................................................................................................1

**Other Authorities:**

Order, *In re Trump*,
  No. 20-70365 (9th Cir. Feb. 12, 2020) .............................................................4

Video of Oral Arg. 52:50-53:37, *In re Trump*,
  No. 18-72159 (9th Cir. Oct. 10, 2018), https://go.usa.gov/xGNeB.........................20

## INTRODUCTION AND SUMMARY

Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Federal Rule of Appellate Procedure 21, the federal government respectfully petitions this Court to issue a writ of mandamus directing the district court to reverse its orders of September 2 and 14, 2020, which require a sitting Cabinet Secretary, a former Cabinet Secretary, and two other former high-ranking military officials to sit for depositions. The individuals are: current Secretary of Veterans Affairs Robert Wilkie Jr.; former Secretary of Defense James Mattis; former Vice Chairman of the Joint Chiefs of Staff General Paul J. Selva; and former Vice Chief of Naval Operations Admiral William F. Moran. As this Court is aware from the pending mandamus petition in *In re Trump*, No. 20-70365 (9th Cir.), in which oral argument is scheduled for October 14, the most recent orders follow a chain of increasingly intrusive and erroneous discovery rulings.

The district court's September 2 and 14 orders warrant this Court's correction in their own right. The Supreme Court and courts of appeals have uniformly rejected depositions of high-ranking federal officials in civil cases, and have long held that such an official should not be "subjected to [an] examination" "regarding the process by which he reached the conclusions of his [decision], including the manner and extent of his study of the record and his consultation with subordinates." *United States v. Morgan*, 313 U.S. 409, 422 (1941); *see Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979) ("Heads of government agencies are not normally subject to deposition."). Plaintiffs have not demonstrated the extraordinary circumstances that are required

before they may depose two Cabinet Secretaries, among others, and the district court's orders authorizing those depositions are a marked departure from established precedent.

These deposition orders also underscore the continuing, basic errors of the district court in this action.  Plaintiffs challenge the military's policy concerning service by transgender individuals and individuals with gender dysphoria.  That Mattis policy and its rationales are set out in the Department of Defense's detailed 44-page Report submitted to the President by Secretary Mattis, who himself adopted in full the recommendations of a Panel of Experts charged with conducting "an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  Add. 242; *see* Add. 165-209 (Department of Defense's Report and Recommendations on Military Service by Transgender Persons).

The district court has issued an extraordinary series of discovery orders for the purpose of letting plaintiffs hunt for evidence of impermissible discriminatory intent in this military decisionmaking process.  In June 2019, this Court issued a writ of mandamus to vacate an order compelling disclosure of all documents subject to the deliberative process privilege and production of a document-by-document privilege log from the President.  *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (per curiam).  Subsequent to that decision, the government produced an unredacted Administrative Record supporting the rationales for the Mattis policy, plus every deliberative

2

document sent from, received by, generated by, presented to, or considered by the Panel that recommended the policy.

Without evaluating whether there is any need for additional discovery in light of those productions, the district court continued by issuing orders requiring disclosure of tens of thousands of deliberative documents, forcing the government in February 2020 to seek this Court's review once again. That mandamus petition is pending in No. 20-70365. The Court stayed those discovery orders on February 12, and has scheduled oral argument for October 14. As detailed in supplemental filings requested by the Court in those proceedings, the district court has in the meantime issued over a dozen more rulings authorizing intrusive discovery, and has indicated that it is reviewing documents subject to this Court's stay based on plaintiffs' request to have them disclosed prior to this Court's argument. *See* 20-70365 Gov't Suppl. Resp. 4-5. The district court has been straying far outside the bounds of any recognized conception of discovery in a challenge to a military policy, and its continuing actions threaten this Court's ability to grant meaningful relief.

The latest deposition orders thus epitomize the district court's continued refusal to heed this Court's instructions in its 2019 decision. This Court stressed that the Mattis policy "must be evaluated on the record supporting that decision and with the appropriate deference due to a proffered military decision." *Karnoski*, 926 F.3d at 1207. And if there were to be discovery, the Court emphasized that the district court needed to assess what "was sufficient to allow for judicial review." *Id.* at 1206 n.22

3

(citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2409 (2018)).  Insofar as plaintiffs sought to probe military decisionmaking, this Court further recognized that "the military's interest in full and frank communication about policymaking raises serious—although not insurmountable—national defense interests." *Id.* at 1206.  But even with that guidance along with numerous Supreme Court and circuit precedents rejecting depositions of high-ranking officials, the district court failed to identify a meaningful need for the extraordinary depositions here, let alone any aspect of plaintiffs' claims that requires further discovery to litigate.  And even though greater restraint was called for by this Court's direction that discovery "involving the most senior executive branch officials" in particular "may require greater deference," *id.*, the district court authorized plaintiffs to interrogate multiple senior officials about military decisionmaking.

We respectfully request that the Court grant two forms of mandamus relief. First and most immediately, we request that the Court direct the district court to reverse its September 2 and 14 orders and grant the government's motions to quash the depositions.  The Court also should stay the depositions pending its disposition of this petition and consider this petition together with the pending mandamus petition and supplemental filings in No. 20-70365.  Because plaintiffs have now informally indicated that they no longer plan to notice depositions immediately (despite having scheduled the depositions for May 2020 and litigated these issues to obtain judicial authorization), we do not request immediate emergency relief at this time.  But

because plaintiffs could at any time demand that the depositions proceed, including during the pendency of this Court's review, a stay is essential.

Second and more fundamentally, we respectfully urge that the Court instruct the district court to terminate discovery and proceed to the merits of this dispute, and that this Court, at a minimum, issue a stay of further discovery pending the October 14 argument and any forthcoming decision in these proceedings. Plaintiffs have presented increasingly speculative theories for discovery, and the district court has repeatedly accepted those theories in entering increasingly unusual and intrusive discovery orders. Plaintiffs have now made quite clear to this Court that they do not even know "how much, or which, evidence is 'needed to resolve this litigation.'" 20-70365 Pls.' Suppl. Resp. 3. Plaintiffs' hunt for discriminatory intent has turned into a fishing expedition, and it is necessary and appropriate for this Court to direct the district court to adjudicate the merits of the case. Particularly because argument is set for October 14, a stay of discovery pending this Court's disposition of the government's petitions will also result in no meaningful injury to plaintiffs and at least protect this Court's ability to issue meaningful relief.

## STATEMENT

**A.** The background of this litigation is set out in the mandamus petition already pending in this Court. *See* 20-70365 Pet. 6-18. The current depositions represent plaintiffs' latest search for purported evidence of impermissible discriminatory intent in the formulation of the Mattis policy. To assist the Court in assessing plaintiffs'

putative need for depositions of two Cabinet Secretaries and other high-ranking military officials, we recount the administrative process with particular attention to the roles of the four subpoenaed individuals in that process, much of which this Court detailed in its 2019 decision.  *See Karnoski v. Trump*, 926 F.3d 1180, 1188-92 (9th Cir. 2019) (per curiam).

As the Court is aware, following the President's announcements in July and August 2017, Secretary James Mattis established a Panel of Experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members."  Add. 242.  Secretary Mattis instructed that the "Panel and designated support personnel shall bring a comprehensive, holistic, and objective approach to study" that topic.  *Id.*

The Panel consisted of "senior uniformed and civilian Defense Department and U.S. Coast Guard leaders," Add. 210, who "met 13 times over a period of 90 days" between October 13, 2017 and January 11, 2018, *see Karnoski*, 926 F.3d at 1191. The Panel included several high-ranking military officials, including (as relevant here) former Vice Chief of Naval Operations Admiral William Moran, the second-highest uniformed officer in the Navy.  *See* 10 U.S.C. § 8035; Add. 119 (Moran Decl.).  "The Panel met with and received input from transgender Service members, commanders of transgender Service members, military medical professionals, and civilian medical professionals with experience in the care and treatment of individuals with gender

dysphoria," in addition to reviewing information on gender dysphoria and "military effectiveness, unit cohesion, and resources." Add. 210-11.

Former Deputy Assistant Secretary of Defense for Military Personnel Policy Anthony Kurta chaired and facilitated the first seven meetings (in his role as the Acting Under Secretary of Defense for Personnel and Readiness). *See* Add. 111-12 (Hebert Decl.). Relevant here, former Under Secretary of Defense for Personnel and Readiness Robert Wilkie chaired the remaining six meetings once the Senate confirmed him for that position. Add. 112. Because Under Secretary Wilkie had not attended the first seven meetings, he participated on the Panel as a non-voting member and permitted current Deputy Assistant Secretary of Defense for Military Personnel Policy Lernes Hebert to facilitate these remaining six meetings. *Id.* Under Secretary Wilkie is now the Secretary of Veterans Affairs—the head of the Department of Veterans Affairs. The Panel was to report to then-Deputy Secretary of Defense Patrick Shanahan and (as relevant here) General Paul Selva, then-Vice Chairman of the Joint Chiefs of Staff and the Nation's second-highest-ranking uniformed officer. Add. 241; *see* 10 U.S.C. § 154; Add. 115-16 (Selva Decl.).

During the Panel process, on December 15, 2017, Deputy Secretary Shanahan and General Selva were briefed on its progress, which is reflected in a draft "Final Report and Recommendations of the Transgender Panel." *See* Add. 216-39. According to one Panel member, they allegedly indicated that the Panel should reconvene for the purpose of collecting more data and adding clarity to its

recommendations.  20-70365 SA.395 (December 15, 2017 email from Panel member communicating General Selva's statements).  The Panel accordingly held four more meetings, and, at that point, the Panel issued the identical recommendations it had previously provided.  *See* Add. 4.  Under Secretary Wilkie then sent a memorandum—via Deputy Secretary Shanahan and General Selva—that informed Secretary Mattis of the Panel's recommendations on January 11, 2018.  Add. 214.

In provisionally accepting the Panel's recommendations, Secretary Mattis directed Under Secretary Wilkie, Kurta, and Hebert to coordinate the preparation of a formal report describing those recommendations and explaining the rationales for them in detail.  Add. 113.  The result was the Department's 44-page Report and Recommendations on Military Service by Transgender Persons.  *Id.*  That Report thus "contain[s] the same recommendations" that the Panel reached.  *Id.*; *see* Add. 183 (Department's Report "propos[ing] [a] policy consistent with [the Panel's] recommendations").

Secretary Mattis formally adopted the Panel's recommendations, approved the Report, and conveyed his proposed policy in a memorandum to the President on February 22, 2018.  Add. 210.  As Secretary Mattis explained, the policy was based on "the Panel's professional military judgment and [his] own professional judgment." Add. 212.  The President "revoke[d]" his prior directives and permitted the military to adopt the policy, which is the Mattis policy now in effect.  Add. 163.

**B.**  This Court is familiar with the discovery that has occurred since its 2019 decision, which is detailed in the government's filings in the pending mandamus proceedings.  *See* 20-70365 Pet. 6-18; 20-70365 Gov't Suppl. Br. 2-7; 20-70365 Gov't Suppl. Resp. 4-5.  The premise of the district court's ongoing proceedings has been that plaintiffs need still more information to litigate whether the Mattis policy was indeed "animated by independent military judgment" or was "instead the product of impermissible discriminatory intent."  Doc. 394, at 2 (Nov. 19, 2019).

Recently, plaintiffs served subpoenas on former Secretary Mattis, Secretary Wilkie, former General Selva, and former Admiral Moran, scheduling four depositions to occur between May 25 and 28, 2020.  *See* Add. 145 (Mattis subpoena); Add. 139 (Wilkie subpoena); Add. 151 (Selva subpoena); Add. 157 (Moran subpoena). In seeking the four depositions at issue here, plaintiffs hypothesized that General Selva might have "directed the Panel to attempt to support the President's [directives] rather than formulate an 'independent' policy on transgender service," No. 20-mc-15 (E.D. Va.), Doc. 18, at 23 (Plaintiffs' Opposition to Motion to Quash Selva Subpoena), notwithstanding Secretary Mattis's express instructions to "bring a comprehensive, holistic, and objective approach," Add. 242.  Plaintiffs have speculated that particular members of the Panel such as Under Secretary Wilkie— rather than the Panel itself—were "the driving force" behind its recommendations. Doc. 581, at 2 (Plaintiffs' Opposition to Motion to Quash Wilkie Subpoena).  And plaintiffs have postulated that it is "an alternative reality" that Secretary Mattis

adopted a policy based on the Panel's recommendations and as explained in the Department's Report, and that he must instead have personally injected undisclosed "after-the-fact" "animus and anti-transgender views." Doc. 586, at 19, 27 (Plaintiffs' Opposition to Motion to Quash Mattis Subpoena).

The government moved to quash the four subpoenas in their respective jurisdictions, though each of those district courts transferred its subpoena dispute to the district court in the underlying action. *See Karnoski v. Trump (Mattis)*, No. 20-mc-10 (E.D. Va. July 15, 2020) (Doc. 41), *transferred to* No. 20-mc-61 (W.D. Wash.); *Karnoski v. Trump (Wilkie)*, No. 20-mc-16 (E.D. Va. July 15, 2020) (Doc. 35), *transferred to* No. 20-mc-56 (W.D. Wash.); *Karnoski v. Trump (Selva)*, No. 20-mc-15 (E.D. Va. July 7, 2020) (Doc. 35), *transferred to* No. 20-mc-55 (W.D. Wash.); *Karnoski v. Trump (Moran)*, No. 20-mc-13 (M.D.N.C. Aug. 10, 2020) (Doc. 23), *transferred to* No. 20-mc-69 (W.D. Wash.). Those disputes have since been consolidated with the underlying action. *See* Docs. 555, 564.

On September 2, 2020, the district court issued an order denying the government's motions to quash and permitting the depositions, stating that the "very reason" for all the depositions was "to determine whether the policy has been decided by the appropriate military officials." Add. 22. The court believed such an inquiry was proper even though plaintiffs identified nothing in the Administrative Record, or any of the 60,000 documents already produced, suggesting that the Panel's recommendations were in effect a sham. The court asserted that the depositions were

10

needed because plaintiffs had "little insight" into the period from the Panel's initial recommendation briefing on December 15, 2017, to Secretary Mattis's memorandum to the President on February 22, 2018. Add. 19. The court failed to acknowledge that plaintiffs have already obtained around 14,000 documents from that period alone. Add. 93. Nor did the court explain what additional "insight" might be obtained from these depositions: there is no dispute that the Panel's final recommendations were "identical" to those found in its initial briefing, Add. 19, and that the Department's Report also expresses "the same recommendations" as the Panel, Add. 113.

The district court recognized that the Supreme Court and courts of appeals have uniformly rejected depositions of high-ranking government officials under *United States v. Morgan*, 313 U.S. 409 (1941). Add. 20-21. But the court announced that there were "extraordinary circumstances" for every one of the depositions here. Add. 23.

First, the district court declared that Secretary Mattis had proceeded in "bad faith." Add. 26. The court cited this Court's statement that the Mattis policy "discriminates on the basis of transgender status on its face." *Id.* (quoting *Karnoski*, 926 F.3d at 1201 n.18). Of course, even setting aside the government's disagreement with that characterization, this Court did not suggest that the military had impermissibly adopted that classification or had been motivated by animus. On the contrary, this Court simply set the standard of review and confirmed that, based on the then-existing record, "the [Mattis] Policy appears to have been the product of independent military judgment." *Karnoski*, 926 F.3d at 1201. The district court's

additional discussion of "bad faith" noted supposed "evidence that Secretary Mattis's decision-making process may have been influenced by animus, noting his interest in contacting purported "anti-transgender rights advocates" and his email correspondence with a former colleague that discussed the "'psychological' problems of transgender persons." Add. 26. The court cited no authority whatsoever for its view that a Secretary of Defense's efforts to make an informed decision regarding the recognized condition of gender dysphoria—including hearing from persons whose viewpoints plaintiffs do not share—constitutes "bad faith."

Second, the district court found that Secretary Wilkie's deposition was warranted because of plaintiffs' speculation—unsupported by any record evidence—that Secretary Wilkie was "the driving force" behind the Panel's recommendations to Secretary Mattis. Add. 25. The court also believed that a deposition was necessary based on plaintiffs' assertions that (as Under Secretary of Defense) Secretary Wilkie "collect[ed] additional support for the Panel's findings" on his own and was one of three Panel members charged with "drafting the [Department's] Report." *Id.*

Third, as to General Selva (who heard reports from the Panel), the district court found that he had "first-hand knowledge" about the reasons the Panel engaged in further deliberations following December 2017 and other issues preceding the Mattis policy. Add. 24.

And fourth, as to Admiral Moran (who was a Panel member), the district court ruled that plaintiffs could depose him regarding his views on "the data underlying the

12

Mattis Policy," without any explanation for why another deponent could not address that question.  Add. 28.

**C.**  On September 10, 2020, the government requested that the district court stay its September 2 order and stay all discovery pending these mandamus proceedings.  *See* Doc. 601.  The court has not ruled on that stay motion.  Plaintiffs may notice the depositions at any time, and although they have stated that they do not intend to notice the depositions in the immediate future, they have not agreed to stay the depositions pending this Court's review and thus may demand the depositions during the Court's review of this petition.

On September 14, the district court corrected several ancillary factual or citation errors in its prior order but otherwise reissued the order authorizing plaintiffs to proceed with the depositions.  Add. 14 (amending September 2 order); Add. 1 (reissuing September 2 order (Add. 16-28) as amended order (Add. 1-13)).

## ARGUMENT

### III.  THIS COURT SHOULD EXERCISE ITS MANDAMUS AUTHORITY TO QUASH THE DEPOSITIONS OF CABINET SECRETARIES AND OTHER HIGH-RANKING MILITARY OFFICIALS

Mandamus relief is appropriate where a petitioner has "no other adequate means to attain the relief desired," where "the right to the writ is clear and indisputable," and where "'the writ is appropriate under the circumstances.'"  *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (per curiam) (quoting *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 381 (2004)).  This Court considers

"(1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression." *Id.* These factors "serve as guidelines," and "[n]ot every factor need be present at once" or even "point in the same direction." *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) (quotations omitted).

This Court recognized that these factors warranted mandamus relief in its 2019 decision, and it has subsequently stayed discovery orders pending consideration of the government's second mandamus petition. *See* Order, *In re Trump*, No. 20-70365 (Feb. 12, 2020). The district court's September 2 and 14 deposition orders reflect the same consistent failures to heed this Court's guidance. And they further disregard the fundamental concerns that arise when a court orders the deposition of high-ranking federal officials at the behest of private litigants—a step the Supreme Court and multiple courts of appeals have repeatedly determined involves an extraordinary intrusion into executive decisionmaking that warrants correction.

**A.** It is well-settled that, "absent 'extraordinary circumstances,' high-level agency officials should not 'be called to testify regarding their reasons for taking official action.'" *NEC Corp. v. United States*, 151 F.3d 1361, 1375-1376 (Fed. Cir. 1998)

(quoting *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985)); *accord In re McCarthy*, 636 F. App'x 142, 143 (4th Cir. 2015) ("It is well established that high-ranking government officials may not be deposed or called to testify about their reasons for taking official actions absent 'extraordinary circumstances.'" (quoting *Franklin Sav. Ass'n v. Ryan,* 922 F.2d 209, 211 (4th Cir. 1991))). "When such circumstances are not present, mandamus is appropriate to prevent a district court from compelling an official's appearance." *In re McCarthy*, 636 F. App'x at 143 (EPA Administrator) (citing *U.S. Bd. of Parole v. Merhige,* 487 F.2d 25, 29 (4th Cir. 1973) (Parole Board members); *In re United States (Jackson),* 624 F.3d 1368, 1372-73 (11th Cir. 2010) (EPA Administrator); *In re Cheney,* 544 F.3d 311, 314 (D.C. Cir. 2008) (Vice President's Chief of Staff)); *see, e.g.*, *In re Commodity Futures Trading Comm'n*, 941 F.3d 869, 875 (7th Cir. 2019) (CFTC Chairman, commissioners, and staff); *In re United States (Bernanke)*, 542 F. App'x 944 (Fed. Cir. 2013) (Chairman of the Federal Reserve Board); *In re United States (Holder)*, 197 F.3d 310, 314 (8th Cir. 1999) (Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995) (three FDIC Board members); *Franklin Sav. Ass'n*, 922 F.2d at 211 (Director of Office of Thrift Supervision). This Court has recognized, in particular, that "[h]eads of government agencies are not normally subject to deposition." *Kyle Eng'g Co. v. Kleppe*, 600 F.2d 226, 231 (9th Cir. 1979).

Mandamus has issued even when the proposed deposition is subject to significant limitations. For example, the Eleventh Circuit in *In re United States (Kessler)*,

985 F.2d 510, 512-13 (11th Cir. 1993) (per curiam), issued a writ of mandamus to quash an order directing the Commissioner of the Food and Drug Administration "to be available for thirty minutes" by telephone.  That court has thus explained "that compelling the testimony of the Commissioner of the Food and Drug Administration would have [had] 'serious repercussions for the relationship between two coequal branches of government.'"  *In re United States (Jackson)*, 624 F.3d at 1372 (quoting *In re United States (Kessler)*, 985 F.2d at 513); *cf. United States v. U.S. Dist. Court for the N. Mariana Islands*, 694 F.3d 1051, 1059 (9th Cir. 2012) (issuing mandamus to quash an order requiring Assistant Attorney General to appear at a settlement conference).

These well-established limitations on compelling testimony of high-ranking federal officials reflect significant "separation of powers concerns" that are not limited to the burdens placed on sitting officers.  *In re United States (Jackson)*, 624 F.3d at 1372; *cf. Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203-04 (2d Cir. 2013) (former deputy mayor).  As the Supreme Court cautioned in *United States v. Morgan*, the executive and judicial processes represent "collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." 313 U.S. 409, 422 (1941).  The Supreme Court has thus stressed that "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government."  *Department of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)); *see William Jefferson & Co. v. Board of Assessment & Appeals*

16

*No. 3 for Orange Cty.*, 482 F. App'x 273, 274 (9th Cir. 2012) (agreeing that "[i]nquiry into the deliberative processes of administrators is generally disfavored").  Under *Morgan*, "where there are administrative findings that were made at the same time as the decision . . . , there must be a strong showing of bad faith or improper behavior before" an "inquiry into the mental processes of administrative decisionmakers" is made.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

In *Morgan* itself, which concerned a challenge to an order of the Secretary of Agriculture, the Supreme Court rejected the plaintiffs' efforts to depose the Secretary "at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates."  313 U.S. at 422.  "Just as a judge cannot be subjected to such a scrutiny, so the integrity of the administrative process must be equally respected," and "it was not the function of the court to probe the mental processes of the Secretary." *Id.* (quotation omitted).  As the Supreme Court emphasized, "the short of the business is that the Secretary should never have been subjected to this examination."  *Id.*  And the concerns animating this principle "hardly become[] inapplicable upon an official's departure from his office."  *In re United States (Bernanke)*, 542 F. App'x at 948-49; *see Lederman*, 731 F.3d at 203-04.

These separation-of-powers concerns take on an additional dimension when plaintiffs seek to depose high-ranking officials from the military.  The Supreme Court has further required "that the judiciary be as scrupulous not to interfere with

17

legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Munaf v. Geren*, 553 U.S. 674, 700 (2008) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)).  Courts are fundamentally "'ill-equipped'" to intrude upon the decisionmaking of "the military authorities [that] have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986) (quoting *Chappell v. Wallace*, 462 U.S. 296, 305 (1983)).  Consistent with those principles, this Court's previous decision in this case stressed that the policy here "must be evaluated on the record supporting that decision and with the appropriate deference due to a proffered military decision." *Karnoski*, 926 F.3d at 1207.

**B.**  The district court's order is irreconcilable with these precedents and with any recognized conception of proper discovery, especially in a military case.  The court has ordered the depositions of former and current Cabinet Secretaries, the former second-highest-ranking uniformed officer in the Nation, and the former second-highest-ranking uniformed officer in the Navy.  Any one of those depositions would have been unusual, as "a district court should rarely, if ever, compel the attendance of a high-ranking official in a judicial proceeding." *In re United States (Jackson)*, 624 F.3d at 1376.  It was incumbent on plaintiffs to demonstrate the "extraordinary circumstances" that would warrant each of these intrusions, much less all of them at once.  They have signally failed to do so, and the district court has authorized what can at best be described as a fishing expedition.

18

The purported justification for the current deposition orders—and the vast discovery previously ordered—is that plaintiffs need information to litigate whether the Mattis policy was the result of independent military judgment rather than discriminatory intent.  But as this Court observed, based on the then-existing record, "the [Mattis] Policy appears to have been the product of independent military judgment." *Karnoski*, 926 F.3d at 1201.  After obtaining a trove of discovery to dispute that premise, plaintiffs have offered no basis to revisit this Court's conclusion, much less to permit these depositions.

Plaintiffs have in fact  received every deliberative document sent from, received by, generated by, presented to, or considered by the Panel that produced the recommendations.  They have received the Department's 44-page Report, and there is no dispute that the Report represents "the same recommendations" that the Panel reached.  Add. 113.  And those documents represent only a small fraction of the discovery plaintiffs have obtained.  The government has made approximately 100 document productions from over 150 custodians across all levels of the military during a five-year period.  Plaintiffs have obtained more than 60,000 documents totaling over 400,000 pages.[1]

---

[1]  The government in prior filings reported that plaintiffs had received over 500,000 pages of documents.  *See* 20-70365 Gov't Suppl. Br. 2.  That number, however, includes slip sheets that were used in place of redacted pages, and the more conservative figure is over 400,000 pages.  *See* Add. 92.

Plaintiffs have also taken three depositions and have had access to the transcripts of five depositions taken in related litigation.  And the government informed plaintiffs two years ago that if a deposition proved necessary, plaintiffs could depose former Deputy Assistant Secretary Anthony Kurta, who chaired numerous Panel meetings and participated in preparing the Department's Report. Indeed, government counsel explicitly offered such a deposition during the previous oral argument before this Court as an example of discovery that plaintiffs should pursue before demanding further sensitive discovery.  Video of Oral Arg. 52:50-53:37, *In re Trump*, No. 18-72159 (9th Cir. Oct. 10, 2018), https://go.usa.gov/xGNeB.  They have not done so.

**C.**  The discovery plaintiffs have already obtained plainly demonstrates that the Mattis policy was based on the military's professional judgment.  There is no reason why plaintiffs cannot now litigate the constitutional merits of that policy.  Plaintiffs' argument for further discovery reduces to wholly unsupported speculation—without a trace in the evidentiary record—that this exercise of military judgment might have been manipulated through secret influences or might represent "an alternative reality" (as they put it).  Doc. 586, at 19.  The district court committed clear and indisputable error in accepting that speculation as a basis for each of the four proposed deponents.

**1.**  The district court justified the deposition of Secretary Mattis on the theory that the Secretary might have harbored personal "animus" and that "the central issue"

20

in dispute is whether the Mattis policy reflected "orders of his Commander-in-Chief or the military's exercise of independent judgment."  Add. 11 (quotation omitted).

This accusation of "animus" against a 44-year veteran of the Marine Corps and the former Secretary of Defense is based on emails indicating his interest in hearing out the views of individuals the district court deemed to be "anti-transgender rights advocates," including a psychiatry professor and a law professor.  Add. 11; *see* Add. 213, 240.  That the district court regarded this as evidence of "bad faith" indicates how far this case has departed from any recognized analytical framework.  An interest in hearing multiple views demonstrates *good* faith—of not having *prejudged* a matter.  Indeed, even if Secretary Mattis wished to hear from those who disagreed with plaintiffs' view because he was inclined to adopt with those perspectives, that would not itself be impermissible.  *See Department of Commerce*, 139 S. Ct. at 2574 ("It is hardly improper for an agency head to come into office with policy preference and ideas, discuss them with affected parties, sound out other agencies for support, and work with [subordinates] to substantiate the legal basis for a preferred policy.").  Even more fundamentally, the district court correctly recognized that "Secretary Mattis's mental processes are irrelevant to Plaintiffs' claims."  Add. 11.  This case is about the policy adopted by the Department of Defense under Secretary Mattis and the justifications for that policy.  In no event is probing Secretary Mattis's personal mental processes a permissible or relevant avenue of discovery, let alone a basis for a deposition of a former Cabinet Secretary.

21

The district court nonetheless authorized plaintiffs to "ask Secretary Mattis about his role in drafting [his February 22, 2018 memorandum to the President] and the [Department's] Report, the extent to which he obtained input from the Panel, whether he sought information from sources outside the Panel, and whether he was instructed to obtain particular information that was absent from the Panel's Final Report." Add. 11. The district court thus ordered precisely what *Morgan* proscribes. The Supreme Court made clear that it is wholly improper to depose a Cabinet Secretary on "the manner and extent of his study of the record and his consultation with subordinates." *Morgan*, 313 U.S. at 422.

Apart from those basic errors, there is no factual predicate that could make it appropriate to question Secretary Mattis on these matters. It is undisputed that the Secretary of Defense adopted the Panel's recommendations. The district court nevertheless believed it appropriate to allow plaintiffs to question Secretary Mattis to determine whether the Panel's 13 meetings and recommendations were in effect a façade to disguise an outcome ordained by the President through unidentified means. *See* Add. 11 (referencing "orders" by the President). The court did not explain how this could possibly be the case, and it makes particularly little sense given that, as this Court has explained at length, Secretary Mattis ultimately proposed that "a change to [the President's] policy is warranted." *Karnoski*, 926 F.3d at 1202 (quotation omitted); *see id.* at 1188-92. Secretary Mattis's memorandum informed the President that these changes were based on "the Panel's professional military judgment and [his] own

professional judgment." Add. 212. Plaintiffs have offered nothing that casts doubt on the Secretary's statement2.

**2.** The district court's order is at least equally indefensible with respect to the deposition of Secretary Wilkie, a sitting member of the President's Cabinet and head of the federal government's second-largest department. In his prior role in the Defense Department, then-Under Secretary Wilkie chaired the final six meetings of the Panel and was a non-voting Panel member. He informed Secretary Mattis and his superiors of the Panel's recommendations, and he and two other officials (former and current Deputy Assistant Secretaries Kurta and Hebert) were charged with coordinating the preparation of the Department's Report. The purported "extraordinary circumstances" justifying his deposition consist of plaintiffs' unsupported allegations that "political appointees like [Under Secretary] Wilkie" were "the driving force" behind the proposed policy and that he secretly "collect[ed] evidence supporting the policy on his own, without Panel involvement." Add. 10.

This theory, too, posits that the Panel was a sham to which Secretary Wilkie as well as Secretary Mattis were somehow parties. That is an extraordinary allegation against two Cabinet Secretaries, made particularly extraordinary by the fact that plaintiffs have every document received or generated by the Panel and offer not a shred of evidence to support their assertions.

The district court was quite wrong, moreover, to suggest that "military judgment" does not include the judgment of the Secretary of Defense or an Under

23

Secretary charged with personnel policy.  High-level Senate-confirmed civilian officials at the Pentagon are rightly involved in formulating military policy and their participation does not cast doubt on the fact that the policy here is the product of military judgment.  *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (holding that "professional military judgments" are "subject *always* to civilian control of the Legislative and Executive Branches" (emphasis in original)).  That same error infected the court's ruling that a deposition would be proper because of indications that Secretary Wilkie was "collect[ing] evidence . . . without Panel involvement" when he assisted in drafting the Department's Report.  Add. 10.  The court was citing to instances where Secretary Wilkie received, for exaple, a public news article on the relevant issues.  *See* Add. 243 (relaying article from the *Military Times*).  That contention does not remotely establish the "extraordinary circumstances" required to justify the deposition of a sitting Cabinet Secretary.

The district court was equally mistaken in justifying the deposition on the theory that Secretary Wilkie could provide testimony regarding a "critical time period" between December 15, 2017 and January 11, 2018.  Add. 10.  This was not a "critical time period" in any relevant sense, and it is unclear what Secretary Wilkie's testimony would add to the material plaintiffs have already received, which includes all deliberative and non-deliberative documents received, sent, or created by the Panel in this period.  The Panel reported its initial recommendations in December 2017 to Deputy Secretary Shanahan and General Selva, who advised that the Panel should

engage in further study and collect more objective evidence.  *See* 20-70365 SA.395 (The court repeatedly and inaccurately refers to this as an "initial rejection" of the Panel's recommendations.  Add. 4, 9, 10.)  After four more meetings, the Panel produced a set of recommendations that concededly "were identical to the [prior] recommendations."  Add. 4.  Under Secretary Wilkie then communicated those recommendations to Secretary Mattis in January 2018 through Deputy Secretary Shanahan and General Selva.  *Id.*  Insofar as this sequence of administrative decisionmaking indicates anything of relevance at all, it underscores that the independent Panel was in fact independent, even after December 2017.

Even assuming that there were any basis for pursuing further inquiries into this supposed "critical" period or anything else, moreover, plaintiffs have not demonstrated that "the relevant information could not be obtained elsewhere." *Lederman*, 731 F.3d at 203; *see In re United States (Jackson)*, 624 F.3d at 1369 (requiring district court to substitute lower-ranking official).  Plaintiffs have around 14,000 documents from the period spanning the Panel's December 2017 briefing to Secretary Mattis's February 2018 adoption of the policy alone.  Add. 93.  And the district court completely failed to address the serious ramifications of deposing a sitting Cabinet Secretary, as "the cumulative effect" of such depositions would be that "his time would be monopolized by preparing and testifying in such cases."  *In re United States (Kessler)*, 985 F.2d at 512; *see U.S. Dist. Court for the N. Mariana Islands*, 694 F.3d at 1059 (finding it would be "highly impractical, if not physically impossible," for Assistant

Attorney General to appear in all settlement conferences).  As noted, the government two years ago indicated that it was willing to make former Deputy Assistant Secretary Kurta available for a deposition.  Kurta also chaired Panel meetings and participated in the Panel's deliberations in the so-called "critical time period," in addition to assisting in the drafting of the Report.  Add. 10.

**3.**  The district court's grounds for permitting the deposition of General Selva, the former Vice Chairman of the Joint Chiefs of Staff, are likewise insubstantial. General Selva was the Nation's second-highest-ranking uniformed officer and a member of the Joint Chiefs of Staff, and Secretary Mattis charged him with receiving periodic reports from the Panel.  *See* 10 U.S.C. § 154.

The district court believed that General Selva's deposition was justified because he might have provided undisclosed "guidance and boundaries" to the Panel.  Add. 9. Thus, in the court's view, General Selva too had a covert role in superseding Secretary Mattis's own instructions to take "a comprehensive, holistic, and objective approach." Add. 242.  As noted, plaintiffs have in their possession every communication sent to the Panel, including privileged deliberative materials, and they have provided no ground for speculating that there may have been undisclosed guidance.

The factual basis for any deposition of General Selva is even more tenuous because plaintiffs' theories would have one believe that he both undermined the objective inquiry of the Panel and promoted it, all at the same time.  The district court declared that a deposition was also appropriate on the basis of General Selva's advice

26

in December 2017 that the Panel should collect additional, objective data. *See* 20-70365 SA.395. A suggestion that an administrative process can be made more robust provides no basis for a deposition of a high-ranking official. And a deposition on that basis is impossible to square with the district court's acceptance of the unfounded assertion that General Selva was secretly steering the Panel toward "the President's order[s] and directives." Add. 9. None of plaintiffs' contradictory inferences withstands scrutiny, and again, it is undisputed that the Panel in fact issued the same recommendations after further deliberation following the December 2017 briefing.

The district court was equally incorrect to direct that plaintiffs could depose General Selva regarding delays in implementing the prior Carter policy in June 2017, a matter wholly irrelevant to plaintiffs' challenge to the Mattis policy. Add. 9. And in any case, former Deputy Assistant Secretary Kurta has been available to discuss that topic for over two years without any apparent interest by plaintiffs.

**4.** Finally, the district court's authorization of the deposition of Admiral Moran—formerly the second-highest-ranking uniformed officer in the Navy—is inexplicable. Admiral Moran was a Panel member and his participation, like that of all the other members, is documented in the discovery plaintiffs have received. Plaintiffs have offered no reason why his testimony in particular is required with regard to any issue. Instead, the district court simply declared that Admiral Moran had his own "concerns" and "questions" during the Panel process after he "listen[ed] to the presentation of the data and testimony from a variety of sources" and "took part in

27

the Panel's deliberations." Add. 12 (quotation omitted). It may be assumed that every Panel member had questions and concerns. But that has no bearing on whether the Panel's recommendations were an exercise of military judgment. And Admiral Moran's potential testimony as to quite irrelevant pre-Carter policy events could not be a serious basis for discovery, let alone the deposition of a high-ranking military official when other officials (as again, former Deputy Assistant Secretary Kurta) have long been available on that topic. *See id.* at 13 (incorrectly stating that Kurta was not involved prior to the Carter policy); *see also* Doc. 602-3.

* * *

In sum, the district court's September 2 and 14 orders authorizing the four depositions rest on clear and significant legal errors that warrant this Court's review. We therefore ask that the Court consider this petition together with the pending filings in No. 20-70365, which is scheduled for argument on October 14. We also ask that the Court stay the orders pending its review of the petition. *See In re Department of Commerce*, 139 S. Ct. 16, 16-17 (2018) (staying deposition of Secretary of Commerce pending mandamus petition). Subsequent to our motion for a stay in district court, plaintiffs have informally indicated that they do not plan to notice depositions in the immediate future, and we therefore do not seek emergency relief. A stay is essential, however, to preserve the status quo and to avoid the potential need for emergency litigation during this Court's review.

28

## IV. THIS COURT SHOULD DIRECT THE DISTRICT COURT TO TERMINATE DISCOVERY AND PROCEED TO THE MERITS, AND, AT A MINIMUM, STAY ALL FURTHER DISCOVERY PENDING THIS COURT'S GUIDANCE

Although the district court's September 2 and 14 orders directly concern the four depositions that are the subject of this petition, those orders reflect continued disregard for this Court's 2019 decision, settled precedent on what discovery is proper, and escalating intrusions into military decisionmaking based on increasingly tenuous theories and erroneous rulings. We thus respectfully ask that the Court instruct the district court to terminate further discovery and proceed with assessing the merits of the case, and ask, at a minimum, that the Court stay all discovery in this case until the district court can have the benefit of this Court's guidance after review of the pending mandamus petition, the supplemental filings in those pending mandamus proceedings, and the instant petition.

In its 2019 decision, this Court instructed the district court to give "thorough consideration" to the "reasonableness" of the Mattis policy, which "must be evaluated on the record supporting that decision and with the appropriate deference due to a proffered military decision." *Karnoski*, 926 F.3d at 1207. The Court determined, based "[o]n the current record," that the Mattis policy "appears to have been the product of independent military judgment." *Id.* at 1202. The Court further noted that if discovery were to proceed at all, it should be tailored to what "was sufficient to allow for judicial review." *Id.* at 1206 n.22 (citing *Trump v. Hawaii*, 138 S. Ct. 2392, 2409 (2018)).

29

After this Court's decision, the district court instead sanctioned further discovery for plaintiffs to revisit whether the Mattis policy was "animated by independent military judgment" or was "instead the product of impermissible discriminatory intent." Doc. 394, at 2. But the government has released all deliberative documents to, from, or by the Panel (and more than 60,000 documents in all), and plaintiffs have located nothing that refutes this Court's prior conclusions. As exemplified by the deposition orders, what remains are increasingly speculative theories that the Panel's administrative process was a sham, and increasingly intrusive discovery demands based on those theories.

Even after over two years of discovery, plaintiffs are unwilling to represent to this Court "how much, or which, evidence is 'needed to resolve this litigation." 20-70365 Pls.' Suppl. Resp. 3. And though they state that any and all additional discovery is "indispensable" to "the searching judicial inquiry heightened scrutiny requires," *id.*, those statements are impossible to square with this Court's instruction that, even under the relevant standard of review, the district court as factfinder has no proper role in "substitut[ing] its 'own evaluation of evidence for a reasonable evaluation' by the military." *Karnoski*, 926 F.3d at 1202 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 68 (1981)).

Without attempting to evaluate the reasonableness of the Mattis policy in light of the unredacted Administrative Record and the voluminous materials already produced, the district court has accepted plaintiffs' demands in authorizing ever-

expanding discovery, even aside from the current deposition orders.  On July 23, the court declared that it would set no "discovery cutoff deadline" at all, preferring instead to proceed with indefinite discovery in this matter.  Add. 79.  On August 24, the court opined that plaintiffs "don't have to justify why they should get" further discovery into privileged deliberative documents "at this point."  Add. 39:25-40:1.  Indeed, the court has refused to even inquire into what further information plaintiffs "believe they need . . . to advance their case."  Doc. 560, at 5.

Those statements reflect the district court's consistent disregard for the proper bounds of discovery in this case.  The pending mandamus proceedings address orders of the district court that once again required *en masse* disclosure of tens of thousands of deliberative documents.  Although this Court has stayed those orders, the district court—as detailed in our supplemental filings—has continued to authorize yet more discovery, issuing no fewer than a dozen intrusive and erroneous discovery orders since our pending petition.  *See* 20-70365 Gov't Suppl. Br. 2-7; 20-70365 Gov't Suppl. Resp. 4-5.  Any number of the district court's orders might have justified a searching judicial inquiry into whether the court exceeded its bounds, but together they demonstrate a persistent failure to address what more plaintiffs need for their claims.  The court has instead remained singularly focused on potentially disclosing an "enormous number of relevant documents that remain contested"—that is, protected under recognized privileges—"in this matter."  Add. 78.

31

Significantly, and as this Court knows, on July 15, the district court declared that it would set aside the deliberative process privilege as to effectively all remaining documents not subject to this Court's order. Add. 80. The court announced that it would do so by defining two narrow timeframes during which, in its view, the Department formulated the Carter policy (July 2015 to June 2016) and Mattis policy (September 2017 to January 2018). Add. 86-88. The court held that all policy deliberations outside of these timeframes were not pre-decisional for purposes of the privilege, because they did not pertain to the two "specific policies at issue in this litigation." Add. 84. The manifest error of that analysis is reflected in the court's conclusion that Secretary's Mattis's handwritten notes on a 2017 "Recommended Transgender Way Ahead" memorandum, for instance, would not be privileged based on those artificial timeframes. Doc. 547, at 7.

The district court at present is engaging in *in camera* review of those remaining deliberative documents based on that erroneous understanding of the privilege, regardless of the documents' relationship to plaintiffs' claims. Most recently, the court has demanded review of hundreds of deliberative documents that are before this Court and subject to the Court's stay, including documents that post-dated the Panel's recommendations (January 11, 2018) but pre-dated Secretary Mattis's proposal of that policy to the President (February 22, 2018)—such as the Secretary's personal notes and drafts of the Department's Report. Add. 64. And for numerous deliberative documents subject to the Court's stay order, the district court has

announced its intention to "give [plaintiffs] the documents" in advance of the Court's

oral argument on October 14, Add. 47:5-6, based on plaintiffs' view that they "need"

the documents "for the Ninth Circuit argument," Add. 42:5; *see* Add. 46:24-25

(alleging that longer timeframe "means we won't have those in time for the—for the

argument at the Ninth Circuit").

The latest orders thus exemplify the problems that have characterized this

litigation for over two years, and manifest the district court's "oft repeated error[s]."

*Karnoski*, 926 F.3d at 1203.  As these orders illustrate, there is no end in sight for the

discovery process that has strayed so far from this Court's guidance.  And plaintiffs

have indicated their intention, for example, to depose current or former White House

officials, demand White House documents, and notice depositions of numerous other

military officials.  Add. 98; *see* Add. 104-05 (noting numerous instances where

plaintiffs have noticed depositions of military officials and then cancelled them); *see*

*also Karnoski*, 926 F.3d at 1204-06 (granting mandamus relief as to presidential

communications privilege).

The government has been ready to defend the merits of the Mattis policy based

on the Department's rationales stated in its Report and the Administrative Record

supporting those rationales, ever since the President permitted its adoption over two

years ago.  *See* Add. 135 (May 2020 joint status report indicating that the government

was prepared to proceed to summary judgment); Doc. 225, at 6 (March 2018 motion

indicating that the government was ready to defend Mattis policy based on

33

Administrative Record).  This Court should thus direct the district court to resolve those merits, rather than accept plaintiffs' baseless theories as reasons for continued intrusive discovery orders.  It is time to require plaintiffs to demonstrate that they have any viable theory at all on which they could prevail, rather than engage in their ongoing endless and intrusive fishing expedition.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for a writ of mandamus and reverse the district court's September 2 and 14 orders that deny the government's motions to quash the four depositions, and should stay those depositions pending this petition.  The Court should also instruct that the district court terminate discovery and proceed to the merits, and should, at a minimum, stay all discovery pending review of this petition and the government's pending petition and supplemental filings in No. 20-70365, so that further discovery, if any, can conform to the Court's guidance.

Respectfully submitted,

SCOTT G. STEWART
  *Deputy Assistant Attorney General* [2]

MARK R. FREEMAN
MARK B. STERN
MARLEIGH D. DOVER

*s/ Dennis Fan*
BRAD HINSHELWOOD
DENNIS FAN
ASHLEY A. CHEUNG
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Washington, DC 20530*
  *202-514-2494*
  *dennis.fan@usdoj.gov*

SEPTEMBER 2020

---

[2] The Acting Assistant Attorney General is recused from this matter.

## STATEMENT OF RELATED CASES

The federal government is aware of the pending mandamus proceedings, *In re Trump*, No. 20-70365 (9th Cir.), and the prior mandamus proceedings, *In re Trump*, No. 18-35347 (9th Cir), that arose from the same district court action as this mandamus petition and implicate related discovery issues. The government respectfully requests that the Court consider this petition along with the petition in No. 20-70365, in which this Court has scheduled argument for October 14, 2020.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this petition complies with the limit of Ninth Circuit Rule 21-2(c) and 32-3(2) because it totals 8,400 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).  I further certify that this petition complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared using Microsoft Word 2016 in a proportionally spaced typeface, 14-point Garamond font.

*s/ Dennis Fan*
DENNIS FAN

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2020, I electronically filed the foregoing petition with the Clerk of the Court by using the appellate CM/ECF system. Service has been accomplished via e-mail to the following counsel:

*Counsel for Real-Parties-in-Interest–Plaintiffs:*

Vanessa Barsanti (vbarsanti@redgravellp.com)
Jordan M. Heinz (jheinz@kirkland.com)
James F. Hurst (james.hurst@kirkland.com)
Sam Ikard (sam.ikard@kirkland.com
Daniel I. Siegfried (daniel.siegfried@kirkland.com)
Stephen R. Patton (stephen.patton@kirkland.com)
Tara Borelli (tborelli@lambdalegal.org)
Peter C. Renn (prenn@lambdalegal.org)
Sasha J. Buchert (sbuchert@lambdalegal.org)
Carl Charles (ccharles@lambdalegal.org)
Kara N. Ingelhart (kingelhart@lambdalegal.org)
Camilla B. Taylor (ctaylor@lambdalegal.org)
Paul D. Castillo (Pcastillo@lambdalegal.org)
Lambda Legal Defense & Education Fund, Inc.
Rachel J. Horvitz (rachel@newmanlaw.com)
Derek Alan Newman (derek@newmanlaw.com)
Jason Sykes (jason@newmanlaw.com)
Peter E. Perkowski (peter@perkowskilegal.com)

*Counsel for Real-Party-in-Interest–Intervenor-Plaintiff:*

Colleen M. Melody (colleen.melody@atg.wa.gov)
Chalia I. Stallings-Ala'ilima (chalias@atg.wa.gov)

The district court has been provided with a copy of this petition pursuant Federal Rule of Appellate Procedure 21(a).

*s/ Dennis Fan*
DENNIS FAN